ANTHONY R. SEGALL (CSB No. 101340)
asegall@rsglabor.com
ROTHNER, SEGALL & GREENSTONE
510 South Marengo Avenue
Pasadena, California 91101-3115
Telephone: (626) 796-7555
Facsimile: (626) 577-0124

KATHERINE S. CHRISTOVICH (CSB No. 178397)
LEILA B. AZARI (CSB No. 262443)
lazari@wga.org
WRITERS GUILD OF AMERICA, WEST, INC.
7000 West Third Street
Los Angeles, CA 90048
Telephone: (323) 782-4521
Facsimile: (323) 782-4806

Attorneys for Respondent Writers Guild of America, West, Inc.

FILED
CLERK, U.S. DISTRICT COURT
JAN - 8 2014
CENTRAL DISTRICT OF CALIFORNIA
BY DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DISTRICT

| | |
|---|---|
| HACHIKO PRODUCTIONS, LLC AND ROBERT ORTIZ<br><br>Petitioners,<br><br>vs.<br><br>WRITERS GUILD OF AMERICA, WEST, INC,<br><br>Respondent. | CASE NO. CV14-0165 JFW-JCx<br><br>NOTICE OF REMOVAL OF CIVIL ACTION<br><br>[Los Angeles Superior Court Case No. BS146288] |

**PLEASE TAKE NOTICE** that Respondent Writers Guild of America, West, Inc. ("Guild") hereby removes the above-entitled action from the Superior Court of the State of California for the County of Los Angeles to the United States District Court for the Central District of California pursuant to 28 U.S.C. §§ 1441 and 1446. This removal is based on the original jurisdiction of the district court pursuant to 29 U.S.C. § 185, and 28 U.S.C. §§ 1331 and 1337. In support of this Notice of Removal of Civil Action, the Guild alleges as follows:

1. On December 11, 2013, an action was commenced in the Superior Court of the State of California for the County of Los Angeles, entitled *Hachiko Productions, LLC, a Rhode Island limited liability company, and Robert V. Ortiz, an individual, Petitioners, v. Writers Guild of America, West, Inc., Respondent,* Case No. BS146288. A copy of the entire state court file in Case No. BS146288 is attached as Exhibit "A."

2. The first date on which the Guild was served a copy of the Petitioners' Petition to Vacate Contractual Arbitration Award ("Petition") was December 11, 2013.

3. This case is a civil action of which this Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1337. It may be removed to this Court by the Guild pursuant to the provisions of 28 U.S.C. § 1441(b), because it arises under 29 U.S.C. § 185(a). The factual bases for the jurisdictional claims in this paragraph are as follows:

a. At all relevant times, the Guild was a labor organization which exists for the purpose of representing writers in the motion picture, broadcast, cable, interactive and new media industries, industries affecting commerce within the meaning of § 301(a) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a).

b. At all relevant times, the Guild has represented writers in the motion picture, broadcast, cable, interactive and new media industries.

c. At all relevant times, the Guild was the exclusive bargaining representative of writers employed by, or who have contracted with, Petitioner Hachiko Productions, LLC ("Company"), an employer in an industry affecting commerce within the meaning of LMRA § 301(a), 29 U.S.C. § 185(a).

d. At all relevant times, the Company was signatory to an industrywide collective bargaining agreement with the Guild known as the Writers Guild of America Theatrical and Television Basic Agreement ("MBA").

e. At all relevant times, Petitioner Robert V. Ortiz, an individual, was a signatory to a Letter of Guarantee in which he agreed to assume all obligations of the Company under the MBA and to guarantee performance of the MBA by the Company.

f. In their Petition, Petitioners seek to vacate an arbitration award ("Award") rendered in favor of the Guild pursuant to the arbitration agreement contained in the MBA. The action to vacate the Award arises under LMRA § 301(a), 29 U.S.C. § 185(a).

g. The district court has jurisdiction over all the parties and its territorial jurisdiction encompasses the place where the Petition is pending.

4. No other parties have been named in the Petition, and therefore no joinders are required to be filed herewith.

**WHEREFORE,** the Guild prays that Petitioners' Petition be removed from the Superior Court of the State of California for the County of Los Angeles to the United States District Court for the Central District of California.

Dated: January 8, 2014

ANTHONY R. SEGALL
ROTHNER, SEGALL & GREENSTONE

KATHERINE S. CHRISTOVICH
LEILA B. AZARI
WRITERS GUILD OF AMERICA, WEST, INC.

By:____________________
LEILA B. AZARI
Attorneys for Respondent Writers Guild of America, West, Inc.

# EXHIBIT A

CM-010

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
Alan Abrams, Esq. (SBN: 75637) and Natalie Hottle, Esq. (SBN: 265918)
COSTA ABRAMS & COATE, LLP
1221 Second Street, Third Floor
Santa Monica, CA 90401
TELEPHONE NO.: 310-576-6161 FAX NO.: 310-576-6160
ATTORNEY FOR (Name): Petitioner

FOR COURT USE ONLY

CONFORMED COPY
ORIGINAL FILED
Superior Court of California

DEC 11 2013

Sherri R. Carter, Executive Officer/Clerk
By: Judi Lara, Deputy

SUPERIOR COURT OF CALIFORNIA, COUNTY OF
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS: 111 North Hill Street
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Central District

CASE NAME:
Hachiko Productions, LLC v. Writers Guild of America, West, Inc.

## CIVIL CASE COVER SHEET

[✓] Unlimited (Amount demanded exceeds $25,000) [ ] Limited (Amount demanded is $25,000 or less)

Complex Case Designation
[ ] Counter [ ] Joinder
Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402)

CASE NUMBER: BS146288
JUDGE:
DEPT:

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[✓] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint (*not specified above*) (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition (*not specified above*) (43)

2. This case [ ] is [✓] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision
3. Remedies sought (*check all that apply*): a. [✓] monetary b. [ ] nonmonetary; declaratory or injunctive relief c. [ ] punitive
4. Number of causes of action (*specify*):
5. This case [ ] is [✓] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (*You may use form CM-015.*)

Date: December 10, 2013
Natalie Hottle, Esq.
(TYPE OR PRINT NAME)
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**

- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

CIVIL CASE COVER SHEET

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

COPY

0004

| SHORT TITLE: HACHIKO PRODUCTIONS, LLC v. WGA, WEST, INC. | CASE NUMBER BS146288 |
|---|---|

# CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

**This form is required pursuant to Local Rule 2.0 in all new civil case filings in the Los Angeles Superior Court.**

**Item I.** Check the types of hearing and fill in the estimated length of hearing expected for this case:

JURY TRIAL? ☑ YES CLASS ACTION? ☐ YES LIMITED CASE? ☐ YES TIME ESTIMATED FOR TRIAL 2-3 ☐ HOURS/ ☑ DAYS

**Item II.** Indicate the correct district and courthouse location (4 steps – If you checked "Limited Case", skip to Item III, Pg. 4):

**Step 1:** After first completing the Civil Case Cover Sheet form, find the main Civil Case Cover Sheet heading for your case in the left margin below, and, to the right in Column **A**, the Civil Case Cover Sheet case type you selected.

**Step 2:** Check one Superior Court type of action in Column **B** below which best describes the nature of this case.

**Step 3:** In Column **C**, circle the reason for the court location choice that applies to the type of action you have checked. For any exception to the court location, see Local Rule 2.0.

**Applicable Reasons for Choosing Courthouse Location (see Column C below)**

1. Class actions must be filed in the Stanley Mosk Courthouse, central district.
2. May be filed in central (other county, or no bodily injury/property damage).
3. Location where cause of action arose.
4. Location where bodily injury, death or damage occurred.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.
7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office

**Step 4:** Fill in the information requested on page 4 in Item III; complete Item IV. Sign the declaration.

| | A<br>Civil Case Cover Sheet Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons - See Step 3 Above |
|---|---|---|---|
| Auto Tort | Auto (22) | ☐ A7100 Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| Auto Tort | Uninsured Motorist (46) | ☐ A7110 Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1., 2., 4. |
| Other Personal Injury/ Property Damage/ Wrongful Death Tort | Asbestos (04) | ☐ A6070 Asbestos Property Damage<br>☐ A7221 Asbestos - Personal Injury/Wrongful Death | 2.<br>2. |
| | Product Liability (24) | ☐ A7260 Product Liability (not asbestos or toxic/environmental) | 1., 2., 3., 4., 8. |
| | Medical Malpractice (45) | ☐ A7210 Medical Malpractice - Physicians & Surgeons<br>☐ A7240 Other Professional Health Care Malpractice | 1., 4.<br>1., 4. |
| | Other Personal Injury Property Damage Wrongful Death (23) | ☐ A7250 Premises Liability (e.g., slip and fall)<br>☐ A7230 Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.)<br>☐ A7270 Intentional Infliction of Emotional Distress<br>☐ A7220 Other Personal Injury/Property Damage/Wrongful Death | 1., 4.<br>1., 4.<br>1., 3.<br>1., 4. |



| SHORT TITLE: HACHIKO PRODUCTIONS, LLC v. WGA, WEST, INC. | CASE NUMBER |
|---|---|

| | A Civil Case Cover Sheet Category No. | B Type of Action (Check only one) | C Applicable Reasons - See Step 3 Above |
|---|---|---|---|
| Non-Personal Injury/ Property Damage/ Wrongful Death Tort | Business Tort (07) | ☐ A6029 Other Commercial/Business Tort (not fraud/breach of contract) | 1., 3. |
| | Civil Rights (08) | ☐ A6005 Civil Rights/Discrimination | 1., 2., 3. |
| | Defamation (13) | ☐ A6010 Defamation (slander/libel) | 1., 2., 3. |
| | Fraud (16) | ☐ A6013 Fraud (no contract) | 1., 2., 3. |
| | Professional Negligence (25) | ☐ A6017 Legal Malpractice<br>☐ A6050 Other Professional Malpractice (not medical or legal) | 1., 2., 3.<br>1., 2., 3. |
| | Other (35) | ☐ A6025 Other Non-Personal Injury/Property Damage tort | 2.,3. |
| Employment | Wrongful Termination (36) | ☐ A6037 Wrongful Termination | 1., 2., 3. |
| | Other Employment (15) | ☐ A6024 Other Employment Complaint Case<br>☐ A6109 Labor Commissioner Appeals | 1., 2., 3.<br>10. |
| Contract | Breach of Contract/ Warranty (06) (not insurance) | ☐ A6004 Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction)<br>☐ A6008 Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence)<br>☐ A6019 Negligent Breach of Contract/Warranty (no fraud)<br>☐ A6028 Other Breach of Contract/Warranty (not fraud or negligence) | 2., 5.<br>2., 5.<br>1., 2., 5.<br>1., 2., 5. |
| | Collections (09) | ☐ A6002 Collections Case-Seller Plaintiff<br>☐ A6012 Other Promissory Note/Collections Case | 2., 5., 6.<br>2., 5. |
| | Insurance Coverage (18) | ☐ A6015 Insurance Coverage (not complex) | 1., 2., 5., 8. |
| | Other Contract (37) | ☐ A6009 Contractual Fraud<br>☐ A6031 Tortious Interference<br>☐ A6027 Other Contract Dispute(not breach/insurance/fraud/negligence) | 1., 2., 3., 5.<br>1., 2., 3., 5.<br>1., 2., 3., 8. |
| Real Property | Eminent Domain/Inverse Condemnation (14) | ☐ A7300 Eminent Domain/Condemnation Number of parcels______ | 2. |
| | Wrongful Eviction (33) | ☐ A6023 Wrongful Eviction Case | 2., 6. |
| | Other Real Property (26) | ☐ A6018 Mortgage Foreclosure<br>☐ A6032 Quiet Title<br>☐ A6060 Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2., 6.<br>2., 6.<br>2., 6. |
| Unlawful Detainer | Unlawful Detainer-Commercial (31) | ☐ A6021 Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Residential (32) | ☐ A6020 Unlawful Detainer-Residential (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Post-Foreclosure (34) | ☐ A6020F Unlawful Detainer-Post-Foreclosure | 2., 6. |
| | Unlawful Detainer-Drugs (38) | ☐ A6022 Unlawful Detainer-Drugs | 2., 6. |

| SHORT TITLE: HACHIKO PRODUCTIONS, LLC v. WGA, WEST, INC. | CASE NUMBER |
|---|---|

| | A Civil Case Cover Sheet Category No. | B Type of Action (Check only one) | C Applicable Reasons - See Step 3 Above |
|---|---|---|---|
| Judicial Review | Asset Forfeiture (05) | ☐ A6108 Asset Forfeiture Case | 2., 6. |
| | Petition re Arbitration (11) | ☑ A6115 Petition to Compel/Confirm/Vacate Arbitration | 2., 5. |
| | Writ of Mandate (02) | ☐ A6151 Writ - Administrative Mandamus<br>☐ A6152 Writ - Mandamus on Limited Court Case Matter<br>☐ A6153 Writ - Other Limited Court Case Review | 2., 8.<br>2.<br>2. |
| | Other Judicial Review (39) | ☐ A6150 Other Writ /Judicial Review | 2., 8. |
| Provisionally Complex Litigation | Antitrust/Trade Regulation (03) | ☐ A6003 Antitrust/Trade Regulation | 1., 2., 8. |
| | Construction Defect (10) | ☐ A6007 Construction Defect | 1., 2., 3. |
| | Claims Involving Mass Tort (40) | ☐ A6006 Claims Involving Mass Tort | 1., 2., 8. |
| | Securities Litigation (28) | ☐ A6035 Securities Litigation Case | 1., 2., 8. |
| | Toxic Tort Environmental (30) | ☐ A6036 Toxic Tort/Environmental | 1., 2., 3., 8. |
| | Insurance Coverage Claims from Complex Case (41) | ☐ A6014 Insurance Coverage/Subrogation (complex case only) | 1., 2., 5., 8. |
| Enforcement of Judgment | Enforcement of Judgment (20) | ☐ A6141 Sister State Judgment<br>☐ A6160 Abstract of Judgment<br>☐ A6107 Confession of Judgment (non-domestic relations)<br>☐ A6140 Administrative Agency Award (not unpaid taxes)<br>☐ A6114 Petition/Certificate for Entry of Judgment on Unpaid Tax<br>☐ A6112 Other Enforcement of Judgment Case | 2., 9.<br>2., 6.<br>2., 9.<br>2., 8.<br>2., 8.<br>2., 8., 9. |
| Miscellaneous Civil Complaints | RICO (27) | ☐ A6033 Racketeering (RICO) Case | 1., 2., 8. |
| | Other Complaints (Not Specified Above) (42) | ☐ A6030 Declaratory Relief Only<br>☐ A6040 Injunctive Relief Only (not domestic/harassment)<br>☐ A6011 Other Commercial Complaint Case (non-tort/non-complex)<br>☐ A6000 Other Civil Complaint (non-tort/non-complex) | 1., 2., 8.<br>2., 8.<br>1., 2., 8.<br>1., 2., 8. |
| Miscellaneous Civil Petitions | Partnership Corporation Governance (21) | ☐ A6113 Partnership and Corporate Governance Case | 2., 8. |
| | Other Petitions (Not Specified Above) (43) | ☐ A6121 Civil Harassment<br>☐ A6123 Workplace Harassment<br>☐ A6124 Elder/Dependent Adult Abuse Case<br>☐ A6190 Election Contest<br>☐ A6110 Petition for Change of Name<br>☐ A6170 Petition for Relief from Late Claim Law<br>☐ A6100 Other Civil Petition | 2., 3., 9.<br>2., 3., 9.<br>2., 3., 9.<br>2.<br>2., 7.<br>2., 3., 4., 8.<br>2., 9. |

| SHORT TITLE: HACHIKO PRODUCTIONS, LLC v. WGA, WEST, INC. | CASE NUMBER |
|---|---|

**Item III.** Statement of Location: Enter the address of the accident, party's residence or place of business, performance, or other circumstance indicated in Item II., Step 3 on Page 1, as the proper reason for filing in the court location you selected.

| REASON: Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected for this case. ☐1. ☑2. ☐3. ☐4. ☑5. ☐6. ☐7. ☐8. ☐9. ☐10. | | | ADDRESS: 7000 West Third Street |
|---|---|---|---|
| CITY: Los Angeles | STATE: CA | ZIP CODE: 90048 | |

**Item IV.** *Declaration of Assignment*: I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that the above-entitled matter is properly filed for assignment to the Stanley Mosk courthouse in the Central District of the Superior Court of California, County of Los Angeles [Code Civ. Proc., § 392 et seq., and Local Rule 2.0, subds. (b), (c) and (d)].

Dated: December 10, 2013

(SIGNATURE OF ATTORNEY/FILING PARTY)

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.
2. If filing a Complaint, a completed Summons form for issuance by the Clerk.
3. Civil Case Cover Sheet, Judicial Council form CM-010.
4. Civil Case Cover Sheet Addendum and Statement of Location form, LACIV 109, LASC Approved 03-04 (Rev. 03/11).
5. Payment in full of the filing fee, unless fees have been waived.
6. A signed order appointing the Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court in order to issue a summons.
7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

NOTICE OF CASE ASSIGNMENT - UNLIMITED CIVIL CASE (NON-CLASS ACTION)

Case Number BS146288

THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT

Your case is assigned for all purposes to the judicial officer indicated below. There is additional information on the reverse side of this form.

| | ASSIGNED JUDGE | DEPT | ROOM | ASSIGNED JUDGE | DEPT | ROOM | |
|---|---|---|---|---|---|---|---|
| | Hon. Daniel Buckley | 1 | 534 | Hon. Malcolm H. Mackey | 55 | 515 | |
| | Hon. Barbara A. Meiers | 12 | 636 | Hon. Michael Johnson | 56 | 514 | |
| ✓ | Hon. Terry A. Green | 14 | 300 | Hon Rolf M. Treu | 58 | 516 | |
| | Hon. Richard Fruin | 15 | 307 | Hon. Michael L. Stern | 62 | 600 | |
| | Hon. Rita Miller | 16 | 306 | Hon. Mark Mooney | 68 | 617 | |
| | Hon. Richard E. Rico | 17 | 309 | Hon. William F. Fahey | 69 | 621 | |
| | Hon. Kevin C. Brazile | 20 | 310 | Hon. Soussan G. Bruguera | 71 | 729 | |
| | Hon. Robert L. Hess | 24 | 314 | Hon. Ruth Ann Kwan | 72 | 731 | |
| | Hon. Mary Ann Murphy | 25 | 317 | Hon. Teresa Sanchez-Gordon | 74 | 735 | |
| | Hon. Yvette M. Palazuelos | 28 | 318 | | | | |
| | Hon. Barbara Scheper | 30 | 400 | | | | |
| | Hon. Mary H. Strobel | 32 | 406 | **Hon. Emilie H. Elias** | **324** | **CCW** | |
| | Hon. Michael P. Linfield | 34 | 408 | **Hon. Elihu M. Berle*** | **323** | **CCW** | |
| | Hon. Maureen Duffy-Lewis | 38 | 412 | OTHER | | | |
| | Hon. Michelle R. Rosenblatt | 40 | 414 | | | | |
| | Hon. Ronald M. Sohigian | 41 | 417 | | | | |
| | Hon. Holly E. Kendig | 42 | 416 | | | | |
| | Hon. Mel Red Recana | 45 | 529 | | | | |
| | Hon. Debre Katz Weintraub | 47 | 507 | | | | |
| | Hon. Elizabeth Allen White | 48 | 506 | | | | |
| | Hon. Deirdre Hill | 49 | 509 | | | | |
| | Hon. John L. Segal | 50 | 508 | | | | |
| | Hon. Abraham Khan | 51 | 511 | | | | |
| | Hon. Susan Bryant-Deason | 52 | 510 | | | | |
| | Hon. Steven J. Kleifield | 53 | 513 | | | | |
| | Hon. Ernest M. Hiroshige | 54 | 512 | | | | |

***Complex**

All cases designated as complex (other than class actions) are initially assigned to Judge Elihu M. Berle in Department 323 of the Central Civil West Courthouse (600 S. Commonwealth Ave., Los Angeles 90005). This assignment is for the purpose of assessing whether or not the case is complex within the meaning of California Rules of Court, rule 3.400. Depending on the outcome of that assessment, the case may be reassigned to one of the judges of the Complex Litigation Program or reassigned randomly to a court in the Central District.

Given to the Plaintiff/Cross-Complainant/Attorney of Record on DEC 11 2013    SHERRI R. CARTER, Executive Officer/Clerk

By ____________________, Deputy Clerk

# INSTRUCT NS FOR HANDLING UNLIMITEL IVIL CASES

The following critical provisions of the Chapter Three Rules, as applicable in the Central District, are summarized for your assistance.

## APPLICATION

The Chapter Three Rules were effective January 1, 1994. They apply to all general civil cases.

## PRIORITY OVER OTHER RULES

The Chapter Three Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

## CHALLENGE TO ASSIGNED JUDGE

A challenge under Code of Civil Procedure section 170.6 must be made within 15 days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

## TIME STANDARDS

Cases assigned to the Individual Calendaring Court will be subject to processing under the following time standards:

**COMPLAINTS:** All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days of filing.

**CROSS-COMPLAINTS:** Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed. Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

A Status Conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint. Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

## FINAL STATUS CONFERENCE

The Court will require the parties at a status conference not more than 10 days before the trial to have timely filed and served all motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested jury instructions, and special jury instructions and special jury verdicts. These matters may be heard and resolved at this conference. At least 5 days before this conference, counsel must also have exchanged lists of exhibits and witnesses and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Eight of the Los Angeles Superior Court Rules.

## SANCTIONS

The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Three Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Three Rules. Such sanctions may be on a party or if appropriate on counsel for the party.

**This is not a complete delineation of the Chapter Three Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction. Careful reading and compliance with the actual Chapter Rules is absolutely imperative.**

# VOLUNTARY EFFICIENT LITIGATION STIPULATIONS

Superior Court of California County of Los Angeles

Los Angeles County Bar Association Litigation Section

Los Angeles County Bar Association Labor and Employment Law Section

Consumer Attorneys Association of Los Angeles

Southern California Defense Counsel

Association of Business Trial Lawyers

California Employment Lawyers Association

The Early Organizational Meeting Stipulation, Discovery Resolution Stipulation, and Motions in Limine Stipulation are voluntary stipulations entered into by the parties. The parties may enter into one, two, or all three of the stipulations; however, they may not alter the stipulations as written, because the Court wants to ensure uniformity of application. These stipulations are meant to encourage cooperation between the parties and to assist in resolving issues in a manner that promotes economic case resolution and judicial efficiency.

*The following organizations endorse the goal of promoting efficiency in litigation and ask that counsel consider using these stipulations as a voluntary way to promote communications and procedures among counsel and with the court to fairly resolve issues in their cases.*

**◆Los Angeles County Bar Association Litigation Section◆**

**◆ Los Angeles County Bar Association Labor and Employment Law Section◆**

**◆Consumer Attorneys Association of Los Angeles◆**

**◆Southern California Defense Counsel◆**

**◆Association of Business Trial Lawyers◆**

**◆California Employment Lawyers Association◆**

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.: FAX NO. (Optional): E-MAIL ADDRESS (Optional): ATTORNEY FOR (Name): | | |
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES** | | |
| COURTHOUSE ADDRESS: | | |
| PLAINTIFF: | | |
| DEFENDANT: | | |
| **STIPULATION – EARLY ORGANIZATIONAL MEETING** | | CASE NUMBER: |

**This stipulation is intended to encourage cooperation among the parties at an early stage in the litigation and to assist the parties in efficient case resolution.**

**The parties agree that:**

1. The parties commit to conduct an initial conference (in-person or via teleconference or via videoconference) within 15 days from the date this stipulation is signed, *to discuss and consider whether there can be agreement on the following*:

   a. Are motions to challenge the pleadings necessary? If the issue can be resolved by amendment as of right, or if the Court would allow leave to amend, could an amended complaint resolve most or all of the issues a demurrer might otherwise raise? If so, the parties agree to work through pleading issues so that a demurrer need only raise issues they cannot resolve. Is the issue that the defendant seeks to raise amenable to resolution on demurrer, or would some other type of motion be preferable? Could a voluntary targeted exchange of documents or information by any party cure an uncertainty in the pleadings?

   b. Initial mutual exchanges of documents at the "core" of the litigation. (For example, in an employment case, the employment records, personnel file and documents relating to the conduct in question could be considered "core." In a personal injury case, an incident or police report, medical records, and repair or maintenance records could be considered "core.");

   c. Exchange of names and contact information of witnesses;

   d. Any insurance agreement that may be available to satisfy part or all of a judgment, or to indemnify or reimburse for payments made to satisfy a judgment;

   e. Exchange of any other information that might be helpful to facilitate understanding, handling, or resolution of the case in a manner that preserves objections or privileges by agreement;

   f. Controlling issues of law that, if resolved early, will promote efficiency and economy in other phases of the case. Also, when and how such issues can be presented to the Court;

   g. Whether or when the case should be scheduled with a settlement officer, what discovery or court ruling on legal issues is reasonably required to make settlement discussions meaningful, and whether the parties wish to use a sitting judge or a private mediator or other options as

| SHORT TITLE: | CASE NUMBER: |
| --- | --- |
| | |

discussed in the "Alternative Dispute Resolution (ADR) Information Package" served with the complaint;

h. Computation of damages, including documents not privileged or protected from disclosure, on which such computation is based;

i. Whether the case is suitable for the Expedited Jury Trial procedures (see information at www.lasuperiorcourt.org under "*Civil*" and then under "*General Information*").

2. The time for a defending party to respond to a complaint or cross-complaint will be extended to ______________ (INSERT DATE) for the complaint, and ______________ (INSERT DATE) for the cross-complaint, which is comprised of the 30 days to respond under Government Code § 68616(b), and the 30 days permitted by Code of Civil Procedure section 1054(a), good cause having been found by the Civil Supervising Judge due to the case management benefits provided by this Stipulation.

3. The parties will prepare a joint report titled "Joint Status Report Pursuant to Initial Conference and Early Organizational Meeting Stipulation, and if desired, a proposed order summarizing results of their meet and confer and advising the Court of any way it may assist the parties' efficient conduct or resolution of the case. The parties shall attach the Joint Status Report to the Case Management Conference statement, and file the documents when the CMC statement is due.

4. References to "days" mean calendar days, unless otherwise noted. If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day

The following parties stipulate:

Date:

______________________ (TYPE OR PRINT NAME) ➤ ______________________ (ATTORNEY FOR PLAINTIFF)

Date:

______________________ (TYPE OR PRINT NAME) ➤ ______________________ (ATTORNEY FOR DEFENDANT)

Date:

______________________ (TYPE OR PRINT NAME) ➤ ______________________ (ATTORNEY FOR DEFENDANT)

Date:

______________________ (TYPE OR PRINT NAME) ➤ ______________________ (ATTORNEY FOR DEFENDANT)

Date:

______________________ (TYPE OR PRINT NAME) ➤ ______________________ (ATTORNEY FOR ______________)

Date:

______________________ (TYPE OR PRINT NAME) ➤ ______________________ (ATTORNEY FOR ______________)

Date:

______________________ (TYPE OR PRINT NAME) ➤ ______________________ (ATTORNEY FOR ______________)

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.: FAX NO. (Optional): E-MAIL ADDRESS (Optional): ATTORNEY FOR (Name): | | |
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES** | | |
| COURTHOUSE ADDRESS: | | |
| PLAINTIFF: | | |
| DEFENDANT: | | |
| **STIPULATION – DISCOVERY RESOLUTION** | | CASE NUMBER: |

**This stipulation is intended to provide a fast and informal resolution of discovery issues through limited paperwork and an informal conference with the Court to aid in the resolution of the issues.**

**The parties agree that:**

1. Prior to the discovery cut-off in this action, no discovery motion shall be filed or heard unless the moving party first makes a written request for an Informal Discovery Conference pursuant to the terms of this stipulation.

2. At the Informal Discovery Conference the Court will consider the dispute presented by parties and determine whether it can be resolved informally. Nothing set forth herein will preclude a party from making a record at the conclusion of an Informal Discovery Conference, either orally or in writing.

3. Following a reasonable and good faith attempt at an informal resolution of each issue to be presented, a party may request an Informal Discovery Conference pursuant to the following procedures:

   a. The party requesting the Informal Discovery Conference will:

      i. File a Request for Informal Discovery Conference with the clerk's office on the approved form (copy attached) and deliver a courtesy, conformed copy to the assigned department;

      ii. Include a brief summary of the dispute and specify the relief requested; and

      iii. Serve the opposing party pursuant to any authorized or agreed method of service that ensures that the opposing party receives the Request for Informal Discovery Conference no later than the next court day following the filing.

   b. Any Answer to a Request for Informal Discovery Conference must:

      i. Also be filed on the approved form (copy attached);

      ii. Include a brief summary of why the requested relief should be denied;

| SHORT TITLE: | CASE NUMBER: |
| --- | --- |
| | |

iii. Be filed within two (2) court days of receipt of the Request; and

iv. Be served on the opposing party pursuant to any authorized or agreed upon method of service that ensures that the opposing party receives the Answer no later than the next court day following the filing.

c. No other pleadings, including but not limited to exhibits, declarations, or attachments, will be accepted.

d. If the Court has not granted or denied the Request for Informal Discovery Conference within ten (10) days following the filing of the Request, then it shall be deemed to have been denied. If the Court acts on the Request, the parties will be notified whether the Request for Informal Discovery Conference has been granted or denied and, if granted, the date and time of the Informal Discovery Conference, which must be within twenty (20) days of the filing of the Request for Informal Discovery Conference.

e. If the conference is not held within twenty (20) days of the filing of the Request for Informal Discovery Conference, unless extended by agreement of the parties and the Court, then the Request for the Informal Discovery Conference shall be deemed to have been denied at that time.

4. If (a) the Court has denied a conference or (b) one of the time deadlines above has expired without the Court having acted or (c) the Informal Discovery Conference is concluded without resolving the dispute, then a party may file a discovery motion to address unresolved issues.

5. The parties hereby further agree that the time for making a motion to compel or other discovery motion is tolled from the date of filing of the Request for Informal Discovery Conference until (a) the request is denied or deemed denied or (b) twenty (20) days after the filing of the Request for Informal Discovery Conference, whichever is earlier, unless extended by Order of the Court..

   It is the understanding and intent of the parties that this stipulation shall, for each discovery dispute to which it applies, constitute a writing memorializing a "specific later date to which the propounding [or demanding or requesting] party and the responding party have agreed in writing," within the meaning of Code Civil Procedure sections 2030.300(c), 2031.320(c), and 2033.290(c).

6. Nothing herein will preclude any party from applying *ex parte* for appropriate relief, including an order shortening time for a motion to be heard concerning discovery.

7. Any party may terminate this stipulation by giving twenty-one (21) days notice of intent to terminate the stipulation.

8. References to "days" mean calendar days, unless otherwise noted. If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day.

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

**The following parties stipulate:**

Date:

(TYPE OR PRINT NAME) ➤ (ATTORNEY FOR PLAINTIFF)

Date:

(TYPE OR PRINT NAME) ➤ (ATTORNEY FOR DEFENDANT)

Date:

(TYPE OR PRINT NAME) ➤ (ATTORNEY FOR DEFENDANT)

Date:

(TYPE OR PRINT NAME) ➤ (ATTORNEY FOR DEFENDANT)

Date:

(TYPE OR PRINT NAME) ➤ (ATTORNEY FOR ____________)

Date:

(TYPE OR PRINT NAME) ➤ (ATTORNEY FOR ____________)

Date:

(TYPE OR PRINT NAME) ➤ (ATTORNEY FOR ____________)

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.: FAX NO. (Optional): E-MAIL ADDRESS (Optional): ATTORNEY FOR (Name): | | |
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES** | | |
| COURTHOUSE ADDRESS: | | |
| PLAINTIFF: | | |
| DEFENDANT: | | |
| **INFORMAL DISCOVERY CONFERENCE** (pursuant to the Discovery Resolution Stipulation of the parties) | | CASE NUMBER: |

1. This document relates to:
   - ☐ Request for Informal Discovery Conference
   - ☐ Answer to Request for Informal Discovery Conference
2. Deadline for Court to decide on Request: ________________ (insert date 10 calendar days following filing of the Request).
3. Deadline for Court to hold Informal Discovery Conference: ________________ (insert date 20 calendar days following filing of the Request).
4. **For a Request for Informal Discovery Conference, briefly describe the nature of the discovery dispute, including the facts and legal arguments at issue. For an Answer to Request for Informal Discovery Conference, briefly describe why the Court should deny the requested discovery, including the facts and legal arguments at issue.**

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.: FAX NO. (Optional): E-MAIL ADDRESS (Optional): ATTORNEY FOR (Name): | | |
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES** | | |
| COURTHOUSE ADDRESS: | | |
| PLAINTIFF: | | |
| DEFENDANT: | | |
| **STIPULATION AND ORDER – MOTIONS IN LIMINE** | | CASE NUMBER: |

**This stipulation is intended to provide fast and informal resolution of evidentiary issues through diligent efforts to define and discuss such issues and limit paperwork.**

**The parties agree that:**

1. At least ____ days before the final status conference, each party will provide all other parties with a list containing a one paragraph explanation of each proposed motion in limine. Each one paragraph explanation must identify the substance of a single proposed motion in limine and the grounds for the proposed motion.

2. The parties thereafter will meet and confer, either in person or via teleconference or videoconference, concerning all proposed motions in limine. In that meet and confer, the parties will determine:

   a. Whether the parties can stipulate to any of the proposed motions. If the parties so stipulate, they may file a stipulation and proposed order with the Court.

   b. Whether any of the proposed motions can be briefed and submitted by means of a short joint statement of issues. For each motion which can be addressed by a short joint statement of issues, a short joint statement of issues must be filed with the Court 10 days prior to the final status conference. Each side's portion of the short joint statement of issues may not exceed three pages. The parties will meet and confer to agree on a date and manner for exchanging the parties' respective portions of the short joint statement of issues and the process for filing the short joint statement of issues.

3. All proposed motions in limine that are not either the subject of a stipulation or briefed via a short joint statement of issues will be briefed and filed in accordance with the California Rules of Court and the Los Angeles Superior Court Rules.

| SHORT TITLE: | CASE NUMBER: |
| --- | --- |
| | |

**The following parties stipulate:**

Date:

_______________ (TYPE OR PRINT NAME) ➤ _______________ (ATTORNEY FOR PLAINTIFF)

Date:

_______________ (TYPE OR PRINT NAME) ➤ _______________ (ATTORNEY FOR DEFENDANT)

Date:

_______________ (TYPE OR PRINT NAME) ➤ _______________ (ATTORNEY FOR DEFENDANT)

Date:

_______________ (TYPE OR PRINT NAME) ➤ _______________ (ATTORNEY FOR DEFENDANT)

Date:

_______________ (TYPE OR PRINT NAME) ➤ _______________ (ATTORNEY FOR _______________)

Date:

_______________ (TYPE OR PRINT NAME) ➤ _______________ (ATTORNEY FOR _______________)

Date:

_______________ (TYPE OR PRINT NAME) ➤ _______________ (ATTORNEY FOR _______________)

**THE COURT SO ORDERS.**

Date: _______________ _______________ JUDICIAL OFFICER

0019

ADR-106

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
Alan Abrams, Esq. (SBN: 75637); Natalie Hottle, Esq. (SBN: 265918)
COSTA ABRAMS & COATE LLP
1221 Second Street, Third Floor
Santa Monica, CA 90401
TELEPHONE NO.: (310) 576-6161 FAX NO. (Optional): (310) 576-6160
E-MAIL ADDRESS (Optional): aafilmlaw@aol.com; nhottle@cacllp.com
ATTORNEY FOR (Name): Petitioners Hachiko Productions, LLC and Robert Ortiz

FOR COURT USE ONLY

CONFORMED COPY
ORIGINAL FILED
Superior Court Of California
County Of Los Angeles

DEC 11 2013

Sherri R. Carter, Executive Officer/Clerk
By: Judi Lara, Deputy

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles
STREET ADDRESS: 111 N. Hill St.
MAILING ADDRESS: 111 N. Hill St.
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Stanley Mosk Courthouse

PETITIONER: Hachiko Productions, LLC and Robert Ortiz
RESPONDENT: Writer's Guild of America West, Inc.

**PETITION TO ☐ CONFIRM ☐ CORRECT ☑ VACATE CONTRACTUAL ARBITRATION AWARD**

CASE NUMBER: BS146288

**Jurisdiction** *(check all that apply):*

☐ **Action is a limited civil case**
Amount demanded ☐ does not exceed $10,000
☐ exceeds $10,000, but does not exceed $25,000

☑ **Action is an unlimited civil case** (exceeds $25,000)

**NOTICE: You may use this form to request that the court confirm, correct, or vacate an award in an arbitration conducted pursuant to an agreement between the parties that is subject to Code of Civil Procedure section 1285 et seq. and that does not involve an attorney-client fee dispute. If you are requesting court action after an attorney-client fee arbitration award, please read Alternative Dispute Resolution form ADR-105, *Information Regarding Rights After Attorney-Client Fee Arbitration.***

1. **Petitioner and respondent.** Petitioner *(name each):*
Hachiko Production, LLC, a Rhode Island limited liability company; Hachiko Productions, LLC, a California limited liability company; and Robert V. Ortiz, an individual
alleges and requests relief against respondent *(name each):*
Writer's Guild of America West, Inc.

2. **Contractual arbitration.** This petition requests the court to confirm, correct, or vacate an award in an arbitration conducted according to an agreement between the parties that is subject to Code of Civil Procedure section 1285 et seq.

3. **Pending or new action.**
   a. ☐ A court case is already pending, and this is a petition filed in that action. *(If so, proceed to item 4.)*
   b. ☑ This petition commences a new action. *(If so, complete items 3b(1) through 3b(4).)*
      (1) **Petitioner's capacity.** Each petitioner named in item 1 is an individual,
      ☑ except petitioner *(state name and complete one or more of the following):* Hachiko Productions, LLC
      (a) ☐ is a corporation qualified to do business in California.
      (b) ☐ is an unincorporated entity *(specify):*
      (c) ☐ is a representative *(specify):*
      (d) ☑ is *(specify other capacity):* a limited liability company

      (2) **Respondent's capacity.** Each respondent named in item 1 is an individual,
      ☑ except respondent *(state name and complete one or more of the following):* Writer's Guild of America
      (a) ☐ is a business organization, form unknown.
      (b) ☑ is a corporation.
      (c) ☐ is an unincorporated entity *(specify):*
      (d) ☐ is a representative *(specify):*
      (e) ☐ is *(specify other capacity):*

Form Approved for Optional Use
Judicial Council of California
ADR-106 [New January 1, 2004]

**PETITION TO CONFIRM, CORRECT, OR VACATE CONTRACTUAL ARBITRATION AWARD (Alternative Dispute Resolution)**

Code of Civil Procedure, § 1285 et seq.

CONFORMATION COPY

| PETITIONER: Hachiko Productions, LLC and Robert Ortiz<br>RESPONDENT: Writer's Guild of America West, Inc. | CASE NUMBER: |
|---|---|

3. b. (3) **Amount or property in dispute.** This petition involves a dispute over *(check and complete all that apply)*:
   - (a) [✓] the following amount of money *(specify amount)*: $ 280,132.67
   - (b) [ ] property *(if the dispute involves property, complete both of the following)*:
     - (i) consisting of *(identify property in dispute)*:
     - (ii) having a value of *(specify value of property in dispute)*: $

   (4) [✓] **Venue.** This court is the proper court because *(check (a) or (b))*:
   - (a) [✓] this is the court in the county in which the arbitration was held.
   - (b) [ ] the arbitration was not held exclusively in any county of California, or was held outside of California, **and** *(check one or more of the following)*:
     - (i) [ ] this is the court in the county where the agreement was made.
     - (ii) [ ] this is the court in the county where the agreement is to be performed.
     - (iii) [ ] the agreement does not specify a county where it is to be performed and was not made in any county in California, and the following party resides or has a place of business in this county *(name of party)*:
     - (iv) [ ] the agreement does not specify a county where it is to be performed and was not made in any county in California, and no party to this action resides or has a place of business in California.

4. **Agreement to arbitrate.**
   - a. **Date.** Petitioner and respondent entered into a written agreement on or about *(date)*: Hachiko (RI) 9/5/07; rest disputed
   - b. [✓] **Attachment.** A copy of the agreement is submitted as Attachment 4(b) and incorporated herein by this reference.
   - c. **Arbitration provision.** Paragraph ______ of the agreement provides for arbitration of disputes arising out of the agreement as follows *(either copy the arbitration provision in full or summarize the provision)*:

     Disputes between the Guild and the Company concerning the interpretation of any of the terms of this Basic Agreement and the application and effect of such terms as determined by an interpretation thereof; alleged breach of Basic Agreement by Guild or Company; claims by Guild and writer against Company

5. **Dispute subject to arbitration.** A dispute arose between petitioner and respondent concerning the following matter covered by the agreement to arbitrate *(summarize the dispute)*:

   The alleged failure to pay writer Stephen Lindsey (then non-WGA) unpaid compensation, interest on unpaid compensation, pension and health contributions, interest on unpaid pension and health contributions, and other damages to the Guild for purported breach of obligations under the Basic Agreement.

6. **Arbitrator.** The following person was duly selected or appointed as arbitrator *(name of each arbitrator)*:

   Arbitrator Michael D. Rappaport, Esq. was appointed as arbitrator

7. **Arbitration hearing.** The arbitration hearing was conducted as follows *(complete both of the following)*:
   - a. **Date** *(each date of arbitration)*: July 2, 2012 (Day 1) and August 14, 2013 (Day 2)
   - b. **Location** *(city and state where arbitration was conducted)*:

     At offices of Writer's Guild of America West, Inc., in Los Angeles, California

8. **Arbitration award.**
   - a. **Date of award.** The arbitration award was made on *(date)*: August 14, 2013
   - b. **Terms of award.** The arbitration award *(check one or more of the following)*:
     - (1) [✓] requires [✓] petitioner [ ] respondent to pay the other party this amount: $ 280,132.67
     - (2) [ ] requires neither party to pay the other anything.
     - (3) [ ] is different as to different petitioners and respondents.
     - (4) [ ] provides *(specify other terms or check item 8(c) and attach a copy of the award)*:
   - c. [✓] **Attachment of Award.** A copy of the award is submitted as Attachment 8(c).

9. **Service of award.**
   - a. The signed award or an accompanying document indicates that the award was served on petitioner on *(date)*: disputed
   - b. [✓] Petitioner alleges that a signed copy of the award was actually served on *(date)*: 9/2/13

| PETITIONER: Hachiko Productions, LLC and Robert Ortiz | CASE NUMBER: |
|---|---|
| RESPONDENT: Writer's Guild of America West, Inc. | |

10. **Petitioner requests that the court** *(check all that apply):*
   a. ☐ **Confirm the award, and enter judgment according to it.**
   b. ☐ **Correct the award and enter judgment according to the corrected award, as follows:**
      (1) The award should be corrected because *(check all that apply):*
         (a) ☐ the amount of the award was not calculated correctly, or a person, thing, or property was not described correctly.
         (b) ☐ the arbitrator exceeded his or her authority.
         (c) ☐ the award is imperfect as a matter of form.
      (2) The facts supporting the grounds for correcting the award alleged in item 10b(1) are as follows *(if additional space is required, check here ☐ and submit facts on an attachment labeled 10b(2)):*
      (3) The award should be corrected as follows *(if additional space is required, check here ☐ and describe requested correction on an attachment labeled 10b(3)):*
   c. ☑ **Vacate (cancel) the award.**
      (1) The award should be vacated because *(check all that apply):*
         (a) ☑ the award was obtained by corruption, fraud, or other unfair means.
         (b) ☑ an arbitrator was corrupt.
         (c) ☑ the misconduct of a neutral arbitrator substantially prejudiced petitioner's rights.
         (d) ☑ the arbitrator exceeded his or her authority, and the award cannot be fairly corrected.
         (e) ☑ the arbitrator unfairly refused to postpone the hearing or to hear evidence useful to settle the dispute.
         (f) ☑ an arbitrator failed to disclose within the time for disclosure a ground for disqualification of which the arbitrator was then aware.
         (g) ☑ an arbitrator should have disqualified himself or herself after petitioner made a demand to do so.
      (2) The facts supporting the grounds for vacating the award alleged in item 10c(1) are as follows *(if additional space is required, check here ☑ and submit facts on an attachment labeled 10c(2)):*
      (3) Petitioner ☐ does ☑ does not request a new arbitration hearing.
   d. ☐ **Award petitioner interest** from *(date):*
      (1) ☐ at the statutory rate.
      (2) ☐ at rate of ____ % per year.
   e. ☑ **Award petitioner costs of suit:**
      (1) ☐ in the amount of: $
      (2) ☑ according to proof.
   f. ☑ **Award petitioner attorney fees incurred in this action** *(check only if attorney fees are recoverable in this action according to statute or the parties' agreement):*
      (1) ☐ in the amount of: $
      (2) ☑ according to proof.
   g. ☐ **Award petitioner the following other relief** *(describe relief requested; if additional space is required, check here ☐ and describe relief on an attachment labeled 10g):*

11. **Pages and attachments.** Number of pages attached:

Date: December 11, 2013

Alan Abrams, Esq.
(TYPE OR PRINT NAME)

▶ [signature]
(SIGNATURE OF PETITIONER OR ATTORNEY)

# Attachment 4(b)

Attachment 4(b)



WGAW
WRITERS
GUILD OF
AMERICA, WEST

**WGA INFORMATION SHEET**

Return to:
Writers Guild of America, West
Attn: Signatories Department
7000 West Third Street
Los Angeles, CA 90048

Company: Hachiko Productions, LLC

D/B/A: ______

**Address: 9595 Wilshire Blvd, Suite 900
Beverly Hills, CA 90212

Contact: Carl Baker

Telephone #: 323-848-8973

Fax #: 323-848-8963

Email Address: carl@infernodistribution.com

**This is the official company address for WGA records, correspondence and notices.

I. COMPANY INFORMATION

Complete Section A, B or C on behalf of Company.

A. ☐ INDIVIDUAL

Name: ______

Fictitious Business Name (if applicable): ______

Federal ID# ______

Date Registered: ______ State and County: ______

SIGNATORIES DEPT.
SEP 18 2007
RECEIVED

(A copy of Page 2 must be completed by each Parent Company in addition to pending Signatory Company)

Re: Hachiko Productions, LLC
(company name)

B. ☐ CORPORATION ☒ LIMITED LIABILITY COMPANY

Incorporated/Formed in the State of: Rhode Island

Principal place of Business in the State of: Rhode Island

Date of Incorporation/Formation: Sept. 1, 2007

Federal ID#:

| OFFICERS/MANAGERS | | PRINCIPAL STOCKHOLDERS/ MEMBERS | % OWNED |
|---|---|---|---|
| Chair/Board: | N/A | | % |
| President: | Rob Ortiz | | % |
| V.P.: | N/A | | % |
| Sec.: | Rob Ortiz | | % |
| Treas.: | N/A | | % |
| Other: | N/A | | % |

Parent Corporation N/A

Subsidiaries: N/A

**If the principal stockholder/member is a company, complete another Page 2 for that company. Each principal owner who is an individual must complete Page 3.**

C. ☐ GENERAL PARTNERSHIP ☐ LIMITED PARTNERSHIP ☐ JOINT VENTURE

Organized in the State of:

Date Formed:

| General Partners/Joint Venturers | | Limited Partners |
|---|---|---|
| | % | |
| | % | |
| | % | |
| | % | |

**Each partner or joint venturer that is a company must each complete another Page 2. Each partner or joint venturer who is an individual must complete Page 3.**

SIGNATORIES DEPT.
SEP 1 2007
RECEIVED

II. PRINCIPAL OWNER(S)

(A copy of Page 3 must be completed for each 10% or more owner)

Professional Name: ______

Full Legal Name: ROBERT V. ORTIZ

Social Security #: 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

Date of Birth: JAN 6, 1972

Home Address: 2365 COVE AVE
LA, CA 90039

Telephone #: (323) 667-1884 Cell #: (323) 821-6603

Primary Source of Income: ______

Occupation/Position: LINE PRODUCER

Employer: HACHIKO PRODUCTIONS, LLC

Address: ______

Telephone #: ______

Type of Business: FILM PRODUCTION

Name of Spouse: NONE

Spouse's Professional Name: ______

Please include the names of any motion picture/television/radio industry guilds or unions of which you are a member: DIRECTORS GUILD OF AMERICA

Please list any previous projects you have produced: ______

If you are an officer, owner or partner of any other production company, please indicate below:

| Companies: | WGA Signator? Yes | No |
|---|---|---|
| ______ | ☐ | ☐ |
| ______ | ☐ | ☐ |
| ______ | ☐ | ☐ |
| ______ | ☐ | ☐ |

SIGNATORIES DEPT.
SEP 18 2007
RECEIVED
WRITERS GUILD OF AMERICA WEST, INC.

## III. PROJECT INFORMATION

☒ Theatrical ☐ Television/Initial Release: Hachiko: A Dog's Story

Project title(s):

Name(s) of Writer(s) — Start Date

1.) Paul Mason

2.) Vicki Wong

3.)

4.)

Production Start Date: 10-15-07

Above-listed writer's work is to be based upon the following:

| SOURCE MATERIAL | WRITTEN BY | ENTITLED |
|---|---|---|
| ☐ Story | | |
| ☐ Treatment | | |
| ☒ Screenplay | Stephen P. Lindsey | Hachiko |
| ☐ Unpublished Novel | | |
| ☐ Published Novel | | |
| ☐ Stage Play | | |
| ☐ Other(describe) | | |

☒ OUTRIGHT PURCHASE/SALE OF LITERARY MATERIAL; OR:

☐ OPTION TO PURCHASE/SELL LITERARY MATERIAL

Option Periods:

Are Writing Services Involved? ☐ Yes ☐ NO

If "Yes", please describe:

SIGNATORIES DEPT.
SEP 18 2007
RECEIVED
WRITERS GUILD OF AMERICA WEST, INC.

## IV. FINANCIAL INFORMATION

Projected Budget of Project: $ 15 Million

B. Financing Sources:

Name: D. B. Zwirn

Address: 745 Fifth Ave., 18th Floor

New York, NY 10151

Contact: Eileen Burke

Percentage of Budget Financed: 100 %

Phone #: 646-720-9164

Fax #: 646-720-9064

Name: ______

Address: ______

Contact: ______

Percentage of Budget Financed: ______ %

Phone #: ______

Fax #: ______

C. DISTRIBUTION INFORMATION: TBD

FOREIGN

Distributor: ______

Address: ______

Contact: ______

Telephone #: ______

DOMESTIC

Distributor: Sony Worldwide SPE Aquisitions, Inc.

Address: ______

Contact: ______

Telephone #: ______

## V. OWNERSHIP INFORMATION

The entity owning the underlying rights to the material and/or project at the time of principal photography:

Hachiko Productions, LLC

The entity owning the copyright once the project is completed:

Hachiko Productions, LLC

## VI. COLLECTIVE BARGAINING AGREEMENTS

Is your company signed to any of the following collective bargaining agreements? If so, please check below:

☐ IATSE ☒ DGA ☒ SAG ☐ NABET ☐ Teamsters ☐ Other: ______

SIGNATORIES DEPT.
SEP
RECEIVED

## VII. ADDITIONAL CONTACTS

**ATTORNEY**

Name: Carl Baker
Name of Firm: Inferno Distribution, LLC
Street Address: 9595 Wilshire Bl. #900
City State Zip: Beverly Hills, CA 90212
Area Code and Telephone#: 323-848-8978
Area Code and Fax #: 323-848-8963
Email Address: carl@infernodistribution.com

**PRODUCTION OFFICE**

(If different from official address on Page 1)

Street Address: 154 MAIN ST
City State Zip: WOONSOCKET RI 02895
Area Code and Telephone#: (401) 766-3045
Area Code and fax#: (401) 766-3046
Email Address:

☐ ACC'T or ☐ Business Manager

Name: Andrew Mann
Company or Firm: Inferno Distribution, LLC
Street Address: 9595 Wilshire Bl #900
City State Zip: Beverly Hills, CA 90212
Area Code and Telephone#: 323-848-8973
Area Code and Fax #: 323-848-8963
Email Address: andrew@infernodistribution.com

**OTHER ADDRESS**

Street Address:
City State Zip:
Area Code and Telephone #:
Area Code and Fax #:
Email Address:

THIS DOCUMENT MUST BE SIGNED BY AN OFFICER, OWNER OR PARTNER OF THE COMPANY.

Date: 9-5-07

By: [signature]

Print Name: Rob Ortiz

Title: Manager



WGAW
WRITERS
GUILD OF
AMERICA, WEST

LETTER OF ADHERENCE

## LETTER OF ADHERENCE TO THE 2004 WGA THEATRICAL AND TELEVISION BASIC AGREEMENT

The undersigned Company and the Writers Guild of America, West, Inc., on behalf of itself and its affiliate Writers Guild of America, East, Inc. (collectively "WGA" or "Guild"), accept and agree to abide by all terms and conditions of the 2004 WGA Theatrical and Television Basic Agreement ("2004 MBA") as negotiated between the WGA and **(PLEASE CHECK ONE):**

☒ the Alliance of Motion Picture and Television Producers (**"AMPTP"**)

☐ the production companies of ABC, CBS and NBC (**"Networks"**)

The 2004 MBA is in effect from November 1, 2004 through and including October 31, 2007. A Summary containing the terms and conditions is enclosed. The economic and other terms of the MBAs negotiated with the AMPTP and the Networks are essentially the same. Three differences in terms relating to television are noted in an Addendum at the end of the Summary. A Company executing a Letter of Adherence to either version of the 2004 MBA shall also be bound to the terms and conditions in Attachment 1 hereto. The parties expressly waive the notice requirements of the Labor Management Relations Act § 8 (d) (1) and (3) and Article 2.A.4 of the 2004 MBA.

Anything to the contrary in the 2004 MBA notwithstanding, the undersigned Company shall remain primarily liable for all the terms and conditions of the 2004 MBA in the event the undersigned should sell, transfer or assign any of its rights as set forth and described in the 2004 MBA.

The Guild, may in its discretion, require, at any time, reasonable financial assurances that Writers will receive all compensation (including but not limited to residuals and other forms of contingent compensation) to which they are entitled under the Agreements and their individual agreements with Company. Upon the Guild's written request, Company shall promptly provide such assurances as are acceptable to the Guild in the form of a lien, bond, cash deposit or escrow, security agreement and/or such other type acceptable to the Guild. In the event Company fails to provide such assurances, the Guild shall have the right to withhold the services of its members until such assurances are provided.

The Pension Plan and Health Fund to which contributions are required by the 2004 MBA is a separate entity and will independently determine whether your Company may participate in these trusts. Should your company be acknowledged as a participating employer, only contributions for bona fide covered employment will be accepted by them.

AGREED TO AND ACCEPTED

Hachiko Productions, LLC
FULL LEGAL NAME OF COMPANY

By: [signature]
SIGNATURE

Name: Rob Ortiz
PLEASE PRINT

Title: Manager

Date: Sept. 5, 2007

WRITERS GUILD OF AMERICA, West, INC.
on behalf of itself and its affiliate
WRITERS GUILD OF AMERICA, EAST, INC.

By: [signature] FOR
DAVID YOUNG, EXECUTIVE DIRECTOR

Date: 12/17/07

SIGNATORIES DEPT.
SEP 1 5 2007
RECEIVED
WRITERS GUILD OF AMERICA, WEST, INC.

## ATTACHMENT 1, LETTER OF ADHERENCE TO THE 2004 WGA THEATRICAL & TELEVISION BASIC AGREEMENT

1. Add the following unnumbered paragraph, which is in contract language, as a preamble to Article 13, "Compensation," applicable to both theatrical and television sub-sections of that Article:

"In the event that the Company, either directly or through an affiliated entity, employs, or purchases or options literary material from, a writer who is represented by an individual or entity that, at the time of the transaction, is affiliated with the Company, the Company shall in connection with the employment, sale or option require the affiliated individual or entity to comply with the Artists' Representatives Code of Fair Practices, attached hereto. For the purposes of this provision, an "affiliated" individual or entity is any parent, subsidiary, partner, joint venturer, officer, manager, agent or employee of the Company, as well as any individual or entity which has a financial interest in or controls the Company, or in which the Company has a financial interest or controls. Compliance with this provision is subject to grievance and arbitration pursuant to Articles 10 and 11 of the MBA."

## ARTISTS' REPRESENTATIVES CODE OF FAIR PRACTICES

With respect to the rendition of management or representation services for or on behalf of writers covered by the 2004 WGA-AMPTP Theatrical and Television Basic Agreement and the WGA-Network Theatrical and Television Basic Agreement ("MBA"), a manager or other representative ("Representative") subject to this Code of Fair Practices, on behalf of itself, its partners, principals, employees and agents, agrees as follows:

1. **Representative's fiduciary obligations.** The Representative shall at all times act with reasonable diligence, care and skill on behalf of the writer-client, and shall not act against the writer-client's interest. As part of this fiduciary obligation, the Representative shall:

(1) Consult with writer-client at reasonable times and intervals.
(2) Advance and protect the interests of the writer-client in all fields of writing covered by a WGA collective bargaining agreement.
(3) Notify writer-client promptly of all communications related to the representation and/or WGA-covered writing services, and in the case of any document received by Representative relating to the WGA's determination of credits, deliver it to writer-client no later than the next business day.
(4) Hold confidential all communications identified as such by the writer-client.

(5) Upon request, notify writer-client of the status of all negotiations related to his or her WGA-covered writing services.

(6) Upon request, provide writer-client with a list of all other writers represented by Representative in fields of work covered by the WGA.

(7) Refrain from knowingly negotiating or approving any contract provision that violates the MBA (or other WGA collective bargaining agreement) or a working rule of the Guild.

(8) Obtain written authority from writer-client before collecting monies belonging to the writer-client.

(9) Promptly pay to writer-client any monies received on his/her account less any commission properly payable under this Code.

(10) Refrain from commingling monies belonging to the writer-client or advanced for the benefit of the writer-client with monies belonging to the Representative, and segregate funds due or owing to the writer-client in a client trust account.

(11) Refrain from requiring that writer-client execute a release form with respect to his or her submission of literary material to Representative.

2. **Representative affiliated with signatory employer.** If the writer-client accepts employment with, or sells or options literary material to, a signatory Company affiliated with the Representative (as defined in the first unnumbered paragraph of Article 13 of the 2004 MBA; see Attachment 1 to the Letter of Adherence at paragraph 2), the Representative agrees that:

(1) The Representative shall not receive a commission or any other payment from the writer-client as a result of such WGA-covered employment, sale or option.

(2) The Representative shall provide written notice to the writer-client and the Guild disclosing the nature of the relationship between the Representative and the signatory Company.

3. **Delivery of management contract to Guild.** The Representative shall deliver to the office of WGA west, attention Lewis Moore [or his successor], 7000 West Third Street, Los Angeles, CA 90048, or to the office of WGA East, attention Rochelle Rubin [or her successor], 555 West 57th Street, New York, New York 10019, a copy of the written agreement, if any, between the Representative and the writer-client, within ten (10) business days of its execution.



FORM 5-B

## PRODUCER-WRITERS GUILD OF AMERICA PENSION PLAN FORM 5-B (2004 THEATRICAL & TELEVISION AGREEMENT)

1. The undersigned employer represents and declares:

That it employs Writers (herein "Such Writers") who render writing services in the preparation of literary material subject to the 2004 WGA Theatrical and Television Basic Agreement ("2004 MBA") and/or such other collective bargaining agreements as the Writers Guild of America may enter into with employers who employ Such Writers in Television and Motion Pictures, (herein "Basic Agreements").

That it is familiar with the provisions of (a) the Agreement and Declaration of Trust establishing the Writers Guild-Industry Health Fund dated September 23, 1973, as amended, herein referred to as the "Health Fund", and (b) the Producer-Writers Guild of America Pension Plan dated March 31, 1960, as amended, hereinafter referred to as the "Pension Plan", and (c) said applicable 2004 MBA.

2. That the employer and the Writers Guild of America are signatories to one or more such Basic Agreements, which Basic Agreements are in conformity with the law for the employee unit described below, and such union (a) is a party to the Health Fund, as set forth in Section 1 of Article I of the Health Fund, with respect to Such Writers, and (b) is a party to the Producer-Writers Guild of America Pension Plan as set forth in Section 31 of Article I of the Pension Plan with respect to Such Writers. The rate and obligation of the undersigned employer to make contributions (a) to such Health Fund with respect to Such Writers, and (b) to such Pension Plan with respect to Such Writers, shall commence on and continue for the period and in accordance with the Health Fund and the Pension Plan provisions of the 2004 MBA.

3. Also in accordance with such 2004 MBA and for the period and purposes set forth therein, the employer shall pay to the Pension Plan and Health Fund through its administrator in pursuance of the 2004 MBA the contributions the undersigned employer is obligated to make under such Basic Agreements to the Health Fund.

4. The undersigned by this document adopts and intends (a) to become a party to and to participate in the Health Fund with respect to Such Writers to the same extent as though the undersigned had executed such Trust Agreement or a counterpart thereof, in accordance with Section I, Article IX of said Health Fund, and (b) to become a party to and participate in the Pension Plan with respect to Such Writers by the execution of the document, in accordance with Section 2, Article XIII thereof.

The employer appoints as its agent (check one, if any)

( ) Alliance of Motion Picture & Television Producers ( ) other: ____________________

to act for it under the terms and conditions of said Health Fund and the Pension Plan, except that said agent shall not be empowered to act under the provisions of Article VI, or Section 2, of Article VII and Section 3 of Article XIII of the Pension Plan, or under the provision of Section 2 of Article VIII of the Health Fund.

Hachiko Productions, LLC
EXACT LEGAL NAME OF COMPANY

By: [signature]
SIGNATURE

Name: Rob Ortiz
PLEASE PRINT

Title: Manager

Date: Sept. 5, 2007

FOR OFFICE USE ONLY

Accepted the ___ day of ________, 20___
Producers-Writers Guild of America Pension Plan and on behalf of Writers Guild-Industry Health Fund

By: ____________ ____________
ADMINISTRATOR

SIGNATORIES DEPT.
SEP 10 2007
RECEIVED
WRITERS GUILD OF AMERICA, WEST, INC.

Form 5-B (rev.11/01/04)(2004MBA5)



NOTICE OF AGENT FOR SERVICE OF PROCESS

We (I) hereby appoint the following INDIVIDUAL as the Agent for Service of Process in connection with any disputes arising under the Writers Guild of America collective bargaining agreement to which we (I) are signatory.

Should this individual cease to act as Agent for Service of Process for any reason whatsoever, we (I) agree to appoint a new agent without delay and immediately notify the WGA, in writing, of the new appointment. Notwithstanding any other provision or article of the applicable collective bargaining agreement, should we (I) fail to provide the WGA of timely notice of the appointment of a new agent, along with the new agent's address, telephone number and written acceptance of the appointment, we (I) agree that all written notices required under the provision of said collective bargaining agreement which are sent by first class mail, postage prepaid, to our (my) last address, with a copy sent to the below-appointed agent, shall constitute and be valid service under the applicable bargaining agreement. We (I) understand that the designated Agent will remain in effect until the WGA receives notification from us (me) that the agent has been replaced by another individual.

It is preferable that the Agent is a resident of the State of California. Post Office Box numbers for addresses are not acceptable.

1. NAME OF COMPANY: Hachiko Productions, LLC

Signed by: [signature]

Title: Manager

Date: Sept. 5, 2007

The undersigned hereby agrees to accept service of process in connection with any disputes or notices arising under any collective bargaining agreement:

2. NAME OF APPOINTED AGENT: Carl Baker, Esq.

Company/Law Firm: Inferno Distribution, LLC

Address: 9595 Wilshire Bl
Suite 900
Beverly Hills, CA 90212

Telephone: 323-848-8973

APPOINTED AGENT SIGNS HERE:

By: [signature]

Date: 9-5-07

SIGNATORIES DEPT.
SEP 18 2007



LETTER OF GUARANTEE

# LETTER OF GUARANTEE UNDER THE 2004 WGA THEATRICAL AND TELEVISION BASIC AGREEMENT

Reference is made to the Letter of Adherence to the 2004 Writers Guild of America Theatrical and Television Basic Agreement ("2004 MBA") between Hachiko Productions, LLC (PLEASE PRINT NAME OF COMPANY) (herein after "Company"), and Writers Guild of America ("WGA") which is entered into concurrently with this assumption agreement. To induce the WGA to sign the Letter of Adherence, the undersigned, as an individual, agrees to the following:

You agree to guarantee performance of the 2004 MBA by Company.

You agree to assume all the obligations of Company under each employment agreement for writing services and option or purchase agreement for literary material entered into at any time during the term of the 2004 MBA.

You further agree to assume each and every obligation of the 2004 MBA pertaining to such employment and option or purchase agreement and specifically agree to be bound by, and a party to, any grievance and/or arbitration under the 2004 MBA, should a dispute between a writer and/or WGA and Company arise. You and Company shall be deemed jointly and severally liable under any grievance or arbitration award or settlement.

You agree that service upon Company pursuant to the 2004 MBA shall constitute service upon the undersigned.

Nothing contained in this agreement shall be construed to relieve Company from its obligations under such employment and option or purchase agreement or its obligations under the 2004 MBA.

Very truly yours,

[signature]

David Young
Executive Director

AGREED TO AND ACCEPTED

By: [signature]
INDIVIDUAL'S SIGNATURE

Name: Rob Ortiz
PLEASE PRINT

Date: Sept. 5, 2007

## ARTICLE 10 GRIEVANCE AND ARBITRATION

### A. MATTERS SUBJECT TO GRIEVANCE AND ARBITRATION (GENERAL)

Except as otherwise specifically provided in this Article or elsewhere in this Basic Agreement, the following matters shall be submitted to grievance and thereafter to arbitration as hereinafter provided, and no other matters shall be submitted to grievance or arbitration:

1. Any dispute between the Guild and the Company concerning the interpretation of any of the terms of this Basic Agreement and the application and effect of such terms as determined by an interpretation thereof.

2. Any alleged breach of any of the terms or provisions of this Basic Agreement by the Guild or the Company.

3. Any claim by the Guild and a writer, on the one hand, against the Company, on the other hand, for unpaid compensation under the writer's individual employment agreement or loan-out agreement with the Company, or for payment under a purchase agreement with the Company in the case of a professional writer, excluding, however, any claim not related to the writer's services as a writer or not related to the sale of literary material. (Claims for compensation or payment under an employment, loan-out or purchase agreement shall be referred to hereafter as "compensation claims" or "claims for compensation.") Notwithstanding the foregoing, the grievance committee and arbitrator shall not have jurisdiction to render an award for compensation or payment exceeding the sum of four hundred thousand dollars ($400,000.00) for a theatrical or television employment or purchase. (This amount is herein referred to as the "jurisdictional maximum.") If a compensation claim exceeds the jurisdictional maximum, the claim may nevertheless be submitted to grievance and/or arbitration, but by such submission the Guild and writer waive any award exceeding the jurisdictional maximum and shall have no further claim or right with respect to any amount in excess of the jurisdictional maximum. A claim for compensation cannot be split nor may more than one (1) grievance or arbitration proceeding be brought for the purpose of avoiding the jurisdictional maximum.

4. In any grievance or arbitration proceeding with respect to a claim for compensation brought under subparagraph 3. of this Article 10.A., the Company may, but need not, assert any and all defenses, including defenses based on an alleged right of suspension or termination, and any counterclaim or setoff (hereinafter referred to as "cross-claim"). A cross-claim is either mandatory or permissive. A mandatory cross-claim is one arising out of or related to the pending claim for unpaid compensation. A permissive cross-claim is any other

cross-claim by the Company against the writer. Provided that the Company has obtained knowledge of the facts upon which the cross-claim is based, the Company shall assert any and all mandatory cross-claims in any arbitration proceeding involving a compensation claim. If the amount claimed by the Company in a cross-claim exceeds the jurisdictional maximum of four hundred thousand dollars ($400,000.00), the Company shall have the option of submitting such cross-claim to grievance and (whether or not submitted to grievance) to arbitration or to institute an action at law or in equity with respect to such cross-claim. The Company may, but need not, assert any permissive cross-claim.

5.   Any claim of overpayment by a Company under Article 11.A.9. of this Basic Agreement.[1]

**B.   LIMITATION OF MATTERS SUBJECT TO GRIEVANCE AND ARBITRATION**

1.   Except as otherwise provided in this Basic Agreement, disputes under individual employment agreements, loan-out agreements or under purchase agreements with professional writers, involving:

a.   Company's rights of suspension and termination,

b.   Company's right to seek or obtain injunctive relief or specific performance,

c.   any of the warranties or grants of rights made by the writer, or

d.   any of the rights of the Company to any literary material,

shall not be subject to grievance or arbitration (except as provided to the contrary in Article 16), and the Company reserves all of its legal and equitable rights and remedies with respect thereto. Any decision in grievance or award in arbitration purporting to determine or affect any of the aforementioned matters shall, to that extent, be of no force or effect whatsoever; provided, however, that if the Company asserts in any grievance or arbitration any defense or cross-claim involving or based upon the alleged exercise of a right of suspension or termination, the same shall be determined in such grievance and arbitration proceeding.

2.   The grievance committee and the arbitrator shall have jurisdiction to determine only such disputes as are submitted for grievance or arbitration under this Basic Agreement, subject to the limitations upon the powers of said grievance committee and arbitrator under this Basic Agreement. Neither the

---

[1] Articles 10.A.5. and 11.A.9. replace Article 13.C. of the 1973 Basic Agreement.

grievance committee nor the arbitrator shall have the power or
jurisdiction to reform, amend or extend the express terms and
provisions of this Basic Agreement or of any employment
agreement, loan-out agreement or purchase agreement.

**C.   MATTERS SUBJECT TO ARBITRATION BUT NOT
       GRIEVANCE**

Notwithstanding anything elsewhere contained in this Article 10, the
following matters shall be submitted to arbitration but not to
grievance:

1.  Any dispute as to whether the arbitrator has jurisdiction or
    whether any matter is arbitrable, provided, however, that the
    arbitrator may not order an arbitration of any matter not
    arbitrable as provided above.

2.  Any dispute concerning the credit provisions of this Basic
    Agreement.  Such disputes are subject to the procedures set
    forth in Article 11.E. of this Basic Agreement.

3.  Any dispute concerning separation of rights under the
    provisions of subparagraph 6. of Article 16.A. of this Basic
    Agreement.

4.  Any dispute concerning allocation of receipts under Article
    15.A.3.a. of this Basic Agreement.

5.  Any dispute concerning Article 16.A.8. which is subject to the
    expedited arbitration procedure in Article 11.F.

**D.   REFUSAL TO ARBITRATE**

A failure or refusal by any party to go to grievance on a matter subject
to grievance or to arbitrate an arbitrable matter, including disputes as
to jurisdiction and arbitrability pursuant to this Article 10, is a
substantial breach of this Basic Agreement.  A failure or refusal by
any party to go to grievance on a matter subject to grievance or to
arbitrate an arbitrable matter shall not limit, impair or divest the
jurisdiction and powers of the grievance committee or arbitrator
provided notice of grievance or arbitration has been served as
provided herein.  Grievance and arbitration may proceed despite the
failure of a party to appear and the grievance committee or arbitrator
may enter an award against such a party.

**E.   REFERENCES**

All references in Articles 10, 11 and 12 to individual employment
agreements, loan-out agreements or purchase agreements only refer to
such agreements as are subject to this Basic Agreement.

## ARTICLE 11 GRIEVANCE AND ARBITRATION RULES AND PROCEDURES

### A. GENERAL RULES

Unless otherwise provided in this Article 11 or elsewhere in this Basic Agreement, the rules and procedures for grievance and arbitration shall be as follows:

1. Parties

a. In any grievance or arbitration concerning any claim by a writer for compensation under Article 10.A.3., the Guild and the writer involved shall be jointly a party and may be represented by joint counsel. In any grievance or arbitration concerning such a claim by any loan-out company, the loan-out company also shall be jointly a party and may be represented by joint counsel. The claim shall be initiated by the Guild on behalf of the writer and the loan-out company, if any.

b. Except as provided in subparagraph a. above, only the Company and the Guild shall be parties.

c. [Renumbered as Article 11.B.3. and deleted here.]

d. The party commencing a claim in grievance or arbitration is sometimes referred to herein as complainant. The party against whom such grievance or arbitration is commenced is sometimes referred to herein as respondent. Use of such terms in the singular shall be deemed to include the plural.

e. The grievance and arbitration provisions shall apply to disputes with respect to purchase agreements with professional writers to the same extent but no greater than they are applicable to disputes involving employed writers.

f. As used in Articles 10, 11 and 12 of this Basic Agreement, the term "writer" shall be deemed to include the plural, the writer's loan-out company if any (as defined in Article 3 of this Basic Agreement) and, in the case of a purchase agreement, a professional writer (as defined in Article 1 of this Basic Agreement).

2. Time Limits

a. Proceedings for grievance (or arbitration, to the extent a party is required to initiate arbitration without invoking a grievance proceeding) of a claim relating to actual or alleged television employment or purchase shall be commenced no later than two (2) years after the party

bringing the grievance or arbitration proceeding (whether it is the Company, Guild or the writer) has obtained knowledge of the facts upon which the claim is based. Proceedings for grievance (or arbitration, to the extent a party is required to initiate arbitration without invoking a grievance proceeding) of a claim relating to actual or alleged theatrical employment or purchase shall be commenced no later than eighteen (18) months after the party bringing the grievance or arbitration proceeding (whether it is the Company, Guild or the writer) has obtained knowledge of the facts upon which the claim is based.

b. In any event, grievance and arbitration proceedings shall commence not later than four (4) years after the occurrence of the facts upon which the claim is based. An arbitration may be commenced prior to initiation or conclusion of a grievance proceeding, if it reasonably appears that the grievance proceeding will not be concluded in sufficient time to permit the arbitration proceeding to be commenced in time.

c. With respect to separation of rights in television literary material, Company may accelerate the applicable limitation of time by serving notice on the Guild, after the literary material is completed, that the writer concerned does not have separation of rights in such material and by furnishing with such notice copies of all literary material and contracts upon which the Company's position in such notice is based. The Guild must respond within ninety (90) days from the date such notice is received or the claim to separation of rights is waived on behalf of the writer and the Guild.

d. If grievance or arbitration proceedings are not commenced within the applicable time period specified in this Article 11, such claim shall be deemed to be waived. All time limits provided in Article 11 may be extended by mutual agreement of the parties to the dispute.

e. It is the intent of the Guild and the Company that all arbitration awards should be rendered within sixty (60) days following the close of the arbitration hearing or submission of post-hearing briefs, whichever is later. However, the arbitrator's failure to render an award within such period shall not deprive him/her of jurisdiction over the dispute or render the award invalid because it is made thereafter.

3.   Place of Hearing

Except as otherwise provided in this paragraph, all arbitrations shall be in Los Angeles, absent agreement of the parties. At the election of Writers Guild of America, East, the arbitration shall be in New York if a majority of the witnesses required for the arbitration hearing reside regularly in and around the New York area; provided, however, if any Company which is a party to the arbitration has its headquarters for the production of motion pictures in California, such arbitration shall be held in Los Angeles. Any dispute as to where the arbitration should be held shall be determined by an arbitrator in Los Angeles, selected in accordance with the procedures set forth in Article 11.C.2., and said arbitrator shall be disqualified from hearing the merits of the dispute. Said arbitrator shall take testimony by telephone from distant witnesses when requested to do so by either party. If the arbitrator determines that the arbitration shall be heard in New York, the arbitrator assigned to hear the merits of the dispute shall be selected from the New York list of arbitrators set forth in Article 11.C.2.

The selection of the situs of the hearing room within the appropriate city shall be by mutual agreement of the Company and the Guild. If there is no such agreement, those parties will alternate in selecting the hearing room, with the party making the selection supplying the room at no charge to the other.

4.   Award

The grievance committee and the arbitrator may make any appropriate award permitted herein. Such award shall be in writing and shall be limited as provided in this Basic Agreement. Subject to the provisions of this Basic Agreement, the award shall be final and binding upon the parties to the proceeding, whether participating in the proceeding or not, and in any grievance or arbitration proceeding in which the writer involved is not a party. Any interpretation of this Basic Agreement made in such award shall be final and binding on such writer.

5.   Costs

Each party shall pay the costs of its representatives on the grievance committee. The fee and expenses of the arbitrator shall be shared equally, unless otherwise provided by the arbitrator. The arbitrator may require a court reporter and a transcript, and if so required, the cost thereof shall be shared equally. All other costs and expenses of grievance and arbitration shall be borne by the party incurring the same.

6. Notices

a. All written notices referred to in this Article 11 commencing a grievance or arbitration or alleging a cross-claim shall be sent by registered or certified mail or by personal delivery and shall set forth the particulars thereof. If the moving party is unable to effect service in this manner, service then may be effected by first class mail, postage prepaid, to the address for service last designated in writing by the Company, together with publication in *Daily Variety, The Hollywood Reporter, The Los Angeles Times* and *The New York Times*. All other written notices may be served by first class mail, postage prepaid, unless otherwise specifically provided herein.

b. All notices sent by the Guild to the Company shall be sent to the address designated by the Company in writing to the Guild at the time Company becomes signatory to the Basic Agreement. Should Company change its address for the purpose of receiving notices relating to grievance or arbitration, the Company shall notify the Executive Director of Writers Guild of America, west, Inc. and the Executive Director of Writers Guild of America, East, Inc. of such new address, which shall then be substituted for the prior address.

c. Unless otherwise designated by Company in a written notice to the Guild, all notices sent by the Guild to the Company shall be addressed to the attention of an officer of the Company, or to its Labor Relations Department. If the Company maintains an office in Los Angeles, California or its vicinity, all such notices shall be sent to said office.

d. A petition to confirm, modify or vacate, as the case may be, an arbitration award in any court of competent jurisdiction shall be served upon the respondent by registered or certified mail or by personal delivery. If the petitioner is unable to effect service in this manner, service then may be effected by first class mail, postage prepaid, to the address for service last designated in writing by the Company, together with publication in *Daily Variety, The Hollywood Reporter, The Los Angeles Times* and *The New York Times*.

7. Conduct of Proceedings

Except as set forth elsewhere herein, the grievance committee and the arbitrator shall adopt such rules of procedure and shall conduct proceedings in such manner as they shall determine to be proper; provided, however, that each party to any grievance or arbitration shall be afforded a reasonable opportunity to

present evidence and argument before the grievance committee and the arbitrator.

All hearings, deliberations and proceedings of the arbitrator and the grievance committee shall be closed to the public and shall be absolutely privileged. Only interested parties, their representatives and witnesses may attend. All communications to and from the arbitrator or the grievance committee shall likewise be absolutely privileged. Unless the Company objects, the arbitrator will send a copy of the award to the AMPTP. The Guild shall have access to those awards.

8. Claims for Compensation, Cross-Claims and Defenses

Subparagraphs a. through e. of this subparagraph 8. relate to compensation claims, cross-claims and defenses covered by Articles 10.A.3. and 10.A.4. of this Basic Agreement.

a. The grievance committee and arbitrator shall have no jurisdiction to determine or affect any claim relating to services in connection with any theatrical or television motion picture other than the theatrical or television motion picture as to which the compensation claim is asserted unless a defense or cross-claim is asserted with respect to another theatrical or television motion picture.

b. A decision made or award rendered in grievance or arbitration of a claim for compensation shall be limited to deciding or awarding what compensation, if any, is due the writer from the Company and what amount, if any, is due the Company from the writer on account of any cross-claim asserted by the Company in such grievance or arbitration.

c. If a claim for compensation under Article 10.A.3. of this Basic Agreement is submitted to grievance or arbitration, any claim of a breach of this Basic Agreement arising out of or connected with said claim must, to the extent permitted by the Basic Agreement, be submitted for grievance and arbitration together with the claim for compensation, provided that the Guild or the writer has obtained knowledge of the facts upon which said claim of breach is based. Failure to so submit such claim shall constitute a waiver of any and all rights to assert such claim thereafter.

d. The institution of any action in court by the Company shall not stay an arbitration proceeding brought by the Guild and writer for compensation, nor shall any such grievance or arbitration proceeding stay any action instituted by the Company upon any matter Company is not required to submit to grievance or arbitration as a defense or cross-claim, whether or not such action is

instituted prior to the submission of the compensation claim to grievance or arbitration.

e. Cross-claims must be submitted to grievance or arbitration by serving written notice on the complainant, by certified or registered mail, setting forth the particulars thereof.

9. Overpayments

If the Company claims that it has made an overpayment to a writer of any compensation provided for in this Basic Agreement or in any prior collective bargaining agreement between the Company and the Guild (*i.e.*, minimum compensation, residuals and other compensation provided for in this Basic Agreement or any other such collective bargaining agreement (hereinafter called "MBA compensation")) or of any compensation provided for in an employment or loan-out contract with a writer or an option agreement subject to the MBA or a purchase agreement with a professional writer not in excess of the applicable jurisdictional maximum of four hundred thousand dollars ($400,000.00) as set forth in Article 10.A.3. above (hereinafter called "arbitrable overscale compensation"), and if the Company desires to offset such payment against other compensation payable to such writer, the Company shall advise the Guild thereof in writing setting forth the particulars of such claim of overpayment. If the Guild requests that the question of whether the Company has overpaid MBA compensation or arbitrable overscale compensation to the writer be submitted to grievance and arbitration, such request shall be made within seven (7) days after such notice from the Company to the Guild. If the Guild does not make a timely request, the Company may proceed with the offset, subject to all of the legal rights and remedies of the writer. If the Guild does make a timely request, then pending the outcome of such grievance and arbitration, the Company agrees that it will not apply the offset, but will pay the amount it desires to apply as an offset to the Guild. The Guild shall then promptly deposit the amount so paid in a separate interest-bearing trust account until it is determined in such grievance and arbitration proceeding whether there was in fact an overpayment of MBA compensation or arbitrable overscale compensation, as the case may be. The grievance and arbitration shall involve only the question of whether there was in fact an overpayment of such compensation, and the amount thereof, and if it is determined that there was in fact an overpayment of such compensation, the right of offset is recognized. Upon conclusion of the arbitration, the payments into such account, together with applicable interest, shall be paid to the Company or to the writer in accordance with the arbitration decision. The parties shall cooperate in obtaining a speedy determination of the grievance and arbitration. As to any claimed right of offset with respect to any alleged overpayments of monies other than MBA

compensation or arbitrable overscale compensation, the Guild and the Company reserve their respective rights and contentions.

10. Withdrawal of Services

Notwithstanding any provision of any personal service contract (including a memorandum agreement) or of the MBA to the contrary, it shall not be a violation thereof for the Guild or any employee (at the direction of the Guild) to withhold services from the Company if the Company fails or refuses to abide by the final award of an arbitrator for any reason whatsoever.

11. Any grievance and/or arbitration concerning a dispute arising under a prior MBA or a writer's individual employment agreement, loan-out agreement, option agreement or purchase agreement subject to a prior MBA shall be subject to the following grievance and arbitration rules and procedures as set forth in the MBA in effect at the time the grievance or arbitration is initiated:

a. The lists of arbitrators;

b. The method of selecting an arbitrator;

c. A party's unilateral right to waive second step grievance;

d. Use of a sole disinterested arbitrator rather than a tripartite arbitration panel;

e. Respondent's written statement of position prior to an arbitration hearing;

f. Methods of effecting service of grievance notices, arbitration claims, cross-claims and notices, and petitions to confirm, modify or vacate an arbitration award;

g. Arbitration of disputes concerning tri-Guild residuals audits as set forth in the Sideletter to Article 11;

h. Expedited arbitration of residuals disputes under Article 11.G.; and

i. Expedited arbitration of reacquisition disputes under Article 11.F.

The parties agree that the provisions of this Article 11.A.11. shall not be construed to render a dispute subject to grievance and/or arbitration hereunder if that dispute was not subject to grievance and/or arbitration under such prior MBA. The parties further agree that to the extent a claim of overpayment as described in Article 11.A.9. of this Agreement or a

"cross-claim" may lie, the provisions of this Article 11.A.11. also shall apply.

B. GRIEVANCE

1. Step One - Informal Conference

Prior to submitting to grievance any matter properly a subject thereof, an authorized representative of the Guild and an authorized representative of the Company will meet in a good faith attempt to settle the dispute. If the representatives of the parties shall fail to settle the dispute within fourteen (14) days after the matter is first brought to the attention of the respondent, then the dispute may be referred to Step Two Grievance.

2. Step Two - Grievance

a. Commencement of Grievance

Complainant shall set out the nature of its claim in writing, and serve a copy ("grievance notice") thereof upon respondent by certified or registered mail. Respondent may, but need not, reply in writing, setting forth its position. The parties shall attempt to agree upon a mutually satisfactory date to convene a grievance committee and hold a grievance hearing, but if no mutually agreeable date is chosen, respondent may, within five (5) days after receipt of the grievance notice, designate by written notice to complainant a date upon which the grievance committee shall convene to hold the grievance hearing. Such date shall be no earlier than fifteen (15) nor later than thirty (30) days after receipt of the grievance notice. If respondent fails or refuses to designate such a date, complainant may designate the date for such meeting, such date to be not earlier than fifteen (15) nor later than thirty (30) days after service of the grievance notice.

b. Grievance Committee

The grievance committee shall consist of three (3) representatives chosen by respondent and three (3) representatives chosen by complainant. Either party shall have the right to designate a substitute for any of its representatives. The committee will, by majority vote, select its chairman. By mutual agreement, the grievance committee may consist of two (2) representatives chosen by respondent and two (2) representatives chosen by complainant.

c. Grievance Hearing

The grievance committee thus designated shall meet upon the date selected pursuant to the procedure described above, and shall consider and attempt to resolve the dispute brought before it. The hearing shall be conducted in an orderly fashion, but rules of evidence and technicalities of procedure shall not be controlling. It is the intent of this Basic Agreement that the committee members shall use their good faith, best judgment and common sense, as persons experienced in the motion picture and television industry, in attempting to resolve the dispute brought before it. No matter shall be considered by the grievance committee unless a quorum is present. A quorum shall consist of six (6) members. If any four (4) members of the committee shall agree on a decision, such decision shall be final and binding upon the parties to the proceedings and any interpretation of this Basic Agreement made in such decision shall also be binding upon the writer or writers involved. If no decision is agreed upon, then in any subsequent arbitration or other proceeding, no reference shall be made to the grievance proceeding or to any statements or discussions therein, or to the failure of the grievance committee to settle the dispute.

d. Unresolved Grievance

If either party fails to designate its representatives within ten (10) days after notice of grievance is served, or if the committee shall fail to meet and commence hearings on the date selected in accordance with the procedures described above, or if four (4) members of the committee shall fail to concur in a decision, or if a grievance hearing is waived by one (1) of the parties hereto, or in any event if the dispute has not been settled by the committee or otherwise within forty-five (45) days after the mailing of the grievance notice, then either party may submit such matter to arbitration.

3. Waiver of Grievance [appeared as Article 11.A.1.c. in predecessor Agreements].

Either party may, by written notice to the other party, waive grievance. In such event, the dispute shall be submitted directly to arbitration.

**C. ARBITRATION**

1. Initiation of Proceedings

A dispute which is subject to grievance proceedings shall not be subject to arbitration, except as provided in subparagraph B.2.d.

or subparagraph B.3. of this Article 11. An arbitration shall be initiated by complainant by written notice, setting forth the particulars of the claim, to be sent to respondent in accord with the procedures described in Article 11.A.6.a. of this Basic Agreement. Respondent will provide complainant with a written statement of its position not later than ten (10) days prior to the date of the hearing.

2. Selection of Arbitrator

The arbitrator shall be a disinterested person. The parties shall in good faith attempt to mutually agree upon an arbitrator within ten (10) business days after respondent's receipt of the arbitration notice. The complainant may extend this ten (10) day period upon written notice to respondent(s) at the time the arbitration claim is served. Such extension is deemed effective at that time absent an objection by respondent(s). In addition, the extension will no longer be deemed effective if respondent(s) gives subsequent written notice to complainant in which case the parties shall in good faith attempt to mutually agree upon an arbitrator within ten (10) business days after complainant's receipt of notice from respondent(s). With respect to arbitration claims served on or after November 1, 2004, if the complainant has failed to take any action to select the arbitrator (either by mutual agreement or the applicable Strike Process), or has failed to withdraw the claim with or without prejudice, for a period of eighteen (18) months after service of the claim on respondent(s), such claim shall be deemed to be waived.

Should the parties fail to agree on an arbitrator, the arbitrator shall be selected by the "Strike Process" as follows:

a. The arbitrators listed in Article 11.C.2.e.(3) shall constitute the lists of arbitrators.

b. On a Company-by-Company basis, the Guild and the Company shall alternate on a case-by-case basis in first striking a name from the applicable list of arbitrators (Los Angeles or New York). Thereafter, the other party shall "strike" a name from the list. The parties shall continue to alternate in striking names from the list, until one (1) arbitrator's name remains.

c. The arbitrator whose name remains (after the Strike Process is completed) shall be the arbitrator.

d. The "Strike Process" shall commence within two (2) business days following completion of the ten (10) business day period referred to in subparagraph 2. above and must conclude no later than three (3) business days following completion of the ten (10) day period referred to in subparagraph 2. above.

e. In the event that one of the parties fails to participate in the Strike Process, or fails to strike in order and/or timely, the other party may thereupon select the arbitrator to hear the matter.

(1) [Deleted.]

(2) If more than one Company is a party, then the Company which is the real party in interest shall participate in the striking process with the Guild. In the event that such Companies cannot agree on which of them is the real party in interest, then such Companies shall determine by lot which Company shall participate in the striking process with the Guild.

(3) The authorized lists of arbitrators approved by the parties hereto are as follows:

LOS ANGELES

Sara Adler
Tom Christopher
Douglas Collins
Dixon Dern
Edna Francis
Joe Gentile
Joel Grossman
Fredric R. Horowitz
Edgar A. Jones, Jr.
Anita Christine Knowlton
Michael Rappaport
Lionel Richman
Tom Roberts
Sol Rosenthal
Robert Steinberg
Barry Winograd
John Zebrowski

NEW YORK

Maurice Benewitz
Noel Berman
Howard Edelman
Susan MacKenzie
George Nicolau
Joan Parker
Janet Spencer

Additional names may be added from time to time during the term of the contract by mutual agreement of the parties, provided that each panel shall consist of an odd number of arbitrators at all times.

3. Substitution of Arbitrators

If the arbitrator selected cannot serve, a substitute shall be selected in accordance with subparagraph 2. above.

4. Notice of Hearing

The arbitrator or, at his/her request, one of the parties shall give written notice to the parties of the time and place of the

arbitration hearing. In fixing such date, the arbitrator shall consult the parties and shall consider the time reasonably necessary for the parties to prepare their cases.

5. Exchange of Information

The parties will cooperate in the exchange of information prior to the hearing regarding the expected utilization of documents and witnesses, including the exchange of lists of witnesses and copies of documents to be utilized. Such utilization shall not be precluded because such exchange did not take place.

6. Hearing

a. The arbitrator may, upon a showing of good cause, continue the hearing.

b. The arbitration shall take place as noticed or continued regardless of whether one (1) or more of the parties fails to participate.

**D. ARBITRATION OF DISPUTES WHICH INVOLVE QUESTIONS OF JURISDICTION OR ARBITRABILITY**

An objection to jurisdiction or arbitrability shall first be determined by the arbitrator prior to proceeding with a hearing on the merits. If the arbitrator determines that there is jurisdiction and that the dispute is arbitrable, the arbitrator shall proceed to a decision on the merits; provided, however, that the party contesting arbitration or jurisdiction shall not, by proceeding to a determination of the merits of such arbitration, be deemed to have waived its position that the dispute is not arbitrable or that the arbitrator does not have jurisdiction. If the arbitrator rules he has no jurisdiction over the dispute or that the dispute is not arbitrable, then each party is relieved of its obligation to further delay taking any action at law or in equity which it may desire to take.

**E. ARBITRATION OF DISPUTES CONCERNING CREDIT PROVISIONS**

A dispute concerning the credit provisions of this Basic Agreement shall be submitted to an expedited arbitration proceeding governed by the following rules:

1. The Guild shall act on behalf of itself and the writer.

2. Within twenty-four (24) hours after the Guild or the Company serves written notice upon the other concerning a dispute involving a credit provision, an authorized representative of the Guild and an authorized representative of the Company will make a good faith attempt to settle or resolve the dispute.

3. In the event the parties shall fail to meet or shall otherwise fail to settle or resolve the dispute within twenty-four (24) hours after the twenty-four (24) hours provided in subparagraph 2. above, the dispute shall be submitted to arbitration to be commenced not later than five (5) business days after the service of the written notice provided for in subparagraph 2. above.

4. The dispute shall be submitted to a sole neutral arbitrator mutually selected from the authorized list of arbitrators approved by the parties hereto as follows:

LOS ANGELES

| | |
|---|---|
| Sara Adler | Anita Christine Knowlton |
| Tom Christopher | Michael Rappaport |
| Douglas Collins | Lionel Richman |
| Dixon Dern | Tom Roberts |
| Edna Francis | Sol Rosenthal |
| Joe Gentile | Robert Steinberg |
| Joel Grossman | Barry Winograd |
| Fredric R. Horowitz | John Zebrowski |
| Edgar A. Jones, Jr. | |

NEW YORK

| | |
|---|---|
| Maurice Benewitz | George Nicolau |
| Noel Berman | Joan Parker |
| Howard Edelman | Janet Spencer |
| Susan MacKenzie | |

Additional names may be added from time to time during the term of the contract by mutual agreement of the parties, provided that each panel shall consist of an odd number of arbitrators at all times.

In the event the parties are unable, within forty-eight (48) hours (not including weekends or holidays) after respondent's receipt of the written notice provided for in subparagraph 2. above, to agree upon an arbitrator from the above list or otherwise, the arbitrator shall be selected by use of the following "strike process:"

a. The arbitrators listed in this Article 11.E.4. shall constitute the lists of arbitrators.

b. On a Company-by-Company basis, the Guild and the Company shall alternate on a case-by-case basis in first striking a name from the applicable list of arbitrators (Los Angeles or New York). Thereafter, the other party shall "strike" a name from the list. The parties shall continue to alternate in striking names from the list until one arbitrator's name remains.

c. The arbitrator whose name remains (after the strike process is completed) shall be the arbitrator, so long as the arbitrator is a disinterested person.

d. The strike process shall commence within twenty-four (24) hours (not including weekends or holidays) after the period for mutual agreement has expired and shall be completed within forty-eight (48) hours (not including weekends or holidays) after the period for mutual agreement has expired.

e. If one of the parties fails to participate in the strike process, or fails to strike in order and/or timely, the other party may thereupon select a neutral arbitrator to hear the matter.

f. If more than one Company is a party, then the Company which is the real party in interest shall participate in the strike process with the Guild. In the event that such Companies cannot agree on which of them is the real party in interest, then such Companies shall determine by lot which Company shall participate in the strike process with the Guild.

5. Notwithstanding anything in this Basic Agreement to the contrary, the arbitrator shall have jurisdiction and power to award damages, to order the Company to withdraw, cancel, change, or re-do advertising materials already issued or prepared, to require the Company to re-do any film titles, and to order any other reasonable relief the arbitrator deems appropriate in the circumstances, whether relating to credit on the screen, advertising or otherwise. Any award rendered by the arbitrator shall be binding on the parties and upon the writer.

6. Any or all time limits set forth herein may be waived by the mutual consent of the parties.

7. To the extent not inconsistent herewith, all other provisions of the Basic Agreement relating to arbitrations shall be applicable.

**F. EXPEDITED ARBITRATION OF CERTAIN DISPUTES CONCERNING REACQUISITION OF UNPRODUCED LITERARY MATERIAL (THEATRICAL)**

1. a. Disputes Subject to Expedited Arbitration Procedure

The following procedure applies only to arbitrable disputes between the Guild and the Company concerning the interpretation or application, or alleged breach, of any provision of Article 16.A.8. of this Basic Agreement or any predecessor WGA Basic Agreement as to which the initial written notice of the writer's desire or intent to

reacquire is received by the Company on or after May 2, 1998.

b. Parties

Only the Guild and the Company shall be parties to an Article 11.F. arbitration proceeding. The Guild shall act on behalf of itself and the writer.

2. Right to Invoke

Either the Guild or the Company shall have the right to invoke this expedited arbitration procedure when there is a likelihood of irreparable harm in connection with the proposed reacquisition if regular arbitration procedures were used. For purposes of Article 11.F., it is agreed that "irreparable harm" means an event or occurrence that cannot be undone or an opportunity or situation that, once lost or foregone, is unlikely to be revived or recaptured. The burden of proof shall be on the moving party to show that use of the expedited procedure is appropriate under the provisions of this subparagraph 2.

3. Commencement of Proceedings

Complainant shall initiate expedited arbitration proceedings by written notice, setting forth the particulars of the claim, to be sent to the respondent in accordance with the procedures described in Article 11.A.6.a. of the Basic Agreement. Such notice shall be served within ten (10) business days after the moving party has obtained knowledge of the facts upon which the claim is based. If expedited arbitration proceedings are not commenced within this time period, use of the expedited procedure shall be deemed waived. When the WGA or the Company has initiated the Article 48.E. Hot Line procedure, the period of no more than seven (7) days used to attempt resolution of the dispute in this manner shall not be included in the computation of the ten (10) business day period under this subparagraph 3.

4. a. Response or Objection to Expedited Claim

The respondent shall respond to the claim or object to use of the expedited procedure within ten (10) business days after its receipt of the expedited arbitration claim. If there is no objection to the procedure, the respondent will provide to complainant a written statement of its position within the time specified in the preceding sentence and, upon selection, to the arbitrator.

b. Objection to Expedited Procedure and Interim Ruling

If the respondent has objected to use of the expedited procedure, the objection must describe the factual or

other basis for its contention that use of the expedited procedure is not appropriate under the provisions of Article 11.F.2. The arbitrator (upon selection) may either convene an informal hearing by conference call, or a formal hearing, for the purpose of determining whether use of the expedited procedure is appropriate.

The hearing will take place within three (3) business days following selection of the arbitrator. Each party may file hearing briefs, page limit to be set by the arbitrator, and may make closing arguments. There will be no post-hearing briefs. The arbitrator must inform the parties of his/her decision as to whether the expedited procedure was appropriately invoked within twenty-four (24) hours after conclusion of the hearing, to be followed by an interim ruling in writing.

5. Selection of an Arbitrator; Place of Hearing

a. The arbitrator shall be a neutral third party. The parties shall in good faith attempt to mutually agree upon an arbitrator within three (3) business days after the response, objection or failure to respond, but in no event later than expiration of the ten (10) business day period in Article 11.F.4.a. above. Should the parties fail to so agree, the arbitrator shall be selected by the "Strike Process" as follows:

(1) The arbitrators listed in subparagraph (7) below shall constitute the lists of arbitrators.

(2) On a respondent-by-respondent basis, the moving party and the respondent shall alternate on a case-by-case basis in first striking a name from the list of arbitrators. Thereafter, the other party shall "strike" a name from the list. The parties shall continue to alternate in striking names from the list, until one (1) arbitrator's name remains.

(3) The arbitrator whose name remains (after the Strike Process is completed) shall be the arbitrator.

(4) The Strike Process shall commence on the first business day following completion of the three (3) business day period referred to in subparagraph 5.a. above and must conclude by close of business that day.

(5) In the event that one of the parties fails to participate in the Strike Process, or fails to strike in order and/or timely, the other party may thereupon select the arbitrator to hear the matter.

(6) If there is more than one respondent, then the respondent which is the real party in interest shall participate in the strike process with the Guild. In the event that such respondents cannot agree on which of them is the real party in interest, then such respondents shall determine by lot which of them shall participate in the striking process with the Guild.

(7) The authorized lists of arbitrators are as follows:

LOS ANGELES

Sara Adler
Tom Christopher
Douglas Collins
Dixon Dern
Edna Francis
Joe Gentile
Joel Grossman
Fredric R. Horowitz
Edgar A. Jones, Jr.
Anita Christine Knowlton
Michael Rappaport
Lionel Richman
Tom Roberts
Sol Rosenthal
Robert Steinberg
Barry Winograd
John Zebrowski

NEW YORK

Maurice Benewitz
Noel Berman
Howard Edelman
Susan MacKenzie
George Nicolau
Joan Parker
Janet Spencer

Additional names may be added from time to time by mutual agreement of the parties, provided that each panel shall consist of an odd number of arbitrators at all times.

b. Substitution of Arbitrators

If the arbitrator selected cannot serve, a substitute shall be selected in accordance with subparagraph 5.a. above.

c. Choice of Two Arbitrators

If there is to be a hearing on the respondent's objection to use of the expedited procedure, the parties have the option of selecting one arbitrator to rule on such objection and another arbitrator to determine the remaining issues in the case, both of whom shall be selected pursuant to this subparagraph 5.

d. Place of Hearing

The place of the arbitration hearing shall be determined in accord with Article 11.A.3. of the Agreement.

6. Timeline; Citation of Expedited Arbitration Awards

a. The hearing on the merits of the claim shall commence within twenty (20) business days following the respondent's receipt of the arbitration claim or, if the respondent has objected to use of this expedited procedure, within twenty (20) business days following the arbitrator's determination that use of this expedited procedure is appropriate.

The arbitrator or, at his/her request, one of the parties, shall give written notice to the other party of the time and place at which the arbitration hearing will commence. In fixing such date, the arbitrator shall consult the parties and shall consider the time reasonably necessary for the parties to prepare their cases. The arbitration shall take place as notified (or as continued) regardless of whether one (1) of the parties fails to participate.

b. The hearing on the merits of the claim shall conclude within ten (10) business days after its commencement, provided that the duration of the hearing is consistent with fundamental fairness in the arbitrator's sole judgment.

c. The parties may file post-hearing briefs within fifteen (15) business days following the close of the hearing. Either party's election to file a post-hearing brief will not preclude that party's right to make a closing argument so long as the hearing concludes within the time permitted in subparagraph 6.b. above.

d. Within ten (10) business days following either receipt of the parties' briefs, or the conclusion of the hearing if no briefs are filed, the arbitrator shall issue a written decision and award on the issues presented. The arbitrator's failure to meet the deadline shall not oust the arbitrator of jurisdiction. The arbitrator's determination of issues and award shall be final and binding upon the Company, the Guild and the writer or writers involved, whether participating in the proceeding or not.

Any award so rendered may be cited or offered into evidence by any party in another arbitration proceeding under this Basic Agreement, whether expedited or not.

7. Waiver of Time Limits

Any or all of the time limits set forth in Article 11.F.6. may be waived by the mutual consent of the parties.

8. Right to Seek an Extension of Time Limit

Upon the arbitrator's finding of good cause demonstrated by either party, the arbitrator may expand the time for conducting the hearing for a maximum of three (3) additional business days, and/or the time for filing post-hearing briefs for a maximum of three (3) additional business days. In making such a determination, the arbitrator shall take into account the position of a party opposing the extension that prejudice would result from the extension. The arbitrator shall advise the parties of his/her ruling on any request for an extension within forty-eight (48) hours after the request is made.

9. Choice of Arbitration Forum; Application of Other Arbitration Provisions

Claims processed under this Article 11.F., which result in expedited arbitration awards on the merits of the issues presented, shall not be subject to adjudication in a judicial forum. The preceding sentence does not reduce or impair the rights of any party under Article 12.C., D., and E. of this Agreement.

In addition, once an expedited arbitration procedure is initiated, the provisions of Article 11.F. shall preclude arbitration under Article 16.A.6. to the extent that the issue(s) under Article 16.A.6. has (have) been decided in the expedited proceeding.

To the extent not inconsistent herewith, all other provisions of Articles 10, 11 and 12 of the Basic Agreement relating to arbitration shall be applicable.

10. Remedies in the Arbitration Forum

In an expedited arbitration proceeding under Article 11.F., the arbitrator is limited to providing remedies that are in the nature of equitable relief such as a declaration of the respective rights of the parties and specific performance.

If all issues in dispute concerning the reacquisition are not fully resolved in the expedited proceeding, the WGA or the Company may initiate a subsequent arbitration proceeding under the regular procedures in the Basic Agreement.

11. Legal Subcommittee

The parties to this Basic Agreement shall establish a legal subcommittee to explore whether the expedited arbitration procedure in Article 11.F. should apply to other Article 16 disputes. The subcommittee shall report its recommendations, if any, to the Contract Adjustment Committee (CAC).

## G. ARBITRATION OF CERTAIN DISPUTES CONCERNING RESIDUALS PROVISIONS

Notwithstanding any other provision of the MBA, a dispute concerning the residuals provisions of this Basic Agreement or a predecessor WGA Basic Agreement shall be submitted to an expedited arbitration proceeding if the respondent is not financially responsible, or it is likely that the respondent's assets will be depleted or transferred, such that in either case it is reasonable to believe that the respondent would be unable to satisfy its residuals liability if the dispute were processed through the grievance and/or arbitration procedures set forth in Articles 11.A. through 11.C., above. This expedited proceeding will be governed by the following rules:

1. Invocation of Expedited Proceeding

   A Notice of Expedited Arbitration (so labeled by the claimant) shall be reduced to writing and delivered to the respondent. The Notice of Expedited Arbitration shall include the name, address and telephone number of the claimant's representatives and the name of the person who represents the respondent, if known. The Notice of Expedited Arbitration shall also set forth the particulars of the claim, including an allegation that the respondent is not financially responsible, or it is likely that the respondent's assets will be depleted or transferred, such that in either case it is reasonable to believe that the respondent would be unable to satisfy its residuals liability if the dispute were processed through the grievance and/or arbitration procedures set forth in Articles 11.A. through 11.C.

   This expedited procedure is not available when the residuals obligation(s) at issue is (are) payable, guaranteed or assumed by a "Qualified Distributor," "Qualified Buyer" and/or a "Qualified Residuals Payor," except by mutual agreement.

2. Attempt to Settle Dispute

   Within seven (7) business days after the claimant serves written notice upon the respondent concerning an expedited arbitration proceeding, an authorized representative of the claimant and an authorized representative of the respondent will make a good faith attempt to settle or resolve the dispute.

3. Submission of Dispute to Arbitrator

   In the event the parties shall fail to meet or discuss the claim, or shall otherwise fail to settle or resolve the dispute within fifteen (15) business days after the respondent's receipt of the claim, the dispute shall be submitted to arbitration to be commenced not later than sixty (60) days after the respondent's receipt of the claim.

4. Place of Hearing

All expedited arbitration hearings under this Paragraph G. shall be in Los Angeles, absent agreement of the parties to another situs.

5. Arbitrator Selection

The dispute shall be submitted to a sole neutral arbitrator mutually selected from the authorized list of arbitrators as follows:

Sara Adler
Tom Christopher
Douglas Collins
Dixon Dern
Edna Francis
Joe Gentile
Joel Grossman
Fredric R. Horowitz
Edgar A. Jones, Jr.
Anita Christine Knowlton
Michael Rappaport
Lionel Richman
Tom Roberts
Sol Rosenthal
Robert Steinberg
Barry Winograd
John Zebrowski

Additional names may be added from time to time during the term of the contract by mutual agreement of the parties, provided that each panel shall consist of an odd number of arbitrators at all times.

In the event the parties are unable, within ten (10) business days (not including weekends or holidays) after the respondent's receipt of the claim, to agree upon an arbitrator from the above list or otherwise, the arbitrator shall be selected by use of the following "strike process:"

a. The arbitrators listed in this Article 11.G. shall constitute the list of arbitrators.

b. On a Company-by-Company basis, the Guild and the Company shall alternate on a case-by-case basis in first striking a name from the list of arbitrators. Thereafter, the other party shall "strike" a name from the list. The parties shall continue to alternate in striking names from the list until one arbitrator's name remains.

c. The arbitrator whose name remains (after the strike process is completed) shall be the arbitrator, so long as the arbitrator is a disinterested person.

d. The strike process shall commence within twenty-four (24) hours (not including weekends or holidays) after the period for mutual agreement has expired and shall be completed within forty-eight (48) hours (not including weekends or holidays) after the period for mutual agreement has expired.

      e. If one of the parties fails to participate in the strike process, or fails to strike in order and/or timely, the other party may thereupon select a neutral arbitrator to hear the matter.

f. If more than one Company is a party, then the Company which is the real party in interest shall participate in the strike process with the Guild. In the event that such Companies cannot agree on which of them is the real party in interest, then such Companies shall determine by lot which Company shall participate in the strike process with the Guild.

6. Award

The arbitrator's written award shall be issued within sixty (60) calendar days from the end of the expedited arbitration hearing if closing argument is substituted for post-hearing briefs, or ninety (90) days following submission of post-hearing briefs. The arbitrator's failure to meet the deadline shall not oust the arbitrator of jurisdiction. The arbitrator's determination of issues and award shall be final and binding on all parties, whether participating in the hearing or not. The parties shall be so bound in any subsequent arbitration proceeding between them concerning a residuals dispute involving the same theatrical and/or television motion picture(s). Except as provided above, awards resulting from the use of these expedited procedures shall not be offered in evidence or cited in arbitrations under this Basic Agreement.

7. Continuance of Hearing and Testimony by Telephone

The hearing shall not be continued, absent agreement of the parties, except upon proof of good cause by the party requesting such continuance. The unavailability of any witness shall not constitute good cause unless the witness' testimony is relevant to the issues in the arbitration and could not be received by means consistent with fundamental fairness which do not require the witness' presence at the hearing. Each party shall have the right to present the testimony of any witness by telephone, so long as the arbitrator is satisfied that the examination is consistent with fundamental fairness.

8. Settlement

Nothing contained in this Article 11.G. shall preclude the parties from discussing the settlement of the dispute, except that such discussion shall not delay the expedited arbitration procedure.

9. Time Limit for Use of Expedited Proceedings and Determination of Claims Not Subject to Expedited Arbitration

The failure of the claimant to serve the Notice of Expedited Arbitration within sixty (60) days following the date on which the facts upon which the claim is based were discovered by the moving party shall constitute a waiver of the right to use this expedited arbitration procedure. If two (2) or more residuals claims are submitted to expedited arbitration and the expedited arbitration procedure has been waived or is inapplicable to one (1) or more claims, absent objection by the respondent, the non-expedited claim(s) may be heard in the expedited proceeding. If the respondent objects to the determination of the non-expedited claim(s) in the expedited proceeding, the same arbitrator selected to hear the expedited claim(s) may, absent objection by a party during the arbitration hearing, determine the claim(s) not subject to expedited arbitration, provided that such non-expedited arbitration claim(s) shall be determined in a separate proceeding conducted in accordance with Article 11.C., above.

10. Right to Object to Expedited Procedures and Interim Ruling

The respondent may object to proceeding under this Article 11.G. by serving written notice of such objection with claimant and the arbitrator within seven (7) business days of receipt of the Notice of Expedited Arbitration. The respondent's notice of objection must describe facts indicating it is financially responsible, or that it is not likely that its assets will be depleted or transferred, such that in either case it is reasonable to believe that the respondent would be able to satisfy its residuals liability if the dispute(s) at issue were processed through the grievance and/or arbitration procedures set forth in Articles 11.A. through 11.C., above. In the event of an objection, the claimant shall have the burden of proving that it is consistent with this Article 11.G. to hear the dispute(s) under these expedited procedures.

The arbitrator may convene an informal hearing by telephone conference call, or a formal hearing, to determine whether it is consistent with this Article 11.G. to hear the dispute(s) under these expedited procedures. If the arbitrator convenes a hearing, that hearing will take place within three (3) business days of receipt of the respondent's notice of objection. The parties may file hearing briefs, the page limit to be set by the arbitrator, and they may make closing argument. There will be no post-hearing briefs. The arbitrator must inform the parties of the interim ruling on the use of the expedited procedures under this Article 11.G. within twenty-four (24) hours after conclusion of the hearing or, in the event no hearing is convened, within twenty-four (24) hours of the submission to the arbitrator of all briefs and/or relevant documents, to be followed by an interim ruling in writing.

11. Bifurcation

If the expedited arbitration involves multiple residuals disputes or controversies, such as which of two (2) or more respondents is liable to make payment and the amount of residuals unpaid, the arbitrator may, upon the request of a party, bifurcate or separate such disputes or controversies and render separate awards, each of which shall be deemed final.

12. Invocation of Expedited Proceeding After Service of Claim Under Articles 11.A. through 11.C.

If, after such time as a residuals arbitration has been commenced under the procedures set forth in Articles 11.A. through 11.C. above, a party learns that a respondent is not financially responsible, or it is likely that the respondent's assets will be depleted or transferred, such that in either case it is reasonable to believe that the respondent would be unable to satisfy its residuals liability if the dispute were processed through such grievance and/or arbitration procedures, any party to that arbitration proceeding may invoke an expedited arbitration under this Article 11.G. by serving appropriate notice to that effect.

13. Waiver of Time Limits

Any and all time limits in Article 11.G. may be waived by the mutual consent of the parties.

14. Other Provisions Applicable

To the extent not inconsistent with Article 11.G., all other provisions of the Basic Agreement relating to arbitrations shall be applicable.

**H. ARBITRATION OF DISPUTES CONCERNING TRI-GUILD RESIDUALS AUDITS**

See Sideletter to Article 11, Arbitration of Disputes Concerning Tri-Guild Residuals Audits, for the procedures applicable to such cases.

**I. EQUAL STATUS OF PARTIES**

It is understood that the Companies and the Guild are parties of equal status under this Agreement and in the administration of the arbitration processes throughout this Agreement. The equal status of the parties in the administration of the arbitration process shall be recognized in matters involving the determination of the availability of arbitrators, the selection of hearing dates, the retention of stenographic reporters, and insofar as applicable in all communications with the arbitrators.

Arbitration claims, cross-claims and notices shall carry the caption "WRITERS GUILD OF AMERICA - PRODUCERS ARBITRATION TRIBUNAL."

## ARTICLE 12 COURT PROCEEDINGS

### A. DISPUTES CONCERNING CREDITS

Nothing in this Basic Agreement shall limit the rights of the Guild or any writer to assert any and all appropriate legal and equitable rights and remedies to which the Guild or such writer is entitled in courts of competent jurisdiction with regard to an alleged breach of Article 8 and Schedule A of this Basic Agreement with respect to writing credit; subject, however, to the following conditions and limitations:

1. The Guild and the writer shall be bound by any court proceedings instituted by the Guild.

2. If the Guild or the writer commences any proceedings in court with respect to any such alleged breach prior to the submission of the dispute to arbitration hereunder, then neither the Guild nor the writer may submit such dispute to arbitration and no arbitrator shall have jurisdiction to consider the alleged breach of such credit provision.

3. If the Guild or the Company commences an arbitration proceeding hereunder with respect to any such alleged breach prior to the submission of the dispute to a court, then neither the Guild nor the writer shall thereafter commence any proceeding in court with respect to such alleged breach.

4. Any permissible court proceeding referred to in this Paragraph A. must be commenced by the Guild or the writer, if at all, within the applicable time limits specified in subparagraph 2. of Article 11.A.

### B. DISPUTES CONCERNING COMPENSATION

With respect to a compensation claim which is arbitrable pursuant to the provisions of this Basic Agreement, the writer, at his/her option, need not proceed by grievance and arbitration, but instead may institute an action at law or in equity with respect to such claim prior to submission of such claim to grievance or arbitration; provided, however, that for compensation claims of four hundred thousand dollars ($400,000.00) or less for theatrical or television employment or purchase, the writer must submit such claim to grievance and arbitration pursuant to Articles 10 and 11 of this Basic Agreement and failure to so proceed by grievance and arbitration shall constitute a waiver by the writer as to such compensation claim.

C. Nothing in this Basic Agreement shall impair, affect or limit the right of the Company, the Guild or any writer to assert and exercise any and

all appropriate legal or equitable rights or remedies to which such Company, Guild or writer is entitled in any court of competent jurisdiction as to any dispute which is not subject to grievance or arbitration pursuant to this Basic Agreement. The rights of the parties to assert and exercise legal or equitable rights or remedies as to disputes which are subject to grievance or arbitration are as more particularly defined in this Basic Agreement.

D. The Guild shall have the right to take to grievance and arbitration a claim of the Guild of a breach by the Company of any of the terms or provisions of this Basic Agreement, including a failure to pay minimum compensation, regardless of whether or not such claimed breach may also involve a breach by the Company of its contract with the writer and such proceeding shall not affect the right of the writer to pursue his/her own remedies at law or in equity, except as limited by the provisions of this Basic Agreement.

E. Nothing in this Basic Agreement shall preclude any court of competent jurisdiction from confirming, setting aside or modifying any grievance or arbitration award hereunder in any proceeding brought for such purpose in accordance with applicable law.

## ARTICLE 13 COMPENSATION

### A. THEATRICAL

Company agrees that the minimum basic compensation to be paid a writer who is employed for a feature length photoplay on a so-called flat deal basis shall be as herein set forth.

For the purpose of this Article 13.A.l.a., "High Budget" photoplay shall be a photoplay the cost of which equals or exceeds five million dollars ($5,000,000.00); a photoplay the cost of which is less than five million dollars ($5,000,000.00) shall be referred to as a "Low Budget" photoplay.

The Company may option to purchase or license from a professional writer literary material, which would be covered by this Basic Agreement, for a period of eighteen (18) months upon payment of ten percent (10%) of the applicable minimum compensation for such literary material. Company may renew or extend such option for subsequent eighteen (18) month periods upon payment of an additional ten percent (10%) of the applicable minimum compensation for such literary material for each such eighteen (18) month period. Notwithstanding anything in this Basic Agreement to the contrary, the option payment(s) shall be credited against the purchase price or other compensation payable to the writer.

Alan Abrams, Esq. (SBN:75637)
Natalie Hottle, Esq. (SBN: 265918)
COSTA ABRAMS & COATE LLP
1221 Second Street, Third Floor
Santa Monica, California 90401
Tel: (310) 576-6161
Fax: (310) 576-6160
Attorneys for Petitioners Hachiko Productions, LLC, and Robert Ortiz

CONFORMED COPY
ORIGINAL FILED
Superior Court Of California
County Of Los Angeles

DEC 11 2013

Sherri R. Carter, Executive Officer/Clerk
By: Judi Lara, Deputy

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTRY OF LOS ANGELES**

HACHIKO PRODUCTIONS, LLC, a Rhode Island limited liability company, and ROBERT V. ORTIZ, an individual,

Petitioners,

vs.

WRITERS GUILD OF AMERICA, WEST, INC,

Respondent.

**CASE NO.:** BS146288

**ATTACHMENT 8 (c) Re: PETITION TO VACATE ARBITRATION AWARD**

Date:
Time:
Dept.:

CONFIRMATION COPY

0065

WGAW WRITERS GUILD OF AMERICA, WEST

LEGAL SERVICES DEPARTMENT
PH 323.782.4521
FAX 323.782.4806

KATHERINE SHANNON CHRISTOVICH
DIRECTOR OF LEGAL SERVICES
HEATHER L. PEARSON
SENIOR COUNSEL
KATYA J. CULBERG
ASSOCIATE COUNSEL
DANIELLE M. FORBES
ASSOCIATE COUNSEL
SHANNON KEAST
ASSOCIATE COUNSEL
MELISSA A. JACKSON
ASSOCIATE COUNSEL
MELISSA S. GLOUSMAN
ASSOCIATE COUNSEL
MARY E. JERRIDO
BUSINESS REPRESENTATIVE
SCOTT SAWYER
BUSINESS REPRESENTATIVE
LATIFAH SALOM
BUSINESS REPRESENTATIVE

August 28, 2013

Jim Seibel
Hachiko Productions, LLC
Inferno Distribution, LLC
Medea Capital, LLC
1888 Century Park East, Suite 1540
Los Angeles, CA 90067

Rob Ortiz
c/o Inferno Distribution, LLC
1888 Century Park East, Suite 1450
Los Angeles, CA 90067
robertortiz1@me.com

Schuyler Merritt Moore, Esq.
Agent for Service of Process
Hachiko Productions, LLC and Rob Ortiz
Stroock & Stroock
2029 Century Park East, 18th Floor
Los Angeles, CA 90067

Alan Abrams, Esq.
Costa Abrams & Coate
1221 2nd Street, 3rd Floor
Santa Monica, CA 90401

Carl Baker
Inferno Distribution, LLC
1888 Century Park East, Suite 1450
Los Angeles, CA 90067

Medea Capital, LLC
c/o Peter L. Kaufman
2001 Wilshire Boulevard, Suite 400
Santa Monica, CA 90403

RE: **WGAW v. Hachiko Productions, LLC., et al.**
**Case Nos. 09-CO-025 and 10-CL-252 (Consolidated) ("Hachiko: A Dog's Story")**

Gentlemen:

Enclosed please find a copy of the August 14, 2013, Arbitrator's Opinion and Award("Award") rendered by sole neutral arbitrator Michael D. Rappaport against Respondents Hachiko Productions, LLC, and Robert V. Ortiz (collectively "Respondents") in the above-referenced matter. We demand that Respondents comply immediately with this Award.

Pursuant to the Award, Respondents have been ordered to pay immediately the total amount of **$280,132.67,** which is comprised of the following:

| | |
|---|---|
| Unpaid compensation for the rewrite | $28,261.00 |
| Unpaid compensation for the polish | $14,130.00 |
| Interest on the late-payment of the rewrite and the polish, up to and including August 28, 2013, and continuing to accrue until the underlying amounts are paid in full | $45,224.82 |

0066

EXHIBIT

| | |
|---|---|
| Contributions to the Producer-Writers Guild of America Pension Plan | $2,543.46 |
| Contributions to the Writers Guild-Industry Health Fund | $3,603.24 |
| Interest on the late-payment of Pension Plan and Health Fund, up to and including August, 28, 2013, and continuing to accrue until the underlying amounts paid in full | $3,683.37 |
| Unpaid Residuals | $103,238.05 |
| Interest on late-payment of residuals and script publication fee up to and including August 28, 2013, and continuing to accrue until the underlying amounts are paid in full | $62.049.00 |
| Damages for failure to report | $7,500.00 |
| Damages for failure to obtain an assumption agreement | $7,500.00 |
| Respondents' one-half share of the Arbitrator's fees | $1,500.00 |
| Respondents' one-half share of the court reporter's fees | $899.73 |
| **Total due as of August 28, 2013** | **$280,132.67** |

A copy of the Award and the Arbitrator's and court reporter's invoices are enclosed.

Demand is made for immediate payment of these outstanding sums. Payment of the full amount of **$280,132.67** should be delivered to the WGAW, to my attention, in the form of a cashier's check or bank draft made payable to the "Writers Guild of America, West, Inc."

If the total amount of **$280,132.67** is paid within ten (10) days of the date of this letter, the WGAW will consider the Award to be paid in full. If payment is not received by the close of business on Monday, September 9, 2013, interest will continue to accrue at a rate of 1.5% per month (or 18% per year) until all compensation, contributions to the Pension Plan and Health Fund, residuals, and all related interest, have been paid in full.

I look forward to Respondents' immediate compliance with the Award. Failure to do so will result in the adding of Respondents' names, Hachiko Productions, LLC, and Robert V. Ortiz, as well as those of Jim Seibel and Bill Johnson, to the WGAW Strike List. Furthermore, we shall immediately move to have the Award confirmed in court.

Please do not hesitate to contact me with any questions.

Very truly yours,

Katya J. Culberg

KJC:eak
Enclosures

BEFORE THE WRITERS GUILD OF AMERICA, WEST, INC. - PRODUCERS

ARBITRATION TRIBUNAL

In the Matter of Arbitration between WRITERS GUILD OF AMERICA, WEST, INC.,

Complainant,

vs.

HACHIKO PRODUCTIONS, LLC and ROBERT V. ORTIZ, an individual, et al.

Respondents,

Relating to unpaid compensation and residuals in connection with the theatrical motion picture project entitled "HACHIKO: A DOG'S STORY."

~~[PROPOSED]~~

ARBITRATOR'S OPINION AND AWARD

CASE NO. 09-CO-025 and 10-CL-252 [Consolidated]

## ARBITRATOR'S OPINION AND AWARD

This matter came on for hearing on July 2, 2012, and August 14, 2013, before the undersigned, acting as sole neutral arbitrator pursuant to the terms of the 2004 Writers Guild of America Theatrical and Television Basic Agreement ("MBA"). The Writers Guild of America, West, Inc.("WGAW") is the Complainant in this matter.

Respondents Hachiko Productions, LLC, Inferno Distribution, LLC, Robert Ortiz, and Medea Capital, LLC, (collectively, "Respondents") were served with the Notice of Claim Submitted to Arbitration and Claim and the Notice of Hearing, and the Notice of Amended Claim Submitted to Arbitration and Amended Claim ("Claim") WGAW case no 09-CO-025 and 10-CL-252 (collectively "Claim"). These matters were consolidated by mutual agreement of the parties.

On July 2, 2012, Katya J. Culberg, Associate Counsel, appeared on behalf of the WGAW. Alan Abrams, Esquire, of the law firm Costa, Abrams and Coate, appeared on behalf of the Respondents. The Guild presented its case-in-chief and each side had an opportunity to examine the witnesses.

A second day of hearing was set for August 14, 2013. On that day, Respondents failed to appear despite being duly served with the Notice of the time and place of the hearing pursuant to MBA Article 11.6.b.

The Award is rendered as to Respondents Hachiko Productions, LLC, and Robert V. Ortiz (collectively "Respondents") only, the Guild having decided not to proceed against Respondents Inferno Distribution, LLC, and Medea Capitol, LLC. The Guild has reserved all of its rights with regard to Respondents Inferno Distribution, LLC, and Medea Capitol, LLC.

## FINDINGS OF FACT

Hachiko Productions, LLC, ("HPL") is signatory to the MBA.

On or about September 5, 2007, Robert V. Ortiz signed a letter personally guaranteeing the MBA obligations of HPL, including those obligations at issue in this matter.

In or around August of 2007, during the term of the MBA, Respondent HPL, an MBA signatory, orally employed writer Stephen Lindsey ("Writer") for writing services consisting of a re-write and a polish in connection with the theatrical motion picture project "Hachiko" ("Picture").

On or about February 21, 2008, Respondent HPL and Writer entered into a letter agreement memorializing their earlier oral agreement, whereby HPL promised that it would compensate Writer at the MBA minimum rates for his writing services which consisted of a re-write and a polish. Specifically, HPL guaranteed that: "Lindsey's writing services on the set of revisions of the Screenplay shall be governed by the appropriate provisions of the MBA and Lindsey shall receive the minimum compensation for such writing services as required by the MBA." (Guild Exhibit 9.)

On or about November of 2008 the writing credit on the Picture became final. The final WGAW determined writing credit is:

Screenplay by Stephen P. Lindsey

1.  **The Guild's Compensation Claim**

Pursuant to Article 13.A. of the MBA, the applicable MBA minimum compensation for writing services consisting of a rewrite is $28,261.

Pursuant to Article 13.A. of the MBA, the applicable MBA minimum compensation for writing services consisting of a polish is $14,130.

Pursuant to Article 13.A.14. of the MBA, Respondents are required to pay interest on the unpaid compensation at a rate of one and one half percent (1.5%) per month on the unpaid compensation commencing to accrue when the compensation became due and continuing to accrue until paid in full.

Pursuant to MBA Article 17, Respondents are required to make Pension Plan and Health Fund contributions on behalf of the Writer at the rate of 6% and 8.5%, respectively, of the gross compensation of $42,391.00, which contributions are currently due, owing and unpaid.

Pursuant to the MBA and the Trust Agreements, Respondents are required to pay interest on the unpaid Pension Plan and Health Fund contributions at the rate of .83% per month, commencing to accrue when the contributions first became due and continuing to accrue until paid in full.

2.  **The Guild's Residuals Claim**

Pursuant to Article 15.A.3. of the MBA, Respondents are required to pay the credited writer residual compensation in an amount totaling two percent (2%) of the accountable receipts derived from the licensing and/or distribution of the Picture to the free TV market.

Pursuant to Article 51.C.1. of the MBA, Respondents are required to pay the credited writer residual compensation in an amount totaling one and two-tenths percent (1.2%) of the accountable receipts derived from the licensing and/or distribution of the Picture to the Pay TV market.

Pursuant to Article 51.C.1. of the MBA, Respondents are required to pay the credited writer residual compensation in an amount totaling one and one-fifth percent (1.5%) of the accountable receipts derived from the licensing and/or distribution of the Picture to the videocassette/DVD market for the first one million dollars ($1,000,000) and one and one-eights percent (1.8%) for all accountable receipts in excess of one million dollars ($1,000,000).

Pursuant to Article 58. of the MBA, Respondents are required to pay the credited writer residual compensation in an amount totaling one and two-tenths percent (1.2%) of the accountable receipts derived from the licensing and/or distribution of the Picture to the basic cable market.

Pursuant to Articles 15.A.3.f. and 51.C.6. of the MBA, Respondents are required to pay interest on all unpaid residuals at a rate of one and one half percent (1.5%) per month and continuing to accrue until all residuals have been paid in full.

Pursuant to the MBA Articles 15.A.3.f , 51.C.6. and 58, Respondents are required to furnish to the to the Guild financial reports showing the accountable receipts on a quarterly basis.

Pursuant to the MBA Articles 51.C.8.d. and 51.C.9. , Respondents are required to deliver to the WGAW a valid written WGA Assumption Agreement from any buyer, transferee or assignee so as to bind such buyer, transferee or assignee to all MBA obligations.

**AWARD**

Respondents HPL and Robert V. Ortiz (collectively "Respondents") are jointly and severally liable for all MBA obligations in connection with the unpaid compensation owed to Writer for the rewrite and the polish;

Respondents are hereby ordered to immediately pay the following amounts to the WGAW on behalf of Writer:

a. $28,261 in guaranteed compensation for the rewrite;

b. $14,130 in guaranteed compensation for the polish;

c. Interest on the unpaid guaranteed compensation at the rate of 1.5% per month which began to accrue when the compensation became due and continues to accrue until all such amounts have been paid in full. As of August 14, 2013, interest on the aggregate unpaid guaranteed compensation has accrued in the total collective amount of $44,932.15;

d. $2,543.46 in contributions to the Producer-Writers Guild of America Pension Plan;

e. $3,603.24 in contributions to the Writers Guild-Industry Health Fund;

f. Interest on the Pension Plan and Health Fund contributions at a rate of .83% per month and continuing to accrue until all contributions have been paid in full. As of August 14, 2013, interest on the aggregate contributions has accrued in the total collective amount of $3,659.53 and continues to accrue until all such amounts have been paid in full;

2. Respondents are jointly and severally liable for all MBA residuals obligations in connection with the Picture;

3. Respondents are hereby ordered to immediately pay the following amounts to the WGAW on behalf of Writer:

a. $30,477.47 in unpaid residuals in connection with the licensing and/or distribution of the Picture to the free TV and basic cable markets;

b. $30,477.47 in unpaid residuals in connection with the licensing and/or distribution of the Picture to the Pay TV market;

c. $42,283.11 in unpaid residuals in connection with the licensing and/or distribution of the Picture to the videocassette/DVD market;

d. Interest on the unpaid residuals at a rate of 1.5% per month and continuing to accrue until all residuals have been paid in full. As of August 14, 2013, interest on the aggregate residuals has accrued in the total collective amount of $61,336.31 and continues to accrue until all such amounts have been paid in full;

e. Damages to the Guild in the amount of $7,500 for their failure to provide the reporting required by the MBA; and

f. Damages to the Guild in the amount of $7,500 for their failure to deliver to the WGAW a valid written WGA assumption agreement as required by the MBA.

3. The WGAW is assigned the right to receive all monies owed to Respondents, by any third party, including but not limited to any licensee, transferee or successor in interest, subject to any prior perfected security agreement in favor of a third party, until the residuals and all interest accrued thereon are paid in full; and

4. The Arbitrator's fee and Court Reporter's fee shall be borne equally by the Complainant and the Respondents pursuant to MBA Article 11.A.5. The Guild shall advance payment of the entire amount of such fees to the Arbitrator and the Court Reporter. Respondents shall reimburse immediately the WGAW for their one-half share of all such fees.

Date: August 14, 2013

Michael D. Rappaport, Arbitrator

**MICHAEL D. RAPPAPORT**
Arbitrator
15445 Ventura Blvd., Box 84
Sherman Oaks, California 91403
559-658-8621 (phone and fax)
mrappaport@aol.com

AUG 26 2013

**INVOICE**

In the Matter of the Arbitration Between:

**WRITERS GUILD OF AMERICA, WEST**

and

**HACHIKO PRODUCTIONS, LLC and
ROBERT ORTIZ and
INFERNO DISTRIBUTIONS and
MEDEA CAPITAL, LLC**

---

2 days of hearing @ $1500 per day (for 7/2/12 and 8/14/13)........................$3000

**TOTAL FEES**..........................................................................................$3000

**MINUS $750 PAID BY WGA FOR ITS HALF OF FEE FOR HEARING ON 7/2/12**

**TOTAL DUE**............................................................................................$2250

Fin. code 8400-210-OPRS-0000
Date 8/26/13
Ok to pay ____

S.S.# 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

**THANK YOU**

RECEIVED
20 2012
LEGAL SERVICES

The
Egnatuk
Agency
CERTIFIED SHORTHAND REPORTERS
2420 West Carson Street • Suite 210 • Torrance, California 90501 • (310) 787-3240

KATYA J. CULBERG, ESQ.
WRITERS GUILD OF AMERICA, WEST, INC.
7000 WEST THIRD STREET
LOS ANGELES, CA 90048

Fin. code 8405-210-OPRS-0000
Date 7/23/12
Ok to pay

Billing Date: JULY 19, 2012

Invoice No.: 7-1-121

IN THE MATTER OF THE ARBITRATION BETWEEN
WRITERS GUILD OF AMERICA, WEST and HACHIKO PRODUCTIONS, LLC

ARBITRATION PROCEEDINGS, VOLUME I

Date of Service: MONDAY, JULY 2, 2012

Description: ORIGNIAL & ONE CERTIFIED TRANSCRIPT $1,387.45

TOTAL DUE UPON RECEIPT: $1,387.45

RECEIVED
AUG 19 2013
LEGAL SERVICES

**The Egnatuk Agency**
CERTIFIED SHORTHAND REPORTERS
2420 West Carson Street • Suite 210 • Torrance, California 90501 • (310) 787-3240

Katya J. Culberg, Esq.
Writers Guild of America, West, Inc.
7000 West Third Street
Los Angeles, California 90048

Fin. code 8405-210-0PRS-0000
Date 8/21/13
Ok to pay

Billing Date: August 19, 2013

Invoice No.: 8-5-131

WGA and HACHIKO PRODUCTIONS

Arbitration: Hold Transcript

Date of Service: Wednesday, August 14, 2013

Description:

| | |
|---|---|
| Arbitration Per Diem | $400.00 |
| Transcript pages held (4 @ 3.00 per page) | $12.00 |

TOTAL DUE UPON RECEIPT: $412.00

ANTHONY R. SEGALL (CSB No. 101340)
ROTHNER, SEGALL & GREENSTONE
510 South Marengo Avenue
Pasadena, California 91101-3115
Telephone: (626) 796-7555
Facsimile: (626) 577-0124

KATHERINE S. CHRISTOVICH (CSB No. 178397)
LEILA B. AZARI (CSB No. 262443)
WRITERS GUILD OF AMERICA, WEST, INC.
7000 West Third Street
Los Angeles, CA 90048
Telephone: (323) 782-4521
Facsimile: (323) 782-4806

Attorneys for Respondent Writers Guild of America, West, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DISTRICT

| | |
|---|---|
| HACHIKO PRODUCTIONS, LLC, a Rhode Island limited liability company, and ROBERT V. ORTIZ, an individual,<br><br>Petitioners,<br><br>vs.<br><br>WRITERS GUILD OF AMERICA, WEST, INC,<br><br>Respondent. | CASE NO.<br><br>NOTICE OF REMOVAL OF CIVIL ACTION Exhibit A (PART 1 of 3)<br><br>[Los Angeles Superior Court Case No. BS146288] |

Alan Abrams, Esq. (SBN:75637)
Natalie Hottle, Esq. (SBN: 265918)
COSTA ABRAMS & COATE LLP
1221 Second Street, Third Floor
Santa Monica, California 90401
Tel: (310) 576-6161
Fax: (310) 576-6160
Attorneys for Petitioners Hachiko Productions, LLC, and Robert Ortiz

CONFORMED COPY
ORIGINAL FILED
Superior Court Of California
County Of Los Angeles

DEC 11 2013

Sherri R. Carter, Executive Officer/Clerk
By: Judi Lara, Deputy

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTRY OF LOS ANGELES

HACHIKO PRODUCTIONS, LLC, a Rhode Island limited liability company, and ROBERT V. ORTIZ, an individual,

Petitioners,

vs.

WRITERS GUILD OF AMERICA, WEST, INC,

Respondent.

CASE NO.: BS146288

ATTACHMENT 10 (c) (2) Re: PETITION TO VACATE ARBITRATION AWARD; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF ROBERT V. ORTIZ, PAUL MASON, JAMES SEIBEL, AND ALAN ABRAMS IN SUPPORT THEREOF
[Part 1 of 3]

Date:
Time:
Dept.:

CONFORMATION COPY

0078

## TABLE OF CONTENTS

I. INTRODUCTION.....2

II. SUMMARY OF FACTS.....4

A. The Consolidated Arbitration.....4

B. The Letter of Guarantee in the WGA Signatory Application Packet.....6

C. Lack of Notice to Petitioners.....7

D. Underlying Facts Regarding Dispute.....7

III. ARGUMENT.....8

A. GROUNDS ENUMERATED BY C.C.P. § 1286.2(A) ARE PRESENT AND THEREFORE THE AWARD MUST BE VACATED.....8

B. THE AWARD MUST BE VACATED AS TO MR. ORTIZ BECAUSE THE ARBITRATOR EXCEEDED HIS POWERS IN DETERMINING THAT MR. ORTIZ WAS PERSONALLY LIABLE BECAUSE MR. ORTIZ WAS NOT BOUND TO THE ARBITRATION AGREEMENT UNDER AN UNCONSCIONABLE ADHESION CONTRACT.....9

1. The Letter of Guarantee Is Procedural Unconscionable.....10

2. The Letter of Guarantee Is Substantively Unconscionable.....12

C. THE ARBITRATOR NEVER RULED ON HIS JURISDICTION AND IN FACT DID NOT HAVE ANY JURISDICTION TO HEAR THE MATTER AS TO HACHIKO PRODUCTIONS, LLC, THE *CALIFORNIA* LIMITED LIABILITY COMPANY, BECAUSE HACHIKO CA NEVER AGREED TO ARBITRATE ANY CLAIMS WITH THE WGA.....13

D. *IN THE ALTERNATIVE*, EVEN IF THE ARBITRATION PROCEEDING WAS VALID, THE PROCEEDING LACKED FAIR NOTICE AND DUE PROCESS AS REQUIRED, AND THEREFORE MUST BE VACATED AS TO BOTH MR. ORTIZ AND HACHIKO PRODUCTIONS, LLC.....14

1. Mr. Ortiz Was Denied His Right To A Fair Hearing Under The Law, And Was Precluded From Having An Independent Representative Present During The Arbitration, In Violation Of Public Policy.....14

2. Hachiko RI Was Never Served The Notices of Arbitration or Any Subsequent Documents; It Was Entitled To a Full Fair Trial Consistent With the Procedures Provided For Under the 2004 MBA, Which It Did Not Get.....15

E. THE ARBITRATOR NEVER DETERMINED WHETHER THE CLAIMS IN CASE NO. 09-CO-025 WERE TIME BARRED.....16

IV. CONCLUSION.....16

# TABLE OF AUTHORITIES

## STATUTES

Cal. Const., art. I, § 16 .......... 12

C.C.P. §1285 .......... 8

C.C.P. §1286 .......... 9

C.C.P. §1286.2(a) .......... 2, 8

C.C.P. 1286.2(a)(4) .......... 8, 13

C.C.P. 1286.2(a)(5) .......... 8

C.C.P. § 1286.4 .......... 8

C.C.P. § 1670.5 .......... 10

C.C.P. § 1670.5(a) .......... 10

U.C.C. §2-302 .......... 10

U.S. Const., Amend. VII. .......... 12

9 U.S.C. §10(a)(4) .......... 13

## CASE LAW

A & M Produce Co. v. FMV Corp. (1982) 135 Cal. App. 3d 473 .......... 10, 11

Advanced Micro Devices Inc. v. Intel Corp. (1994) 9 Cal. 4th 362 .......... 9

American Software, Inc. v. Ali (1996) 46 Cal. App. 4th 1386 .......... 11, 12

Azteca Construction, Inc. v. ADR Consulting, Inc. (2004) 121 Cal.App.4th 1156 .......... 9, 14

Carboni v. Arrospide (1991) 2 Cal. App. 4th 76 .......... 10

Eastern Associated Coal Corp. v. United Mine Workers of America (2000) 531 U.S. 57 .......... 13

Ellis v. McKinnon Broadcasting Co. (1993) 18 Cal. App. 4th 1796 .......... 11, 12

Engalla v. Permanente Medical Group, Inc. (1997) 15 Cal. 4th 951 .......... 9, 11

Graham v. Scissor-Tail, Inc. (1981) 28 Cal. 3d 807 .......... 10, 12

Hall v. Superior Court (1993) 18 Cal.App.4th 427 .......... 9

Haworth v. Superior Court (2010) 50 Cal.4th 372 .......... 9, 14

Hoso Foods, Inc. v. Columbus Club, Inc. (2010) 190 CA 4th 881 .......... 14

Katzir's Floor and Home Design, Inc. v. M-MLS.com (2004) 394 F.3d 1143........................14

Little v. Auto Steigler, Inc. (2003) 29 Cal. 4th 1064........................................................11

Moncharsh v. Heily & Blasé (1992) 3 Cal. 4th 1...............................................................9, 13

Motores De Mexicali v. Superior Court (1958) 331 P.2d 1...............................................14

O'Flaherty v. Belgum (2004) 115 Cal. App. 4th 1044.........................................................9

Perdue v. Crocker National Bank (1985) 38 Cal. 3d 913...........................................10, 11

Ralph Andrews Prod., Inc. v. Writers Guild of America, West (1991) 938 F.2d 128...................13

Retail Clerk's Union v. L. Bloom Sons Co. (1959) 173 Cal. App. 2d 701.............................13

Retail Clerks Union v. Thriftimart, Inc. (1963) 59 Cal. 2d 421............................................13

Sanchez v. Western Pizza Enterprises, Inc. (2009) 172 Cal.App.4th 154................................14

Stirlen v. Supercuts, Inc. (1997) 51 Cal. App. 4th 1519.........................................................10

## I. INTRODUCTION

Under California law the Court "shall" vacate an award when "the arbitrators exceeded their powers and the award cannot be corrected without affecting the merits of the decision upon the controversy submitted," and when "the rights of the party were substantially prejudiced by the refusal of the arbitrator to postpone the hearing upon sufficient cause being show therefore." On the substantial record before this Court such independent grounds are present here. Accordingly, Petitioners respectfully request an order vacating the award issued in this matter.

Per the contested final arbitration award, Hachiko Productions, LLC, a Rhode Island limited liability company (**"Petitioner"** or **"Hachiko RI"**), and Robert V. Ortiz (**"Petitioner"** or **"Ortiz"**) were ordered (by default) to pay an amount in excess of $280,132.67 (**"Award"**) to the Writer's Guild of America West, Inc. (**"WGA"**). The Award, mailed on August 28, 2013, includes amounts for unpaid compensation, interest on the unpaid compensation, contributions to the pension and health funds, interest on the late-payment of pension and health contributions, interest on the late payment of certain fees required, damages for failure to do report, obtain an assumption agreement, etc. and costs related to the arbitration. The WGA letter further demanded immediate payment of the Award with the further threat that interest would continue to accrue at a rate of 18% per year until all compensation, contributions to the Pension Plan and Health Fund, residuals, and all related interest, have been paid in full.

The Award states that the arbitration was heard before a sole arbitrator on August 14, 2013 pursuant to the terms of the 2004 WGA Theatrical and Television Basic Agreement (**"2004 Minimum Basic Agreement"** or **"2004 MBA"**) and improperly concluded that Mr. Ortiz personally guaranteed "the MBA obligations of Hachiko Productions, LLC, including those obligations at issue in this matter.". The Award further improperly concluded that Hachiko RI and Mr. Ortiz are "jointly and severally liable for all MBA obligations in connection with the unpaid compensation owed to Writer for the rewrite and the polish." According to the arbitrator, the Ortiz guarantee also purportedly extended to interest payments, contributions to pension and health funds, and interest on the allegedly belated contributions to pension and health funds. Additionally, the Award further improperly concluded that Hachiko RI, and Mr. Ortiz are "jointly and severally liable for all MBA

residuals obligations" including interest on the unpaid residuals, damages to the WGA for failure to report, etc.

Strikingly, this substantial Award was issued against Mr. Ortiz even though he was not present at the arbitration hearing and was denied the opportunity to present his case with independent counsel. This lack of fundamental fairness and due process is especially egregious given that the WGA is now attempting to collect the entire $280,132.67 Award from Mr. Ortiz. Nonetheless, the more significant injustice in this case lies in the arbitrator's decision to subject Mr. Ortiz to arbitration in the first place—the only basis for claiming that Mr. Ortiz was subject to the arbitration stemmed from an arbitration clause appearing in the boilerplate one-page Letter of Guarantee that Mr. Ortiz signed at the behest of the WGA. The Letter of Guarantee sets the standard for an unconscionable contract that must be annulled—it was drafted entirely by the WGA, a party possessing superior bargaining power; it *incorporated by reference* a *624-page* 2004 MBA (and, specifically, the arbitration provisions therein) to which Mr. Ortiz was never a party and which Mr. Ortiz never saw previously; and placed Mr. Ortiz liable for the outlandish $280,132.67 Award that if paid, will likely place Mr. Ortiz in personal bankruptcy.

To complicate matters further, the WGA purported to mail a copy of the signed Award to several parties, including to the registered agent for service of process on Hachiko Productions, LLC (**"Hachiko CA"**), an entity formed in California that is separate and distinct from the Hachiko RI. Critically, Hachiko RI was the only Hachiko entity over which the arbitrator had jurisdiction, since only Hachiko RI was party to the 2004 MBA that contained the relevant arbitration provisions. Furthermore, the WGA purported to mail a copy of the signed Award to Mr. Ortiz care of Inferno Distribution, LLC (a bankrupt company), but those offices for Inferno Distribution, LLC were shut down one-day after Inferno Distribution, LLC's Chapter 7 filing occurring on February 13, 2013, and remained closed on August 28, 2013 when the Award was purportedly mailed.

In the WGA's letter dated August 28, 2013, enclosing the signed Award, the WGA demanded that the Award be paid in full within ten (10) days of the date of the letter. The WGA further threatened to place Hachiko RI, Mr. Ortiz, James (Jim) Seibel and William (Bill) Johnson on the WGA strike list, which is a "black list" of companies and individuals circulated to the WGA's

members. Neither Jim Seibel nor Bill Johnson were ever personally named in the Consolidated Arbitration, or personally a party to the proceedings at any time. The WGA maliciously placing them on the WGA strike list has now cast them in a false light as well as damaged their business reputation without any basis whatsoever, and prior to an opportunity for the aggrieved to seek court intervention in connection with the Consolidated Arbitration.

In fact, Jim Seibel and Bill Johnson, non-parties to the Consolidated Arbitration, were only connected to this dispute by virtue of their membership in Inferno Distribution, LLC (a now Chapter 7 entity). The WGA now attempts to harm Mr. Seibel and Mr. Johnson personally simply because, the WGA could not proceed against Inferno Distribution, LLC or Medea Capital, LLC in the Consolidated Arbitration once Inferno filed for Chapter 7 bankruptcy. Indeed, as a part of the Inferno Chapter 7 bankruptcy, the United States Trustee froze the assets of Medea Capital, LLC, which was a subsidiary of Inferno Distribution, LLC, and the copyright owner of the Picture.

Therefore, it is in further demonstration of bad faith that the WGA has now placed Jim Seibel and Bill Johnson personally on the WGA's strike list. Neither Jim Seibel nor Bill Johnson can direct the United States Trustee who is in possession of the assets of Inferno Distribution, LLC, and Medea Capital, LLC (and specifically the assets pertaining to the Picture) to pay the Award. Moreover, there has been no allegation of alter-ego or other legal theory permitting the WGA to "pierce the corporate veil" and hold any of these individuals responsible for the conduct of any of the companies involved in the Consolidated Arbitration.

In sum, the WGA continues to act without justification and for the sole purpose of inflicting harm through harassment and embarrassment.

The Consolidated Arbitration Award is properly vacated in its entirety.

## II. SUMMARY OF FACTS

### A. The Consolidated Arbitration

The WGA on behalf of screenwriter Stephen Lindsey (**"Lindsey"** or **"Writer"**) sent a first notice of claim to arbitrate (**"First Notice"**), dated July 16, 2009, and stylized case no. 09-CO-25,

against Hachiko RI[1], and Mr. Ortiz[2], purportedly pursuant to the arbitration provisions in the WGA's 2004 MBA. (See, Declaration of Alan Abrams ["Abrams Decl."], ¶ 3, **Exh. "2"** attached thereo.) In that First Notice, the WGA claimed that the Writer was retroactively entitled to the minimum compensation set forth in the 2004 MBA for Writer's screenwriting services for the theatrical motion picture project entitled "Hachiko: A Dog's Story" (the "**Picture**"). (Id.) The WGA alleged that Hachiko RI and Mr. Ortiz were "jointly and severally liable for **any and all MBA obligations** in connection with the Picture" including the purported obligations set out in the First Notice of Claim to Arbitrate. (Id.)

The WGA then sent a second notice of claim to arbitrate ("Second Notice"), dated December 6, 2011, and stylized case no. 10-CL-252, against Hachiko RI[3], Mr. Ortiz[4] (the same two parties to the First Notice of Claim to Arbitrate), Inferno Distribution, LLC, and Medea Capital, LLC. (Abrams Decl., ¶ 4, **Exh. "3"** attached thereto.) The Second Notice cited the same arbitration provisions in the WGA's 2004 MBA and the WGA claimed that the three entities and one individual were "jointly and severally liable for **any and all MBA obligations** in connection with the Picture." Such obligations were alleged to include an unspecified amount of unpaid residual compensation in connection with Writer's screenwriting services for the Picture. (Id.)

---

[1] At ¶ 3 of the First Notice, the WGA alleges "Respondent Hachiko Productions, LLC ('HPL') is a signatory to the MBA." (Abrams Decl., ¶ 3, **Exh. "2"** attached thereto.)

[2] At ¶ 4 of the First Notice, the WGA alleges, "On or about September 5, 2007, Robert V. Ortiz signed a letter personally guaranteeing the MBA obligations of HPL including but not limited to those outlined herein." (Abrams Decl., ¶ 3, **Exh. "2"** attached thereto.)

[3] ¶ 1 of the Second Notice alleged "Respondent Hachiko Productions, LLC ('HP') is signatory to or otherwise bound by" the WGA's 2004 MBA. (Abrams Decl., ¶ 4, **Exh. "3"** attached thereto.)

[4] ¶ 2 of the Second Notice alleged "In or about 2007, Respondent Rob Ortiz, an individual, signed a letter personally guaranteeing the performance by HP of all MBA obligations including, but not limited to, the MBA residual obligations outlined herein." (Abrams Decl., ¶ 4, **Exh. "3"** attached thereto.)

The above claims to arbitrate were consolidated ("**Consolidated Arbitration**"). (Abrams Decl., ¶ 5.) The claims were, and remain to be, without merit.

**B. The Letter of Guarantee in the WGA Signatory Application Packet**

Robert Ortiz was employed as a line producer for the Picture. He was not personally a member of the WGA and was not otherwise familiar with the 2004 MBA. In or about September 2007, Mr. Ortiz filled out a WGA signatory application packet on behalf of Hachiko RI who needed to become a signatory in order to employ a WGA writer to re-write the screenplay for the Picture. The WGA's signatory application consists of a series of pre-printed fill-in-the-blank type forms. Among those forms is a brief one-page letter of guarantee ("Letter of Guarantee"). Mr. Ortiz was instructed by the WGA to complete all of the forms included in the package, which he did. He was not instructed to have an attorney review the WGA signatory documents before they were submitted because they were on pre-printed forms and appeared non-negotiable and standard for the WGA. Mr. Ortiz did not fully understand what he was "guaranteeing" under the Letter of Guarantee because he was not provided with any information specific to the various obligations of Hachiko RI under the 2004 MBA. Simply, he understood that he could not get the Picture affiliated with the WGA if all of the signatory application documents were not completed and returned. Moreover, at the time the WGA documents were submitted, the writer Stephen Lindsey on whose behalf the WGA brought the Consolidated Arbitration was not even a member of the bargaining unit that the WGA represents. (See, Declaration of Robert Ortiz [Ortiz Decl.], ¶¶ 1-5; **Exh. "A"** attached thereto.)

The Letter of Guarantee states in regular font and in no way highlights that, "[you] specifically agree to be bound by, and a party to, any grievance and/or arbitration under the 2004 MBA, should a dispute between a writer and/or WGA and Company arise. You and Company shall be deemed jointly and severally liable under any grievance or arbitration award or settlement." (Id.)

Although the Letter of Guarantee referenced the 2004 MBA, Mr. Ortiz had never previously seen the 2004 MBA, was not familiar with it, and a copy of the 2004 MBA was not provided to Mr. Ortiz by the WGA in the signatory application package. (Ortiz Decl., ¶ 7.)

Inferno Distribution, LLC agreed to indemnify Mr. Ortiz with respect to any claims brought by the WGA and Inferno Distribution, LLC defended Mr. Ortiz in the Consolidated Arbitration until

Inferno Distribution, LLC went into bankruptcy. (Ortiz Decl., ¶ 6, 8.) On or about August 24, 2012, Inferno Distribution, LLC filed Chapter 11 bankruptcy. (Declaration of James Seibel [Seibel Decl.], ¶2; **Exh. "AA"** attached thereto.) Thereafter, approximately six months later, on or about February 7, 2013, Inferno Distribution, LLC filed Chapter 7 bankruptcy. (See, Seibel Decl., ¶ 3, **Exh. "BB"** attached thereto.)

Rather than stay the proceedings entirely, the WGA persisted to proceed against Hachiko RI and Mr. Ortiz personally, and the Award is properly vacated in its entirety.

**C. Lack of Notice To Petitioners**

The WGA never personally notified Mr. Ortiz regarding the arbitration hearings occurring on July 2, 2012 ("Day 1") and August 14, 2013 ("Day 2"). (See, Ortiz Decl., ¶ 10.) In fact, in addition to not serving Mr. Ortiz personally with the notices, the WGA also failed to serve Hachiko RI. The WGA's notices of arbitration hearing, (see, Abrams Decl., ¶ 6; consolidated **Exh. "6"** thereto), conclusively demonstrate that the WGA served the agent for service of process for Hachiko CA, (see, Abrams Decl., ¶ 21; **Exh. "17"** thereto), and not Hachiko RI, (see, Abrams Decl., ¶ 22; **Exh. "18"** thereto), despite that Hachiko RI was the WGA affiliated-entity, (see, Abrams Decl., ¶ 3; **Exh. "2"** thereto).

**D. Underlying Facts Regarding Dispute**

In 2006, Paul Mason and his partner, Vicki Wong (hereafter "Mason & Wong"), engaged Writer Lindsey to write a story outline and a first draft of a screenplay in connection with the Picture which was based on a screen story Mason & Wong wrote as well as a public domain story involving the Hachiko dog, a well-known Japanese dog. In exchange for Lindsey's screen writing services, Mason & Wong agreed to pay Lindsey $52,000 for his services as follows: $500 after delivery of an approved story outline, $1,000 after delivery of his first draft screenplay, $500 after delivery of a final revised screenplay, and $50,000 on the first day of principal photography of the Picture. Mason & Wong also designated that Lindsey would receive a share of the profits. (Declaration of Paul Mason ["Mason Decl."], ¶ 2, **Exh. "D"** attached thereto.)

At the time Mason & Wong hired Mr. Lindsey, he was not a member of the bargaining unit which the WGA represents, and the WGA did not have any jurisdiction over his writing services.

(Mason Decl., ¶ 3.) Mr. Lindsey provided his screen writing services as a "work for hire" for Mason & Wong, and Mason & Wong owned the copyright in the results and proceeds of Mr. Lindsey's services. (Mason Decl., ¶ 4.) Mason & Wong then entered into an agreement ("Option Agreement") with Inferno Distribution, LLC and granted Inferno Distribution, LLC an option to acquire their rights in the screenplay written by Mr. Lindsey. (Mason Decl., ¶ 5.)

Hachiko Productions, LLC, organized under the laws of the state of California ("Hachiko CA"), then purchased all of the rights from Mason & Wong in the screenplay and story with respect to the Picture. Hachiko CA was not a signatory company to the WGA Basic Agreement. The Picture was originally contemplated to be a California production however the producers of the Picture couldn't get the budget to work for shooting in California so the production was moved to Rhode Island to take advantage of the local film tax incentives. To access the Rhode Island state tax rebate a Rhode Island company had to be formed, i.e. the Hachiko Productions, LLC formed in Rhode Island became signatory to the 2004 MBA. Hachiko CA was no longer used as a result. (Seibel Decl., ¶ 5.)

## III. ARGUMENT

### A. GROUNDS ENUMERATED BY C.C.P. § 1286.2(A) ARE PRESENT AND THEREFORE THE AWARD MUST BE VACATED.

California Code of Civil Procedure ("C.C.P.") § 1285 provides that any party to an arbitration in which an award has been made may petition the Court to vacate the award. C.C.P. § 1286.2 (a) subject to C.C.P. § 1286.4, sets out the extent of relief available and the grounds for vacation of an award. Specifically, the Court **shall** vacate the award if the court determines that (1) the arbitrator exceeded his powers and the award cannot be corrected without affecting the merits of the decision upon the controversy submitted (§1286.2 (a)(4)) or (2) the rights of the party were substantially prejudiced by the refusal of the arbitrators to postpone the hearing upon sufficient cause being shown therefor…(§1286.2 (a)(5)).

The powers of an arbitrator derive from, and are limited by, the agreement to arbitrate. (Advanced Micro Devices Inc. v. Intel Corp. (1994) 9 Cal. 4th 362, 378.) Although arbitrators are accorded great power, such power is not infallible and is also limited by California law. Moreover,

C.C.P. § 1286.2 provides a statutory safety valve for awards that are the product of procedural irregularities (Moncharsh v. Heily & Blasé (1992) 3 Cal. 4th 1, 33; Hall v. Superior Court (1993) 18 Cal.App.4th 427, 438-439.) According to C.C.P. § 1286, after a petition is duly served and filed, the Court can confirm the award, correct and confirm the award as corrected, vacate the award, or dismiss the proceeding. It is precisely because "arbitrators wield such mighty and largely unchecked power" that the Legislature has taken an increasingly more active role in protecting the fairness of the process. (Azteca Construction, Inc. v. ADR Consulting, Inc. (2004) 121 Cal.App.4th 1156, 1165; see also, Haworth v. Superior Court (2010) 50 Cal.4th 372, 395 [dis. opn. of Werdegar, J.]) [explaining that while the finality of arbitration awards is an important principle, "[a]n equally vital principle, however, is that with such limited judicial review the arbitration system must have—and must be seen to have—sufficient integrity that parties can be confident they will receive a fair hearing and an impartial decision from the arbitrator"]). Therefore, whether an arbitrator exceeded his authority is a question of law that is reviewed de novo. (Advanced Micro Devices, Inc., supra, 9 Cal.4th 362, 376, fn. 9; O'Flaherty v. Belgum (2004) 115 Cal.App.4th 1044, 1056.) For the reasons set forth below, the Award can and should be properly vacated on the numerous grounds set forth herein.

**B. THE AWARD MUST BE VACATED AS TO MR. ORTIZ BECAUSE THE ARBITRATOR EXCEEDED HIS POWERS IN DETERMINING THAT MR. ORTIZ WAS PERSONALLY LIABLE BECAUSE MR. ORTIZ WAS NOT BOUND TO THE ARBITRATION AGREEMENT UNDER AN UNCONSCIONABLE ADHESION CONTRACT.**

The existence of a valid agreement to arbitrate is determined by reference to state law principles regarding the formation, revocation, and enforceability of contracts generally. (Engalla v. Permanente Medical Group, Inc. (1997) 15 Cal. 4th 951, 971-973.) The Letter of Guarantee as a whole–or, at a minimum, the arbitration provisions in the 2004 MBA which were incorporated by reference into the Letter of Guarantee—constitute(s) an unconscionable adhesion contract that should not be enforced.

In Graham v. Scissor-Tail, Inc. (1981) 28 Cal. 3d 807, the California Supreme Court addressed the criteria for determining whether an arbitration clause set forth in an adhesion contract is unenforceable on grounds of unconscionability pursuant to common law. (Id.) In

accordance with Graham, "there are two judicially imposed limitations on the enforcement of adhesion contracts or provisions thereof. The first is that such a contract or provision which does not fall within the reasonable expectations of the weaker or 'adhering' party will not be enforced against him. The second – a principle of equity applicable to all contracts generally – is that a contract or provision, even if consistent with the reasonable expectations of the parties, will be denied enforcement if, considered in its context, it is unduly oppressive or 'unconscionable.'" (Id. at 820.)

Civil Code § 1670.5 (which adopts the standard of unconscionability set forth in §2-302 of the Uniform Commercial Code), applies to all contracts. (Stats. 1979, ch. 819, § 3, p. 2827). Civil Code § 1670.5(a) provides "[i]f the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made[,] the court may refuse to enforce the contract, or . . . any unconscionable clause . . .". (See also, A & M Produce Co. v. FMV Corp. (1982) 135 Cal. App. 3d 473, 484.) The doctrine of unconscionability generally arises where there is " '. . . an absence of meaningful choice on the part of one of the parties[,] together with contract terms which are unreasonably favorable to the other party.'" (Id. at 486; see also Graham v. Scissor-Tail, Inc., supra, 28 Cal. 3d at 280 [a contract of adhesion is unenforceable if its terms are unduly oppressive or outside the reasonable expectations of the weaker party.])

California courts analyze unconscionability as having a procedural and substantive element. (Stirlen v. Supercuts, Inc. (1997) 51 Cal. App. 4th 1519, 1531-1533; see also Perdue v. Crocker National Bank (1985) 38 Cal. 3d 913, 925, fn. 9.) Although both elements must be present before a contract or contract provision is rendered unenforceable on grounds of unconscionability, they are reviewed in tandem such that "the greater the degree of substantive unconscionability, the less the degree of procedural unconscionability that is required to annul the contract or clause." (Carboni v. Arrospide (1991) 2 Cal. App. 4th 76, 83.)

**1. The Letter of Guarantee Is Procedurally Unconscionable.**

Procedural unconscionability concerns the manner in which the contract was negotiated and the circumstances of the parties at that time. (A & M Produce Co., supra, 135 Cal. App. 3d at 486.) It focuses on factors of oppression and surprise. (Id.) The oppression component arises from the inequality of bargaining power of the parties to the contract and an absence of real negotiation or a

meaningful choice on the part of the weaker party. (Id.)

In this case, there can be no dispute that the Letter of Guarantee satisfies this component of procedural unconscionability. The WGA's signatory application is comprised of a packet of pre-printed fill-in-the-blank type forms. As a condition of completing the WGA's signatory process, an individual must sign a short one-page document entitled "Letter of Guarantee" that is included among those forms. The Letter of Guarantee states that the person who signs the form agrees to assume all the obligations of the Company becoming a signatory to the 2004 MBA, and to be bound by any arbitration under the 2004 MBA with respect to the Company. In these circumstances, it is clear that Mr. Ortiz had no opportunity to negotiate regarding the terms of the 2004 MBA or the Letter of Guarantee incorporating by reference the 2004 MBA. (See, Engalla, supra, 15 Cal. 4th at 984-985; Perdue, supra, 38 Cal. 3d at 924-925.) This is grossly unconscionable. Moreover, the California courts have held that the existence of a contract of adhesion ***alone*** constitutes procedural unconscionability. (See, Little v. Auto Steigler, Inc. (2003) 29 Cal. 4th 1064, 1071.)

The second component of procedural unconscionability encompasses an aspect of surprise, with the terms to which the party supposedly agreed being hidden in a printed form drafted by the party seeking to enforce them. (American Software, Inc. v. Ali (1996) 46 Cal. App. 4th 1386, 1390-1391; Ellis v. McKinnon Broadcasting Co., (1993) 18 Cal. App. 4th 1796, 1803.) In this case, although the Letter of Guarantee incorporates by reference the **624-page** 2004 MBA, the WGA did not provide Mr. Ortiz with a copy of the 2004 MBA, nor was there a copy of the pertinent provisions of the 2004 MBA for Mr. Ortiz's consideration. In any event, Mr. Ortiz is not a lawyer, nor a member of the WGA, and the language of the 2004 MBA is so extensive as to render it difficult for a layperson to read and understand the complete parameters of a signatory company's obligations thereunder. It is entirely unreasonable to use an incorporation clause on a one-page document to smuggle a here-to-for unknown 624-page legal document into the contract.

Although the Letter of Guarantee itself mentioned the 2004 MBA and referred to arbitration thereunder, the Letter of Guarantee did not specify any details of the pertinent provisions of the 2004 MBA, including the fact that the arbitration provisions of the 2004 MBA significantly limited Mr. Ortiz's procedural and substantive rights. The Letter of Guarantee did not even identify the

provisions of the MBA that discussed arbitration. Given that the terms worked so clearly to the WGA's advantage, and to the detriment of Mr. Ortiz, the element of surprise is satisfied. (See, Graham, supra, 28 Cal. 3d at 820, fn. 18 [lack of notice is a significant factor in determining unconscionability].) In any event, to the extent that Mr. Ortiz knew or was on notice of a general requirement that his claims had to be pursued in arbitration rather than in some other forum, this does not preclude a finding that the arbitration provision incorporated by reference into the Letter of Guarantee is nonetheless unenforceable. (Ellis, supra, 18 Cal. App. 4th at 1805.)

**2. The Letter of Guarantee Is Substantively Unconscionable.**

"Substantive unconscionability" focuses on the terms of the agreement and whether those terms are "so one-sided as to 'shock the conscience.'" (American Software, Inc., supra, 46 Cal. App. 4th at 1391.) Here, the terms of the Letter of Guarantee carry potentially devastating losses personally. Other than the WGA's own action with respect to the WGA Strike List, Mr. Ortiz and his personal assets are really the only known source of recovery for the WGA, particularly given that neither Hachiko RI (the WGA affiliated company) nor Hachiko CA (the non-WGA entity who the WGA continues to serve in connection with the Consolidated Arbitration) have any assets. Mr. Ortiz would have never signed a Letter of Guarantee if he understood that the WGA could take this much money from him personally. Mt. Ortiz is a freelance independent contractor who provides his unit production manager services to producers of motion picture projects, on a per-project basis. As a result, he does not rely on a steady stream of income, but instead continually seeks out work. He also supports his spouse, who works a part time job only, and their small child.

The Letter of Guarantee also purports to subject Mr. Ortiz to the arbitration provisions contained within the **624-page** legal document negotiated by the collective bargaining unit for matters pertaining to WGA members. It is substantially unfair to Mr. Ortiz to have unknowingly and purportedly waived several rights otherwise guaranteed by the federal and state Constitutions, including the right to have his claims tried before a jury. (U.S. Const., Amend. VII; Cal. Const., art. I, § 16.)

For the foregoing reasons, Petitioners respectfully submit that because the Letter of Guarantee as a whole is unconscionable, or at a minimum, the clause incorporating the 2004 MBA

arbitration agreement standing alone is unconscionable, the Arbitrator was without jurisdiction to hear the matter as to Mr. Ortiz. Moreover, because Mr. Ortiz was not actually bound by the underlying arbitration agreement in the 2004 MBA, the Arbitrator exceeded his power in determining that Mr. Ortiz was personally liable for all of the claimed obligations of Hachiko RI. (See, Ralph Andrews Productions, Inc. v. Writers Guild of America West, Inc. (9th Cir. 1991) 938 F.2d 128 [Ninth Circuit vacated an arbitration award against an individual under 9 U.S.C.A. § 10(a)(4) upon finding that the arbitrator exceeded his power based on the arbitrator's decision of personal liability against an individual who was the sole officer and shareholder of the two defendant companies involved in the arbitration proceeding. Court held that because the individual was not actually bound by the underlying arbitration agreement, and had clearly objected to arbitration, he could not be personally liable under the agreement.].)

Therefore, the Award is properly vacated as to Mr. Ortiz.

**C. THE ARBITRATOR NEVER RULED ON HIS JURISDICTION AND IN FACT DID NOT HAVE ANY JURISDICTION TO HEAR THE MATTER AS TO HACHIKO PRODUCTIONS, LLC, THE *CALIFORNIA* LIMITED LIABILITY COMPANY, BECAUSE HACHIKO CA NEVER AGREED TO ARBITRATE ANY CLAIMS WITH THE WGA.**

California law is clear on this point. A nonsignatory to an arbitration agreement is **not** required to arbitrate a dispute **absent a *court* determination of an alter ego relationship between the signatory to the arbitration agreement and the nonsignatory.** (Retail Clerks Union v. Thriftimart, Inc. (1963) 59 Cal. 2d 421, 426.) "A corporation's separate identity will be disregarded only when, and to the extent that, it is necessary so to do in order to prevent fraud or injustice." (Retail Clerk's Union, 173 Cal. App. 2d at 704.) However, "the proper forum for that determination is, of course, a court of law." (Id.)

Here, the WGA signatory documents conclusively demonstrate that Hachiko RI (and **not** Hachiko CA) was party to the 2004 MBA that contained the relevant arbitration provisions. (See, Abrams Decl., ¶ 3; **Exh. "2"** attached thereto; see also, Ortiz Decl., ¶ 3.) In other words, Hachiko RI was the signatory, and Hachiko CA was the nonsignatory. Moreover, there was no prerequisite determination made that Hachiko CA is the alter ego of Hachiko RI. The Arbitrator exceeded his powers when he completely ignored this distinction.

Indeed, there was a completely legitimate business reason for the formation of two separate Hachiko Production, LLC entities. (See, Seibel Decl., ¶ 5.) Specifically, the Picture was originally contemplated to be a California production however the producers of the Picture couldn't get the budget to work for shooting in California so the production was moved to Rhode Island to take advantage of the local film tax incentives. To access the Rhode Island state tax rebate a Rhode Island company had to be formed, i.e. the Hachiko Productions, LLC formed in Rhode Island which became signatory to the 2004 MBA. Hachiko CA was no longer used as a result. (See, Seibel Decl., ¶; see also, Abrams Decl. ¶¶ 21-22; Exhs. "17" and "18".)

To address this issue, counsel for respondents filed with the Arbitrator a copy of respondent Hachiko Productions, LLC's Notice of Motion and Motion To Dismiss ("Motion") Case Nos. 09-CO-025 and 10-CL-252 for Lack of Jurisdiction. (See, Abrams Decl., ¶ 9; Exh. "7" attached thereto.) The Motion was filed with the Arbitrator at the conclusion of the WGA's case in chief on Day 1 occurring on July 2, 2012. (Id.) The Arbitrator never ruled on the merits of the jurisdiction issues presented in such Motion. (Abrams Decl., ¶ 11.)

Because there was no court determination of an alter ego relationship between Hachiko RI (the signatory to the WGA arbitration agreement) and Hachiko CA (the nonsignatory), the Award is properly vacated to the extent it seeks to hold Hachiko CA responsible for the Award on the basis that the Arbitrator lacked jurisdiction as to Hachiko CA.

### D. *IN THE ALTERNATIVE*, EVEN IF THE ARBITRATION PROCEEDING WAS VALID, THE PROCEEDING LACKED FAIR NOTICE AND DUE PROCESS AS REQUIRED, AND THEREFORE THE AWARD MUST BE VACATED AS TO BOTH MR. ORTIZ AND HACHIKO PRODUCTIONS LLC.

The award must be vacated pursuant to C.C.P. § 1296.2(a)(4) because the Arbitrator exceeded his powers by depriving Hachiko RI (and Hachiko CA to the extent the WGA purported to make them a party to the proceedings) and Robert Ortiz of the opportunity to be heard and a fair hearing. (See, Hoso Foods, Inc. v. Columbus Club, Inc. (2010) 190 CA 4th 881, 888-892.)

**1. Mr. Ortiz Was Denied His Right To A Fair Hearing Under The Law, And Was Precluded From Having An Independent Representative Present During The Arbitration, In Violation Of Public Policy.**

Mr. Ortiz was indemnified by Inferno Distribution, LLC for any and all claims that arose against him in connection with the Picture. (Ortiz Decl., ¶ 6, Exh. "B".) As a result of the Inferno Distribution, LLC bankruptcy (commencing on August 24, 2012 as a Chapter 11 and subsequently converted into a Chapter 7 on February 13, 2013), (see Seibel Decl., ¶¶ 2-3,) Inferno Distribution could no longer appear in the proceeding on Mr. Ortiz's behalf. The WGA and the Arbitrator were made aware of the fact that Mr. Ortiz was being defended in the proceeding by Inferno Distribution, LLC, and that as a result of the bankruptcy, Mr. Ortiz needed opportunity to retain independent counsel. (See, Abrams Decl., ¶¶ 17, 19 Exhs. "14" and "15".) Because Mr. Ortiz was never personally served with the WGA's notices of hearing, (Abrams Decl., ¶ 8; Exh. "6" attached thereto,) he did not actually learn ***until the day before the second day*** of hearing that the matter would not be continued as a result of the bankruptcy and that the WGA still intended to proceed against him personally. (Ortiz Decl., ¶ 11.) Mr. Ortiz was in New Orleans, Lousiana at the time and could not attend. Therefore, he wrote a letter to the Arbitrator requesting a continuance. (Ortiz Decl., ¶ 11; Exh. "C".) Based on the fact that the Award was issued the next day, the Arbitrator denied Mr. Ortiz the opportunity to retain independent counsel to defend him and raise the new issues that arose as a result of the Inferno Distribution bankruptcy.

**2. Hachiko RI Was Never Served The Notices of Arbitration or Any Subsequent Documents; It Is Entitled To a Full Fair Trial Consistent With the Procedures Provided For Under the 2004 MBA**

Hachiko RI (the signatory) was never properly served with process in the arbitration proceeding but the Arbitrator nonetheless directed an Award against it. Rather, the WGA continually served "Hachiko Productions, LLC" through the registered agent for service of process for Hachiko CA (the nonsignatory) and not Hachiko RI (the signatory). (See, Abrams Decl., ¶¶ 4-6, 8, 21 **Exhs. "3" through "6".**) Again, Hachiko CA was not the company bound by the 2004 MBA. (See, Abrams Decl., ¶3; **Exh. "2"**; Ortiz Decl., ¶¶ 3-4; **Exh. "A".**)

Therefore, the Award is properly vacated as to Hachiko RI because insofar as it is related to Hachiko RI as the signatory company, Hachiko RI is entitled to a full fair trial consistent

with procedure provided for under the 2004 MBA.

**E. THE ARBITRATOR NEVER DETERMINED WHETHER THE CLAIMS IN CASE NO. 09-CO-025 WERE TIME BARRED.**

Here, it is undisputed that the WGA served its First Notice of Arbitration regarding WGA case no. 09-CO-025 on July 16, 2009. (Abrams Decl., ¶ 5, **Exh. "4".**) It is further undisputed that the WGA signatory documents submitted to the WGA on September 5, 2007, stated that the Picture would be based on source material written by Writer Lindsey.

Under Article 11 D of the MBA, the arbitrator is required to determine jurisdiction before proceeding with a hearing on the merits. (See, Abrams Decl., ¶ 2, Exh. "1" attached thereto.) Given that more than eighteen (18) months lapsed between the time the WGA first had knowledge of Writer Lindsey's involvement as a screenwriter to the time the WGA served its First Notice of Arbitration, the claim raised in WGA Case No. 09-CO-024 was time barred.

The above issue was raised to the Arbitrator in the Motion to Dismiss filed by respondents in the arbitration proceeding at the conclusion of the Day 1 Hearing, and the Arbitrator never ruled on the issue.

**F. CONCLUSION**

For the foregoing reasons, the petitioners respectfully request this court to vacate the Award, for costs of suit herein, and for other and further relief as the Court deems just and proper.

Dated: December 11, 2013

Respectfully submitted,

COSTA ABRAMS & COATE LLP

By: ______________________

Alan Abrams
Natalie Hottle
Attorneys for Petitioners Hachiko Productions, LLC, and Robert Ortiz

## DECLARATION OF ROBERT ORTIZ

1. I am a party to the within action and am over 18 years of age. I have personal knowledge of the matters set forth herein and such matters are true and correct, and I could and would competently testify thereto if called upon to do so.

2. I was employed to render services as a line producer/unit production manager for the motion picture entitled "Hachiko: A Dog's Story" (the "Picture"). I was not even a highly paid employee on the Picture and in fact, after agreeing to a reduction in salary, I received less than $50,000 total for my work on the Picture, a sum far below the amount I am now ordered to pay under the arbitration award that is the subject of the attached petition. I am not personally a member of the Writer's Guild of America ("WGA") and I am not otherwise familiar with Theatrical and Television Basic Agreement ("2004 MBA").

3. The production company (i.e., my employer) requested I organize Hachiko Productions, LLC, a Rhode Island limited liability company ("Company"), which I did, and I was initially a member of the Company at the request. My employer wanted to hire a WGA writer to re-write the screenplay for the Picture, which required that Company to be affiliated with the WGA. This required filling out the standard WGA signatory application documents. Therefore, I requested the signatory package from the WGA and in September, 2007, I filled out the WGA documents for the Company.

4. The WGA's signatory application consists of a series of pre-printed fill in the blank type forms. I was instructed by the WGA to complete all of the forms included in the package, which I did. I filled out all of the WGA documents because my employer required that we get the Company affiliated with the WGA. Attached as **Exhibit "A"** and incorporated herein by reference is a true and correct copy of the signatory application I submitted to the WGA with respect to Hachiko Productions, LLC.

5. Nobody ever suggested that I have an attorney review the WGA documents for the Company before I submitted them because they were on pre-printed forms and appeared non-negotiable. The one page letter of guarantee ("Letter of Guarantee") included among the WGA documents did not have any specific information about the various provisions under the 2004 MBA

and I did not understand that I was agreeing to be personally responsible for the recent arbitration award. I just knew that I had to sign all of the WGA documents in order to get the Company affiliated with the WGA and the documents seemed standard and non-negotiable.

6.      Inferno Distribution, LLC then provided me a letter of indemnification to protect me. Attached as **Exhibit "B"** and incorporated herein by reference is a true and correct copy of the Indemnification Agreement.

7.      The Letter of Guarantee references the 2004 MBA, which was a document I had never seen previously, that I was not familiar with, and which not provided by the WGA with the signatory application package.

8.      After the WGA initiated arbitration against the Company, I understood that Inferno Distribution, LLC defended me for some time, until Inferno Distribution, LLC went into bankruptcy.

9.      I learned that the WGA still intended to proceed against me personally because of that Letter of Guarantee.

10.     The WGA never personally notified me about the arbitration hearings.

11.     In fact, I did not learn about the August 14, 2013 hearing until the night before, on August 13, 2013. It was on August 13, 2013, that I learned the WGA was still proceeding against me personally. Because I now reside in New Orleans, Louisiana, I wrote a letter to the Arbitrator asking him if he could postpone the hearing to a time when I could arrange to be present in Los Angeles and also have my own lawyer representing me. Attached hereto as **Exhibit "C"** is a true and correct copy of the letter I emailed Arbitrator Rappaport the night before day two of the hearing.

12.     The Arbitrator's response was that he would not "deal" with my letter the night before the August 14th hearing but would instead be at the WGA's office in the morning and would deal with it them.

13.     I never received any other response to my letter.

14.     I thereafter learned about the arbitration award ("Award") in early September, 2013, and have been devastated.

15.     I have considered filing for bankruptcy because there is no way that I could ever pay such an award. It will financially destroy me. I work as a freelance unit production manager on

motion picture projects and my income is inconsistent as I work on a per-picture project basis. On average I can work on one to two motion picture projects per year. I also support my family. I have a spouse who works part time only and a small child to care for. I do not have the assets to pay the arbitration award.

This Declaration is executed under penalty of perjury in accordance with the laws of the State of Louisiana, at New Orleans, Louisiana on December 10, 2013.

ROBERT V. ORTIZ

19

ATTACHMENT 10 (C) (2) RE: PETITION TO VACATE ARBITRATION AWARD; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS

0099

## DECLARATION OF PAUL MASON

1. I am over 18 years of age. I have personal knowledge of the matters set forth herein and such matters are true and correct, and I could and would competently testify thereto if called upon to do so.

2. In 2006, I and my partner, Vicki Wong, engaged Stephen Lindsey ("Lindsey") to write a story outline and a first draft of a screenplay in connection with the motion picture "Hachiko: A Dog's Story" (the "Picture") which was based on a screen story I and Ms. Wong wrote as well as a public domain story involving the Hachiko dog, a well-known Japanese dog. In exchange for Lindsey's screen writing services, I and Ms. Wong agreed to pay Lindsey $52,000 for his services as follows: $500 after delivery of an approved story outline, $1,000 after delivery of his first draft screenplay, $500 after delivery of a final revised screenplay, and $50,000 on the first day of principal photography of the Picture. We also designated that Lindsey would receive a share of the profits. Attached as **Exhibit "D"** is a true and correct copy of the agreement we signed with Mr. Lindsey.

3. At the time we hired Mr. Lindsey, he was not a member of the bargaining unit which the Writer's Guild of America, Inc. ("WGA") represents, and the WGA did not have any jurisdiction over his Mr. Lindsey's services for us.

4. Mr. Lindsey provided his screen writing services as a "work for hire" for me and Ms. Wong, and we (me and Ms. Wong) owned the copyright in the results and proceeds of Mr. Lindsey's services.

5. I and Ms. Wong then entered into an agreement ("Option Agreement") with Inferno Distribution, LLC and granted Inferno Distribution, LLC an option to acquire our rights in the screenplay written by Mr. Lindsey.

6. Hachiko Productions, LLC, which I am informed and believe the producers of the Picture organized under the laws of the state of California, then purchased all of our rights in the screenplay and story with respect to the Picture.

7. I am informed and believe that the California organized Hachiko Productions, LLC was not a signatory company to the WGA Basic Agreement.

This Declaration is executed under penalty of perjury in accordance with the laws of the State of California, at Los Angeles, California on December 10, 2013.

PAUL MASON

0101

2

ATTACHMENT 10 (C) (2) RE: PETITION TO VACATE ARBITRATION AWARD; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS

## DECLARATION OF JAMES SEIBEL

1. I am over 18 years of age. I have personal knowledge of the matters set forth herein and such matters are true and correct, and I could and would competently testify thereto if called upon to do so.

2. On August 24, 2012, Inferno Distribution, LLC filed for Chapter 11 bankruptcy.

3. Subsequently, on February 13, 2013, Inferno Distribution, LLC filed for Chapter 7 bankruptcy.

4. Inferno Distribution's offices were shut down one day after the Chapter 7 filing occurring on February 13, 2013 and remained closed on August 28, 2013 when the arbitration award was purportedly mailed by the WGA.

5. Hachiko Productions, LLC, organized under the laws of the state of California ("Hachiko CA"), purchased all of the rights from Paul Mason & Vicki Wong in the screenplay and story with respect to the motion picture "Hachiko: A Dog's Story" (the "Picture"). Hachiko CA was not a signatory company to the Writer's Guild of America. The Picture was originally contemplated to be a California production however the producers of the Picture couldn't get the budget to work for shooting in California so the production was moved to Rhode Island to take advantage of the local film tax incentives. To access the Rhode Island state tax rebate a Rhode Island company had to be formed, i.e. the Hachiko Productions, LLC formed in Rhode Island became signatory to the 2004 MBA. Hachiko CA was no longer used as a result.

This Declaration is executed under penalty of perjury in accordance with the laws of the State of California, at Los Angeles, California on December 10, 2013.

JAMES SEIBEL

## DECLARATION OF ALAN ABRAMS

1. I am an attorney at law duly licensed to practice before the Courts of the State of California, and I am a name partner of Costa Abrams & Coate LLP, counsel of record for Petitioners in this proceeding (and respondents in the underlying Consolidated Arbitration) Hachiko Productions, LLC, and Robert Ortiz. In connection with the underlying Consolidated Arbitration, I was also counsel of record for Inferno Distribution, LLC, and Medea Capital, LLC. I have personal knowledge of the matters set forth herein and such matters are true and correct, and I could and would competently testify thereto if called upon to do so.

2. Attached hereto as **Exhibit "1"** is a true and correct copy of the 2004 Writer's Guild of America West, Inc. ("WGA") Theatrical and Television Basic Agreement ("2004 MBA").

3. Attached hereto as **Exhibit "2"** is a true and correct copy of the WGA signatory application that was submitted by Hachiko Productions, LLC, organized in Rhode Island, and which was included in the WGA's exhibit book in connection with the Consolidated Arbitration. The letter of guarantee signed by Mr. Ortiz is at page 12 of 12 of the attached Exhibit "2".

4. Attached hereto as **Exhibit "3"** is a true and correct copy of the WGA letter enclosing a signed copy of the Arbitrator's Opinion and Award ("Award") signed on or about August 14, 2013, and mailed on or about August 28, 2013.

5. Attached hereto as **Exhibit "4"** is a true and correct copy of the first notice ("First Notice") of claim to arbitrate sent by the WGA on behalf of screenwriter Stephen Lindsey ("Lindsey" or "Writer"), dated July 16, 2009, and stylized case no. 09-CO-25, against Hachiko Productions, LLC ("Hachiko RI"), and Robert V. Ortiz ("Ortiz"), purportedly pursuant to the arbitration provisions in the WGA's 2004 MBA.

6. Attached hereto as **Exhibit "5"** is a true and correct copy of the second notice ("Second Notice") of claim to arbitrate sent by the WGA, dated December 6, 2011, and stylized case no. 10-CL-252, against Hachiko RI, Mr. Ortiz (the same two parties to the First Notice), Inferno Distribution, LLC, and Medea Capital, LLC, and relating to purportedly unpaid residual compensation.

7. WGA Case Nos. 09-CO-25 and 10-CL-252 were consolidated ("Consolidated

Arbitration".)

8. Attached hereto collectively as **Exhibit "6"** is a true and correct copy of the WGA's initial notices, amended notice, and second amended notice of arbitration hearing which were included in the WGA's exhibit book in connection with the Consolidated Arbitration.

9. Attached hereto as **Exhibit "7"** is a true and correct copy of the Motion to Dismiss for Lack of Jurisdiction on behalf of Hachiko Productions, LLC, that I personally submitted to the Arbitrator in the Consolidated Arbitration at the conclusion of the presentation of the WGA's case in chief at the arbitration hearing held on July 2, 2012 ("Day 1").

10. Attached hereto as **Exhibit "8"** is a true and correct copy of the Motion to Dismiss for Lack of Jurisdiction on behalf of Medea Capital, LLC that I also personally submitted to the Arbitrator in the Consolidated Arbitration at the conclusion of Day 1.

11. The Arbitrator in the Consolidated Arbitration never ruled on the jurisdictional issues presented in the two (2) Motions to Dismiss for Lack of Jurisdiction that I submitted.

12. On or about August 24, 2012, Inferno Distribution, LLC filed a Voluntary Petition for Chapter 11 bankruptcy. Attached hereto as **Exhibit "9"** is a true and correct copy of the bankruptcy petition.

13. On or about October 23, 2012, Katya Culberg, Esq. on behalf of the WGA objected to the automatic stay in the Consolidated Arbitration pursuant to 11 U.S.C. § 362(a) and served an Objection to Notice of Automatic Stay of Respondent Inferno Distribution, LLC ("Objection to Automatic Stay") in connection with the Consolidated Arbitration. Attached hereto as **Exhibit "10"** is a true and correct copy of the WGA's Objection to Automatic Stay.

14. On or about February 4, 2013, a Notice of Debtors' Joint Application to Employ Costa Abrams & Coate LLP as Special Litigation Counsel ("Application") was filed in the United States Bankruptcy Court in an effort to permit my firm to continue representing Inferno Distribution, LLC. Attached hereto as **Exhibit "11"** is a true and correct copy of such Application. This Application was subsequently denied.

15. On or about February 13, 2013, the Inferno Distribution, LLC Chapter 11 bankruptcy was converted into a Chapter 7 liquidation by order of the U.S. Bankruptcy Court. Attached hereto

as **Exhibit "12"** is a true and correct copy of the Order Converting Case to Chapter 7.

16. On or about March 7, 2013, I filed a Notice of Motion and Motion to be Relieved as Counsel ("First Motion to Withdraw"), and related documents, with the Arbitrator on the basis of the conflict described therein. Attached hereto as **Exhibit "13"** is a true and correct copy of the First Motion to Withdraw. The Arbitrator never ruled on the First Motion to Withdraw, or signed the proposed order served concurrently therewith.

17. On or about March 6, 2013, I emailed with Katya Culberg, Esq. of the WGA who was counsel of record for the WGA in the Consolidated Arbitration and addressed with her that the Chapter 7 Trustee in the above bankruptcy matter recommended a continuance of the Consolidated Arbitration on the basis that no relief had been obtained from the automatic stay and the Consolidated Arbitration purported to affect the property of the debtors in bankruptcy. Specifically, I informed Ms. Culberg that in the residuals case, Medea Capital, LLC, was owned by one of the debtors, and that in the other, compensation case, Mr. Ortiz had a claim for indemnity against Inferno Distribution, LLC, and Hachiko CA never signed any collective bargaining agreement with the WGA and never agreed to arbitrate disputes with the WGA, and further than there were various Motions to Dismiss pending on jurisdictional grounds which have not yet been addressed. I further informed Ms. Culberg that I understood that as a result of the bankruptcy, that I may need to withdraw from representation and allow the various respondents in the Consolidated Arbitration to retain separate counsel.

Further, on or about March 8, 2013, I confirmed by email with the WGA that I could put the First Motion to Withdraw on hold to see whether my employment application with the U.S. Bankruptcy Court was approved and attempt to address the representation matters in an acceptable manner and possibly continue to represent one or more of the respondents in the Consolidated Arbitration.

In response, on or about March 8, 2013, the WGA stipulated to a short continuance of the hearing.

Attached hereto as **Exhibit "14"** is a true and correct copy of the email chain concerning the above matters.

18. The second day of hearing ("Day 2") in the Consolidated Arbitration was next set for August 14, 2013.

19. In light of the fact that the Arbitrator had never ruled on the First Motion to Withdraw, and given that my employment application with the U.S. Bankruptcy Court was not approved, I had no choice but to submit a second Notice of Motion and Motion to be Relieved as Counsel ("Second Notice to Withdraw"). Attached hereto as **Exhibit "15"** is a true and correct copy of the Second Notice to Withdraw.

20. Attached hereto as **Exhibit "16"** is a true and correct copy of the description of the WGA Strike List from the WGA website at www.wga.org, as well as relevant excerpts from the WGA Strike/Unfair List showing the newly listed names of Hachiko Productions, LLC, Robert Ortiz, James (Jim) Seibel, and William (Bill) Johnson.

21. Attached hereto as **Exhibit "17"** is a true and correct copy of the California Secretary of State Business Entity Detail for Hachiko Productions, LLC, bearing entity number 00716310007, and filed in California on June 11, 2007.

22. Attached hereto as **Exhibit "18"** is a true and correct copy of the State of Rhode Island and Providence Planataions Office of the Secretary of State, Hachiko Prodcutions, LLC Summary Screen, bearing identification number 200930, organized in Rhode Island on August 30, 20078, and indicating that a revocation certificate was issued on November 8, 2010.

This Declaration is executed under penalty of perjury in accordance with the laws of the State of California, at Los Angeles, California on December 10, 2013.

ALAN ABRAMS



WGAW
WRITERS
GUILD OF
AMERICA, WEST

WGA INFORMATION SHEET

Return to:
Writers Guild of America, West
Attn: Signatories Department
7000 West Third Street
Los Angeles, CA 90048

Company: Hachiko Productions, LLC

D/B/A:

**Address: 9595 Wilshire Blvd., Suite 900
Beverly Hills, CA 90212

Contact: Carl Baker

Telephone #: 323-848-8973

Fax #: 323-848-8963

Email Address: carl@infernodistribution.com

**This is the official company address for WGA records, correspondence and notices.

I. COMPANY INFORMATION

Complete Section A, B or C on behalf of Company.

A. ☐ INDIVIDUAL

Name:

Fictitious Business Name (if applicable):

Federal ID#

Date Registered: State and County:

0107

EXHIBIT
A

SIGNATORIES DEPT.
SEP 18 2007
RECEIVED

(A copy of Page 2 must be completed by each Parent Company in addition to pending Signatory Company)

Re: Hachiko Productions, LLC
(company name)

B. ☐ CORPORATION ☒ LIMITED LIABILITY COMPANY

Incorporated/Formed in the State of: Rhode Island

Principal place of Business in the State of: Rhode Island

Date of Incorporation/Formation: Sept. 1, 2007

Federal ID#: ____

| OFFICERS/MANAGERS | | PRINCIPAL STOCKHOLDERS/ MEMBERS | % OWNED |
|---|---|---|---|
| Chair/Board: | N/A | | % |
| President: | Rob Ortiz | | % |
| V.P.: | N/A | | % |
| Sec.: | Rob Ortiz | | % |
| Treas.: | N/A | | % |
| Other: | N/A | | % |

Parent Corporation: N/A

Subsidiaries: N/A

**If the principal stockholder/member is a company, complete another Page 2 for that company. Each principal owner who is an individual must complete Page 3.**

C. ☐ GENERAL PARTNERSHIP ☐ LIMITED PARTNERSHIP ☐ JOINT VENTURE

Organized in the State of: ____

Date Formed: ____

| General Partners/Joint Venturers | % | Limited Partners |
|---|---|---|
| | % | |
| | % | |
| | % | |
| | % | |

**Each partner or joint venturer that is a company must each complete another Page 2. Each partner or joint venturer who is an individual must complete Page 3.**

**0108**

SIGNATORIES DEPT.
SEP 1 [illegible] 2007
Page 2
RECEIVED
WRITERS GUILD OF AMERICA WEST, INC.

**II. PRINCIPAL OWNER(S)**

**(A copy of Page 3 must be completed for each 10% or more owner)**

Professional Name: ______

Full Legal Name: ROBERT V. ORTIZ

Social Security #: 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

Date of Birth: JAN 6, 1972

Home Address: 2365 COVE AVE
LA, CA 90039

Telephone #: (323) 667-1884 Cell #: (323) 821-6603

Primary Source of Income: ______

Occupation/Position: LINE PRODUCER

Employer: HACHIKO PRODUCTIONS LLC

Address: ______

Telephone #: ______

Type of Business: FILM PRODUCTION

Name of Spouse: NONE

Spouse's Professional Name: ______

Please include the names of any motion picture/television/radio industry guilds or unions of which you are a member:
DIRECTORS GUILD OF AMERICA

Please list any previous projects you have produced: ______

If you are an officer, owner or partner of any other production company, please indicate below:

Companies: ______ WGA Signator? Yes ☐ No ☐

☐ ☐

☐ ☐

☐ ☐

SIGNATORIES DEPT.
SEP 18 2007
RECEIVED
WRITERS GUILD OF AMERICA WEST

III. PROJECT INFORMATION

☒ Theatrical ☐ Television/Initial Release: Hachiko: A Dog's Story

Project title(s): ______

Name(s) of Writer(s) — Start Date

1.) Paul Mason ______

2.) Vicki Wong ______

3.) ______

4.) ______

Production Start Date: 10-15-07

Above-listed writer's work is to be based upon the following:

| SOURCE MATERIAL | WRITTEN BY | ENTITLED |
|---|---|---|
| ☐ Story | | |
| ☐ Treatment | | |
| ☒ Screenplay | Stephen P. Lindsey | Hachiko |
| ☐ Unpublished Novel | | |
| ☐ Published Novel | | |
| ☐ Stage Play | | |
| ☐ Other(describe) | | |

☒ OUTRIGHT PURCHASE/SALE OF LITERARY MATERIAL; OR:

☐ OPTION TO PURCHASE/SELL LITERARY MATERIAL

Option Periods: ______

Are Writing Services Involved? ☐ Yes ☐ NO

If "Yes", please describe: ______

SIGNATORIES DEPT.
SEP 18 2007
RECEIVED
WRITERS GUILD OF AMERICA WEST, INC.

Page 4

## IV. FINANCIAL INFORMATION

Projected Budget of Project: $ 15 Million

B. Financing Sources:

Name: D. B. Zwirn
Address: 745 Fifth Ave., 18th Floor
New York, NY 10151
Contact: Eileen Burke

Percentage of Budget Financed: 100 %
Phone #: 646-720-9164
Fax #: 646-720-9064

Name:
Address:

Contact:

Percentage of Budget Financed: %
Phone #:
Fax #:

C. DISTRIBUTION INFORMATION: TBD

FOREIGN
Distributor:
Address:

Contact:
Telephone #:

DOMESTIC
Distributor: Sony Worldwide SPE Acquisitions, Inc.
Address:

Contact:
Telephone #:

## V. OWNERSHIP INFORMATION

The entity owning the underlying rights to the material and/or project at the time of principal photography:
Hachiko Productions, LLC

The entity owning the copyright once the project is completed:
Hachiko Productions, LLC

## VI. COLLECTIVE BARGAINING AGREEMENTS

Is your company signed to any of the following collective bargaining agreements? If so, please check below:

☐ IATSE ☒ DGA ☒ SAG ☐ NABET ☐ Teamsters ☐ Other:

SIGNATORIES DEPT.
SEP 1 (Page 5)
RECEIVED
WRITERS GUILD OF AMERICA, WEST, INC.

## VII. ADDITIONAL CONTACTS

**ATTORNEY**

Carl Baker
Name

Inferno Distribution, LLC
Name of Firm

9595 Wilshire Bl. #900
Street Address

Beverly Hills, CA 90212
City State Zip

323- 848- 8973
Area Code and Telephone#

323- 848- 8963
Area Code and Fax #

carl@ infernodistribution.com
Email Address

**PRODUCTION OFFICE**
(If different from official address on Page 1)

154 MAIN ST
Street Address

Woonsocket RI 02895
City State Zip

(401) 766 - 3015
Area Code and Telephone#

(401) 766 - 3016
Area Code and fax#

Email Address

☐ ACC'T or ☐ Business Manager

Andrew Mann
Name

Inferno Distribution, LLC
Company or Firm

9595 Wilshire Bl #900
Street Address

Beverly Hills, CA 90212
City State Zip

323- 848- 8973
Area Code and Telephone#

323- 848- 8963
Area Code and Fax #

andrew@ infernodistribution.com
Email Address

**OTHER ADDRESS**

Street Address

City State Zip

Area Code and Telephone #

Area Code and Fax #

Email Address

THIS DOCUMENT MUST BE SIGNED BY AN OFFICER, OWNER OR PARTNER OF THE COMPANY.

Date: 9-5-07

By: [signature]

Print Name: Rob Ortiz

Title: Manager



WGAW
WRITERS GUILD OF AMERICA, WEST

LETTER OF ADHERENCE

## LETTER OF ADHERENCE TO THE 2004 WGA THEATRICAL AND TELEVISION BASIC AGREEMENT

The undersigned Company and the Writers Guild of America, West, Inc., on behalf of itself and its affiliate Writers Guild of America, East, Inc. (collectively "WGA" or "Guild"), accept and agree to abide by all terms and conditions of the 2004 WGA Theatrical and Television Basic Agreement ("2004 MBA") as negotiated between the WGA and **(PLEASE CHECK ONE):**

- [X] the Alliance of Motion Picture and Television Producers ("AMPTP")
- [ ] the production companies of ABC, CBS and NBC ("Networks")

The 2004 MBA is in effect from November 1, 2004 through and including October 31, 2007. A Summary containing the terms and conditions is enclosed. The economic and other terms of the MBAs negotiated with the AMPTP and the Networks are essentially the same. Three differences in terms relating to television are noted in an Addendum at the end of the Summary. A Company executing a Letter of Adherence to either version of the 2004 MBA shall also be bound to the terms and conditions in Attachment 1 hereto. The parties expressly waive the notice requirements of the Labor Management Relations Act § 8 (d) (1) and (3) and Article 2.A.4 of the 2004 MBA.

Anything to the contrary in the 2004 MBA notwithstanding, the undersigned Company shall remain primarily liable for all the terms and conditions of the 2004 MBA in the event the undersigned should sell, transfer or assign any of its rights as set forth and described in the 2004 MBA.

The Guild, may in its discretion, require, at any time, reasonable financial assurances that Writers will receive all compensation (including but not limited to residuals and other forms of contingent compensation) to which they are entitled under the Agreements and their individual agreements with Company. Upon the Guild's written request, Company shall promptly provide such assurances as are acceptable to the Guild in the form of a lien, bond, cash deposit or escrow, security agreement and/or such other type acceptable to the Guild. In the event Company fails to provide such assurances, the Guild shall have the right to withhold the services of its members until such assurances are provided.

The Pension Plan and Health Fund to which contributions are required by the 2004 MBA is a separate entity and will independently determine whether your Company may participate in these trusts. Should your company be acknowledged as a participating employer, only contributions for bona fide covered employment will be accepted by them.

**AGREED TO AND ACCEPTED**

Hachiko Productions, LLC
FULL LEGAL NAME OF COMPANY

By: [signature]
SIGNATURE

Name: Rob Ortiz
PLEASE PRINT

Title: Manager

Date: Sept. 5, 2007

**WRITERS GUILD OF AMERICA, West, INC.**
on behalf of itself and its affiliate
**WRITERS GUILD OF AMERICA, EAST, INC.**

By: [signature] FOR
DAVID YOUNG, EXECUTIVE DIRECTOR

Date: 12/17/07

SIGNATORIES DEPT.
SEP 1 5 2007
RECEIVED
WRITERS GUILD OF AMERICA, WEST, INC.

## ATTACHMENT 1, LETTER OF ADHERENCE TO THE 2004 WGA THEATRICAL & TELEVISION BASIC AGREEMENT

1. Add the following unnumbered paragraph, which is in contract language, as a preamble to Article 13, "Compensation," applicable to both theatrical and television sub-sections of that Article:

"In the event that the Company, either directly or through an affiliated entity, employs, or purchases or options literary material from, a writer who is represented by an individual or entity that, at the time of the transaction, is affiliated with the Company, the Company shall in connection with the employment, sale or option require the affiliated individual or entity to comply with the Artists' Representatives Code of Fair Practices, attached hereto. For the purposes of this provision, an "affiliated" individual or entity is any parent, subsidiary, partner, joint venturer, officer, manager, agent or employee of the Company, as well as any individual or entity which has a financial interest in or controls the Company, or in which the Company has a financial interest or controls. Compliance with this provision is subject to grievance and arbitration pursuant to Articles 10 and 11 of the MBA."

## ARTISTS' REPRESENTATIVES CODE OF FAIR PRACTICES

With respect to the rendition of management or representation services for or on behalf of writers covered by the 2004 WGA-AMPTP Theatrical and Television Basic Agreement and the WGA-Network Theatrical and Television Basic Agreement ("MBA"), a manager or other representative ("Representative") subject to this Code of Fair Practices, on behalf of itself, its partners, principals, employees and agents, agrees as follows:

1. **Representative's fiduciary obligations.** The Representative shall at all times act with reasonable diligence, care and skill on behalf of the writer-client, and shall not act against the writer-client's interest. As part of this fiduciary obligation, the Representative shall:

(1) Consult with writer-client at reasonable times and intervals.
(2) Advance and protect the interests of the writer-client in all fields of writing covered by a WGA collective bargaining agreement.
(3) Notify writer-client promptly of all communications related to the representation and/or WGA-covered writing services, and in the case of any document received by Representative relating to the WGA's determination of credits, deliver it to writer-client no later than the next business day.
(4) Hold confidential all communications identified as such by the writer-client.

(5) Upon request, notify writer-client of the status of all negotiations related to his or her WGA-covered writing services.

(6) Upon request, provide writer-client with a list of all other writers represented by Representative in fields of work covered by the WGA.

(7) Refrain from knowingly negotiating or approving any contract provision that violates the MBA (or other WGA collective bargaining agreement) or a working rule of the Guild.

(8) Obtain written authority from writer-client before collecting monies belonging to the writer-client.

(9) Promptly pay to writer-client any monies received on his/her account less any commission properly payable under this Code.

(10) Refrain from commingling monies belonging to the writer-client or advanced for the benefit of the writer-client with monies belonging to the Representative, and segregate funds due or owing to the writer-client in a client trust account.

(11) Refrain from requiring that writer-client execute a release form with respect to his or her submission of literary material to Representative.

2. **Representative affiliated with signatory employer.** If the writer-client accepts employment with, or sells or options literary material to, a signatory Company affiliated with the Representative (as defined in the first unnumbered paragraph of Article 13 of the 2004 MBA; see Attachment 1 to the Letter of Adherence at paragraph 2), the Representative agrees that:

(1) The Representative shall not receive a commission or any other payment from the writer-client as a result of such WGA-covered employment, sale or option.

(2) The Representative shall provide written notice to the writer-client and the Guild disclosing the nature of the relationship between the Representative and the signatory Company.

3. **Delivery of management contract to Guild.** The Representative shall deliver to the office of WGA west, attention Lewis Moore [or his successor], 7000 West Third Street, Los Angeles, CA 90048, or to the office of WGA East, attention Rochelle Rubin [or her successor], 555 West 57th Street, New York, New York 10019, a copy of the written agreement, if any, between the Representative and the writer-client, within ten (10) business days of its execution.



FORM 5-B

## PRODUCER-WRITERS GUILD OF AMERICA PENSION PLAN FORM 5-B (2004 THEATRICAL & TELEVISION AGREEMENT)

1.The undersigned employer represents and declares:

That it employs Writers (herein "Such Writers") who render writing services in the preparation of literary material subject to the 2004 WGA Theatrical and Television Basic Agreement ("2004 MBA") and/or such other collective bargaining agreements as the Writers Guild of America may enter into with employers who employ Such Writers in Television and Motion Pictures, (herein "Basic Agreements").

That it is familiar with the provisions of (a) the Agreement and Declaration of Trust establishing the Writers Guild-Industry Health Fund dated September 23, 1973, as amended, herein referred to as the "Health Fund", and (b) the Producer-Writers Guild of America Pension Plan dated March 31, 1960, as amended, hereinafter referred to as the "Pension Plan", and (c) said applicable 2004 MBA.

2. That the employer and the Writers Guild of America are signatories to one or more such Basic Agreements, which Basic Agreements are in conformity with the law for the employee unit described below, and such union (a) is a party to the Health Fund, as set forth in Section 1 of Article I of the Health Fund, with respect to Such Writers, and (b) is a party to the Producer-Writers Guild of America Pension Plan as set forth in Section 31 of Article I of the Pension Plan with respect to Such Writers. The rate and obligation of the undersigned employer to make contributions (a) to such Health Fund with respect to Such Writers, and (b) to such Pension Plan with respect to Such Writers, shall commence on and continue for the period and in accordance with the Health Fund and the Pension Plan provisions of the 2004 MBA.

3. Also in accordance with such 2004 MBA and for the period and purposes set forth therein, the employer shall pay to the Pension Plan and Health Fund through its administrator in pursuance of the 2004 MBA the contributions the undersigned employer is obligated to make under such Basic Agreements to the Health Fund.

4. The undersigned by this document adopts and intends (a) to become a party to and to participate in the Health Fund with respect to Such Writers to the same extent as though the undersigned had executed such Trust Agreement or a counterpart thereof, in accordance with Section I, Article IX of said Health Fund, and (b) to become a party to and participate in the Pension Plan with respect to Such Writers by the execution of the document, in accordance with Section 2, Article XIII thereof.

The employer appoints as its agent (check one, if any)

( ) Alliance of Motion Picture & Television Producers ( ) other:____________________

to act for it under the terms and conditions of said Health Fund and the Pension Plan, except that said agent shall not be empowered to act under the provisions of Article VI, or Section 2, of Article VII and Section 3 of Article XIII of the Pension Plan, or under the provision of Section 2 of Article VIII of the Health Fund.

Hachiko Productions, LLC
EXACT LEGAL NAME OF COMPANY

By: [signature]
SIGNATURE

Name: Rob Ortiz
PLEASE PRINT

Title: Manager

Date: Sept. 5, 2007

FOR OFFICE USE ONLY

Accepted the ___ day of , _____, 20___
Producers-Writers Guild of America Pension Plan and on behalf of Writers Guild-Industry Health Fund

By: ________________
ADMINISTRATOR

SIGNATORIES DEPT.
Form 5-B (rev 11/01/06)(2004MBA)
RECEIVED
WRITERS GUILD OF AMERICA WEST, INC.



WGAW
WRITERS
GUILD OF
AMERICA, WEST

NOTICE OF AGENT FOR SERVICE OF PROCESS

We (I) hereby appoint the following INDIVIDUAL as the Agent for Service of Process in connection with any disputes arising under the Writers Guild of America collective bargaining agreement to which we (I) are signatory.

Should this individual cease to act as Agent for Service of Process for any reason whatsoever, we (I) agree to appoint a new agent without delay and immediately notify the WGA, in writing, of the new appointment. Notwithstanding any other provision or article of the applicable collective bargaining agreement, should we (I) fail to provide the WGA of timely notice of the appointment of a new agent, along with the new agent's address, telephone number and written acceptance of the appointment, we (I) agree that all written notices required under the provision of said collective bargaining agreement which are sent by first class mail, postage prepaid, to our (my) last address, with a copy sent to the below-appointed agent, shall constitute and be valid service under the applicable bargaining agreement. We (I) understand that the designated Agent will remain in effect until the WGA receives notification from us (me) that the agent has been replaced by another individual.

It is preferable that the Agent is a resident of the State of California. Post Office Box numbers for addresses are not acceptable.

1. NAME OF COMPANY: Hachiko Productions, LLC

Signed by: [signature]

Title: Manager

Date: Sept. 5, 2007

The undersigned hereby agrees to accept service of process in connection with any disputes or notices arising under any collective bargaining agreement:

2. NAME OF APPOINTED AGENT: Carl Baker, Esq.

Company/Law Firm: Inferno Distribution, LLC

Address: 9595 Wilshire Bl
Suite 900
Beverly Hills, CA 90212

Telephone: 323-848-8973

APPOINTED AGENT SIGNS HERE:

By: [signature]

Date: 9-5-07

SIGNATORIES DEPT.
SEP 18 2007



WGAW
WRITERS GUILD OF AMERICA, WEST

LETTER OF GUARANTEE

## LETTER OF GUARANTEE UNDER THE 2004 WGA THEATRICAL AND TELEVISION BASIC AGREEMENT

Reference is made to the Letter of Adherence to the 2004 Writers Guild of America Theatrical and Television Basic Agreement ("2004 MBA") between Hachiko Productions, LLC (PLEASE PRINT NAME OF COMPANY) (herein after "Company"), and Writers Guild of America ("WGA") which is entered into concurrently with this assumption agreement. To induce the WGA to sign the Letter of Adherence, the undersigned, as an individual, agrees to the following:

You agree to guarantee performance of the 2004 MBA by Company.

You agree to assume all the obligations of Company under each employment agreement for writing services and option or purchase agreement for literary material entered into at any time during the term of the 2004 MBA.

You further agree to assume each and every obligation of the 2004 MBA pertaining to such employment and option or purchase agreement and specifically agree to be bound by, and a party to, any grievance and/or arbitration under the 2004 MBA, should a dispute between a writer and/or WGA and Company arise. You and Company shall be deemed jointly and severally liable under any grievance or arbitration award or settlement.

You agree that service upon Company pursuant to the 2004 MBA shall constitute service upon the undersigned.

Nothing contained in this agreement shall be construed to relieve Company from its obligations under such employment and option or purchase agreement or its obligations under the 2004 MBA.

Very truly yours,

David Young
Executive Director

AGREED TO AND ACCEPTED

By: ______________________
INDIVIDUAL'S SIGNATURE

Name: Rob Ortiz
PLEASE PRINT

Date: Sept. 5, 2007



INFERNO

September 11, 2007

Mr. Rob Ortiz
c/o Hachiko Productions, LLC
154 Main St.
Woonsocket, RI 02895

Re: Hachiko Productions, LLC – Indemnity

Dear Rob:

This letter shall confirm that Inferno Distribution, LLC hereby agrees to indemnify and hold you harmless, and upon request to defend you, from and against any and all claims, liabilities, damages, losses and expenses (including, without limitation, reasonable outside attorneys' fees) which may arise from your service as the sole member of Hachiko Productions, LLC, excepting matters arising out of your negligence or willful misconduct.

Very truly yours,

Jim Seibel. Managing Member
Inferno Distribution, LLC

0119

9595 Wilshire Blvd, Suite 900, Beverly Hills, CA 90212
P. 323.848.8973 F. 323.848.8963
www.infernodistribution.com

EXHIBIT
B

August 13, 2013

Dear Mr. Rappaport:

My name is Robert V. Ortiz. I was the line producer on Hachiko. Jim Seibel, who worked for Inferno Distribution at the time, informed me last night that there is a hearing scheduled for Wednesday regarding Hachiko and that I have been personally sued by the WGA because I signed a document that makes me liable as "the last man standing" so to speak. Last night was the first time I heard about this WGA case.

As the line producer, my job on Hachiko required me to manage the budget, every person and issue during the making of Hachiko. As a part of my job, I obtained the WGA signatory paperwork and filled it out and signed where indicated in order to get the production signed with the guild. I did not know that I signed anything that could make me responsible for my employer's failure or inability to defend itself or pay its own debts to the guilds. I understand that Inferno cannot defend itself in this case because of the bankruptcy. Nonetheless, Stephen Lindsey and the WGA are proceeding against me personally. Like Stephen Lindsey, I was hired by an employer to do a specific job and I was compensated at DGA Production Manager scale for my services on Hachiko. I did my job and moved on to the next one, not thinking that something that I signed for this production would subject me to any legal claims. I was not entitled to any profit participation, nor do I have any ownership in the film or in my former employer. I am a self-employed line producer and trying to support my family and infant child from project to project. I do not have the financial resources to defend against or pay any substantial monetary award.

After I signed the WGA documents, I brought this to the attention of a lawyer and that lawyer reviewed them and told me to get an indemnification from Inferno Distribution, which I did. Inferno Distribution is supposed to defend me and pay for my expenses and anything that results from this kind of situation. But, as I understand it, the bankruptcy trustee has the discretion to disregard that indemnity and I am, as they say, "the last man standing".

Now that Inferno Distribution is bankrupt, Jim Seibel informed me last night that the WGA case is now proceeding solely against me, as an individual. I was never made aware of the fact that I could later be responsible for my employer because of the bankruptcy.

In any event, I am now working for a new employer on a new show in Louisiana and there is no way that I will be able to attend the hearing tomorrow. Also I will probably need to get my own lawyer if the WGA insists to proceed against me personally.

Can we schedule a time to address my responsibility under the guarantee while I am in Los Angeles and where I can attend with an attorney?

0120

Sincerely,

Robert V. Ortiz



Dear Stephen,

This letter confirms the understanding between us. We are asking you to write a storyline and screenplay based on our ideas for a movie based on the true story of the Japanese dog named "Hachiko".

We will pay you the sum of $2,000 (two thousand dollars) for your work.

This sum will be payable as follows:

$500 after delivery of approved story outline.
$1,000 payable after delivery of first draft screenplay.
$500 payable after delivery of final revised screenplay.

Should the picture go into production, you will be paid the sum of $50,000 (fifty thousand dollars) for the screenplay on the first day of principal photography.

Additionally, you will share 5% of our portion of the profits.

You will receive writing credit to be determined by your contribution to the final screenplay as filmed.

If this is acceptable to you, please sign below.

Sincerely,

Paul Mason and Vicki Wong

Stephen Philip Lindsey — Date 03.06/2006

Paul Mason — Date 3/6/06

Vicki Wong — Date 3/6/06

EXHIBIT D

**2004 WRITERS GUILD OF AMERICA - ALLIANCE OF MOTION PICTURE & TELEVISION PRODUCERS THEATRICAL AND TELEVISION BASIC AGREEMENT**

**TABLE OF CONTENTS**

Table of Contents . . . . . i
Preamble Regarding So-Called "Possessive Credits" . . . . . xiii

ARTICLE — PAGE

1. DEFINITIONS
   A. General . . . . . 10
   B. Theatrical . . . . . 12
   C. Television . . . . . 17

2. TERM AND EFFECTIVE DATE OF AGREEMENT
   A. General . . . . . 27
   B. Theatrical . . . . . 28
   C. Television . . . . . 28

3. WORK LISTS, LOAN-OUTS AND RECOGNITION
   A. General . . . . . 29
   B. Recognition (Theatrical) . . . . . 31
   C. Recognition (Television) . . . . . 31

4. PARTIES BOUND BY THIS BASIC AGREEMENT
   A. General . . . . . 32
   B. Theatrical . . . . . 32
   C. Television . . . . . 33

5. GEOGRAPHICAL APPLICATION OF THIS BASIC AGREEMENT (GENERAL) . . . . . 34

6. GUILD SHOP (GENERAL) . . . . . 35

7. NO STRIKE, NO LOCKOUT CLAUSE (GENERAL) . . . . . 40

8. CREDITS FOR SCREEN AUTHORSHIP (GENERAL) . . . . . 42

9. MINIMUM TERMS (GENERAL) . . . . . 42

10. GRIEVANCE AND ARBITRATION
   A. Matters Subject to Grievance and Arbitration (General) . . . . . 43
   B. Limitation of Matters Subject to Grievance and Arbitration . . . . . 44
   C. Matters Subject to Arbitration but Not Grievance . . . . . 45
   D. Refusal to Arbitrate . . . . . 45
   E. References . . . . . 45

EXHIBIT 1

ARTICLE PAGE

11. GRIEVANCE AND ARBITRATION RULES AND PROCEDURES

A. General Rules ........ 46
B. Grievance ........ 53
C. Arbitration ........ 54
D. Arbitration of Disputes Which Involve Questions of Jurisdiction or Arbitrability ........ 57
E. Arbitration of Disputes Concerning Credit Provisions ........ 57
F. Expedited Arbitration of Certain Disputes Concerning Reacquisition of Unproduced Literary Material (Theatrical) ........ 59
G. Arbitration of Certain Disputes Concerning Residuals Provisions ........ 65
H. Arbitration of Disputes Concerning Tri-Guild Residuals Audits ........ 69
I. Equal Status of Parties. ........ 69

12. COURT PROCEEDINGS

A. Disputes Concerning Credits ........ 70
B. Disputes Concerning Compensation ........ 70

13. COMPENSATION

A. Theatrical ........ 71
1. a. Minimum Compensation ........ 72
b. Discount - New Writers ........ 73
c. Additional Payment - No Assigned Material ........ 73
2. Narration by a Writer Other Than any Writer of Screenplay or Story and Screenplay ........ 73
3. Initial Payment ........ 74
4. Maximum Period of Employment ........ 75
5. Computation of Writer's Period of Employment ........ 75
6. Waiting Time ........ 76
7. Extension of Employment Period ........ 76
8. Failure to Deliver Material Within Allotted Time Period ........ 77
9. Teams ........ 77
10. Week-to-Week, Term, Flat Deal ........ 78
11. Applicable Deal Minimum Compensation ........ 79
12. Inapplicability of Provisions ........ 79
13. Purchases ........ 80
14. Payment of Compensation Under Deal Contract ........ 81
15. Minimum Weekly Compensation ........ 81
16. Theatrical Motion Picture Released on Free Television ........ 82
17. Remakes ........ 82
18. Script Annotations ........ 84

B. Television

1. Minimum Basic Compensation ........ 84
a. Options ........ 84
b. Other Compensation Minimums ........ 84

**ARTICLE** **PAGE**

2. "High Budget" Films . . . . . 85
3. "Low Budget" Films . . . . . 86
4. "Negative Cost" . . . . . 86
5. Story Claim by Production Executive . . . . . 87
6. Step Outline . . . . . 87
7. Schedule of Minimum Compensation . . . . . 88
   a. Story . . . . . 88
   b. Teleplay . . . . . 88
   c. Story and Teleplay . . . . . 89
   cc. Story with Options . . . . . 90
   d. Network Prime Time . . . . . 90
      (1) Story . . . . . 91
      (2) Teleplay . . . . . 91
      (3) Story and Teleplay . . . . . 91
   dd. Segment Rate . . . . . 92
   e. Serials . . . . . 94
   f. Installment Payments . . . . . 95
   g. Plot Outline - Narrative Synopsis of Story . . . . . 96
   h. Compensation for Rewrites and Polishes . . . . . 97
      (1) Rewrites . . . . . 98
      (2) Polishes . . . . . 98
   m. (1) Format . . . . . 99
      (2) Bible . . . . . 100
      (3) Rewrite or Polish of Format or Bible . . . . . 100
   n. Narration . . . . . 101
   o. Remakes . . . . . 104
   p. Non-Commercial Openings and Closings . . . . . 105
   q. Total Writing Cost . . . . . 106
   r. Pilot Scripts, Back-Up Scripts and Spin-offs . . . . . 106
   s. Week-to-Week and Term Employment . . . . . 107
8. Reading Time and Obligations of Freelance Writer Re Revisions . . . . . 110
   a. Story . . . . . 110
   b. Teleplay . . . . . 110
   c. Teleplays Over 30 Minutes . . . . . 110
   d. Writer's Obligation . . . . . 111
   e. Company's Best Efforts . . . . . 111
   f. Writer Entitled to Script . . . . . 111
   g. Revisions in Pilot . . . . . 111
9. Time of Payment . . . . . 111
10. Cut-Off . . . . . 112
11. Script Annotations . . . . . 112
12. Notice of Conditions Precedent . . . . . 112

C. Claimed Overpayments . . . . . 112
D. Payment Procedures (General) . . . . . 112

14. WRITERS ALSO EMPLOYED IN ADDITIONAL CAPACITIES (TELEVISION) . . . . . 113

A. Definition . . . . . 113
B. Contracts of Employment . . . . . 113

ARTICLE PAGE

C. Forms of Employment ........ 114
D. Amount, Nature and Extent of Services ........ 114
E. ........ 115
F. ........ 116
G. Program Fees ........ 119
H. Suspension, Termination and/or Offset ........ 120
I. Hiatus Periods ........ 120
J. ........ 121
K. Minimum Compensation ........ 122
L. ........ 122
M. Better Terms ........ 123

15. TELEVISION EXHIBITION

A. Theatrical ........ 123
Literary Material Assumption Agreement ........ 134
B. Television – Reruns & Foreign Telecasts of Television Motion Pictures
1. United States and Canada ........ 138
2. Foreign Telecasting Formula ........ 143
3. Application of Excess ........ 148
4. ........ 148
5-6. ........ 149
7-8. Television Literary Material Assumption Agreement ........ 150
9. [deleted]
10. Use of excerpts ........ 152
11. [Deleted]
12. Small Accountings ........ 157
13. Additional Compensation for Theatrical Exhibition ........ 157
14. Additional Compensation for Certain Use of Material to Which Separated Rights Do Not Apply ........ 161
15. Simulcasts ........ 172
16. Basic Cable ........ 172
17. ........ 172

16. SEPARATION OF RIGHTS

A. Theatrical
1. Definitions ........ 172
2. Initial Qualification ........ 173
3. Final Qualification ........ 175
4. Separable Material ........ 187
5. Sequel and Interactive Payments ........ 189
6. Arbitration ........ 191
7. Miscellaneous ........ 195
8. Writer's Right to Reacquire Literary Material ........ 197
9. Hot Line Dispute Resolution ........ 209
10. Publication Fee ........ 209

ARTICLE PAGE

B. Television
1. General Qualifications . . . . . 210
2. Television Rights . . . . . 211
3. Other Rights . . . . . 217
4. Sketches and Routines . . . . . 223
5. Upset Price . . . . . 224
6. Adapter's Royalty . . . . . 225
7. Extricable Material . . . . . 226
8. Continuing Rights and Obligations . . . . . 226
9. Hot Line Dispute Resolution . . . . . 226

17. PENSION PLAN AND HEALTH FUND

A. General Provisions . . . . . 226
B. Pension Plan . . . . . 227
C. Health Fund . . . . . 231
D. [Deleted] . . . . . 235
E. Audits . . . . . 235
F. Committee on Pension and Health . . . . . 237

18. NOTICE TO WRITERS EMPLOYED ON SAME MATERIAL

A. General . . . . . 237
B. Theatrical . . . . . 238
C. Television . . . . . 239

19. USE AND DELIVERY OF STANDARD FORM CONTRACTS

A. General . . . . . 239
B. Theatrical . . . . . 239
C. Television . . . . . 241

20. SPECULATIVE WRITING

A. Theatrical . . . . . 242
B. Television . . . . . 243

21. LOCATION EXPENSES (GENERAL) . . . . . 247

22. TERM CONTRACTS - OPTIONS (GENERAL) . . . . . 248

23. LAY-OFF (GENERAL) . . . . . 249

24. GUARANTEED EMPLOYMENT (GENERAL) . . . . . 250

25. NOTICE OF TERMINATION OF EMPLOYMENT (GENERAL) . . 251

26. FORCE MAJEURE . . . . . 251

27. MOTION PICTURES TO WHICH AGREEMENT NOT APPLICABLE (THEATRICAL) . . . . . 252

ARTICLE PAGE

28. WARRANTY AND INDEMNIFICATION (GENERAL) .......... 252

29. SEPARATE AGREEMENT (GENERAL) .................... 253

30. WRITER EMPLOYMENT AGREEMENT WITH COMPANY (THEATRICAL) .......... 254

31. OPPORTUNITY TO EXECUTE SIMILAR AGREEMENT (THEATRICAL) .......... 254

32. REFERENCE TO AGREEMENT (GENERAL) .......... 254

33. JURISDICTIONAL DISPUTES (GENERAL) .......... 254

34. [Deleted]

35. RECOGNITION OF AGREEMENT (GENERAL) .......... 254

36. TERMS AND CONDITIONS APPLICABLE TO CERTAIN CATEGORIES OF PROGRAMS .......... 255

37. NAMES ON LITERARY MATERIAL (GENERAL) .......... 255

38. NON-DISCRIMINATION

A. Policy and New Programs .......... 256
B. Representatives .......... 257
C. Human Resources Coordinating Committee .......... 257
D. Data Submission Program .......... 258
E. Script Submission Program .......... 260
F. Writers' Training Program .......... 260
G. Arbitration .......... 262
H. .......... 263

39. PILOT SCREENING (TELEVISION) .......... 263

40. SECURITY INSTRUMENTS (TELEVISION) .......... 263

41. NOTICES (GENERAL) .......... 265

42. POSTING BONDS (GENERAL) .......... 265

43. COMPUTATION OF TIME (GENERAL) .......... 266

44. SEVERABILITY OF PROVISIONS (GENERAL) .......... 266

45. LABOR-MANAGEMENT COOPERATIVE COMMITTEE .......... 266

46. FOREIGN PERFORMANCE FEES (THEATRICAL) .......... 266

47. RESIDUALS PROTECTION .......... 268

ARTICLE PAGE

48. PROFESSIONAL STATUS OF WRITERS: WRITER PARTICIPATION IN THE PRODUCTION PROCESS (GENERAL) .......... 268

A. .......... 268
B. Theatrical .......... 269
C. Television .......... 271
D. .......... 273
E. "Hot Line Dispute Resolution" .......... 273
F. Committee on the Professional Status of Writers .......... 273
G. Authorized Expenses .......... 273
H. Campaign For Greater Appreciation of the Role of the Writer .. 274
I. [Deleted]
J. .......... 274
K. .......... 274

49. SHOPPING OF MATERIAL .......... 275

50. COPYRIGHT (TELEVISION) .......... 275

51. SUPPLEMENTAL MARKETS .......... 276
Literary Material Assumption Agreement .......... 288

52. INDUSTRIAL FILMS (GENERAL) .......... 290

53. FINANCIAL INFORMATION .......... 290

54. PROHIBITION OF SO-CALLED "MORALS CLAUSE" .......... 292

55. RESTRAINT ON LICENSEE RIGHT OF APPROVAL .......... 292

56. SIGNIFICANCE OF TITLES AND SUB-TITLES (GENERAL) .... 292

57. PAY TELEVISION AND VIDEODISC/VIDEOCASSETTE PRODUCTION .......... 293

58. RELEASE OF FREE TELEVISION PROGRAMMING AND THEATRICAL MOTION PICTURES TO BASIC CABLE .......... 293

59. COPYRIGHT ROYALTY TRIBUNAL MONIES (GENERAL) .... 294

60. DISSEMINATION OF CRITIQUES OF LITERARY MATERIAL (GENERAL) .......... 294

61. JOINT COMMITTEES .......... 294

62. CONTRACT ADJUSTMENT COMMITTEE .......... 295

63. CREDITS REVIEW .......... 295

**ARTICLE** **PAGE**

64. REUSE OF MBA-COVERED MATERIAL IN INTERACTIVE PROGRAMS .... 296

A. Definitions and Coverage .... 296
B. Reuse of Covered Motion Pictures, In Whole or In Part .... 299
C. Interactive Programs Based Upon Literary Material .... 301
D. Combination Payments for Reuses Described in Article 64.B. and C. .... 302
E. Reporting and Assumption Agreements .... 303
F. .... 317
G. Recognition of Experimental Nature of Article; Cooperation .... 317
H. Interactive Media Committee .... 318

65. RESPONSIBILITY FOR RESIDUAL PAYMENTS (GENERAL) .. 318

A. Theatrical Motion Pictures .... 318
1. Distributor's Assumption Agreement .... 318
2. Buyer's Assumption Agreement .... 329
3. Distributor's Liability .... 338
B. Television Motion Pictures .... 339
1. Television Distributor's Assumption Agreement .... 339
2. Television Buyer's Assumption Agreement .... 350
C. Definition of Company for Purposes of Article 65.A. and B. .... 359
D. Company's Dissolution (General) .... 359
E. Networks and Television Stations (General) .... 360

66. TRAINING PROGRAM FOR EPISODIC TELEVISION WRITERS .... 360

THEATRICAL SCHEDULE A (THEATRICAL CREDITS) .... 362
Notice of Tentative Writing Credits .... 368

TELEVISION SCHEDULE A (TELEVISION CREDITS) .... 386
Notice of Tentative Writing Credits .... 398

SIDELETTER TO THEATRICAL SCHEDULE A AND TO TELEVISION SCHEDULE A (COMMITTEE ON CREDIT DETERMINATION PROCESS) .... 403

TELEVISION SCHEDULE B (STANDARD FORM FREELANCE TELEVISION WRITER'S EMPLOYMENT CONTRACT) .... 404

SIDELETTER A (WGA-AFFILIATION SCREEN AND TELEVISION CREDITS AGREEMENT) .... 407
EXHIBIT A (SCREEN AND TELEVISION CREDITS AGREEMENT) .... 409

SIDELETTER B - Article 42 .... 411

APPENDIX A
General .... 412
1. Definitions .... 412

ARTICLE PAGE

3. Recognition .......... 416
5. Application of this Basic Agreement .......... 417
8. Credit .......... 417
13. B. Compensation
1. Minimum Basic Compensation .......... 417
2. Comedy-Variety Programs .......... 418
3. Self-Contained Portions of Programs .......... 423
4. Quiz and Audience Participation Programs .......... 424
5. Serials - Other than Prime Time .......... 426
6. Other Non-Dramatic Programs .......... 436
7. Compensation Provisions Applicable to Television Programs Covered by Appendix A (Other than Documentary) .......... 446
8. Documentary Programs .......... 450
14. Writers Also Employed in Additional Capacities .......... 457
15. B. Television Exhibition
1. Generally .......... 458
2. Comedy-Variety Programs - Prime Time, Once a Week or Less .......... 459
3. Non-Prime Time Serials .......... 460
3.1 Other Non-Dramatic Programs, Documentary, News and Public Affairs Programs .......... 462
4. Documentary Programs .......... 463
5. Application of Article 15.B.14 .......... 463
6. Radio Use of Simulcast Programs .......... 463
16. B. Separation of Rights
1. Comedy-Variety Programs .......... 463
2. Serials (Non-Prime Time) .......... 464
3. Quiz and Audience Participation Programs .......... 465
4. "Incidental Uses" of Material .......... 465
17. Pension Plan and Health Fund .......... 466
19. Use and Delivery of Standard Form Contracts .......... 467
20. Speculative Writing .......... 467
21. Location Expenses .......... 467
22. Term Contracts - Options .......... 467
28. Warranty and Indemnification .......... 467
39. Pilot Screening .......... 468
41. Notices .......... 468
48. Committee on Professional Status of Serial Writers .......... 468
61. Services Not Covered by This Agreement (Documentary) .......... 469

ATTACHMENT TO APPENDIX A - PROCEDURES WITH RESPECT TO ASSIGNMENTS AND INDIVIDUAL CONTRACTS REFERRED TO IN ARTICLES 19 AND 20 .......... 471

TELEVISION SCHEDULE C - APPENDIX A - PROGRAM CREDITS (OTHER THAN DOCUMENTARY) .......... 472

TELEVISION SCHEDULE D - APPENDIX A - DOCUMENTARY, NEWS AND PUBLIC AFFAIRS PROGRAM CREDITS .......... 477

ARTICLE PAGE

SCHEDULE D-1 - DOCUMENTARY WRITING CREDITS ADDENDUM. .484

SIDELETTER TO APPENDIX A RE LITERARY MATERIAL .......... 485

SIDELETTER TO APPENDIX A, ARTICLE 13.B.2.b.(3), ANNIVERSARY AND SPECIAL EPISODES OF WEEKLY SERIES PROGRAMS ...... 486

SIDELETTER TO APPENDIX A, ARTICLE 13.B.5. (DAILY WRITING CREDIT) ................................................ 487

APPENDIX B - PRODUCTION FOR THE PAY TELEVISION AND THE VIDEODISC/VIDEOCASSETTE MARKETS

A. Introduction and Scope ................................ 488
B. Definitions ................................................ 488
C. Compensation for Covered Programs (other than Dramatic Programs of a Type Generally Produced for Prime Time Network Television Which are Produced Principally for Pay Television) . 489
   1. Initial Compensation ................................ 489
   2. What Initial Compensation Covers .................... 489
   3. Additional Compensation (Residuals) .................. 491
D. Compensation for Dramatic Programs of a Type Generally Produced for Prime Time Network Television Which are Produced Principally for Pay Television ................... 493
   1. Initial Compensation ................................ 493
   2. What Initial Compensation Covers .................... 493
   3. Additional Compensation (Residuals) .................. 494
E. ................................................ 495
F. Distribution Formula ..................................... 495
G. Release in Other Media ................................... 496
H. Separation of Rights ..................................... 496
I. Other Provisions ......................................... 497
J. Use of Excerpts .......................................... 497

APPENDIX C - PROGRAMS MADE FOR BASIC CABLE TELEVISION . 498

APPENDIX D - WRITER-DIRECTOR COLLABORATION - THEATRICAL ............................................. 503

APPENDIX E - WRITER-DIRECTOR COLLABORATION - TELEVISION ............................................. 506

SIDELETTER TO ARTICLE 3, QUARTERLY EARNINGS REPORTS AND EMPLOYMENT NOTICES ............................... 510

SIDELETTER TO ARTICLE 11.F., "EXPEDITED ARBITRATION OF CERTAIN DISPUTES CONCERNING REACQUISITION OF UNPRODUCED LITERARY MATERIAL (THEATRICAL) ........... 512

SIDELETTER TO ARTICLE 11.H., ARBITRATION OF DISPUTES CONCERNING TRI-GUILD RESIDUALS AUDITS .................. 513

| ARTICLE | PAGE |
|---|---|

EXHIBIT A TO ARTICLE 11.H., COLLECTIVE BARGAINING AGREEMENTS .......... 521

SIDELETTER TO ARTICLE 13.B.7. RE "SUPERSIZED" EPISODES .... 525

SIDELETTER TO ARTICLE 13.B.7.f., RE LONG-FORM TELEVISION MOTION PICTURES; PAYMENT FOR WRITING STEPS .......... 527

COVENANT OF TIMELY PAYMENT IN LONG-FORM TELEVISION .. 528

SIDELETTER RE PENSION PLAN AND HEALTH FUND CONTRIBUTIONS FOR ARTICLE 14 WRITERS .......... 529

SIDELETTER TO ARTICLE 15.B.1. RE INTERRUPTED BROADCASTS . 530

SIDELETTER NO. 1 TO ARTICLE 15.B.1.b.(2)(c) - WAIVER RE DOMESTIC FREE TELEVISION RESIDUALS FOR ONE-HOUR NETWORK PRIME TIME DRAMATIC SERIES .......... 532

SIDELETTER NO. 2 TO ARTICLE 15.B.1.b.(2)(c) - EXPERIMENT IN SYNDICATION OF HALF-HOUR SERIES IN MARKETS REPRESENTING 50% OR FEWER OF U.S. TELEVISION HOUSEHOLDS .......... 536

SIDELETTER TO ARTICLE 15.B.14.h.(2) RE CHARACTER PAYMENTS .......... 538

SIDELETTER RE ELECTRONIC DATA TRANSFER .......... 539

SIDELETTER TO ARTICLE 16 - REACQUISITION PROVISIONS ...... 540

SIDELETTER TO ARTICLE 16.A.8.d) - REACQUISITION .......... 542

SIDELETTER RE ARTICLE 16.A.8. RE COMMITTEE TO ADDRESS REACQUISITION .......... 545

SIDELETTER RE THEATRICAL RIGHTS .......... 546

SIDELETTER RE PENSION PLAN .......... 547

SIDELETTER TO ARTICLE 17.C.1. AND ARTICLE 14.E.2., COMPANIES' OBLIGATIONS RE COPYRIGHT TERM EXTENSION LAW .......... 548

SIDELETTER RE CHANGES IN HEALTH FUND BENEFITS .......... 549

SIDELETTER RE ARTICLE 48.B., MODIFICATION OF .......... 550

SIDELETTER NO. 2 RE ARTICLE 48.B., WRITER'S VIEWING PERIOD 552

ARTICLE PAGE

SIDELETTER TO ARTICLE 48.F. - COMMITTEE ON THE PROFESSIONAL STATUS OF WRITERS ........ 554

SIDELETTER TO ARTICLE 48.F. - COMMITTEE ON THE PROFESSIONAL STATUS OF WRITERS -- TELEVISION ........ 556

SIDELETTER TO ARTICLE 51 RE "DISTRIBUTOR" ........ 558

SIDELETTER ON LITERARY MATERIAL WRITTEN FOR PROGRAMS MADE FOR THE INTERNET ........ 561

SIDELETTER ON EXHIBITION OF MOTION PICTURES TRANSMITTED VIA THE INTERNET ........ 563

SIDELETTER RE INDUSTRY-WIDE DISCUSSIONS OF EXHIBITIONS OF MOTION PICTURES TRANSMITTED VIA THE INTERNET ........ 566

ARTICLE 64 SIDELETTER RE CREDITS ........ 568

SIDELETTER REGARDING INTEREST ON DELINQUENT RESIDUALS PAYMENTS ........ 571

QUALIFIED DISTRIBUTOR/BUYER LETTER OF AGREEMENT (THEATRICAL) ........ 572

STANDARD LETTER OF GUARANTY (THEATRICAL) ........ 575

QUALIFIED RESIDUAL PAYOR LETTER OF AGREEMENT (TELEVISION) ........ 577

STANDARD LETTER OF GUARANTY (TELEVISION) ........ 580

SIDELETTER ON NEW TECHNOLOGIES COOPERATIVE EDUCATION PROGRAM ........ 583

SIDELETTER ON INFORMATIONAL PROGRAMS ........ 585

SIDELETTER RE METHODS OF ENCOURAGING ORIGINAL WRITER'S CONTINUED PERFORMANCE OF WRITING SERVICES - TELEVISION ........ 587

AMENDMENT AGREEMENT RE RELEASE OF ROYALTY PLAN PROGRAMS TO BASIC CABLE ........ 588

## PREAMBLE REGARDING SO-CALLED "POSSESSIVE CREDITS"

***Purpose of Preamble***

In the negotiations leading to the 1995 Minimum Basic Agreement, the Companies and the Guild confirmed their jointly held view that the making of film and television is a collaborative art and business venture in which the contributions of many persons are essential, and without which motion pictures cannot be made. The AMPTP and the Guild sought to reach an agreement to meet the Guild's long-standing objection to the use of possessive credits. It was concluded that a comprehensive resolution of the issues involved would not be reached prior to the end of the negotiation, but that a comprehensive resolution would be sought in the future. The bargaining parties further agreed to the inclusion of this PREAMBLE as a means of highlighting the Writers Guild's strong, continuing, long-standing opposition and objections to the use of so-called "Possessive Credit(s)."

***Defining Possessive Credit(s)***

The term "possessive credits" refers to such credits as are generally regarded as such in the film and television industry and which attribute, impute and/or which could be reasonably construed to credit a person with the authorship of a film. It is understood that the term "possessive credits" does not include any forms of writing or source material credits. Examples of such credits are:

"A Film By ____________________"

"Pat Brown's [title of film]"

"A Robin Smith Film"

The PREAMBLE is in two parts:

1. Statement by the Writers Guild of America.

2. Acknowledging statement by each Company signatory to this MBA.

### STATEMENT OF THE WRITERS GUILD OF AMERICA

**Writers Guild Objections to Possessive Credits**

Since its founding, the Writers Guild has opposed the use of the so-called "possessive credit" on screen and in advertising and promotion when used to refer to a person who is not the sole author of the screenplay.

The Guild's historic, current and ongoing opposition is based upon beliefs and principles which include the following:

Credits should, as far as possible, accurately reflect each individual's contribution.

The granting of a possessive credit to a person who has not both written and directed a given motion picture inaccurately imputes sole or preeminent authorship.

The proliferation of the number of unnecessary credits on screen and in advertising devalues credits in general.

The widespread use of the credit denigrates the creative contributions of others.

## ACKNOWLEDGING STATEMENT BY EACH COMPANY

Each Company acknowledges that the Guild holds the foregoing strong objections and beliefs regarding the use of the "possessive credit."

The Companies believe that the best way to address the foregoing objections is through tripartite discussions among the Companies, the WGA and the DGA and, therefore, commit to their full participation in that process.

**2004 WRITERS GUILD OF AMERICA –
ALLIANCE OF MOTION PICTURE & TELEVISION PRODUCERS
THEATRICAL AND TELEVISION BASIC AGREEMENT**

This Agreement, to be referred to as the **"2004 Writers Guild of America-Alliance of Motion Picture & Television Producers Theatrical and Television Basic Agreement,"** was executed as of the 1st day of November, 2004, by and between Writers Guild of America, west, Inc. and Writers Guild of America, East, Inc. (hereinafter referred to as the "Guild"), and the following producing companies represented for purposes of collective bargaining by the Alliance of Motion Picture & Television Producers, Inc. ("AMPTP"):

12:05 AM Productions, LLC
37th Floor Productions, Inc.
66 Degrees North Post

Abby Mann Productions, Inc.
Act III Productions, LP
AGV Productions, Inc.
Alan Barnette Productions, Inc.
Alan Chazin Productions
Alan Wagner Productions, Inc. dba Boardwalk Entertainment
Alex Entertainment, Inc.
All Media Inc.
Allenford Productions, Inc.
Amati, Inc.
Antonia Productions Inc.
Appleton Productions, Inc.
AR Etc. Productions, Inc.
Aries Pictures LLC
Arlington Productions, Inc.
Arnold Shapiro Productions, Inc.
Arpad Productions, Inc.
Ashland Productions, Inc.
Asuncion Development LLC
Auckland Productions, Inc.
Aura Writes, LLC
Avery Pix, Inc.
The Avnet/Kerner Company

The Barn Productions, Inc.
Barry Rosen Films
Beacon Communications, LLC
Behave Productions, Inc.
Bella Donna Pictures, Inc.
Belleville Productions, Inc.
BG Properties, Inc.
Big Ticket Pictures Inc.
Big Ticket Productions Inc.
Blackbird Films Ltd
Blenheim Films Limited
Blueprint Entertainment (USA), Inc. dba Blueprint Entertainment

Blueprint Entertainment Corporation
BoJames Entertainment, Inc.
Borndreamer Inc.
BOT Productions, Inc.
Brad Lachman Productions, Inc.
Braun Entertainment Group, Inc.
Bright Lady Productions, LLC
Bright Star Pictures LLC
The Bubble Factory LLC
Bungalow 78 Entertainment, Inc.
Bungalow 78 Productions, Inc.

C.G. Productions
Camelot Pictures LLC
Camelot Productions, LLC
Candagallo Productions, Inc.
Cannell Entertainment, Inc.
Canterbury Productions, Inc.
Cara Communications Corporation d/b/a Vin Di Bona Productions
Carnegie Hill Productions, Inc.
Castle Rock Pictures, Inc.
Castle Rock Television, Inc.
Catch23 Productions, Inc.
CB Productions, LLC
Cecchi Gori Pictures
Centropolis Entertainment, Inc. (formerly RE Film Development, Inc.)
Chainsaw Productions LLC
The Childhood Project, Inc.
Chiz Schultz, Inc.
ChubbCo FilmCo
Chuck Fries Productions, Inc.
Cinergi Pictures Entertainment, Inc.
Cloverleaf Productions Inc. dba CL Productions Inc.
Coconuts Productions, Inc.
Code 2 Productions Inc.
Columbia Pictures Industries, Inc.
Columbia TriStar Television, Inc.
Constantin Media GmbH Audiovisuelle Produktion
Corapeake Productions, Inc.
Corday Productions, Inc.
Cornerstone Productions - A California Corporation
Corsica Productions, Inc.
Cosgrove/Meurer Productions, Inc.
Costume & Production Services Inc.
Country Music Association, Inc.
CPT Holdings, Inc.

Dakota North Entertainment, Inc.
Dale Earnhardt Foundation Inc.
Dan Curtis Productions, Inc.
Dan Wigutow Productions, Inc.
Daniel Giat d/b/a Carroll Street Productions
Danjaq LLC

Dave Dog Productions, Inc.
Deeper Dimensions, Inc.
dick clark film group, inc.
dick clark productions, inc.
Dino De Laurentiis Company
Documentary Broadcasting Company
Dog Run Production, Inc.
DR Productions, Inc.
DreamWorks Dramatic Television L.L.C.
DreamWorks Films LLC
DreamWorks SKG TV L.L.C.
DreamWorks Television LLC

East of Doheny, Ltd.
EE Development and Productions, LLC
Elizabeth Street Productions, Inc.
ELP Communications
Entertainment Industries Council, Inc.
E.O.B. Productions, Inc.
Escape Artists Productions, LLC
Essence Film & Television Productions, LLC
EUE Temps Inc.
Evergreen Pictures LLC
Exclamation Productions, Inc.

Family Tree Productions, Inc
Figaro Films, Inc.
The Film Foundry, Inc.
FilmQuest Pictures Corporation
Final Draft, LLC
Final Stretch Productions, Inc. fka Lookalike Productions, Inc.
Fireworks Media Inc.
First Light Productions, Inc.
The FKPS Company
fleisherfilm, inc.
Floresta Productions, Inc.
Flye Bye Nyte Productions, Inc.
FM Rocks Films, Inc.
Focus I Productions, Inc.
Forward Pass, Inc.
Fountain Productions, Inc.
Four Winds Entertainment, LLC
Fox Late Night Productions, Inc.
Fox Nitetime Prod., Inc.
Fox Square Productions, Inc.
Frank & Bob Films II
Frozen Lake Productions, LLC
FSO Productions, Inc.
Fuma Films, Ltd.
Furious Pictures Corporation
FWA Productions, Inc.

Galaxy Way Productions, Inc.
Gary Hoffman Productions, Inc.
George S. Taweel, Inc.
Get A Life Productions, Inc.
Girl Group Co.
Glenhill Productions, Inc.
Goldberg and O'Reily Enterprises, Inc.
Granada US Productions
Grand Productions, Inc.
Granville Productions, Inc.
Green/Epstein Productions, Inc.
The Greenblatt Janollari Studio, Inc.
Gross/Weston Productions, Inc.

Halberd Productions, Inc.
Hallmark Entertainment Productions, LLC
Hardware Distribution, Inc.
Hearst Entertainment, Inc.
Helfgott-Turner Productions, Inc.
High Productions, Inc.
Highlander Pictures, Ltd.
Hillard Productions, Inc.
Hitmakers Publishing, LLC
Holding Pictures Development Co., LLC
Hollyvista Productions, Inc.
Hoosier Daddy, Inc.
Howard Dratch Productions
Hudson Productions, Inc.

Iberoamericana Films Produccion S.A.
Imagine Television
Independent Projects, Inc.
Interim Productions, Inc.
Intermedia Film Development Ltd.
International Movie Trading Inc.
Intravenous Therapy Services, Inc.
Invader Productions, Inc.
It's Mitz Productions, Inc.

Jam Bay Productions, Inc.
James B. Harris Productions, Inc.
Jay Wolpert Enterprises Inc.
Jeff Margolis Productions, Inc.
Jennilind Productions, Inc.
Jeopardy Productions, Inc.
Jerry Reger Productions, Inc.
Joel Freeman Productions, Inc.
John G. Farbes
Johnny Lindy Company d/b/a Vin Di Bona Productions
The Jon Avnet Co. II

Katja Motion Picture Corp.
Kelley Productions, Inc. dba David E. Kelley Productions

The Kemp Company, Inc.
Kid Ro Productions, LLC DBA One Canvas Productions, LLC
Killer Bunny Inc.
Kinema Motion Pictures, Inc.
KLS Communications Inc.

La Boca Productions LLC
La Mesa Productions, Inc.
Lafitte Productions, Inc.
Lakeshore Entertainment Group LLC
Lance Burton Productions, Inc.
Landscape Entertainment, Inc.
Lary Simpson Productions
Lava Films LLC
Leibovitz-Hellman Productions, Inc.
Lester Persky Productions, Inc.
Let's Make A Deal
Level Pictures, Inc.
L G Films
L.H. Pictures Corporation
Lifetime Television Development, Inc.
Lightstream Entertainment, Inc.
Lightyear Entertainment Inc.
Lincoln Center for the Performing Arts, Inc.
Llamame Loco Producciones, Inc.
LMK Productions, Inc.
LMNO Productions, Inc.
Long Acre Productions Limited
Longbow Productions, LLC
Looking Glass Entertainment
A Louis J. Horvitz Production
LRF Development Company, Inc.
LST International Productions, Inc.
Lumiere Productions, Inc.

Mad Mack Productions Inc.
Madison Avenue Productions, Inc.
Madison Productions, Inc.
Mar Azul Productions, LLC
Marigold Productions, LLC
Mark Ritts Productions, Inc.
Marlig Entertainment, LLC
Maroda, Inc.
Maxwell Productions, Inc.
McFarlane Productions, Inc.
Mc Gee Street Productions, Inc.
Mendocino Communications, Inc.
Merchant Ivory Productions Inc.
Mersey Masala, Inc.
Metro-Goldwyn-Mayer Pictures Inc.
MGM Television Entertainment Inc.
Michele Lee Entertainment, Inc.
Michele Lee Productions, Inc.

Middle Fork Productions
Milkwood Films, L.L.C.
Millennium Mediaworks, Inc.
Millie Film Development, LLC
Miltod Productions, LLC
Montecito Pictures, LLC
Montrose Productions, Inc.
Morrow-Heus Productions, Inc.
MT2 Services, Inc.
Mysteries of History Productions, Inc.

Nasser Brothers Studio
National Studios, Inc.
New Amsterdam Entertainment, Inc.
New Regency Productions, Inc.
Night Life Inc.
Niki Marvin Productions, Inc.
Northfork Pictures LLC
N.W. Productions

October Holdings, Inc.
On TV, Inc.
One On Productions, Inc.
Open Water Productions LLC
Osage Productions, Inc.
OTML Productions, Inc.

Pacifica Film Development, Inc.
Paradyne
Paramount Pictures Corporation
Park Court Productions, Inc.
Paul Clifford Escoll dba Paul Clifford Escoll Entertainment
Paulist Pictures, Inc.
Pebblehut Doc IV Inc.
Pebblehut F.B. Eye Inc.
Pense Productions LLC
Penthouse Presentations Inc.
Pet II Productions, Inc.
Peter Matulavich
Phoenix Pictures Development Corp.
Phonograph Films, Inc.
Picante Pictures LLC
Plan 10, Inc.
Platinum Band LLC
Pond Writer, LLC
Post Aw, Inc.
Priority Productions, Inc.
Punch Productions, Inc.

Quadra Productions, Inc.

Ralph Edwards Productions
Ralph Edwards/Stu Billett Productions

Readcrest Productions, Inc.
Red Cliff Productions, LLC
Red Shoes, Inc.
Redweed Productions, LLC
Regency Television Productions, Inc.
Remote Broadcasting, Inc.
Renaissance Films Limited
Revolution Studios Development Company, LLC
Richmel Productions, Inc.
Rick Locke Productions Inc.
Risk Control Productions Inc.
Riverside Actors Holdings, Inc.
RLR Associates Ltd.
Robert Benedetti Productions, Inc.
Roma Pictures Inc.
Room 9 Productions LLC
Rosecrans Productions, Inc.
Rubin Productions, Inc.
The Ruddy Morgan Organization, Inc.
Run It Raw, Inc.

Sam Denoff Productions, Inc.
Sam Pillsbury Films, Inc.
Samson, Inc.
Samuel Goldwyn Productions
San Bao Enterprises, Inc.
San Vicente Productions, Inc.
Sand Creek, Ltd.
The Saul Zaentz Company
SBF/Kaplan Corporation
Scenic Productions, Inc.
SCFV Development, Inc.
Scriveners, Inc.
Sea Side Film Company
Segue Productions, Inc.
Seligman Entertainment, Inc.
Senator Development, Inc.
Seneca Productions, Inc.
Seven Arrows Multimedia, Inc.
ShadowCatcher Entertainment, LLC
Shangri-La Pictures, LLC
Shoot the Horse Productions, Inc.
Showtime Pictures Development Company
Sidney Kimmel Entertainment Inc.
Silver Dream Productions, Inc.
The SKPS Company
Sleeping Bricks, Inc.
Smash Media, Inc.
Smith & Weed Productions, Inc.
Snug Entertainment, Inc.
The Somerset Foundation, Inc.
Sony Pictures Television Inc.
Spelling Television, Inc.

Sphinx Corporation (dba Dimitri Villard Productions)
Spinnaker Films, Inc.
Spooky House Entertainment, LLC
Spun Out Productions, Inc.
Spy Guise Video, Inc.
StarDusters Workshop Enterprises, Inc.
The Steve Tisch Company
Still Life Pictures, Inc.
Strike Entertainment, Inc.
Strike-a-Match Productions
Stuart Benjamin Productions, Inc.
StudioCanal Entertainment Development, Inc.
Summit Entertainment Development Services
Sussex Ltd., Inc.

Table Rock Productions, Inc.
Talking Wall Pictures, Inc.
TaurusRex Productions GmbH
Tavistock Films, Inc.
Taweel-Loos & Company dba TLC Entertainment
TCRK Productions LLC
Ten Point Productions, Inc.
Theodore Thomas Productions
Thunder Highway Productions
Together Again Productions Inc.
Together Again Video Productions, Inc.
Topanga Productions, Inc.
Touchstone Television Productions, LLC
Trackdown Productions, Inc.
Trailer Park Pictures, Inc.
Trial Productions, Inc.
TriStar Pictures, Inc.
TriStar Television, Inc.
Turner Pages, Inc.
TurtleBack Productions, Inc.
TV is OK Productions, Inc.
TVM Productions, Inc.
Twentieth Century Fox Film Corporation

Uncommon Productions LLC
United Artists Pictures Inc.
Universal City Studios LLLP
Universal Family Entertainment LLC
Universal Network Programming LLC
Universal Network Television LLC
Universal Studios Network Programming
USA Cable Entertainment Development LLC
USI Network Development LLC

Vasanta Productions, Inc.
Viacom Productions Inc.
Village Roadshow Productions Inc.
Vincent Pictures, Inc.

Visual Media Ltd.
Volpone Productions, Inc.

WAD Productions Inc.
Walking Woman Productions, Inc.
Walt Disney Pictures and Television
Warner Bros. Pictures Inc.
Warner Bros. Television Production Inc.
Warner Independent Pictures, Inc.
Washo Bros. Entertainment, Inc.
Westgate Productions, Inc.
Westholme Productions, Inc.
A WGA Signatory Company Inc.
Whidbey Island Films, Inc.
Whining Dog Co., Inc.
White Cherry Entertainment, Inc.
White Oak Co., Inc.
Wilarvi Communications, Inc.
Wild Arrow Productions, LLC
Wilton Production, Inc.
Winchester Films Development, Inc.
WIP Productions Inc.
Woodridge Productions, Inc.
Wooster Productions, Inc.
World Film Services, Inc.
Writers Development LLC
WW&S Productions, Inc.

Zing Productions, Inc.
Zito Productions, Inc.

[The Company names listed above were furnished to the Guild by the AMPTP. The Guild does not insure that any such name is in its full and correct form or is spelled correctly. Inquiries regarding the full and correct legal name of a signatory Company may be directed to the Guild's Signatories Department.]

(Each entity listed above is hereinafter referred to as the "Company" and collectively as the "Companies.") In consideration of the mutual agreements contained in this Agreement, the Guild and the Companies agree as follows:

The provisions of this Basic Agreement shall be designated as follows:

(i) General provisions (herein designated "General") applicable to both theatrical employment, options (to the extent provided in this Agreement) and purchases and to television employment, options (to the extent provided in this Agreement) and purchases, and

(ii) Provisions (herein designated "Television") applicable to television employment, options (to the extent provided in this Agreement) and purchases only, and

(iii) Provisions (herein designated "Theatrical") applicable to theatrical employment, options (to the extent provided in this Agreement) and purchases only.

The provisions of this Basic Agreement which are applicable to employment, options and purchases for free television motion pictures are also applicable to employment, options and purchases for:

(a) live television programs to the extent that such programs would be covered if they were television motion pictures; and

(b) programs covered by Appendix B to the extent provided in Appendix B; and

(c) motion pictures produced primarily for the basic cable market to the extent provided in Appendix C.

Notwithstanding any of the foregoing, the provisions of this Basic Agreement are not applicable to employment, options and purchases for:

(a) [Deleted.]

(b) programs excluded from the coverage of Appendix B which are produced principally for the pay television and/or videodisc/ videocassette markets except to the extent provided in the Sideletter on Informational Programs.

The Company agrees that if it produces program(s) for television of the types heretofore traditionally produced for free television pursuant to any WGA Basic Agreement, such program(s) will be considered to be produced either for free television, basic cable or pay television. In the event a new distribution system evolves (distinct from the foregoing three methods), the parties to this Agreement reserve their respective rights with regard to such new system.

## ARTICLE 1 DEFINITIONS

The following terms or words used in this Basic Agreement shall have the following meanings:

### A. GENERAL

1. The term "***television motion picture***" (sometimes referred to in this Basic Agreement as "television film") means the entertainment portion of motion pictures, whether made on or by film, tape or otherwise and whether produced by means of motion picture cameras, electronic cameras or devices or any combination of the foregoing or any other means, methods or devices, now used or which may hereafter be adopted for the recordation of motion pictures produced primarily for exhibition by free television. The prefatory language to this Basic Agreement and the provisions cited therein determine the extent to which the provisions of the Basic Agreement which

are applicable to television motion pictures are also applicable to pay television and basic cable.

2. The term "***theatrical motion picture***" means motion pictures and photoplays, whether made on or by film, tape or otherwise and whether produced by means of motion picture cameras, electronic cameras, or devices or any combination of the foregoing or any other means, methods or devices now used or which may be hereafter adopted for the recordation of motion pictures produced primarily for exhibition in a theater or similar location in which a fee or admission charge is paid by the viewing audience, other than those motion pictures produced primarily for exhibition in another market covered by this Basic Agreement.

3. The term "***basic cable***," as distinguished from pay television or free television, refers to that type of exhibition which is commonly understood in the industry today to be basic cable exhibition.

4. The terms "***pay television***" and "***videodisc/videocassette***" are defined in Article 51 and in Appendix B of this Basic Agreement.

5. The term "***literary material***" shall be deemed to include stories, adaptations, treatments, original treatments, scenarios, continuities, teleplays, screenplays, dialogue, scripts, sketches, plots, outlines, narrative synopses, routines, and narrations, and, for use in the production of television film, formats.

6. The term "***radio rights***" means the right to broadcast by radio for aural reception only and unaccompanied by any recordation, transmission or broadcast intended for visual reception.

7. The term "***week-to-week employment***" means the employment of a writer on a week-to-week basis which, except for such restrictions as may herein elsewhere be contained, may be terminated by the Company or writer at any time.

8. The term "***public domain***" refers to literary material which is not subject to copyright protection in the United States.

9. The term "***member of the Guild in good standing***" means a member of the Guild who has tendered the initiation fee and periodic dues uniformly required as a condition of acquiring or retaining membership.

10. The term "***writer***" shall not be deemed to include any corporate or impersonal purveyor of literary material or rights therein.

11. Other than as provided in Article 14 hereof, this Basic Agreement shall not, nor is it intended to cover, the employment of Producers, Directors, Story Supervisors,

Composers, Lyricists, or other persons employed in a *bona fide* non-writing capacity except to the extent that such employment consists of writing services covered under this Article 1, section B.1.a.(2) or section C.1.a., nor the employment of Story Analysts, at any time prior to the expiration of this Basic Agreement, in the synopsizing of literary material, as referred to in the footnotes to Paragraph 1 of the wage scales and working conditions of the current agreement between "Producer and I.A.T.S.E. & M.P.T.A.A.C. and Local #700S thereof."

12. It is understood that this Basic Agreement shall not, nor is it intended to, cover contracts for the purchase of literary material (a) which literary material at the time of purchase is published or exploited in any manner or by any medium whatever, or (b) with a person who is not a professional writer as defined in Article 1.B.1.b. or 1.C.1.b. hereof, whichever of said subparagraphs of Article 1 is applicable.

12.1. The term "***network,***" as used in this Agreement, means ABC, CBS, FBC (Fox Broadcasting Company) and NBC, or any other entity which qualifies as a "network" under Section 73.662(f) of the rules of the Federal Communications Commission, unless the FCC determines that such entity is not a "network" for purposes of such Section.

13. Other terms not expressly defined in this Basic Agreement are used in their present commonly understood meaning in the theatrical motion picture and television motion picture industry in the State of California.

14. [Deleted.]

15. [Deleted.]

16. [Deleted.]

17. [Deleted.]

**B. THEATRICAL**

1. Writer and Professional Writer

a. A "***writer***" is a person who is:

(1) employed by the Company to write literary material as defined herein, where the Company has the right by contract to direct the performance of personal services in writing or preparing such material or in making revisions, modifications or changes therein; or

(2) employed by Company, who performs services (at Company's direction or with its consent) in writing

or preparing such literary material or making revisions, modifications, or changes in such literary material regardless of whether such services are described or required in his/her contract of employment; provided, however, that any writing services described below performed by Producers, Directors, Story Supervisors (other than as provided in Article 14 hereof), Composers, Lyricists, or other employees, shall not be subject to this Basic Agreement and such services shall not constitute such person a writer hereunder:

(a) Cutting for time
(b) Bridging material necessitated by cutting for time
(c) Changes in technical or stage directions
(d) Assignment of lines to other existing characters occasioned by cast changes
(e) Changes necessary to obtain continuity acceptance or legal clearance
(f) Casual minor adjustments in dialogue or narration made prior to or during the period of principal photography
(g) Such changes in the course of production as are made necessary by unforeseen contingencies (*e.g.*, the elements, accidents to performers, etc.)
(h) Instructions, directions, or suggestions, whether oral or written, made to writer regarding story or screenplay

In addition to the foregoing, in the case of a person who at the time he/she performs services has not received at least two (2) screen credits for story or screenplay or both, as determined pursuant to Theatrical Schedule A of this Basic Agreement, or Schedule A of prior Theatrical Basic Agreements, within a period of ten (10) years (or has not received at least one (1) of such credits within a period of five (5) years) immediately prior to the rendition of such services, and who is employed solely in the capacity of the *bona fide* producer of a motion picture and whose employment does not include the requirement that he/she perform writing services, then, such person may, in addition to the above, perform the following writing services: make changes in dialogue, narration or action, but not including significant changes in plot, story line or interrelationship of characters, and such services by such person shall not be subject to this Basic Agreement. If such person does make significant changes in plot, story line or interrelationship of characters, then such services by such person shall be subject to this Basic Agreement, except Article 6 hereof.

In addition to the foregoing, in the case of a person who at the time he/she performs services has received at least two (2) such screen credits within such ten (10) year period (and with at least one (1) of such credits within such five (5) year period) immediately prior to the rendition of such services, and who is employed solely in the capacity of the *bona fide* producer of a motion picture, and whose employment does not include the requirement that he/she perform writing services, then, if such person shall perform writing services in addition to those described in (a) through (h) above, such services by such person shall be subject to this Basic Agreement.

In addition to the foregoing, in the case of a person who at the time he/she performs services is employed solely in the capacity of the director of a motion picture, and whose employment does not include the requirement that he/she perform writing services, then, such person may, in addition to the above, perform the following writing services: make changes in dialogue, narration or action, but not including significant changes in plot, story line or interrelationship of characters, and such services by such person shall not be subject to this Basic Agreement.

If such person does make significant changes in plot, story line or interrelationship of characters, then such services by such person shall be subject to this Basic Agreement, except Article 6 hereof.

In any event, if any producer or director shall receive screen credit pursuant to the provisions of Theatrical Schedule A and the Guild's credit rules relating to the writing contribution necessary for such credit, then the provisions of Paragraph I. of Article 6 of this Basic Agreement shall apply with respect to such person.

With respect to a person employed solely as a producer-director, on the motion pictures which he/she directs, the director paragraph above shall apply and on the motion pictures which he/she does not direct, the producer paragraphs above shall apply.

As used above, "producer" shall also include the *bona fide* executive producer of said motion picture if such executive producer is of the same industry stature and has responsibilities and functions similar to those held or exercised by the following executive producers during 1977: Samuel Arkoff, Ron Miller and Marvin Mirisch.

With respect to signatory Companies, no services of any kind of any executive of the same industry stature and with responsibilities and functions similar to those held by or exercised by the following executives during 1977:

Cardon Walker, Alan Ladd, Jr., John Calley, and Daniel Melnick shall be covered by any provisions of this Basic Agreement, except that if any such executive shall receive screen credit pursuant to the provisions of Theatrical Schedule A and the Guild's credit rules relating to the writing contribution necessary for such credit, then the provisions of Paragraph I. of Article 6 of this Basic Agreement shall apply to such person.

b. The term "***professional writer***" means a person who on or after November 1, 2004, sells, licenses or options to the Company the ownership of or rights to use literary material written by such writer, for use in the production of a motion picture, which literary material had not prior to such sale, license or option been published or exploited in any manner or by any medium whatever, and who at such time:

(1) has received employment for a total of thirteen (13) weeks, which need not be consecutive, as a motion picture and/or television writer, or radio writer for dramatic programs; or

(2) has received credit on the screen as a writer for a television or theatrical motion picture; or

(3) has received credit for three (3) original stories or one (1) teleplay for a program one-half hour or more in length in the field of live television; or

(4) has received credit for three (3) radio scripts for dramatic radio programs one-half hour or more in length; or

(5) has received credit for one (1) professionally produced play on the legitimate stage, or one (1) published novel.

The Company may rely on the statement of the writer with respect to whether or not the material had theretofore been published or otherwise exploited.

2. The term "***treatment***" means an adaptation of a story, book, play or other literary, dramatic or dramatico-musical material for motion picture purposes in a form suitable for use as the basis of a screenplay.

The term "***original treatment***" means an original story written for motion picture purposes in a form suitable for use as the basis of a screenplay.

3. The term "***screenplay***" means the final script with individual scenes, full dialogue and camera setups.

4. The term "***first draft screenplay***" means a first complete draft of any script in continuity form, including full dialogue.

5. The term "***story***" means literary or dramatic material indicating the characterization of the principal characters and containing sequences and action suitable for use in, or representing a substantial contribution to, a final script.

6. The term "***shorts***" or "***short subjects,***" for the purposes of this Basic Agreement, is defined as motion pictures which when released are 3,600 lineal feet or less in length, other than motion pictures known as cartoons, newsreels, trailers, travelogues, commercials or news and sports commentaries and motion pictures intended primarily for exhibition by free television, if such motion pictures are originally made and originally distributed as such.

7. The term "***rewrite***" means the writing of significant changes in plot, story line, or interrelationship of characters in a screenplay. "***Polish,***" as used herein, means the writing of changes in dialogue, narration or action, but not including a rewrite.

8. Merchandising Rights - The term "***merchandising rights***" means the right to manufacture and to sell or otherwise dispose of any object or thing first described in literary material written by the writer pursuant to an employment agreement subject to this Basic Agreement, entered into on or after November 1, 2004, or acquired from a professional writer; provided such object or thing is fully described in such literary material and by such description appears to be unique and original. Merchandising rights include the right of publication in publications of the generic type described as "photo novels" or "photo albums."

   The writer shall have no merchandising rights. However, if the Company exploits the merchandising rights (as defined above) in any such literary material, Company shall pay to such writer an amount equal to five percent (5%) of absolute gross, that is, monies remitted by the manufacturer on account of the exploitation of the subject merchandising rights. The provisions of this subparagraph 8. are also applicable to a writer who is not entitled to Separation of Rights.

9. The term "***interactive rights***" means the right:

   a. to reuse a theatrical motion picture, in whole or in substantial part, in an interactive program, as provided in Article 64.B.1.;

   b. to utilize excerpts from a theatrical motion picture in an interactive program, as provided in Article 64.B.2.; and

c. to produce an interactive program based upon literary material for a theatrical motion picture written by a writer pursuant to an employment agreement (to which employment the provisions of this Basic Agreement or any prior MBA containing a separation of rights provision applies) or acquired by the Company from a professional writer (to which acquisition the provisions of this Basic Agreement or any prior MBA containing a separation of rights provision applies), which interactive program meets the requirements of Article 64.C.1.

The writer shall have no interactive rights. However, if the interactive rights are licensed as provided in Article 64.B.1., B.2., C.1., D.1.a. or D.2.a., Company shall make payment to the writer in accordance with such provisions.

**C. TELEVISION**

1. Writer and Professional Writer

a. A "***writer***" is a person who is:

(1) engaged by the Company to write literary material as defined herein (including making changes or revisions in literary material), when the Company has the right by contract to direct the performance of personal services in writing or preparing such material or in making revisions, modifications or changes therein; or

(2) engaged by Company who performs services (at Company's direction or with its consent) in writing or preparing such literary material or making revisions, modifications, or changes in such material regardless of whether such services are described or required in his/her contract of employment.

A writer is a creative and professional person who performs a unique and indispensable function in relation to the production of motion pictures. It is an element of good faith, and part of the consideration of this Agreement, that no Company will use any of the following provisions of this paragraph with the purpose or intent of circumventing the employment of writers. Accordingly, it is agreed that the following services performed by an employee who is not employed as a writer shall not be subject to this Agreement and such services shall not constitute such a person a writer hereunder:

(a) Cutting for time
(b) Bridging material necessitated by cutting for time
(c) Changes in technical or stage directions
(d) Assignment of lines to other existing characters occasioned by cast changes
(e) Changes necessary to obtain continuity acceptance or legal clearance
(f) Casual minor adjustments in dialogue or narration made prior to or during the period of principal photography
(g) Such changes in the course of production as are made necessary by unforeseen contingencies (*e.g.*, the elements, accidents to performers, etc.)
(h) Instructions, directions or suggestions, whether oral or written, made to a writer regarding story or teleplay

In addition to the foregoing, if a person is employed solely in the capacity of the *bona fide* executive producer or *bona fide* producer of a specific television program and his/her employment agreement does not include the requirement that he/she perform writing services, and if said person has not been employed as a writer at least twice since June 1, 1966, and if said person nevertheless renders writing services (other than those specified in (a) through (h) above), then his/her employment as a writer shall be subject to this Basic Agreement, except that Article 6 and Article 14 of this Basic Agreement shall not be applicable if he/she performs no more than the following writing services on not more than three (3) programs in any one (1) production season (not more than one (1) of which may be a program in a mini-series, which for this purpose is a series of not more than eight (8) episodes in the production season): changes in dialogue, narration or action, but not including significant changes in plot, story line or interrelationship of characters. If such person makes significant changes in plot, story line or interrelationship of characters, such person shall be subject to Articles 6 and 14 of this Basic Agreement.

In determining whether a person has been employed as a writer since June 1, 1966, for the purposes of this subparagraph, (i) each separate occasion, if any, for which he/she has declared earnings to the Guild for services as a writer performed on a particular theatrical motion picture or television project since June 1, 1966, and (ii) each occasion, if any, on which he/she has been listed as a participating writer in relation to a screen authorship credit determination pursuant to a collective bargaining agreement with the Guild with respect to

services performed as a writer since June 1, 1966 shall be conclusively counted as an employment as a writer. The exception provided for in this subparagraph shall not be valid in a particular case unless the Company obtains from the individual a warranty in writing that he/she has not been employed as a writer at least twice since June 1, 1966. If the Guild should question whether the exception applies, whether relating to employment by the Company or by another signatory, the Company shall cooperate in making available to the Guild any evidence in its possession or control which may be relevant to the inquiry. Said exception shall not apply to a writer if such writer has been previously employed as a writer also employed in additional capacities as provided in said Article 14.

With respect to signatory Companies, no services of any kind of any executive of the same industry stature and with responsibilities and functions similar to those held by or exercised by the following executives during the 1977-78 broadcast season: Larry White at Columbia Pictures Industries, Inc., Allan Shayne at Warner Bros. Inc., Sy Salkowitz at Twentieth Century-Fox Film Corp., and Ron Miller at Walt Disney Productions, shall be covered by any provisions of the Basic Agreement, except that if any such executive shall receive screen credit pursuant to the provisions of Television Schedule A and the Guild's credit rules relating to the writing contribution necessary for such credit, then the provisions of Article 6, Paragraph I. shall apply to such person.

In addition to the foregoing, in the case of a person who at the time he/she performs services is employed solely in the capacity of the director of a specific television program, and whose employment does not include the requirement that he/she perform writing services, then, such person may, in addition to (a) through (h) above, perform the following writing services: make changes in dialogue, narration or action, but not including significant changes in plot, story line or interrelationship of characters, and such services by such person shall not be subject to this Basic Agreement. If such person does make significant changes in plot, story line or interrelationship of characters, then such services by such person shall be subject to this Basic Agreement, except Article 6 hereof.

In any event, if any director shall, with respect to the particular program, receive screen credit pursuant to the provisions of Television Schedule A and the Guild's credit rules relating to the writing contribution necessary for such credit, then the provisions of Article 6,

Paragraph I. shall apply to such person. A writer who renders services as a director on a particular episode shall be deemed to be a director as to such episode.

b. A "***professional writer***" means any person who has (1) received employment for a total of thirteen (13) weeks as a television, motion picture or radio writer, or (2) has received credit on the screen as a writer for a television or theatrical motion picture, or (3) has received credit for three (3) original stories or one (1) teleplay for a program one-half hour or more in length in the field of live television, or (4) has received credit for three (3) radio scripts for radio programs one-half hour or more in length, or (5) has received credit for one (1) professionally produced play on the legitimate stage or one (1) published novel.

2. The term "***teleplay***" means the final script with individual scenes, full dialogue or monologue (including narration in connection therewith), and camera setups if required; provided, however, that if the Company desires any script to consist in part of suggested or indicated dialogue (so that an actor portraying a role may extemporize therefrom), such suggested or indicated dialogue shall be deemed to satisfy the requirement of "full dialogue or monologue."

3. The term "***rewrite***" means the writing of significant changes in plot, story line or interrelationship of characters in a teleplay.

4. The term "***polish***" means the writing of changes in dialogue, narration or action, but not including a rewrite.

5. A "***back-up script***" is a story and/or teleplay for a proposed episodic series for which a writer is employed prior to the exploitation of the television series sequel rights for such proposed series, other than a pilot script.

6. A "***pilot script***" is a story and/or teleplay intended to be used for the production of a pilot for a proposed serial or episodic series and setting forth the framework intended to be repeated in subsequent episodes, including the setting, theme and premise of the proposed serial or series and its central running characters. A story and/or teleplay may be a "pilot script" whether or not there is a separate format for the proposed serial or series and regardless of whether it is written for broadcast as a unit of a unit series or as a one-time program. The foregoing definition of pilot script also may apply to a story and/or teleplay intended to be used for the production of a pilot for a proposed unit series which does not have central running characters, but which story and/or teleplay does set forth the context and continuing framework intended to be repeated in subsequent units, including the central premises, themes, setting

(locale, time, etc.), flavor, mood, style and attitude of the proposed unit series.

Nothing herein shall be construed to require that a pilot be produced for any such serial or series nor that a pilot script must be written for any such serial or series.

7. The term "***first draft teleplay***" means a first complete draft of any script in continuity form, including the full dialogue.

8. The term "***story***" means a story indicating the characterization of the principal characters and containing sequences and action suitable for use in or representing a substantial contribution to a final script; provided, however, that the writer shall not be obligated to insert dialogue therein (except to the extent necessary to show characterization) or to prepare the story in the form of a step outline.

9. a. A "***national radio network broadcast***" means a broadcast carried simultaneously by a station or stations in excess of the stations comprising a regional radio network.

   b. A "***regional radio network***" means a network maintained by a network company for regional coverage as distinguished from national or transcontinental coverage.

10. The term "***dramatic rights***" means the right of presentation in dramatic form on the speaking stage with living actors appearing and performing in the immediate presence of an audience, without any recordation, transmission, or broadcast thereof intended for aural or visual reception at places away from the place of performance, except that the dramatic rights shall include the right to broadcast directly by television such live presentation without any kinescope or other recording thereof, subject to restriction concerning the time when such broadcasts may be made as hereinafter provided.

11. The term "***publication rights***" means the right to publication of the work in book form or in magazine or periodical form, including serial publication.

12. "***Series sequel rights***" means the right to use the leading character or characters of a work participating in a substantially different story in an "episodic series" or "serial" type television program or radio program.

"***MOW sequel rights***" means the right to use the leading character or characters of a work participating in a substantially different story in a program, ninety (90) minutes or longer, which is ordered subsequent to the broadcast of the "first MOW," as defined in Article 16.B.2.b., and is other than an exploitation of the "series sequel rights."

13. The term "***single unit***" means a television program intended for broadcast as a single show, broadcast or program, and not as a part of a unit series or episodic series.

14. The term "***unit series***" means a series of programs, each of which contains a separate complete story, without a character or characters common to each of the programs in the series, but held together by the same title, trade name or mark or identifying device or personality common to all the programs in the series.

15. "***Episodic series***" means a series of programs, each of which contains a separate complete story with a character or characters common to each of the programs in the series, provided, however, that such series shall still remain an episodic series even though a two- three- four- or five- multi-part story is utilized in the series.

    With regard to "literary material" for an "episodic series," extricable material shall consist of the plot of such material, and such original characters and characterizations which are distinctive and identifiable and which are the sole original creation of the writer, but shall not include the names of the characters.

16. The term "***serial***" means a series of programs in which generally the same characters carry on a continuing narrative.

17. The term "***established serial or episodic series***" means a serial or episodic series based upon material that has been published or exploited in any manner or by any medium whatsoever, or based upon a story in the public domain or owned by the Company.

18. Merchandising Rights

    a. The term "***merchandising rights***" with regard to any established serial or episodic series, or any unit series or one-time television program to which separated rights do not apply, means the right to manufacture and to sell or otherwise dispose of any object or thing first described in literary material written by the writer, provided such object or thing is fully described therein and by such description appears to be unique and original.

    b. With regard to writers entitled to separation of rights, merchandising rights shall mean the exclusive right to grant to manufacturers or others the right to refer, in conjunction with the marketing or exploitation of objects or things, to the series in which the writer's separation of rights exists or to characters of such series, but such objects or things shall not include:

(1) The television motion picture itself or any part of the television motion picture;

(2) Music composed for or identified with such series or with any episode of such series, including any form of exploitation of music, such as records or publishing;

(3) Objects or things furnished by a manufacturer or other person or company for use in or in connection with such series or any episode of such series, where the Company receives no revenue from the marketing of such objects or things (for example, a motorcycle manufacturer furnishes motorcycles to the Company for photography in a series dealing with motorcyclists in exchange for the right granted to the manufacturer to refer to the series or to characters of the series in conjunction with the marketing and exploitation of its motorcycles);

(4) Objects or things manufactured or sold by any sponsor of such series, where the right to refer to such series or characters of such series in conjunction with the marketing of such objects or things is obtained by the sponsor as part of the initial agreement for the sponsorship of the series, and the Company receives no revenue from the marketing of such objects or things (as distinguished from the revenue received by the Company for the series itself); but the sponsor referred to in this subparagraph (4) refers to the overall sponsor or sponsors of the series, as distinguished from the companies advertising in "spot" commercials;

(5) Objects or things which, in the reasonable judgment of the Company, would be harmful to the Company, network, sponsor or series to identify with such series or with characters of such series.

To effectuate the purposes of the foregoing provisions, the writer shall notify the Company in writing of the proposed license and the object or thing which is to be the subject of the license at least ten (10) business days before granting the license, so as to give the Company the opportunity to give appropriate notice to the writer. If the Company notifies the writer that any proposed license is in violation of any of the foregoing provisions of this subparagraph 18., the Company shall concurrently send a copy of such notice to the Guild. Within one (1) business day after receipt of such notice the Guild may submit the dispute to arbitration, for which purpose the

"quick arbitration" provisions of Paragraph 26 of Theatrical Schedule A shall be used (but for this purpose a special panel of arbitrators shall be selected by the parties as promptly as possible following the execution of this Agreement). With respect to subparagraph (5), the arbitrator's authority shall be limited to deciding whether the Company's judgment was reasonable. The reserved merchandising rights do not include the right to use or license the use of:

(i) The name or likeness of any person;

(ii) Any proper name, trademark, service mark, trade name, or literary or artistic character (except public domain characters) existing and first exploited independently of such series.

The Company does not warrant or represent that it has or will have the right to use the title of the series or of any episode of the series in merchandising deals. In the event that a writer of a particular episode is entitled to a merchandising rights payment, the amount due such individual shall be deducted from the merchandising rights payment which would otherwise be due the writer entitled to separation of rights in the series. The definition of "merchandising rights," as it applies to writers entitled to separation of rights, shall be without prejudice to the respective positions of the parties hereto as to the meaning of the term in previous collective bargaining agreements.

19. The term "***interactive rights***" means the right:

a. to reuse a television motion picture, in whole or in substantial part, in an interactive program, as provided in Article 64.B.1.;

b. to utilize excerpts from a television motion picture in an interactive program, as provided in Article 64.B.2.; and

c. to produce an interactive program based upon literary material for a television motion picture written by a writer pursuant to an employment agreement (to which employment the provisions of this Basic Agreement or any prior MBA containing a separation of rights provision applies) or acquired by the Company from a professional writer (to which acquisition the provisions of this Basic Agreement or any prior MBA containing a separation of rights provision applies), which interactive program meets the requirements of Article 64.C.2., subject to the following:

(1) When separation of rights does not apply to such literary material, but the writer(s) describes an object or thing or introduces a character as provided in Article 64.C.2.a. or b., such writer shall have no interactive rights. However, if the Company exploits the interactive rights as provided in Article 64.C.2., D.1.b. or D.2.b., Company shall make payment to such writer in accordance with such provisions.

(2) The interactive rights described in this subparagraph c. are reserved to the writer(s) entitled to separation of rights pursuant to Article 16.B.3.a. (subject to Article 16.B.3.d. or e. and 16.B.5.).

With respect to subparagraphs a. and b. above, the writer shall have no interactive rights. However, if the Company exploits either of such rights as provided in Article 64.B., D.1.b. or D.2.b. (subject to subparagraph c.(2) above), Company shall make payment to the writer in accordance with such provision.

20. A "***routine***" means a self-contained dramatic unit constituting fifty percent (50%) or less of the entertainment portion of a comedy-variety program; provided that such routine is either (a) an adaptation of material previously used in television or any other medium, or (b) original and written to fit the special talents and personality of the particular actor or actors in the program involved.

21. The term "***simulcast***" means the broadcast of a single performance of a program by radio and television, whether or not the radio and television broadcasts are made at the same time, provided that the original broadcasts by radio and television take place within twenty-one (21) days of each other.

22. Writers of variety and audience participation programs shall be deemed included under all provisions of this Basic Agreement to the same extent as writers of dramatic programs, despite the fact that only "story" and "teleplay" are hereinafter referred to in the Agreement.

23. The term "***weekly unit of television films***" means the number of television films of a particular series of variety (including comedy-variety), quiz or audience participation programs prepared by the same writer or writers for initial broadcast within one (1) week.

24. The term "***format***" means a written presentation consisting of the following:

a. As to a serial or episodic series, such format sets forth the framework within which the central running characters will operate and which framework is intended to be repeated in each episode; the setting, theme, premise or general story line of the proposed serial or episodic series; and the central running characters which are distinct and identifiable, including detailed characterizations and the interplay of such characters. It also may include one or more suggested story lines for individual episodes.

b. As to a multi-part series telling a complete story such as *"Rich Man, Poor Man"* (Book I) or *"Roots"* or a prime time serial, such as *"Executive Suite,"* such format as described in a. above shall be called a ***"bible"*** if, in addition and at the request or upon the instructions of the Company, it contains all of the following characteristics and requirements:

(1) It is in much greater detail than a traditional format, and includes the context, framework, and central premises, themes and progression of the multi-part series or serial.

(2) It sets forth a detailed overall story development for the multi-part series or for the first broadcast season of the serial (or such lesser period as may be contracted for with the writer) and includes detailed story lines for (a) all of the projected episodes of the multi-part series or (b) most of the projected episodes for the first broadcast season of the serial (or such lesser period as may be contracted for with the writer).

(3) The characters must be not only distinct and identifiable, but must be set forth with detailed descriptions and characterizations.

c. Except as to minimum compensation and reversion pursuant to Article 16.B.2.a., a "***bible***" is a format for all other purposes of this Agreement, including but not limited to other applicable provisions of Article 16.B.

d. As to a unit (anthology) series, a format means a written presentation consisting of the following: a detailed description of the concept of the proposed series; the context and continuing framework intended to be repeated in each episode; and the central premises, themes, setting (locale, time, etc.), flavor, mood, style and attitude of the proposed series; and it may include

suggested story lines for several of the projected episodes.

25. The term "***narration***" means material used (typically off camera) to explain or relate sequences or action (excluding promos or trailers).

26. ***Narrative Synopsis***: An outline of a story owned by a writer, which is prepared for the purpose of determining the suitability of the story for teleplay purposes, which outline shall indicate characters and plot line but need not be sufficiently developed to meet the definition of a story.

## ARTICLE 2 TERM AND EFFECTIVE DATE OF AGREEMENT

### A. GENERAL

1. The term of this Basic Agreement shall commence on November 1, 2004 and shall continue to and include October 31, 2007.

2. With respect to all employment agreements with writers in effect on November 1, 2004, the terms of this Basic Agreement relating to minimum compensation and to rights in material shall apply only to services performed and literary material written under such employment contracts where the date of actual employment (*i.e.*, the commitment date) was on or after November 1, 2004, except as specifically otherwise provided herein in Article 2, Section B. or Section C.

3. With respect to literary material licensed or acquired from professional writers (as described herein), the terms of this Basic Agreement relating to minimum compensation and rights in material shall apply only to unpublished and unexploited literary material licensed or acquired from such professional writers on or after November 1, 2004. Options of unpublished and unexploited literary material obtained from professional writers on or after November 1, 2004 shall be subject only to the provisions of this Basic Agreement relating to options (*i.e.*, third paragraph of Article 13.A., Article 13.B.1.a., Article 16.A.3.d. and Article 16.B.3.i.), and then only to the extent applicable. Disputes relating to the options provisions listed in the preceding sentence shall be subject to grievance and arbitration as provided in Articles 10, 11 and 12 of this Agreement.

4. Company or Guild may, by written notice to the other served not earlier than ninety (90) days nor later than sixty (60) days prior to the expiration date of this Basic Agreement, signify its desire to negotiate a new collective bargaining agreement which shall become effective upon a date determined by mutual agreement between the Company and the Guild. Such notice

shall set forth in detail the proposals or recommendations of the party serving such notice. If such notice is served, the parties agree to commence negotiations covering the proposals or recommendations in the notice, and the proposals and recommendations of the party receiving such notice, within thirty (30) days after the receipt of such notice and to continue such negotiations diligently and in good faith. It is understood and agreed that the existing Basic Agreement shall continue in full force and effect until the termination date above provided.

5. [Deleted] (See the fourth and fifth paragraphs of Article 17.C.1. for provisions relating to the diversion of salary increases to Health Fund contributions and *vice versa*.)

6. [Appeared as Article 2.A.5. in predecessor Basic Agreements.] Nothing herein contained shall be deemed to modify or affect the terms or conditions of any existing contract which are more favorable to the writer than the terms and conditions of this Basic Agreement.

**B. THEATRICAL**

1. With respect to all theatrical employment agreements with writers under term or deal contracts which were in effect on November 1, 2004, the new minimum compensations, conditions and Theatrical Schedule A as herein contained shall not in any manner be applicable for the period prior to, nor effective until:

   a. in the case of a term contract, the effective date of the exercise of the next option which occurs after November 1, 2004, for the renewal of the employment period, or six (6) months after the effective date of the commencement of the current employment period, whichever occurs first, but in no event prior to November 1, 2004.

   b. in the case of a deal contract, the effective date of the next step of such deal contract which commences after November 1, 2004.

2. Any contractual obligation by Company, in effect on December 12, 1966, to give credit for source material or story in connection with a photoplay shall not in any manner be affected by the provisions of Theatrical Schedule A contained herein.

**C. TELEVISION**

1. With respect to television employment agreements with writers on a term or week-to-week contract basis in effect on November 1, 2004, the terms of this Basic Agreement relating to rights in material shall apply only to literary material written pursuant to assignments made on or after November 1, 2004.

2. Notwithstanding any other provisions of this Article, the terms of this Basic Agreement relating to rights in material shall not apply to literary material written pursuant to any agreement in effect on November 1, 2004, if the granting or reserving of such rights, as herein provided, would conflict with any contractual obligation of the Company to any third party entered into prior to the effective date of this Basic Agreement; provided that the Company does not have a right to require the removal or elimination of the conflict created by such contractual obligation to the third party.

## ARTICLE 3 WORK LISTS, LOAN-OUTS AND RECOGNITION

### A. GENERAL

1. Work Lists and Notices of Employment

Company each week shall send the Guild a list of the names of writers in the employ of a Company, and/or the names of professional writers from whom previously unexploited literary material has been purchased, at any time during the preceding week. Copies of such list shall be mailed concurrently to the Writers Guild of America, west, Inc., 7000 West Third Street, Los Angeles, CA 90048 and to the Writers Guild of America, East, Inc., 555 West 57th Street, New York, New York 10019. Company will send two (2) additional copies of work lists to the Guild, so that the Guild may distribute copies to Pension and Health Fund Administrators.

The notice of employment will contain the name and address of the writer, the form of the material, the place of delivery and, if the information is then available, whether or not any material has been assigned to the writer. In addition, for theatrical motion pictures, the notice of employment shall include the title of the picture and the initial compensation for writing services. For television motion pictures, the notice of employment shall include the type, title and length of the program and the "initial compensation," as that term is defined in Article 17.B.1.e.

The Company each week shall also send the writer and the Guild a notice of employment for each freelance writer, other than those employed for episodic series, for whom a deal was made during the preceding week. The notice will also indicate the name of the Company representative to contact in connection with such notice. The notice may contain a statement substantially as follows, and in any event shall be deemed to contain the following statement:

> "This information is furnished pursuant to the requirements of Article 3.A. of the 2004 Writers Guild of America-AMPTP Basic Agreement. It is based upon the facts presently available to us and, in any event, may be

subject to change. THIS IS NOT A CONTRACT. All contractual provisions, including rights, and compensation terms, whether or not specified above, will be contained in the agreement entered into between the parties."

The notices of employment may be combined with the weekly work lists referred to above.

Failure on the part of the Company to furnish any notice of employment or any list shall not constitute a default by the Company or a breach of this Basic Agreement unless the Company fails to deliver such list or such notice within seven (7) days after receiving the Guild's written request to do so. The Guild will not send such request unless it has in fact failed to receive such list or such notice within a reasonable period of time. In case of a failure to send such list and/or any such notice or notices after receiving a request to do so, liquidated damages totaling two hundred fifty dollars ($250.00) shall be paid for all such failures for any week. This shall be the sole and exclusive remedy for such breach.

2. Loan-Out Agreements

In the event the Company borrows the services of a writer from a loan-out company, then the Company shall not acquire such writer's services on terms less advantageous to the loan-out company than if the Company had employed an individual to write the material pursuant to the terms of this Basic Agreement.

Borrowing a writer's services through a loan-out company will not in any manner deprive the writer of any benefits of this Agreement to which the writer would have been entitled had he/she been employed directly by the Company, provided that the Company (as distinguished from the loan-out company) shall be responsible for such benefits only to the extent that they are within the control of the Company. Such benefits to which the writer is entitled from the Company shall include but not be limited to credits, compensation for television licensing of theatrical motion pictures, residuals with respect to television motion pictures, and separation of rights, if applicable.

With respect to compensation, and other payments which may be due under this Basic Agreement, the Company shall pay the loan-out company or the writer at least minimum, but is not responsible for payment by the loan-out company to the writer. With respect to grievance and arbitration, claims by the loan-out company against the Company for unpaid compensation for writing services under the loan-out agreement shall be subject to grievance and arbitration to the same extent as though the transaction had been an employment contract. With respect to pension and health, the agreement between the

Company and the loan-out company shall provide that the Company shall make pension and health contributions directly to the Plans on behalf of the loan-out company. In no event shall the Company be obligated to make larger contributions than it would have been obligated to make had it employed the borrowed writer directly. "Loan-out company," for the purposes of the foregoing and for the purposes of Article 12 of this Basic Agreement, means a company controlled by the writer.

**B. RECOGNITION (THEATRICAL)**

1. The Company hereby recognizes the Guild as the exclusive representative for the purpose of collective bargaining for all writers in the motion picture industry.

2. The provisions of this Basic Agreement, to the extent the same are applicable, shall apply to professional writers. However, the provisions of Article 6, "Guild Shop," and Article 17, "Pension Plan and Health Fund" are not applicable to professional writers, except to the extent that the second sentence of Article 17.B.1. and the second paragraph of Article 17.C.1. are applicable. The Company each week shall send the Guild a list of the names of the writers, professional and non-professional, from whom the Company acquired literary material which had not been previously published or exploited in any manner or by any medium, provided that failure on the part of the Company to furnish any such list shall not constitute a default by the Company or a breach of this Basic Agreement unless the Company fails to deliver such list within forty-eight (48) hours after receiving the Guild's written request to do so.

**C. RECOGNITION (TELEVISION)**

1. The Company hereby recognizes the Guild as the exclusive representative for the purpose of collective bargaining of all writers engaged by the Company as employees for the purpose of preparing literary material for the entertainment portion of motion pictures produced primarily for exhibition over television.

2. If a professional writer sells or licenses to the Company the ownership of or rights to use literary material written by such writer, for use in the production of a television motion picture, then upon condition that such literary material had not prior to such sale or license been published or exploited in any manner or by any medium whatsoever, Company agrees that the provisions of this Basic Agreement, to the extent the same are applicable, shall be effective to determine the rights of such professional writer and the obligations of the Company with respect to such literary material. However, the provisions of Article 6, "Guild Shop," and Article 17, "Pension Plan and Health Fund," are not applicable, except to the extent that the

second sentence of Article 17.B.1. and the second paragraph of Article 17.C.1. are applicable. The Company may rely on the statement of the writer with respect to whether or not the material had theretofore been published or otherwise exploited. The Company each week shall send the Guild a list of the names of the writers from whom the Company acquired literary material which had not been previously published or exploited in any manner or by any medium, provided that failure on the part of the Company to furnish any such list shall not constitute a default by the Company or a breach of this Basic Agreement unless the Company fails to deliver such list within forty-eight (48) hours after receiving the Guild's written request to do so.

## ARTICLE 4 PARTIES BOUND BY THIS BASIC AGREEMENT

### A. GENERAL

1. With regard to a partnership signatory, all general partners are personally bound.

2. With regard to any entity which becomes bound by this Basic Agreement by reason of this section, said entity will, upon request of the Guild, execute necessary documentation, but will be deemed signatory even without doing so.

3. With respect to a theatrical or television motion picture covered hereunder which is financed fifty percent (50%) or more by the Company (or a fifty percent (50%) or more owned subsidiary of the Company), Company will obtain a warranty from the actual employer or purchaser that writer was paid all compensation for writing services theretofore due. Upon request of the Guild, Company will provide the Guild with a certified copy of such warranty provision.

4. In the event the Company borrows a writer (whose employment had he/she been employed directly by the Company would have been covered by this Basic Agreement), whether from a domestic or foreign company, the Company shall, within ten (10) days after the execution of the agreement covering the loan-out transaction, give the Guild a written notice of the transaction, including the name of the lending company. An inadvertent failure by the Company to give such notice shall not be deemed to be a breach of this Basic Agreement.

### B. THEATRICAL

1. This Basic Agreement shall be binding upon the Company and its subsidiaries in which it has a fifty percent (50%) or more financial interest and all parties who by reason of mergers, consolidations, reorganizations, sale, assignment or the like shall succeed to or become entitled to a substantial part of the business of a signatory.

2. With respect to a motion picture produced by an independent producer under a contract with the Company for the financing and distribution of such motion picture, if Company gives the Guild notice within ten (10) days following agreement between Company and independent producer with respect to such contract that such motion picture is not covered by this Basic Agreement, then Company shall not be obligated with respect to such picture except as otherwise provided in Article 15. If the Company does not give the Guild such notice, then Company shall be obligated under this Basic Agreement (and no other collective bargaining agreement with the Guild shall be applicable) with respect to such motion picture. The provisions of this subparagraph 2. apply only to:

   a. a writer whose employment, had he/she been employed directly by Company in connection with such motion picture, would have been covered by this Basic Agreement; and

   b. a professional writer where the sale or license of the literary material involved, had it been made directly to Company in connection with the motion picture involved, would have been covered by this Basic Agreement.

3. Company agrees to notify the Guild within seven (7) days after it executes an agreement with any person, firm or corporation (not covered by the provisions of the preceding subparagraphs 1. and 2. of this Article), for the use of its studio for the production of a theatrical motion picture. Company further agrees to notify the Guild within fourteen (14) days after it executes an agreement in the County of Los Angeles, California, with any person, firm or corporation (not covered by the provisions of the preceding subparagraphs 1. and 2. of this Article) for the production, distribution or release of a theatrical motion picture where Company's studio is not used for the production of such picture; such notice to the Guild shall contain the name and address of such person, firm or corporation as well as the name of the person who signed the agreement on behalf of such person, firm or corporation. An inadvertent failure on the part of the Company to comply with the provisions of this paragraph shall in no event constitute a default by the Company or a breach of this Basic Agreement.

## C. TELEVISION

1. Company agrees to cause any subsidiary company, owned or controlled by it, which shall hereafter engage in the production of television motion pictures, to become a signatory to this Basic Agreement prior to its employment of any writer employed to prepare any material for use in such motion pictures.

2. With respect to a television motion picture produced by a non-signatory independent producer under a contract with Company for the financing, production and distribution of such television motion picture, if Company gives the Guild written notice not later than ten (10) days following agreement between Company and independent producer with respect to such contract that this motion picture is not to be covered by this Basic Agreement, then Company shall not be obligated hereunder with respect to it.

a. If Company does not give the Guild such notice, then Company shall be obligated hereunder with respect to such television motion picture.

b. This provision is subject to Article 5, "Geographical Application."

## ARTICLE 5 GEOGRAPHICAL APPLICATION OF THIS BASIC AGREEMENT (GENERAL)

Notwithstanding anything to the contrary contained herein, this Basic Agreement shall apply to writers only in the specific instances set forth below regardless of where the contract of employment or acquisition, as the case may be, is signed:

A. As to a writer or professional writer who lives in the United States, if a deal is made in the United States to employ such writer to render his/her services or if an acquisition deal is made in the United States with such professional writer, and if at the time such deal is made such writer or professional writer is present in the United States, regardless of where the services are rendered; provided further, however, that if such writer or professional writer is a permanent resident of the United States but is temporarily abroad, and if the deal is made by his/her agent, attorney or other representative (including the Guild acting on the writer's behalf) who is in the United States at the time the deal is made, such deal shall be within the scope and coverage of this Paragraph A., even if such deal is made by such representative in communication by telephone, mail or cable with a representative of the Company, whether such representative of the Company is in the United States or abroad.

B. As to a writer or professional writer who lives in the United States and is transported abroad by Company, if a deal is made to employ such writer to render his/her services or if an acquisition deal is made with such professional writer while the writer or professional writer is abroad as a result of being so transported.

C. As to an employee whose writing services are required or requested by the Company to be performed and are performed in the United States under the supervision and direction of the Company.

D. "A writer or professional writer who lives in the United States," as such phrase is used in Paragraphs A. and B. above, does not include either of the following:

1. A person who lives outside the United States (other than for a temporary visit) even though he/she may at any given time be temporarily in the United States; or

2. A person who lives outside of the United States (other than for a temporary visit) whether or not he/she has retained his/her domicile in the United States.

E. A "deal is made" within the meaning of both Paragraphs A. and B. above when agreement is reached by the Company and the writer as to the money terms.

**ARTICLE 6 GUILD SHOP (GENERAL)**

A. Except as provided below, in both theatrical and television motion pictures, each writer employed by Company on the effective date of this Basic Agreement who is then a member of the Guild in good standing shall remain a member in good standing, and each writer so employed who is not a member shall, on or before the thirtieth day following the effective date of this Basic Agreement, become and remain a member of the Guild in good standing. Each writer employed hereunder by Company after the effective date of this Basic Agreement shall, not later than the thirtieth day following the beginning of his/her first employment, as hereinafter defined, in the motion picture and television industry, become and remain a member of the Guild in good standing.

The term "first employment," as referred to above, shall mean the first such employment to which the provisions of this Basic Agreement apply as a writer for a motion picture by an employer in the motion picture and television industry, on or after the effective date of this Basic Agreement.

B. The provisions of Paragraph A. of this Article 6 shall not apply:

1. If a writer is not a member of the Guild at the time of his/her employment and although required by the provisions of his/her employment agreement to do so, fails or refuses to become a member of the Guild in good standing within the thirty (30) days above-mentioned, provided that within fifteen (15) days after written notice thereof from the Guild to the Company, the Company shall either terminate such employment or shall pay or cause to be paid the initiation fees and dues of the writer in the manner, within the time, and subject to the provisions of subparagraph E.2. hereof relating to the payment of dues. If the Company elects to and does pay such initiation fees and dues, such writer shall be deemed to be a member of the Guild in good standing, but only for the period necessary to permit

him/her to complete the performance of his/her services in connection with the then current assignment. The Company may use this exception only once for any particular person.

2. To a writer whom the Company is required to employ as a condition of the sale, license or option of material, provided that within fifteen (15) days after written notice from the Guild to the Company that such writer is not a member of the Guild in good standing, the Company shall either terminate such employment, or shall pay or cause to be paid the initiation fees and dues that the writer would otherwise be required to pay hereunder during such employment, in the manner, within the time, and subject to the provisions of subparagraph E.2. hereof relating to the payment of dues. However, the writers employed by the Company within the exception provided for in this subparagraph 2. shall not exceed ten percent (10%) of the total number of writers in the employ of the Company. For the purpose of such computation, if the Company has in its employ at any time less than ten (10) writers, then one (1) of such writers so employed may fall within this exception. Promptly following the employment of any writer claimed by the Company to be within this exception, the Company will notify the Guild in writing of the name of the writer employed, the date of the employment agreement and the fact that the Company claims that such writer is an exception hereunder. For the purpose of such computation, a writer who is employed under an exclusive contract by a Company shall be regarded as being employed by the Company at all times during the term of such contract, including periods during which the writer may be on layoff and periods during which such contract may be suspended by reason of illness or default of the writer or otherwise. The writer shall be regarded as continuing in the employ of the Company by which he/she is employed regardless of the fact that his/her services may be loaned to another Company.

C. The term "dues," as used herein, shall not include fines or initiation fees.

D. Promptly after request by any person designated by the Company, the Guild will admit such person to membership in the Guild upon terms and conditions not more burdensome to such person than those then applicable to other applicants. Membership shall be effective as of the date of such request. Guild agrees that during the term it will not impose any unreasonable initiation fee as a condition to admission to membership, and agrees that during the term hereof it will not impose upon its members any obligation to pay dues that does not uniformly apply to all members of the Guild.

It is agreed that the Guild shall not close its membership books or otherwise prevent any person who wishes to become or remain a writer from becoming a member of the Guild, but on the contrary (subject to the provisions hereof relating to waivers as to members

suspended or expelled) will make available the privileges of membership to any and all writers employed by the Company. The Guild will reinstate or readmit to membership any writer who applies for reinstatement or readmission, after being declared to be not in good standing or after suspension, expulsion, or resignation for any reason whatsoever, provided the writer will apply for such reinstatement or readmission and with such application tender to the Guild unpaid dues permitted by law, and upon such tender the Company may employ or continue to employ such writer. Instead of readmitting or reinstating such writer, the Guild may, at its option, grant to the Company a waiver as to such writer, in which event, for the purpose of determining the Company's compliance with the provisions of this Article 6, such writers shall not be considered as being employed by the Company.

E. If, during any time that a writer is employed by the Company under a contract of employment, such writer is or becomes a member of the Guild in good standing and if such writer shall subsequently and before his/her employment under such contract terminates, cease to be a member of the Guild in good standing then:

1. If such writer has ceased or shall cease to be a member for any reason other than his/her failure to pay dues, such writer shall, for the purposes of this Basic Agreement, be deemed to remain a member of the Guild in good standing throughout the writer's employment under said contract of employment as the same may be extended or renewed pursuant to any provisions or options therein contained.

2. If he/she has ceased or shall cease to be a member in good standing by reason of his/her failure to pay dues, and if the Guild gives the Company written notice of that fact within three (3) business days after such writer is first named on the weekly list provided for in Article 3.A.1. of this Basic Agreement (in the case in which he/she has ceased to be a member in good standing prior to such employment), such writer shall, for the purposes of this Basic Agreement, be deemed to remain a member in good standing for a period of fifteen (15) days after written notice from the Guild to such writer and to the Company that he/she has ceased to be a member in good standing for failure to pay dues. If, prior to the expiration of said fifteen (15) day period, payment of said dues in fact due and owing and specified in said notice shall be made by the writer or the Company, then, for the purposes of this Basic Agreement, such writer shall not lose his/her status as a member in good standing. To the extent that it may be lawful for the Company to do so, the Company may require, as a condition of employment, that any writer become and/or remain a member of the Guild in good standing, and may also require such written consent or consents as may be necessary so that, if the Company elects, it may pay to the Guild any dues of any writer and the Company shall have the right, insofar as its obligations to the Guild and to any writer under the terms and provisions of

this Basic Agreement are concerned, if it elects, to deduct the amount of such dues from any compensation then or thereafter due or to become due to the writer. If, prior to the expiration of said fifteen (15) day period, payment of said dues in fact due and owing as specified in said notice shall not be made, the Company shall terminate the employment of such writer.

Every personal service contract of employment shall provide that if the writer fails or refuses to become or remain a member of the Guild in good standing, as above provided, the Company shall have the right at any time thereafter to terminate such employment agreement with such writer.

If the Company is required or directed by any decision of a court of competent jurisdiction or any proper governmental authority to refund to any writer, in whatsoever form the same may be recovered, any dues deducted and paid to the Guild by the Company under the provisions of subparagraph 2. of this Paragraph E., the Guild agrees to repay to the Company the amount of such dues so refunded. The Guild will cooperate with the Company in obtaining the necessary authorizations from writers for the payment and deduction of dues in the manner provided in subparagraph 2. above.

Notwithstanding anything to the contrary in Paragraph B. of this Article 6 or in this Paragraph E., if the payment of initiation fees or dues (in the case of Paragraph B.), or if the payment of dues (in the case of this Paragraph E.), or the deduction thereof from the compensation of the writer, is or shall become contrary to law, or any statute, or is declared by any court of competent jurisdiction in the State of California or by any Federal Court or the National Labor Relations Board or its General Counsel, or by any other board or individual having jurisdiction over the matter, to be in violation of any applicable law or statute and if, by reason thereof, the Company fails to deduct and pay to the Guild such initiation fees or dues, as the case may be, as aforesaid, and shall notify the Guild thereof in writing within the fifteen (15) days after any notice from the Guild above-mentioned, then although such initiation fees or dues, as the case may be, are not paid within the fifteen (15) day period, for the purposes of this Basic Agreement, such writer shall nevertheless be deemed to remain a member of the Guild in good standing throughout the term of the writer's assignment.

F. The Guild will facilitate employment of its members by the Company and will at all reasonable times promptly furnish to the Company in writing information concerning the status of any of its members, and the Company shall be entitled to rely upon such information so furnished by the Guild.

G. The Guild represents and warrants that discipline, resignation, admission, reinstatement, readmission and all other matters relating to membership status will at all times during the term hereof be within the exclusive jurisdiction of the Guild. The Guild agrees that it will exercise such jurisdiction subject to and in accordance with the

provisions and intent of this Article 6 and of any other applicable provisions of this Basic Agreement.

H. It is understood that the provisions of this Article 6 shall never under any circumstances be so construed during the term of this Basic Agreement as to constitute or permit what is known as a "closed shop" or construed in any manner that will at any time deprive the Company of its right to employ or continue the employment of a writer who is not a member of the Guild in good standing, or who does not become a member of the Guild in good standing within the period prescribed in Paragraph A. of this Article 6 if the Company has reasonable grounds for believing that such a membership was not available to such writer on the same terms and conditions generally applicable to other like members of the Guild, or if the Company has reasonable grounds for believing that membership in the Guild was denied, deferred, suspended or terminated for reasons other than the failure of such person to tender the applicable periodic dues uniformly required as a condition for acquiring or retaining membership in the Guild.

I. If a person who has not been listed by the Company as a writer in accordance with the provisions of Article 3 hereof shall receive, or shall have been entitled to receive, a writing credit in the form of *"Story by," "Written by," "Screenplay by,"* or *"Teleplay by,"* and if the period during which the person performed his services in the writing of the literary material has exceeded a period of thirty (30) days from the commencement of such services, then within fifteen (15) days after receipt of written notice from the Guild to the Company, the writer or the Company shall pay or cause to be paid the initiation fee, if any, and the dues which otherwise would have been payable to the Guild and such person shall be deemed to have been a member of the Guild in good standing during the time that he/she was so performing his/her services as a writer. For such purpose, the person receiving or entitled to such credit or the Company may apportion, on a reasonable basis, salary payable to such person during the period he/she was employed as a writer.

J. When the Company has failed to include a writer employed by the Company on the list of names of writers to be sent to the Guild under Article 3 of this Basic Agreement and when such writer's performance of writer's services has continued for more than thirty (30) days after the beginning of his/her first employment, then within fifteen (15) days after receipt of written notice thereof from the Guild to the Company, the writer or the Company shall pay or cause to be paid (in the manner, within the time, and subject to the provisions of subparagraph E.2. hereof, relating to the payment of dues) the initiation fee, if any, and the dues payable to the Guild for the period during which such writer was employed by the Company after such thirty (30) day period. Upon such payment, such writer shall be deemed to have been a member of the Guild in good standing during the time that he/she was so performing his/her services as a writer. The provisions of this paragraph shall not apply in the event the Guild

gives the Company such notice prior to the expiration of such period of thirty (30) days.

K.    In relation to investigations by the Guild of compliance with the provisions of this Agreement, the Guild, through its authorized representatives, shall have access to the Company's premises at reasonable times during normal business hours for the purpose of interviewing the Company's employees whose employment is covered by this Agreement, provided that such interviews shall not interfere with the normal conduct of the Company's business.

## ARTICLE 7    NO STRIKE, NO LOCKOUT CLAUSE (GENERAL)

A.    The Guild agrees that during the term hereof it will not call or engage in any strike, slowdown or stoppage of work affecting theatrical or television motion picture production against the Company.

B.    If, after the expiration or other termination of the effective term of this Basic Agreement, the Guild shall call a strike against any Company, then each respective then current employment contract of writer members of the Guild (hereinafter for convenience referred to as "members") with such Company shall be deemed automatically suspended, both as to service and compensation, while such strike is in effect, and each such member of the Guild shall incur no liability for breach of his/her respective employment contract by respecting such strike call, provided such member shall promptly, upon the termination of such strike, and on the demand of the Company, perform as hereinafter in this paragraph provided, and the member shall be deemed to have agreed as follows:

    1.    That if the writer has been assigned to the writing of any material at the time any such strike is commenced, he/she will, after the termination of such strike and upon the request of the Company, report to the Company and perform his/her services in the completion of such assignment at the same salary and upon the same terms and conditions as were agreed upon prior to the commencement of said strike.

    2.    That he/she will immediately, after the termination of such strike and upon the request of the Company, execute a new contract on the same terms and conditions, and at the same salary or other compensation as provided in the employment contract which was in effect at the time the strike commenced, except that such new contract shall be for a period or periods, including options, equivalent to the unexpired term of the contract which was in effect when such strike was commenced.

    3.    That he/she will, in lieu of subparagraph 2., after the termination of such strike, at the option of the Company, and upon its demand, execute an agreement in writing with the Company extending the term or period of such personal service

contract in effect when such strike was commenced for a period of time equal to the period of any suspension by such strike.

C. If the member shall fail to perform the foregoing, or if he/she shall fail actually to finish his/her services in the assignment mentioned in subparagraph B.1., (except by reason of his/her death, physical disability, or default by the Company), then the waiver of liability by the Company heretofore given shall be null and void.

D. The member further agrees that the statute of limitations as a defense to any action by the Company against the member for his/her failure to perform during such strike is extended by a period equivalent to the duration of such strike. If the member asserts any claim or defense by reason of the expiration of time during which he/she can be required to perform services by virtue of any statute (such as the seven-year statute), which claim or defense is based in whole or in part on the lapse of time during such strike, the waiver by the Company is ineffective thereupon, and the statute of limitations as to the Company's rights is waived by the member automatically.

E. The automatic suspension provisions of this Article 7 shall not affect the Company's right to sue any individual writer for breach of contract arising during the period of such strike, unless such writer shall have complied with his/her obligations under the provisions of this Article 7. Nothing herein contained shall be construed to deprive the Company of its right to terminate the employment contract at any time after such member shall strike or otherwise fail or refuse to perform services.

F. The provisions of this Article 7 shall be deemed included in all employment contracts between writers and Company which are now in effect and all such employment contracts which shall be entered into during the effective term of this Basic Agreement.

G. The Guild agrees that it will take such affirmative actions as may be necessary and lawful in order to require its members to perform their respective obligations under the provisions of this Article 7.

H. Notwithstanding the expiration or other termination of the effective term of this Basic Agreement, by termination or otherwise, the provisions of this Article 7 shall be and remain in full force and effect for a period of seven (7) years following the termination of any such strike, unless this covenant be sooner terminated by the written consent of Company and Guild.

I. The Guild is a corporation. Nothing in this Paragraph I. shall enlarge the liability of its officers, directors, agents, and members, this Paragraph I. being an additional limitation thereon. The Guild will not be held liable for unauthorized acts of its officers, agents, directors, or members; neither the Guild, nor its officers, directors, agents, or members not participating in the actions hereinafter mentioned shall be liable for any strike, slowdown, or work stoppage, unless the same be authorized by the Guild in accordance with its

by-laws, but the foregoing exemption of this sentence shall not apply unless the Guild, upon request from the Company affected thereby, shall proclaim promptly and publicly that such strike, slowdown or work stoppage is unauthorized and follows such pronouncement within a reasonable time thereafter, if requested so to do by the Company affected, with disciplinary proceedings in accordance with its by-laws against the participants in such unauthorized action.

J.   The Company agrees that it will not call or engage in any lockout of members.

K.   In accordance with and to the extent required by Articles 11 and 12 of this Basic Agreement as to any matter arbitrable thereunder, the Guild has the right to strike Company so long as the Company's wrongful failure to participate in grievance and arbitration procedures continues. Such action on the part of the Guild is not a waiver of the right to compel Company to participate in grievance and arbitration procedures. If the Company contests the arbitrability of such issue, arbitrability shall first be determined prior to the arbitrator's proceeding with a hearing on the merits.

## ARTICLE 8      CREDITS FOR SCREEN AUTHORSHIP (GENERAL)

The Company agrees that credits for screen authorship shall be given only pursuant to the terms of and in the manner prescribed in the applicable Schedule A attached hereto and by this reference incorporated herein, with respect to credits for screen authorship finally determined during the term hereof, and with respect to credits for screen authorship finally determined after the expiration of the term hereof involving material written during the term hereof or during the term of a prior collective bargaining agreement between the Company and the Guild; provided, however, that any such credits determined during the term of a successor collective bargaining agreement between the Company and the Guild shall be determined pursuant to the terms of such successor collective bargaining agreement.

## ARTICLE 9      MINIMUM TERMS (GENERAL)

The terms of this Basic Agreement are minimum terms; nothing herein contained shall prevent any writer from negotiating and contracting with any Company for better terms for the benefit of such writer than are here provided, excepting only credits for screen authorship, which may be given only pursuant to the terms and in the manner prescribed in Article 8. The Guild only shall have the right to waive any of the provisions of this Basic Agreement on behalf of or with respect to any individual writer.

## ARTICLE 10 GRIEVANCE AND ARBITRATION

### A. MATTERS SUBJECT TO GRIEVANCE AND ARBITRATION (GENERAL)

Except as otherwise specifically provided in this Article or elsewhere in this Basic Agreement, the following matters shall be submitted to grievance and thereafter to arbitration as hereinafter provided, and no other matters shall be submitted to grievance or arbitration:

1. Any dispute between the Guild and the Company concerning the interpretation of any of the terms of this Basic Agreement and the application and effect of such terms as determined by an interpretation thereof.

2. Any alleged breach of any of the terms or provisions of this Basic Agreement by the Guild or the Company.

3. Any claim by the Guild and a writer, on the one hand, against the Company, on the other hand, for unpaid compensation under the writer's individual employment agreement or loan-out agreement with the Company, or for payment under a purchase agreement with the Company in the case of a professional writer, excluding, however, any claim not related to the writer's services as a writer or not related to the sale of literary material. (Claims for compensation or payment under an employment, loan-out or purchase agreement shall be referred to hereafter as "compensation claims" or "claims for compensation.") Notwithstanding the foregoing, the grievance committee and arbitrator shall not have jurisdiction to render an award for compensation or payment exceeding the sum of four hundred thousand dollars ($400,000.00) for a theatrical or television employment or purchase. (This amount is herein referred to as the "jurisdictional maximum.") If a compensation claim exceeds the jurisdictional maximum, the claim may nevertheless be submitted to grievance and/or arbitration, but by such submission the Guild and writer waive any award exceeding the jurisdictional maximum and shall have no further claim or right with respect to any amount in excess of the jurisdictional maximum. A claim for compensation cannot be split nor may more than one (1) grievance or arbitration proceeding be brought for the purpose of avoiding the jurisdictional maximum.

4. In any grievance or arbitration proceeding with respect to a claim for compensation brought under subparagraph 3. of this Article 10.A., the Company may, but need not, assert any and all defenses, including defenses based on an alleged right of suspension or termination, and any counterclaim or setoff (hereinafter referred to as "cross-claim"). A cross-claim is either mandatory or permissive. A mandatory cross-claim is one arising out of or related to the pending claim for unpaid compensation. A permissive cross-claim is any other

cross-claim by the Company against the writer. Provided that the Company has obtained knowledge of the facts upon which the cross-claim is based, the Company shall assert any and all mandatory cross-claims in any arbitration proceeding involving a compensation claim. If the amount claimed by the Company in a cross-claim exceeds the jurisdictional maximum of four hundred thousand dollars ($400,000.00), the Company shall have the option of submitting such cross-claim to grievance and (whether or not submitted to grievance) to arbitration or to institute an action at law or in equity with respect to such cross-claim. The Company may, but need not, assert any permissive cross-claim.

5. Any claim of overpayment by a Company under Article 11.A.9. of this Basic Agreement.[1]

**B. LIMITATION OF MATTERS SUBJECT TO GRIEVANCE AND ARBITRATION**

1. Except as otherwise provided in this Basic Agreement, disputes under individual employment agreements, loan-out agreements or under purchase agreements with professional writers, involving:

   a. Company's rights of suspension and termination,

   b. Company's right to seek or obtain injunctive relief or specific performance,

   c. any of the warranties or grants of rights made by the writer, or

   d. any of the rights of the Company to any literary material,

   shall not be subject to grievance or arbitration (except as provided to the contrary in Article 16), and the Company reserves all of its legal and equitable rights and remedies with respect thereto. Any decision in grievance or award in arbitration purporting to determine or affect any of the aforementioned matters shall, to that extent, be of no force or effect whatsoever; provided, however, that if the Company asserts in any grievance or arbitration any defense or cross-claim involving or based upon the alleged exercise of a right of suspension or termination, the same shall be determined in such grievance and arbitration proceeding.

2. The grievance committee and the arbitrator shall have jurisdiction to determine only such disputes as are submitted for grievance or arbitration under this Basic Agreement, subject to the limitations upon the powers of said grievance committee and arbitrator under this Basic Agreement. Neither the

---

[1] Articles 10.A.5. and 11.A.9. replace Article 13.C. of the 1973 Basic Agreement.

grievance committee nor the arbitrator shall have the power or jurisdiction to reform, amend or extend the express terms and provisions of this Basic Agreement or of any employment agreement, loan-out agreement or purchase agreement.

**C. MATTERS SUBJECT TO ARBITRATION BUT NOT GRIEVANCE**

Notwithstanding anything elsewhere contained in this Article 10, the following matters shall be submitted to arbitration but not to grievance:

1. Any dispute as to whether the arbitrator has jurisdiction or whether any matter is arbitrable, provided, however, that the arbitrator may not order an arbitration of any matter not arbitrable as provided above.

2. Any dispute concerning the credit provisions of this Basic Agreement. Such disputes are subject to the procedures set forth in Article 11.E. of this Basic Agreement.

3. Any dispute concerning separation of rights under the provisions of subparagraph 6. of Article 16.A. of this Basic Agreement.

4. Any dispute concerning allocation of receipts under Article 15.A.3.a. of this Basic Agreement.

5. Any dispute concerning Article 16.A.8. which is subject to the expedited arbitration procedure in Article 11.F.

**D. REFUSAL TO ARBITRATE**

A failure or refusal by any party to go to grievance on a matter subject to grievance or to arbitrate an arbitrable matter, including disputes as to jurisdiction and arbitrability pursuant to this Article 10, is a substantial breach of this Basic Agreement. A failure or refusal by any party to go to grievance on a matter subject to grievance or to arbitrate an arbitrable matter shall not limit, impair or divest the jurisdiction and powers of the grievance committee or arbitrator provided notice of grievance or arbitration has been served as provided herein. Grievance and arbitration may proceed despite the failure of a party to appear and the grievance committee or arbitrator may enter an award against such a party.

**E. REFERENCES**

All references in Articles 10, 11 and 12 to individual employment agreements, loan-out agreements or purchase agreements only refer to such agreements as are subject to this Basic Agreement.

## ARTICLE 11 GRIEVANCE AND ARBITRATION RULES AND PROCEDURES

### A. GENERAL RULES

Unless otherwise provided in this Article 11 or elsewhere in this Basic Agreement, the rules and procedures for grievance and arbitration shall be as follows:

1. Parties

a. In any grievance or arbitration concerning any claim by a writer for compensation under Article 10.A.3., the Guild and the writer involved shall be jointly a party and may be represented by joint counsel. In any grievance or arbitration concerning such a claim by any loan-out company, the loan-out company also shall be jointly a party and may be represented by joint counsel. The claim shall be initiated by the Guild on behalf of the writer and the loan-out company, if any.

b. Except as provided in subparagraph a. above, only the Company and the Guild shall be parties.

c. [Renumbered as Article 11.B.3. and deleted here.]

d. The party commencing a claim in grievance or arbitration is sometimes referred to herein as complainant. The party against whom such grievance or arbitration is commenced is sometimes referred to herein as respondent. Use of such terms in the singular shall be deemed to include the plural.

e. The grievance and arbitration provisions shall apply to disputes with respect to purchase agreements with professional writers to the same extent but no greater than they are applicable to disputes involving employed writers.

f. As used in Articles 10, 11 and 12 of this Basic Agreement, the term "writer" shall be deemed to include the plural, the writer's loan-out company if any (as defined in Article 3 of this Basic Agreement) and, in the case of a purchase agreement, a professional writer (as defined in Article 1 of this Basic Agreement).

2. Time Limits

a. Proceedings for grievance (or arbitration, to the extent a party is required to initiate arbitration without invoking a grievance proceeding) of a claim relating to actual or alleged television employment or purchase shall be commenced no later than two (2) years after the party

bringing the grievance or arbitration proceeding (whether it is the Company, Guild or the writer) has obtained knowledge of the facts upon which the claim is based. Proceedings for grievance (or arbitration, to the extent a party is required to initiate arbitration without invoking a grievance proceeding) of a claim relating to actual or alleged theatrical employment or purchase shall be commenced no later than eighteen (18) months after the party bringing the grievance or arbitration proceeding (whether it is the Company, Guild or the writer) has obtained knowledge of the facts upon which the claim is based.

b.    In any event, grievance and arbitration proceedings shall commence not later than four (4) years after the occurrence of the facts upon which the claim is based. An arbitration may be commenced prior to initiation or conclusion of a grievance proceeding, if it reasonably appears that the grievance proceeding will not be concluded in sufficient time to permit the arbitration proceeding to be commenced in time.

c.    With respect to separation of rights in television literary material, Company may accelerate the applicable limitation of time by serving notice on the Guild, after the literary material is completed, that the writer concerned does not have separation of rights in such material and by furnishing with such notice copies of all literary material and contracts upon which the Company's position in such notice is based. The Guild must respond within ninety (90) days from the date such notice is received or the claim to separation of rights is waived on behalf of the writer and the Guild.

d.    If grievance or arbitration proceedings are not commenced within the applicable time period specified in this Article 11, such claim shall be deemed to be waived. All time limits provided in Article 11 may be extended by mutual agreement of the parties to the dispute.

e.    It is the intent of the Guild and the Company that all arbitration awards should be rendered within sixty (60) days following the close of the arbitration hearing or submission of post-hearing briefs, whichever is later. However, the arbitrator's failure to render an award within such period shall not deprive him/her of jurisdiction over the dispute or render the award invalid because it is made thereafter.

3. Place of Hearing

Except as otherwise provided in this paragraph, all arbitrations shall be in Los Angeles, absent agreement of the parties. At the election of Writers Guild of America, East, the arbitration shall be in New York if a majority of the witnesses required for the arbitration hearing reside regularly in and around the New York area; provided, however, if any Company which is a party to the arbitration has its headquarters for the production of motion pictures in California, such arbitration shall be held in Los Angeles. Any dispute as to where the arbitration should be held shall be determined by an arbitrator in Los Angeles, selected in accordance with the procedures set forth in Article 11.C.2., and said arbitrator shall be disqualified from hearing the merits of the dispute. Said arbitrator shall take testimony by telephone from distant witnesses when requested to do so by either party. If the arbitrator determines that the arbitration shall be heard in New York, the arbitrator assigned to hear the merits of the dispute shall be selected from the New York list of arbitrators set forth in Article 11.C.2.

The selection of the situs of the hearing room within the appropriate city shall be by mutual agreement of the Company and the Guild. If there is no such agreement, those parties will alternate in selecting the hearing room, with the party making the selection supplying the room at no charge to the other.

4. Award

The grievance committee and the arbitrator may make any appropriate award permitted herein. Such award shall be in writing and shall be limited as provided in this Basic Agreement. Subject to the provisions of this Basic Agreement, the award shall be final and binding upon the parties to the proceeding, whether participating in the proceeding or not, and in any grievance or arbitration proceeding in which the writer involved is not a party. Any interpretation of this Basic Agreement made in such award shall be final and binding on such writer.

5. Costs

Each party shall pay the costs of its representatives on the grievance committee. The fee and expenses of the arbitrator shall be shared equally, unless otherwise provided by the arbitrator. The arbitrator may require a court reporter and a transcript, and if so required, the cost thereof shall be shared equally. All other costs and expenses of grievance and arbitration shall be borne by the party incurring the same.

6. Notices

a. All written notices referred to in this Article 11 commencing a grievance or arbitration or alleging a cross-claim shall be sent by registered or certified mail or by personal delivery and shall set forth the particulars thereof. If the moving party is unable to effect service in this manner, service then may be effected by first class mail, postage prepaid, to the address for service last designated in writing by the Company, together with publication in *Daily Variety, The Hollywood Reporter, The Los Angeles Times* and *The New York Times*. All other written notices may be served by first class mail, postage prepaid, unless otherwise specifically provided herein.

b. All notices sent by the Guild to the Company shall be sent to the address designated by the Company in writing to the Guild at the time Company becomes signatory to the Basic Agreement. Should Company change its address for the purpose of receiving notices relating to grievance or arbitration, the Company shall notify the Executive Director of Writers Guild of America, west, Inc. and the Executive Director of Writers Guild of America, East, Inc. of such new address, which shall then be substituted for the prior address.

c. Unless otherwise designated by Company in a written notice to the Guild, all notices sent by the Guild to the Company shall be addressed to the attention of an officer of the Company, or to its Labor Relations Department. If the Company maintains an office in Los Angeles, California or its vicinity, all such notices shall be sent to said office.

d. A petition to confirm, modify or vacate, as the case may be, an arbitration award in any court of competent jurisdiction shall be served upon the respondent by registered or certified mail or by personal delivery. If the petitioner is unable to effect service in this manner, service then may be effected by first class mail, postage prepaid, to the address for service last designated in writing by the Company, together with publication in *Daily Variety, The Hollywood Reporter, The Los Angeles Times* and *The New York Times*.

7. Conduct of Proceedings

Except as set forth elsewhere herein, the grievance committee and the arbitrator shall adopt such rules of procedure and shall conduct proceedings in such manner as they shall determine to be proper; provided, however, that each party to any grievance or arbitration shall be afforded a reasonable opportunity to

present evidence and argument before the grievance committee and the arbitrator.

All hearings, deliberations and proceedings of the arbitrator and the grievance committee shall be closed to the public and shall be absolutely privileged. Only interested parties, their representatives and witnesses may attend. All communications to and from the arbitrator or the grievance committee shall likewise be absolutely privileged. Unless the Company objects, the arbitrator will send a copy of the award to the AMPTP. The Guild shall have access to those awards.

8. Claims for Compensation, Cross-Claims and Defenses

Subparagraphs a. through e. of this subparagraph 8. relate to compensation claims, cross-claims and defenses covered by Articles 10.A.3. and 10.A.4. of this Basic Agreement.

a. The grievance committee and arbitrator shall have no jurisdiction to determine or affect any claim relating to services in connection with any theatrical or television motion picture other than the theatrical or television motion picture as to which the compensation claim is asserted unless a defense or cross-claim is asserted with respect to another theatrical or television motion picture.

b. A decision made or award rendered in grievance or arbitration of a claim for compensation shall be limited to deciding or awarding what compensation, if any, is due the writer from the Company and what amount, if any, is due the Company from the writer on account of any cross-claim asserted by the Company in such grievance or arbitration.

c. If a claim for compensation under Article 10.A.3. of this Basic Agreement is submitted to grievance or arbitration, any claim of a breach of this Basic Agreement arising out of or connected with said claim must, to the extent permitted by the Basic Agreement, be submitted for grievance and arbitration together with the claim for compensation, provided that the Guild or the writer has obtained knowledge of the facts upon which said claim of breach is based. Failure to so submit such claim shall constitute a waiver of any and all rights to assert such claim thereafter.

d. The institution of any action in court by the Company shall not stay an arbitration proceeding brought by the Guild and writer for compensation, nor shall any such grievance or arbitration proceeding stay any action instituted by the Company upon any matter Company is not required to submit to grievance or arbitration as a defense or cross-claim, whether or not such action is

instituted prior to the submission of the compensation claim to grievance or arbitration.

e. Cross-claims must be submitted to grievance or arbitration by serving written notice on the complainant, by certified or registered mail, setting forth the particulars thereof.

9. Overpayments

If the Company claims that it has made an overpayment to a writer of any compensation provided for in this Basic Agreement or in any prior collective bargaining agreement between the Company and the Guild (*i.e.*, minimum compensation, residuals and other compensation provided for in this Basic Agreement or any other such collective bargaining agreement (hereinafter called "MBA compensation")) or of any compensation provided for in an employment or loan-out contract with a writer or an option agreement subject to the MBA or a purchase agreement with a professional writer not in excess of the applicable jurisdictional maximum of four hundred thousand dollars ($400,000.00) as set forth in Article 10.A.3. above (hereinafter called "arbitrable overscale compensation"), and if the Company desires to offset such payment against other compensation payable to such writer, the Company shall advise the Guild thereof in writing setting forth the particulars of such claim of overpayment. If the Guild requests that the question of whether the Company has overpaid MBA compensation or arbitrable overscale compensation to the writer be submitted to grievance and arbitration, such request shall be made within seven (7) days after such notice from the Company to the Guild. If the Guild does not make a timely request, the Company may proceed with the offset, subject to all of the legal rights and remedies of the writer. If the Guild does make a timely request, then pending the outcome of such grievance and arbitration, the Company agrees that it will not apply the offset, but will pay the amount it desires to apply as an offset to the Guild. The Guild shall then promptly deposit the amount so paid in a separate interest-bearing trust account until it is determined in such grievance and arbitration proceeding whether there was in fact an overpayment of MBA compensation or arbitrable overscale compensation, as the case may be. The grievance and arbitration shall involve only the question of whether there was in fact an overpayment of such compensation, and the amount thereof, and if it is determined that there was in fact an overpayment of such compensation, the right of offset is recognized. Upon conclusion of the arbitration, the payments into such account, together with applicable interest, shall be paid to the Company or to the writer in accordance with the arbitration decision. The parties shall cooperate in obtaining a speedy determination of the grievance and arbitration. As to any claimed right of offset with respect to any alleged overpayments of monies other than MBA

compensation or arbitrable overscale compensation, the Guild and the Company reserve their respective rights and contentions.

10. Withdrawal of Services

Notwithstanding any provision of any personal service contract (including a memorandum agreement) or of the MBA to the contrary, it shall not be a violation thereof for the Guild or any employee (at the direction of the Guild) to withhold services from the Company if the Company fails or refuses to abide by the final award of an arbitrator for any reason whatsoever.

11. Any grievance and/or arbitration concerning a dispute arising under a prior MBA or a writer's individual employment agreement, loan-out agreement, option agreement or purchase agreement subject to a prior MBA shall be subject to the following grievance and arbitration rules and procedures as set forth in the MBA in effect at the time the grievance or arbitration is initiated:

a. The lists of arbitrators;

b. The method of selecting an arbitrator;

c. A party's unilateral right to waive second step grievance;

d. Use of a sole disinterested arbitrator rather than a tripartite arbitration panel;

e. Respondent's written statement of position prior to an arbitration hearing;

f. Methods of effecting service of grievance notices, arbitration claims, cross-claims and notices, and petitions to confirm, modify or vacate an arbitration award;

g. Arbitration of disputes concerning tri-Guild residuals audits as set forth in the Sideletter to Article 11;

h. Expedited arbitration of residuals disputes under Article 11.G.; and

i. Expedited arbitration of reacquisition disputes under Article 11.F.

The parties agree that the provisions of this Article 11.A.11. shall not be construed to render a dispute subject to grievance and/or arbitration hereunder if that dispute was not subject to grievance and/or arbitration under such prior MBA. The parties further agree that to the extent a claim of overpayment as described in Article 11.A.9. of this Agreement or a

"cross-claim" may lie, the provisions of this Article 11.A.11. also shall apply.

B. GRIEVANCE

1. Step One - Informal Conference

Prior to submitting to grievance any matter properly a subject thereof, an authorized representative of the Guild and an authorized representative of the Company will meet in a good faith attempt to settle the dispute. If the representatives of the parties shall fail to settle the dispute within fourteen (14) days after the matter is first brought to the attention of the respondent, then the dispute may be referred to Step Two Grievance.

2. Step Two - Grievance

a. Commencement of Grievance

Complainant shall set out the nature of its claim in writing, and serve a copy ("grievance notice") thereof upon respondent by certified or registered mail. Respondent may, but need not, reply in writing, setting forth its position. The parties shall attempt to agree upon a mutually satisfactory date to convene a grievance committee and hold a grievance hearing, but if no mutually agreeable date is chosen, respondent may, within five (5) days after receipt of the grievance notice, designate by written notice to complainant a date upon which the grievance committee shall convene to hold the grievance hearing. Such date shall be no earlier than fifteen (15) nor later than thirty (30) days after receipt of the grievance notice. If respondent fails or refuses to designate such a date, complainant may designate the date for such meeting, such date to be not earlier than fifteen (15) nor later than thirty (30) days after service of the grievance notice.

b. Grievance Committee

The grievance committee shall consist of three (3) representatives chosen by respondent and three (3) representatives chosen by complainant. Either party shall have the right to designate a substitute for any of its representatives. The committee will, by majority vote, select its chairman. By mutual agreement, the grievance committee may consist of two (2) representatives chosen by respondent and two (2) representatives chosen by complainant.

c. Grievance Hearing

The grievance committee thus designated shall meet upon the date selected pursuant to the procedure described above, and shall consider and attempt to resolve the dispute brought before it. The hearing shall be conducted in an orderly fashion, but rules of evidence and technicalities of procedure shall not be controlling. It is the intent of this Basic Agreement that the committee members shall use their good faith, best judgment and common sense, as persons experienced in the motion picture and television industry, in attempting to resolve the dispute brought before it. No matter shall be considered by the grievance committee unless a quorum is present. A quorum shall consist of six (6) members. If any four (4) members of the committee shall agree on a decision, such decision shall be final and binding upon the parties to the proceedings and any interpretation of this Basic Agreement made in such decision shall also be binding upon the writer or writers involved. If no decision is agreed upon, then in any subsequent arbitration or other proceeding, no reference shall be made to the grievance proceeding or to any statements or discussions therein, or to the failure of the grievance committee to settle the dispute.

d. Unresolved Grievance

If either party fails to designate its representatives within ten (10) days after notice of grievance is served, or if the committee shall fail to meet and commence hearings on the date selected in accordance with the procedures described above, or if four (4) members of the committee shall fail to concur in a decision, or if a grievance hearing is waived by one (1) of the parties hereto, or in any event if the dispute has not been settled by the committee or otherwise within forty-five (45) days after the mailing of the grievance notice, then either party may submit such matter to arbitration.

3. Waiver of Grievance [appeared as Article 11.A.1.c. in predecessor Agreements].

Either party may, by written notice to the other party, waive grievance. In such event, the dispute shall be submitted directly to arbitration.

C. **ARBITRATION**

1. Initiation of Proceedings

A dispute which is subject to grievance proceedings shall not be subject to arbitration, except as provided in subparagraph B.2.d.

or subparagraph B.3. of this Article 11. An arbitration shall be initiated by complainant by written notice, setting forth the particulars of the claim, to be sent to respondent in accord with the procedures described in Article 11.A.6.a. of this Basic Agreement. Respondent will provide complainant with a written statement of its position not later than ten (10) days prior to the date of the hearing.

2. Selection of Arbitrator

The arbitrator shall be a disinterested person. The parties shall in good faith attempt to mutually agree upon an arbitrator within ten (10) business days after respondent's receipt of the arbitration notice. The complainant may extend this ten (10) day period upon written notice to respondent(s) at the time the arbitration claim is served. Such extension is deemed effective at that time absent an objection by respondent(s). In addition, the extension will no longer be deemed effective if respondent(s) gives subsequent written notice to complainant in which case the parties shall in good faith attempt to mutually agree upon an arbitrator within ten (10) business days after complainant's receipt of notice from respondent(s). With respect to arbitration claims served on or after November 1, 2004, if the complainant has failed to take any action to select the arbitrator (either by mutual agreement or the applicable Strike Process), or has failed to withdraw the claim with or without prejudice, for a period of eighteen (18) months after service of the claim on respondent(s), such claim shall be deemed to be waived.

Should the parties fail to agree on an arbitrator, the arbitrator shall be selected by the "Strike Process" as follows:

a. The arbitrators listed in Article 11.C.2.e.(3) shall constitute the lists of arbitrators.

b. On a Company-by-Company basis, the Guild and the Company shall alternate on a case-by-case basis in first striking a name from the applicable list of arbitrators (Los Angeles or New York). Thereafter, the other party shall "strike" a name from the list. The parties shall continue to alternate in striking names from the list, until one (1) arbitrator's name remains.

c. The arbitrator whose name remains (after the Strike Process is completed) shall be the arbitrator.

d. The "Strike Process" shall commence within two (2) business days following completion of the ten (10) business day period referred to in subparagraph 2. above and must conclude no later than three (3) business days following completion of the ten (10) day period referred to in subparagraph 2. above.

e. In the event that onc of the parties fails to participate in the Strike Process, or fails to strike in order and/or timely, the other party may thereupon select the arbitrator to hear the matter.

(1) [Deleted.]

(2) If more than one Company is a party, then the Company which is the real party in interest shall participate in the striking process with the Guild. In the event that such Companies cannot agree on which of them is the real party in interest, then such Companies shall determine by lot which Company shall participate in the striking process with the Guild.

(3) The authorized lists of arbitrators approved by the parties hereto are as follows:

LOS ANGELES

Sara Adler
Tom Christopher
Douglas Collins
Dixon Dern
Edna Francis
Joe Gentile
Joel Grossman
Fredric R. Horowitz
Edgar A. Jones, Jr.
Anita Christine Knowlton
Michael Rappaport
Lionel Richman
Tom Roberts
Sol Rosenthal
Robert Steinberg
Barry Winograd
John Zebrowski

NEW YORK

Maurice Benewitz
Noel Berman
Howard Edelman
Susan MacKenzie
George Nicolau
Joan Parker
Janet Spencer

Additional names may be added from time to time during the term of the contract by mutual agreement of the parties, provided that each panel shall consist of an odd number of arbitrators at all times.

3. Substitution of Arbitrators

If the arbitrator selected cannot serve, a substitute shall be selected in accordance with subparagraph 2. above.

4. Notice of Hearing

The arbitrator or, at his/her request, one of the parties shall give written notice to the parties of the time and place of the

arbitration hearing. In fixing such date, the arbitrator shall consult the parties and shall consider the time reasonably necessary for the parties to prepare their cases.

5. Exchange of Information

The parties will cooperate in the exchange of information prior to the hearing regarding the expected utilization of documents and witnesses, including the exchange of lists of witnesses and copies of documents to be utilized. Such utilization shall not be precluded because such exchange did not take place.

6. Hearing

a. The arbitrator may, upon a showing of good cause, continue the hearing.

b. The arbitration shall take place as noticed or continued regardless of whether one (1) or more of the parties fails to participate.

**D. ARBITRATION OF DISPUTES WHICH INVOLVE QUESTIONS OF JURISDICTION OR ARBITRABILITY**

An objection to jurisdiction or arbitrability shall first be determined by the arbitrator prior to proceeding with a hearing on the merits. If the arbitrator determines that there is jurisdiction and that the dispute is arbitrable, the arbitrator shall proceed to a decision on the merits; provided, however, that the party contesting arbitration or jurisdiction shall not, by proceeding to a determination of the merits of such arbitration, be deemed to have waived its position that the dispute is not arbitrable or that the arbitrator does not have jurisdiction. If the arbitrator rules he has no jurisdiction over the dispute or that the dispute is not arbitrable, then each party is relieved of its obligation to further delay taking any action at law or in equity which it may desire to take.

**E. ARBITRATION OF DISPUTES CONCERNING CREDIT PROVISIONS**

A dispute concerning the credit provisions of this Basic Agreement shall be submitted to an expedited arbitration proceeding governed by the following rules:

1. The Guild shall act on behalf of itself and the writer.

2. Within twenty-four (24) hours after the Guild or the Company serves written notice upon the other concerning a dispute involving a credit provision, an authorized representative of the Guild and an authorized representative of the Company will make a good faith attempt to settle or resolve the dispute.

3. In the event the parties shall fail to meet or shall otherwise fail to settle or resolve the dispute within twenty-four (24) hours after the twenty-four (24) hours provided in subparagraph 2. above, the dispute shall be submitted to arbitration to be commenced not later than five (5) business days after the service of the written notice provided for in subparagraph 2. above.

4. The dispute shall be submitted to a sole neutral arbitrator mutually selected from the authorized list of arbitrators approved by the parties hereto as follows:

LOS ANGELES

Sara Adler
Tom Christopher
Douglas Collins
Dixon Dern
Edna Francis
Joe Gentile
Joel Grossman
Fredric R. Horowitz
Edgar A. Jones, Jr.
Anita Christine Knowlton
Michael Rappaport
Lionel Richman
Tom Roberts
Sol Rosenthal
Robert Steinberg
Barry Winograd
John Zebrowski

NEW YORK

Maurice Benewitz
Noel Berman
Howard Edelman
Susan MacKenzie
George Nicolau
Joan Parker
Janet Spencer

Additional names may be added from time to time during the term of the contract by mutual agreement of the parties, provided that each panel shall consist of an odd number of arbitrators at all times.

In the event the parties are unable, within forty-eight (48) hours (not including weekends or holidays) after respondent's receipt of the written notice provided for in subparagraph 2. above, to agree upon an arbitrator from the above list or otherwise, the arbitrator shall be selected by use of the following "strike process:"

a. The arbitrators listed in this Article 11.E.4. shall constitute the lists of arbitrators.

b. On a Company-by-Company basis, the Guild and the Company shall alternate on a case-by-case basis in first striking a name from the applicable list of arbitrators (Los Angeles or New York). Thereafter, the other party shall "strike" a name from the list. The parties shall continue to alternate in striking names from the list until one arbitrator's name remains.

c. The arbitrator whose name remains (after the strike process is completed) shall be the arbitrator, so long as the arbitrator is a disinterested person.

d. The strike process shall commence within twenty-four (24) hours (not including weekends or holidays) after the period for mutual agreement has expired and shall be completed within forty-eight (48) hours (not including weekends or holidays) after the period for mutual agreement has expired.

e. If one of the parties fails to participate in the strike process, or fails to strike in order and/or timely, the other party may thereupon select a neutral arbitrator to hear the matter.

f. If more than one Company is a party, then the Company which is the real party in interest shall participate in the strike process with the Guild. In the event that such Companies cannot agree on which of them is the real party in interest, then such Companies shall determine by lot which Company shall participate in the strike process with the Guild.

5. Notwithstanding anything in this Basic Agreement to the contrary, the arbitrator shall have jurisdiction and power to award damages, to order the Company to withdraw, cancel, change, or re-do advertising materials already issued or prepared, to require the Company to re-do any film titles, and to order any other reasonable relief the arbitrator deems appropriate in the circumstances, whether relating to credit on the screen, advertising or otherwise. Any award rendered by the arbitrator shall be binding on the parties and upon the writer.

6. Any or all time limits set forth herein may be waived by the mutual consent of the parties.

7. To the extent not inconsistent herewith, all other provisions of the Basic Agreement relating to arbitrations shall be applicable.

**F. EXPEDITED ARBITRATION OF CERTAIN DISPUTES CONCERNING REACQUISITION OF UNPRODUCED LITERARY MATERIAL (THEATRICAL)**

1. a. Disputes Subject to Expedited Arbitration Procedure

The following procedure applies only to arbitrable disputes between the Guild and the Company concerning the interpretation or application, or alleged breach, of any provision of Article 16.A.8. of this Basic Agreement or any predecessor WGA Basic Agreement as to which the initial written notice of the writer's desire or intent to

reacquire is received by the Company on or after May 2, 1998.

b. Parties

Only the Guild and the Company shall be parties to an Article 11.F. arbitration proceeding. The Guild shall act on behalf of itself and the writer.

2. Right to Invoke

Either the Guild or the Company shall have the right to invoke this expedited arbitration procedure when there is a likelihood of irreparable harm in connection with the proposed reacquisition if regular arbitration procedures were used. For purposes of Article 11.F., it is agreed that "irreparable harm" means an event or occurrence that cannot be undone or an opportunity or situation that, once lost or foregone, is unlikely to be revived or recaptured. The burden of proof shall be on the moving party to show that use of the expedited procedure is appropriate under the provisions of this subparagraph 2.

3. Commencement of Proceedings

Complainant shall initiate expedited arbitration proceedings by written notice, setting forth the particulars of the claim, to be sent to the respondent in accordance with the procedures described in Article 11.A.6.a. of the Basic Agreement. Such notice shall be served within ten (10) business days after the moving party has obtained knowledge of the facts upon which the claim is based. If expedited arbitration proceedings are not commenced within this time period, use of the expedited procedure shall be deemed waived. When the WGA or the Company has initiated the Article 48.E. Hot Line procedure, the period of no more than seven (7) days used to attempt resolution of the dispute in this manner shall not be included in the computation of the ten (10) business day period under this subparagraph 3.

4. a. Response or Objection to Expedited Claim

The respondent shall respond to the claim or object to use of the expedited procedure within ten (10) business days after its receipt of the expedited arbitration claim. If there is no objection to the procedure, the respondent will provide to complainant a written statement of its position within the time specified in the preceding sentence and, upon selection, to the arbitrator.

b. Objection to Expedited Procedure and Interim Ruling

If the respondent has objected to use of the expedited procedure, the objection must describe the factual or

other basis for its contention that use of the expedited procedure is not appropriate under the provisions of Article 11.F.2. The arbitrator (upon selection) may either convene an informal hearing by conference call, or a formal hearing, for the purpose of determining whether use of the expedited procedure is appropriate.

The hearing will take place within three (3) business days following selection of the arbitrator. Each party may file hearing briefs, page limit to be set by the arbitrator, and may make closing arguments. There will be no post-hearing briefs. The arbitrator must inform the parties of his/her decision as to whether the expedited procedure was appropriately invoked within twenty-four (24) hours after conclusion of the hearing, to be followed by an interim ruling in writing.

5. Selection of an Arbitrator; Place of Hearing

a. The arbitrator shall be a neutral third party. The parties shall in good faith attempt to mutually agree upon an arbitrator within three (3) business days after the response, objection or failure to respond, but in no event later than expiration of the ten (10) business day period in Article 11.F.4.a. above. Should the parties fail to so agree, the arbitrator shall be selected by the "Strike Process" as follows:

(1) The arbitrators listed in subparagraph (7) below shall constitute the lists of arbitrators.

(2) On a respondent-by-respondent basis, the moving party and the respondent shall alternate on a case-by-case basis in first striking a name from the list of arbitrators. Thereafter, the other party shall "strike" a name from the list. The parties shall continue to alternate in striking names from the list, until one (1) arbitrator's name remains.

(3) The arbitrator whose name remains (after the Strike Process is completed) shall be the arbitrator.

(4) The Strike Process shall commence on the first business day following completion of the three (3) business day period referred to in subparagraph 5.a. above and must conclude by close of business that day.

(5) In the event that one of the parties fails to participate in the Strike Process, or fails to strike in order and/or timely, the other party may thereupon select the arbitrator to hear the matter.

(6) If there is more than one respondent, then the respondent which is the real party in interest shall participate in the strike process with the Guild. In the event that such respondents cannot agree on which of them is the real party in interest, then such respondents shall determine by lot which of them shall participate in the striking process with the Guild.

(7) The authorized lists of arbitrators are as follows:

LOS ANGELES

| | |
|---|---|
| Sara Adler | Anita Christine Knowlton |
| Tom Christopher | Michael Rappaport |
| Douglas Collins | Lionel Richman |
| Dixon Dern | Tom Roberts |
| Edna Francis | Sol Rosenthal |
| Joe Gentile | Robert Steinberg |
| Joel Grossman | Barry Winograd |
| Fredric R. Horowitz | John Zebrowski |
| Edgar A. Jones, Jr. | |

NEW YORK

| | |
|---|---|
| Maurice Benewitz | George Nicolau |
| Noel Berman | Joan Parker |
| Howard Edelman | Janet Spencer |
| Susan MacKenzie | |

Additional names may be added from time to time by mutual agreement of the parties, provided that each panel shall consist of an odd number of arbitrators at all times.

b. Substitution of Arbitrators

If the arbitrator selected cannot serve, a substitute shall be selected in accordance with subparagraph 5.a. above.

c. Choice of Two Arbitrators

If there is to be a hearing on the respondent's objection to use of the expedited procedure, the parties have the option of selecting one arbitrator to rule on such objection and another arbitrator to determine the remaining issues in the case, both of whom shall be selected pursuant to this subparagraph 5.

d. Place of Hearing

The place of the arbitration hearing shall be determined in accord with Article 11.A.3. of the Agreement.

6.     Timeline; Citation of Expedited Arbitration Awards

    a.     The hearing on the merits of the claim shall commence within twenty (20) business days following the respondent's receipt of the arbitration claim or, if the respondent has objected to use of this expedited procedure, within twenty (20) business days following the arbitrator's determination that use of this expedited procedure is appropriate.

          The arbitrator or, at his/her request, one of the parties, shall give written notice to the other party of the time and place at which the arbitration hearing will commence. In fixing such date, the arbitrator shall consult the parties and shall consider the time reasonably necessary for the parties to prepare their cases. The arbitration shall take place as notified (or as continued) regardless of whether one (1) of the parties fails to participate.

    b.     The hearing on the merits of the claim shall conclude within ten (10) business days after its commencement, provided that the duration of the hearing is consistent with fundamental fairness in the arbitrator's sole judgment.

    c.     The parties may file post-hearing briefs within fifteen (15) business days following the close of the hearing. Either party's election to file a post-hearing brief will not preclude that party's right to make a closing argument so long as the hearing concludes within the time permitted in subparagraph 6.b. above.

    d.     Within ten (10) business days following either receipt of the parties' briefs, or the conclusion of the hearing if no briefs are filed, the arbitrator shall issue a written decision and award on the issues presented. The arbitrator's failure to meet the deadline shall not oust the arbitrator of jurisdiction. The arbitrator's determination of issues and award shall be final and binding upon the Company, the Guild and the writer or writers involved, whether participating in the proceeding or not.

          Any award so rendered may be cited or offered into evidence by any party in another arbitration proceeding under this Basic Agreement, whether expedited or not.

7.     Waiver of Time Limits

    Any or all of the time limits set forth in Article 11.F.6. may be waived by the mutual consent of the parties.

8.    Right to Seek an Extension of Time Limit

Upon the arbitrator's finding of good cause demonstrated by either party, the arbitrator may expand the time for conducting the hearing for a maximum of three (3) additional business days, and/or the time for filing post-hearing briefs for a maximum of three (3) additional business days. In making such a determination, the arbitrator shall take into account the position of a party opposing the extension that prejudice would result from the extension. The arbitrator shall advise the parties of his/her ruling on any request for an extension within forty-eight (48) hours after the request is made.

9.    Choice of Arbitration Forum; Application of Other Arbitration Provisions

Claims processed under this Article 11.F., which result in expedited arbitration awards on the merits of the issues presented, shall not be subject to adjudication in a judicial forum. The preceding sentence does not reduce or impair the rights of any party under Article 12.C., D., and E. of this Agreement.

In addition, once an expedited arbitration procedure is initiated, the provisions of Article 11.F. shall preclude arbitration under Article 16.A.6. to the extent that the issue(s) under Article 16.A.6. has (have) been decided in the expedited proceeding.

To the extent not inconsistent herewith, all other provisions of Articles 10, 11 and 12 of the Basic Agreement relating to arbitration shall be applicable.

10.    Remedies in the Arbitration Forum

In an expedited arbitration proceeding under Article 11.F., the arbitrator is limited to providing remedies that are in the nature of equitable relief such as a declaration of the respective rights of the parties and specific performance.

If all issues in dispute concerning the reacquisition are not fully resolved in the expedited proceeding, the WGA or the Company may initiate a subsequent arbitration proceeding under the regular procedures in the Basic Agreement.

11.    Legal Subcommittee

The parties to this Basic Agreement shall establish a legal subcommittee to explore whether the expedited arbitration procedure in Article 11.F. should apply to other Article 16 disputes. The subcommittee shall report its recommendations, if any, to the Contract Adjustment Committee (CAC).

## G. ARBITRATION OF CERTAIN DISPUTES CONCERNING RESIDUALS PROVISIONS

Notwithstanding any other provision of the MBA, a dispute concerning the residuals provisions of this Basic Agreement or a predecessor WGA Basic Agreement shall be submitted to an expedited arbitration proceeding if the respondent is not financially responsible, or it is likely that the respondent's assets will be depleted or transferred, such that in either case it is reasonable to believe that the respondent would be unable to satisfy its residuals liability if the dispute were processed through the grievance and/or arbitration procedures set forth in Articles 11.A. through 11.C., above. This expedited proceeding will be governed by the following rules:

1. Invocation of Expedited Proceeding

A Notice of Expedited Arbitration (so labeled by the claimant) shall be reduced to writing and delivered to the respondent. The Notice of Expedited Arbitration shall include the name, address and telephone number of the claimant's representatives and the name of the person who represents the respondent, if known. The Notice of Expedited Arbitration shall also set forth the particulars of the claim, including an allegation that the respondent is not financially responsible, or it is likely that the respondent's assets will be depleted or transferred, such that in either case it is reasonable to believe that the respondent would be unable to satisfy its residuals liability if the dispute were processed through the grievance and/or arbitration procedures set forth in Articles 11.A. through 11.C.

This expedited procedure is not available when the residuals obligation(s) at issue is (are) payable, guaranteed or assumed by a "Qualified Distributor," "Qualified Buyer" and/or a "Qualified Residuals Payor," except by mutual agreement.

2. Attempt to Settle Dispute

Within seven (7) business days after the claimant serves written notice upon the respondent concerning an expedited arbitration proceeding, an authorized representative of the claimant and an authorized representative of the respondent will make a good faith attempt to settle or resolve the dispute.

3. Submission of Dispute to Arbitrator

In the event the parties shall fail to meet or discuss the claim, or shall otherwise fail to settle or resolve the dispute within fifteen (15) business days after the respondent's receipt of the claim, the dispute shall be submitted to arbitration to be commenced not later than sixty (60) days after the respondent's receipt of the claim.

4. Place of Hearing

All expedited arbitration hearings under this Paragraph G. shall be in Los Angeles, absent agreement of the parties to another situs.

5. Arbitrator Selection

The dispute shall be submitted to a sole neutral arbitrator mutually selected from the authorized list of arbitrators as follows:

| | |
|---|---|
| Sara Adler | Anita Christine Knowlton |
| Tom Christopher | Michael Rappaport |
| Douglas Collins | Lionel Richman |
| Dixon Dern | Tom Roberts |
| Edna Francis | Sol Rosenthal |
| Joe Gentile | Robert Steinberg |
| Joel Grossman | Barry Winograd |
| Fredric R. Horowitz | John Zebrowski |
| Edgar A. Jones, Jr. | |

Additional names may be added from time to time during the term of the contract by mutual agreement of the parties, provided that each panel shall consist of an odd number of arbitrators at all times.

In the event the parties are unable, within ten (10) business days (not including weekends or holidays) after the respondent's receipt of the claim, to agree upon an arbitrator from the above list or otherwise, the arbitrator shall be selected by use of the following "strike process:"

a. The arbitrators listed in this Article 11.G. shall constitute the list of arbitrators.

b. On a Company-by-Company basis, the Guild and the Company shall alternate on a case-by-case basis in first striking a name from the list of arbitrators. Thereafter, the other party shall "strike" a name from the list. The parties shall continue to alternate in striking names from the list until one arbitrator's name remains.

c. The arbitrator whose name remains (after the strike process is completed) shall be the arbitrator, so long as the arbitrator is a disinterested person.

d. The strike process shall commence within twenty-four (24) hours (not including weekends or holidays) after the period for mutual agreement has expired and shall be completed within forty-eight (48) hours (not including weekends or holidays) after the period for mutual agreement has expired.

e.    If one of the parties fails to participate in the strike process, or fails to strike in order and/or timely, the other party may thereupon select a neutral arbitrator to hear the matter.

f.    If more than one Company is a party, then the Company which is the real party in interest shall participate in the strike process with the Guild. In the event that such Companies cannot agree on which of them is the real party in interest, then such Companies shall determine by lot which Company shall participate in the strike process with the Guild.

6.    Award

The arbitrator's written award shall be issued within sixty (60) calendar days from the end of the expedited arbitration hearing if closing argument is substituted for post-hearing briefs, or ninety (90) days following submission of post-hearing briefs. The arbitrator's failure to meet the deadline shall not oust the arbitrator of jurisdiction. The arbitrator's determination of issues and award shall be final and binding on all parties, whether participating in the hearing or not. The parties shall be so bound in any subsequent arbitration proceeding between them concerning a residuals dispute involving the same theatrical and/or television motion picture(s). Except as provided above, awards resulting from the use of these expedited procedures shall not be offered in evidence or cited in arbitrations under this Basic Agreement.

7.    Continuance of Hearing and Testimony by Telephone

The hearing shall not be continued, absent agreement of the parties, except upon proof of good cause by the party requesting such continuance. The unavailability of any witness shall not constitute good cause unless the witness' testimony is relevant to the issues in the arbitration and could not be received by means consistent with fundamental fairness which do not require the witness' presence at the hearing. Each party shall have the right to present the testimony of any witness by telephone, so long as the arbitrator is satisfied that the examination is consistent with fundamental fairness.

8.    Settlement

Nothing contained in this Article 11.G. shall preclude the parties from discussing the settlement of the dispute, except that such discussion shall not delay the expedited arbitration procedure.

9.     Time Limit for Use of Expedited Proceedings and Determination of Claims Not Subject to Expedited Arbitration

The failure of the claimant to serve the Notice of Expedited Arbitration within sixty (60) days following the date on which the facts upon which the claim is based were discovered by the moving party shall constitute a waiver of the right to use this expedited arbitration procedure. If two (2) or more residuals claims are submitted to expedited arbitration and the expedited arbitration procedure has been waived or is inapplicable to one (1) or more claims, absent objection by the respondent, the non-expedited claim(s) may be heard in the expedited proceeding. If the respondent objects to the determination of the non-expedited claim(s) in the expedited proceeding, the same arbitrator selected to hear the expedited claim(s) may, absent objection by a party during the arbitration hearing, determine the claim(s) not subject to expedited arbitration, provided that such non-expedited arbitration claim(s) shall be determined in a separate proceeding conducted in accordance with Article 11.C., above.

10.     Right to Object to Expedited Procedures and Interim Ruling

The respondent may object to proceeding under this Article 11.G. by serving written notice of such objection with claimant and the arbitrator within seven (7) business days of receipt of the Notice of Expedited Arbitration. The respondent's notice of objection must describe facts indicating it is financially responsible, or that it is not likely that its assets will be depleted or transferred, such that in either case it is reasonable to believe that the respondent would be able to satisfy its residuals liability if the dispute(s) at issue were processed through the grievance and/or arbitration procedures set forth in Articles 11.A. through 11.C., above. In the event of an objection, the claimant shall have the burden of proving that it is consistent with this Article 11.G. to hear the dispute(s) under these expedited procedures.

The arbitrator may convene an informal hearing by telephone conference call, or a formal hearing, to determine whether it is consistent with this Article 11.G. to hear the dispute(s) under these expedited procedures. If the arbitrator convenes a hearing, that hearing will take place within three (3) business days of receipt of the respondent's notice of objection. The parties may file hearing briefs, the page limit to be set by the arbitrator, and they may make closing argument. There will be no post-hearing briefs. The arbitrator must inform the parties of the interim ruling on the use of the expedited procedures under this Article 11.G. within twenty-four (24) hours after conclusion of the hearing or, in the event no hearing is convened, within twenty-four (24) hours of the submission to the arbitrator of all briefs and/or relevant documents, to be followed by an interim ruling in writing.

11. Bifurcation

If the expedited arbitration involves multiple residuals disputes or controversies, such as which of two (2) or more respondents is liable to make payment and the amount of residuals unpaid, the arbitrator may, upon the request of a party, bifurcate or separate such disputes or controversies and render separate awards, each of which shall be deemed final.

12. Invocation of Expedited Proceeding After Service of Claim Under Articles 11.A. through 11.C.

If, after such time as a residuals arbitration has been commenced under the procedures set forth in Articles 11.A. through 11.C. above, a party learns that a respondent is not financially responsible, or it is likely that the respondent's assets will be depleted or transferred, such that in either case it is reasonable to believe that the respondent would be unable to satisfy its residuals liability if the dispute were processed through such grievance and/or arbitration procedures, any party to that arbitration proceeding may invoke an expedited arbitration under this Article 11.G. by serving appropriate notice to that effect.

13. Waiver of Time Limits

Any and all time limits in Article 11.G. may be waived by the mutual consent of the parties.

14. Other Provisions Applicable

To the extent not inconsistent with Article 11.G., all other provisions of the Basic Agreement relating to arbitrations shall be applicable.

## H. ARBITRATION OF DISPUTES CONCERNING TRI-GUILD RESIDUALS AUDITS

See Sideletter to Article 11, Arbitration of Disputes Concerning Tri-Guild Residuals Audits, for the procedures applicable to such cases.

## I. EQUAL STATUS OF PARTIES

It is understood that the Companies and the Guild are parties of equal status under this Agreement and in the administration of the arbitration processes throughout this Agreement. The equal status of the parties in the administration of the arbitration process shall be recognized in matters involving the determination of the availability of arbitrators, the selection of hearing dates, the retention of stenographic reporters, and insofar as applicable in all communications with the arbitrators.

Arbitration claims, cross-claims and notices shall carry the caption "WRITERS GUILD OF AMERICA - PRODUCERS ARBITRATION TRIBUNAL."

## ARTICLE 12 COURT PROCEEDINGS

### A. DISPUTES CONCERNING CREDITS

Nothing in this Basic Agreement shall limit the rights of the Guild or any writer to assert any and all appropriate legal and equitable rights and remedies to which the Guild or such writer is entitled in courts of competent jurisdiction with regard to an alleged breach of Article 8 and Schedule A of this Basic Agreement with respect to writing credit; subject, however, to the following conditions and limitations:

1. The Guild and the writer shall be bound by any court proceedings instituted by the Guild.

2. If the Guild or the writer commences any proceedings in court with respect to any such alleged breach prior to the submission of the dispute to arbitration hereunder, then neither the Guild nor the writer may submit such dispute to arbitration and no arbitrator shall have jurisdiction to consider the alleged breach of such credit provision.

3. If the Guild or the Company commences an arbitration proceeding hereunder with respect to any such alleged breach prior to the submission of the dispute to a court, then neither the Guild nor the writer shall thereafter commence any proceeding in court with respect to such alleged breach.

4. Any permissible court proceeding referred to in this Paragraph A. must be commenced by the Guild or the writer, if at all, within the applicable time limits specified in subparagraph 2. of Article 11.A.

### B. DISPUTES CONCERNING COMPENSATION

With respect to a compensation claim which is arbitrable pursuant to the provisions of this Basic Agreement, the writer, at his/her option, need not proceed by grievance and arbitration, but instead may institute an action at law or in equity with respect to such claim prior to submission of such claim to grievance or arbitration; provided, however, that for compensation claims of four hundred thousand dollars ($400,000.00) or less for theatrical or television employment or purchase, the writer must submit such claim to grievance and arbitration pursuant to Articles 10 and 11 of this Basic Agreement and failure to so proceed by grievance and arbitration shall constitute a waiver by the writer as to such compensation claim.

C. Nothing in this Basic Agreement shall impair, affect or limit the right of the Company, the Guild or any writer to assert and exercise any and

all appropriate legal or equitable rights or remedies to which such Company, Guild or writer is entitled in any court of competent jurisdiction as to any dispute which is not subject to grievance or arbitration pursuant to this Basic Agreement. The rights of the parties to assert and exercise legal or equitable rights or remedies as to disputes which are subject to grievance or arbitration are as more particularly defined in this Basic Agreement.

D. The Guild shall have the right to take to grievance and arbitration a claim of the Guild of a breach by the Company of any of the terms or provisions of this Basic Agreement, including a failure to pay minimum compensation, regardless of whether or not such claimed breach may also involve a breach by the Company of its contract with the writer and such proceeding shall not affect the right of the writer to pursue his/her own remedies at law or in equity, except as limited by the provisions of this Basic Agreement.

E. Nothing in this Basic Agreement shall preclude any court of competent jurisdiction from confirming, setting aside or modifying any grievance or arbitration award hereunder in any proceeding brought for such purpose in accordance with applicable law.

## ARTICLE 13 COMPENSATION

### A. THEATRICAL

Company agrees that the minimum basic compensation to be paid a writer who is employed for a feature length photoplay on a so-called flat deal basis shall be as herein set forth.

For the purpose of this Article 13.A.1.a., "High Budget" photoplay shall be a photoplay the cost of which equals or exceeds five million dollars ($5,000,000.00); a photoplay the cost of which is less than five million dollars ($5,000,000.00) shall be referred to as a "Low Budget" photoplay.

The Company may option to purchase or license from a professional writer literary material, which would be covered by this Basic Agreement, for a period of eighteen (18) months upon payment of ten percent (10%) of the applicable minimum compensation for such literary material. Company may renew or extend such option for subsequent eighteen (18) month periods upon payment of an additional ten percent (10%) of the applicable minimum compensation for such literary material for each such eighteen (18) month period. Notwithstanding anything in this Basic Agreement to the contrary, the option payment(s) shall be credited against the purchase price or other compensation payable to the writer.

1. a. Minimum Compensation

**FLAT DEAL SCREEN MINIMUMS**

| HIGH BUDGET | | EFFECTIVE | | |
|---|---|---|---|---|
| | | 11/1/04-10/31/05 | 11/1/05-10/31/06 | 11/1/06-10/31/07* |
| (1) | Screenplay, including treatment | $86,662 | $89,262 | $91,940 |
| (2) | Screenplay, excluding treatment | 59,927 | 61,725 | 63,577 |
| (3) | Final Draft Screenplay or Rewrite | 26,639 | 27,438 | 28,261 |
| (4) | Polish | 13,318 | 13,718 | 14,130 |
| (5) | First Draft of Screenplay (alone or with option for Final Draft Screenplay): | | | |
| | First Draft Screenplay | 39,957 | 41,156 | 42,391 |
| | Final Draft Screenplay | 26,639 | 27,438 | 28,261 |
| (6) | Treatment | 26,639 | 27,438 | 28,261 |
| (7) | Original Treatment | 39,957 | 41,156 | 42,391 |
| (8) | Story | 26,639 | 27,438 | 28,261 |
| (9) | Additional Compensation Screenplay – No Assigned Material | 13,318 | 13,718 | 14,130 |

| LOW BUDGET | | EFFECTIVE | | |
|---|---|---|---|---|
| | | 11/1/04-10/31/05 | 11/1/05-10/31/06 | 11/1/06-10/31/07* |
| (1) | Screenplay, including treatment | $46,601 | $47,999 | $49,439 |
| (2) | Screenplay, excluding treatment | 29,119 | 29,993 | 30,893 |
| (3) | Final Draft Screenplay or Rewrite | 17,474 | 17,998 | 18,538 |
| (4) | Polish | 8,742 | 9,004 | 9,274 |
| (5) | First Draft of Screenplay (alone or with option for Final Draft Screenplay): | | | |
| | First Draft Screenplay | 20,972 | 21,601 | 22,249 |
| | Final Draft Screenplay | 13,977 | 14,396 | 14,828 |
| (6) | Treatment | 17,474 | 17,998 | 18,538 |
| (7) | Original Treatment | 24,129 | 24,853 | 25,599 |
| (8) | Story | 17,474 | 17,998 | 18,538 |
| (9) | Additional Compensation Screenplay – No Assigned Material | 6,663 | 6,863 | 7,069 |

* The Trustees of the Writers Guild – Industry Health Fund may determine that an increase in the contribution rate for this period is needed to maintain the level of benefits in existence on November 1, 2004 or they may determine that a reduction in the contribution rate for this period is appropriate. If either of these changes occurs, the increases in minimums in the column marked "11/1/06-10/31/07" will be increased or reduced by an equivalent percentage.

NOTE: The minimum for a screen writer shall be not less than the "appropriate" television minimum, consistent with the particular literary element and the length of the motion picture.

b. Discount - New Writers

Company may employ a writer who has not been previously employed as a writer under any Guild MBA in television or theatrical motion pictures or radio dramatic programs on a flat deal basis at not less than seventy-five percent (75%) of the applicable minimum compensation set forth in this subparagraph 1. If such writer receives any writing credit on the theatrical motion picture for which he/she was so employed, his/her compensation will be adjusted to one hundred percent (100%) of the applicable minimum compensation. Such payment will be made within ten (10) business days after determination of final writing credit.

c. Additional Payment - No Assigned Material

When Company employs a writer to write a screenplay on a flat deal basis at the minimum basic compensation provided in this Article 13.A., unless Company in good faith furnishes such writer a novel, play, treatment, original treatment, or story upon which the screenplay is to be based or from which it is to be adapted, such writer shall be paid an additional amount as described in subparagraph 1. above. The assigned material shall be specifically identified in the notice of employment and contract; if not then known, the writer and the Guild shall be furnished with such identification when it is available.

Any dispute as to whether or not Company has so furnished such writer a novel, play, treatment, original treatment, or story shall be subject to automatic arbitration by the Guild arbitration committee (referred to in Theatrical Schedule A); provided, however, that in the event Company or the writer does not accept the decision of such Guild arbitration committee, such party shall notify the Guild and the other party, in writing, of its position and such dispute shall thereupon be subject to the grievance and arbitration provisions of Articles 10, 11 and 12 of this Basic Agreement.

2. Narration by a Writer Other Than any Writer of Screenplay or Story and Screenplay

Minimums for narration are based on status of film assembly and nature of previously written material as follows:

| Nature of Material Written Prior to Employment of Narration Writer | Film Assembled in Story Sequence | Film Footage Not Assembled in Story Sequence |
|---|---|---|
| None | Applicable Screenplay excluding Treatment Minimum | Applicable Screenplay including Treatment Minimum |
| Story Only | Applicable Screenplay excluding Treatment Minimum | Applicable Screenplay excluding Treatment Minimum |
| Story and Screenplay | Per Rate Schedule A | Per Rate Schedule A |

| Rate Schedule A | Effective | | |
|---|---|---|---|
| | 11/1/04-10/31/05 | 11/1/05-10/31/06 | 11/1/06-10/31/07* |
| Two minutes or less | $ 815 | $ 839 | $ 864 |
| Over two minutes through five minutes | 2,880 | 2,966 | 3,055 |
| Over five minutes | applicable polish minimum | | |

Aggregate sound track running time in minutes of narration written by writer hired pursuant hereto.

Narration writer may be hired on a week-to-week basis.

There is no separation of rights for narration.

3. Initial Payment

The Company shall use its best efforts to issue to the writer (or his/her designated representative), for the writer's signature, a written document memorializing the agreement reached between the Company and the writer within ten (10) business days after agreement is reached on the major deal points of a writing assignment (*e.g.*, agreement on initial compensation, including bonus, if any, and number of drafts) for a theatrical motion picture (twelve (12) business days in the case of either a term writing agreement or an agreement for both writing and non-writing services), but in no event later than the earlier of: (a) fifteen (15) business days after agreement is reached on the major deal points of the writing assignment, or (b) the time period required by Article 19. Disputes as to whether Company has submitted such document in a timely manner may be submitted to the "Hot Line" dispute resolution procedure in Article 48.

Company shall attach a cover sheet to the document memorializing the agreement reached between the Company and the writer which sets forth in summary form all conditions precedent which must be satisfied before writing services can commence. The terms of such cover sheet shall not alter or

* See page 72.

vary the terms of the agreement reached between the Company and the writer and, in any event, the terms of the writer's agreement shall prevail.

With respect to any employment under this Article 13.A. on a flat deal basis, the Company will pay to the writer, not later than the next regular payday in the week following the day the Company instructs the writer to commence his/her services, a single advance amount (to be applied against the first compensation which otherwise would be due to the writer) at least equal to the greater of (a) ten percent (10%) of the writer's agreed compensation which otherwise would be due to the writer upon delivery of the first required material, or (b) one week's compensation at the weekly rate for term employment for 14 out of 14 weeks.

4. Maximum Period of Employment

With respect to writers employed at the minimum basic compensation provided for in this Article 13.A. to write a story, treatment, original treatment, first draft screenplay, final draft screenplay, screenplay, or rewrite, the Company shall not require the writer to render services beyond that period of weeks (and fractions thereof) obtained by dividing such applicable minimum basic compensation set forth above in (1) through (9), as the case may be, by the minimum weekly compensation provided for in Article 13.A., subparagraph 15. hereof, for writers employed on a weekly basis.

In the event that the same writer is employed to write any combination of those items set forth above in (1) through (9), such time periods shall be cumulative.

If the writer is required by written notice from the Company to render his/her services beyond such time period, he/she shall be entitled to the specified compensation on delivery and to the minimum weekly compensation to which such writer would be entitled if employed on a weekly basis, as hereinafter in subparagraph 15. of Article 13.A. provided, for services rendered after the expiration of such period.

5. Computation of Writer's Period of Employment

In computing the duration of a writer's employment under this Article 13.A., there shall be excluded the following:

a. Any time during which the writer's employment agreement was suspended by reason of any breach or default on the part of the writer;

b. Any time during which the writer's employment agreement was suspended by reason of any of the causes

specified in the "force majeure" clause of such writer's employment agreement;

c. Except as hereinafter provided, waiting time which occurs during or after the writer's employment.

Any excess waiting time shall be included in computing the duration of the writer's employment. However, excess waiting time after the expiration of the duration of the writer's employment shall not be included in computing the duration of the writer's employment unless the writer holds himself/herself available for the Company's further instructions pursuant to the Company's written notice to the writer so to hold himself/herself available after the expiration of the writer's employment.

Any time during which the writer shall make revisions called for by the Company shall be included in computing the duration of the writer's employment.

6. Waiting Time

The waiting time to be excluded in computing the duration of the writer's employment shall not exceed three (3) days following delivery of material, and such waiting time shall not be compensable. In the event that the same writer is employed to write any combination of story, treatment or original treatment, first draft screenplay, final draft screenplay or screenplay, such waiting time shall be cumulative. "Excess waiting time," as used in this Article 13.A., means waiting time in excess of the waiting time to be excluded as provided in this subparagraph 6. If the writer is called into conference on any day or instructed to perform any services on any day, such day may not be included in waiting time. Sundays and holidays generally recognized in the motion picture industry shall be excluded in computing waiting time.

7. Extension of Employment Period

If the employment agreement under this Article 13.A. for a treatment on a flat deal basis contains any option for additional literary material, and the Company wishes the writer to change, revise or complete his/her assignment after the expiration of the maximum allotted employment period under this Article, the Company may postpone the time for exercise of such option by notifying the writer that it elects to continue the employment of the writer on a week-to-week basis commencing upon the expiration of the employment period then expiring at the minimum weekly compensation prescribed in subparagraph 15. hereof, but without any minimum guaranteed period of employment. The Company must notify the writer to this effect promptly upon the expiration of such maximum allotted

employment period. Such employment shall continue until further notice from the Company, and the waiting time shall commence upon such termination of the employment. If the Company thereafter exercises any option, and the maximum allotted employment period under this Article 13.A. for which the Company would be entitled to the writer's services under such option shall exceed the period during which the writer performed his/her services (excluding time for which the writer was compensated on a week-to-week basis and excluding waiting time), then the Company shall be entitled to credit against the amount due under such option an amount equal to the minimum weekly compensation specified in subparagraph 15. herein for the period of such excess. Such credit shall not exceed the amount actually paid to the writer for services performed on a week-to-week basis.

8. Failure to Deliver Material Within Allotted Time Period

If the writer has not completed and delivered to the Company the material within the maximum allotted employment period provided for in this Article 13.A., or any shorter period specified in the individual writer's employment agreement, then the Company may exercise the succeeding option and require the writer to complete such material within the succeeding option period. If the writer has not completed and delivered to the Company the material within such maximum allotted employment period, or such shorter period specified in the individual writer's employment agreement, and if the failure of the writer so to complete and deliver such material was not caused by any instructions or directions on the part of the Company, then and at any time thereafter and prior to the delivery of such material, the Company may terminate the writer's employment agreement, and the Company shall not be obligated to make any further or additional payment thereunder. For the purposes of determining whether to terminate such contract, the Company may require the writer to deliver for inspection any material then written and compliance with such requirement shall not constitute delivery for the purpose above mentioned without the written consent of the Company. The Company shall retain title to and ownership of any material theretofore delivered for which payment was made by the Company, subject to the provisions of Article 16.A.

9. Teams

Every writer shall receive no less than the applicable minimum, except that if a *bona fide* team of no more than two (2) writers offers, prior to employment on the script in question, to collaborate, the team as a unit shall receive in the aggregate not less than the applicable minimum compensation.

In addition, if a *bona fide* team of no more than three (3) writers offers, prior to employment on the script in question, to

collaborate, the team as a unit shall receive in the aggregate not less than two hundred percent (200%) of the applicable minimum compensation, of which each individual writer shall be paid not less than one-third (a) of said aggregate compensation.

10. Week-to-Week, Term, Flat Deal

The Company may employ a writer on a week-to-week or term basis to write a story, treatment, original treatment, first draft screenplay, final screenplay, screenplay, or rewrite. At any time thereafter, Company may employ such writer or any other writer on a flat deal basis to write any such material in accordance with the provisions of this Article 13.A. If Company employs a writer on a flat deal basis to write any such material, at any time thereafter Company may employ such writer or any other writer to write any such material on a week-to-week basis or term basis. If the Company imposes the condition that such material must be completed and delivered by a specified date, and the writer accepts the employment upon such conditions and completes and delivers the material to the Company in compliance with such condition, then such employment shall be deemed to be employment on a flat deal basis and the writer shall be entitled to the applicable flat deal minimums provided in this Article 13.A. for the work involved. If the Company employs two (2) writers as a team on a week-to-week basis to write a story, treatment, original treatment, first draft screenplay, final screenplay, screenplay or rewrite and imposes the condition that such material must be completed and delivered by a specified date, and if the period by which the writers are to complete and deliver the material under their employment agreement is less than one-half of the applicable maximum period of employment for the work involved as provided in this Article 13.A., the Company shall only be obligated to pay to each such writer one-half of the amount payable to one (1) writer employed on a flat deal basis for the work involved, but if the period by which the writers are to complete and deliver the material under their employment agreement is more than one-half of the applicable maximum period of employment for the work involved provided in this Article, the Company shall not be obligated by this Article 13.A. to pay any additional amount to such writers. For example, if a team of writers is employed on a week-to-week basis during the period November 1, 2004 through October 31, 2005 to write a "screenplay, including treatment" for a High Budget photoplay (for which the flat deal minimum is $86,662 and a date later than ten (10) weeks after the commencement of such employment is specified in the employment agreement for completion and delivery of such final screenplay, then if such final screenplay is completed and delivered within such time, the Company need only pay each writer the $43,331 received as weekly salary. In the event of a dispute as to whether the Company has imposed such a specified date of completion and

delivery, such dispute shall be subject to grievance and arbitration pursuant to the provisions of Articles 10, 11 and 12 hereof.

11. Applicable Deal Minimum Compensation

When Company hereafter employs one (1) or more writers on a flat deal basis for the minimum basic compensation as above provided, then regardless of the exercise of any option, if a motion picture is actually produced by Company from the screenplay so written under such deal basis, the compensation (hereinafter called "applicable minimum deal compensation") paid to the writer or writers who participated in the writing under such flat deal shall be not less than the applicable "Flat Deal Screen Minimums" set forth in Article 13.A., subparagraph 1.a. above. In the event an amount at least equal to such applicable minimum deal compensation has not been paid to such writer or writers by the time screen credits for such motion picture have been finally determined, then Company shall pay to the writer or writers receiving screen credit for such motion picture, within thirty (30) days after such screen credit has been finally determined, the difference between all of the compensation theretofore paid to the writer or writers employed by Company on such flat deal basis in connection with such photoplay, on the one hand, and the applicable minimum deal compensation provided, on the other hand. A writer or writers employed at the minimum week-to-week compensation to write a treatment and also a screenplay for a motion picture which is produced by Company shall be compensated at not less than the applicable minimum basic compensation provided for in this Article 13.A., and shall be considered as employed on a flat deal basis at such minimum compensation for purposes of subparagraph 1.c. of this Article. No writer employed on a term basis shall be entitled to additional compensation by reason of the provisions of this Article 13.A.

When a planned Low Budget theatrical motion picture is produced as a High Budget theatrical motion picture for reasons other than force majeure (including but not limited to disability, illness or inclement weather) or labor cost escalations undetermined at commencement of production, the Company shall pay any necessary increase in the applicable minimum deal compensation within thirty (30) days after Company knows that the cost of the motion picture has increased or will increase past the High Budget break figure, and in any event within thirty (30) days after delivery of the answer print of said motion picture.

12. Inapplicability of Provisions

The provisions of this Article 13.A. shall not apply to writers employed at compensation in excess of the applicable minimum specified in this Article except as hereinafter provided.

However, even though the total compensation shall exceed such minimums, the amount payable for the writing of the story, treatment, original treatment, first draft screenplay, final screenplay, screenplay or rewrite shall be not less than the minimum for such individual work as above designated. The provisions of subparagraphs 4., 5. and 6. of this Article 13.A. shall be applicable to writers employed at compensation not exceeding twice the applicable minimum compensation, except that the three (3) day waiting period in subparagraph 6. shall be two (2) weeks for the above-scale writer covered by this sentence. The provisions of subparagraph 8., subparagraph 14. and the last two paragraphs of subparagraph 15. of this Article 13.A. are applicable to all employment agreements regardless of compensation.

The provisions of this Article 13.A. shall not apply to any short or short subject, except that the Company agrees that any such agreement made by the Company with any writer employed on a similar basis with respect to a short or short subject shall guarantee such writer an aggregate compensation for services rendered in the writing and preparation of such material which shall be not less than a sum equal to the minimum weekly compensation to which such writer would be entitled if employed on a weekly compensation basis, as provided in subparagraph 15. hereof, multiplied by the number of weeks (plus any fraction of a week) during which the writer actually and continuously performed such services, it being understood that the Company may terminate the employment of such writer at the time the writer becomes entitled to additional compensation by reason of the provisions of this paragraph or at any time thereafter.

13. Purchases

a. The applicable minimums for purchases or licenses subject to this Agreement from a professional writer shall be the flat deal minimum for the appropriate budget as determined by the Company in good faith; provided, however, that if a motion picture is produced based upon the story, treatment or screenplay, as the case may be, and if such motion picture is a High Budget photoplay, and if the purchase price or license fee paid for the acquisition or license was less than the applicable minimum for the respective type of work (story, treatment or screenplay, as the case may be) for such class of motion picture, *i.e.*, High Budget, pursuant to Article 13.A.1., an additional payment shall be made to the professional writer in an amount such that such writer shall have received in the aggregate an amount equal to such higher applicable minimum.

b. [Deleted.]

14. Payment of Compensation Under Deal Contract

Company will use its best efforts to pay writers employed to write on a deal basis not less than the applicable minimum within forty-eight (48) hours after the delivery of a completed story, treatment or original treatment, first draft screenplay or final draft screenplay, as the case may be, but in no event shall any such payment be made later than seven (7) days after delivery of such material. Payment shall not be contingent upon the acceptance or approval by the Company of the material so delivered. Company shall include in writer's deal memorandum or personal service contract:

a. the place where and the name(s) or function of the person(s) to whom delivery of such material is to be made, and

b. the name(s) of the person(s) authorized to request rewrites of said material.

The person(s) identified pursuant to subparagraphs a. and b. above shall be at a level no higher than the President of Production (*i.e.*, the individual who heads theatrical creative development).

Company shall give writer written notice of any change in the name(s) of the person(s) to whom delivery is to be made and/or the name(s) of the person(s) authorized to request rewrites.

Company will pay interest of one and one-half percent (1.5%) per month when any initial compensation payment is due and not paid as provided. If the Company has failed to make such payment because the executed contract was not delivered by the writer to the Company, then no such interest is due. If the contract is not so delivered by the writer because of a dispute as to the terms of the contract and the Company shall be held to be wrong, the above-described interest payment shall be applicable.

15. Minimum Weekly Compensation

Every writer employed on a week-to-week or term basis shall receive a salary at the rate of not less than the amount per week specified below for the respective period designated:

| Term Contracts | At the Rate of Per Week | | |
|---|---|---|---|
| | 11/1/04-10/31/05 | 11/1/05 - 10/31/06 | 11/1/06 - 10/31/07* |
| 40 out of 52 weeks | $3,418 | $3,521 | $3,627 |
| 20 out of 26 weeks | 3,716 | 3,827 | 3,942 |
| 14 out of 14 weeks | 4,023 | 4,144 | 4,268 |
| Week-to-Week | 4,334 | 4,464 | 4,598 |

Every week-to-week or term contract shall specify the exact compensation for each full week of services rendered or to be rendered thereunder.

If any writer under a week-to-week or term contract shall render services after the expiration of the guaranteed period of employment, then, for purposes only of prorating days worked in a partial workweek (*i.e.*, less than six (6) days), at the end of such employment, the writer shall receive one-fifth (1/5) of the weekly rate for each day worked during such partial workweek, after the expiration of the guaranteed period.

Company may employ a writer who has not been previously employed as a writer under any Guild MBA in television or theatrical motion pictures or radio dramatic or comedic programs on a week-to-week or term basis for a period not to exceed fourteen (14) consecutive weeks at seventy-five percent (75%) of the minimum weekly compensation as provided in this subparagraph 15.

16. Theatrical Motion Picture Released on Free Television

If a theatrical motion picture is released on free television before it has had a *bona fide* theatrical release (determined as provided in Article 15.A.3.j. of this Basic Agreement), the compensation of the writer or writers who have received screen authorship credit for such motion picture shall be adjusted so that it shall be no less than the appropriate television minimum compensation or the appropriate theatrical minimum compensation, whichever is higher.

17. Remakes

The Company's right to remake a theatrical film shall be subject to the following:

a. If a credited writer's material is used for a remake and no writer is employed to rewrite, adapt or revise such material for the remake, the Company will pay such writer(s) the applicable minimum compensation for the intended medium of the remake (but this provision shall

* See page 72.

not be construed as affecting the rule that a *bona fide* team shall be considered a unit). In addition, the writer will be entitled to receive payment in accordance with Article 15.A. with respect to a theatrical remake licensed to free television, Article 15.B. with respect to reruns or foreign telecast of a television remake, and Article 51 with respect to a theatrical or free television remake released in Supplemental Markets.

b. If a writer is employed to rewrite, adapt or revise such literary material for the remake, then the credited writer(s) of the original material shall also be participant(s) in the credit determination and if accorded credit shall accordingly be entitled to the portion of applicable minimum compensation for the intended medium of the remake equal to the proportion of credit awarded pursuant to subparagraph c.(l) below (but this provision shall not be construed as affecting the rule that a *bona fide* team shall be considered a unit). In addition, the writer will be entitled to share in any additional compensation in accordance with Article 15.A. with respect to a theatrical remake licensed to free television, Article 15.B. with respect to reruns or foreign telecast of a television remake, and Article 51 with respect to a theatrical or free television remake released in Supplemental Markets. The writer's portion of such additional compensation shall be equal to the portion of credit awarded pursuant to subparagraph c.(1) below.

c. With respect to a television remake of a theatrical film, the phrase "applicable minimum compensation" in subparagraphs a. and b. of this subparagraph 17. means the applicable rate provided for in Article 13.B.7.a., b. or e. of this Agreement.

In a credit arbitration concerning such remake, the arbiters shall determine the following issues:

(1) the contribution made by the writer(s) of the original material expressed as a percentage of the whole, and

(2) the form of credit to be accorded such writer(s), which credit may include a credit in the nature of a source material credit, such as "Based on a Screenplay by ..."

The foregoing provisions shall apply to material written during the term of this Agreement upon which a remake is based.

18. Script Annotations

If the Company is to require one or more script annotations, it shall so inform the writer at the time of the negotiation of the writing assignment, or option or acquisition of literary material, unless from the nature of the project the Company's need for the annotation(s) is not reasonably known at the outset. In the latter case, the Company shall inform the writer that an annotation is needed when the Company knows, or reasonably should have known, of it.

If the Company uses written guidelines or standards describing the type of information to be included in an annotation for a fact-based project or a project inspired by fact, such guidelines or standards shall be furnished to the writer when the Company first informs the writer that an annotation is needed.

## B. TELEVISION

1. Minimum Basic Compensation

a. Options

When the Company options to purchase or license from a professional writer literary material, which would be covered under this Basic Agreement, Company shall pay five percent (5%) of the applicable minimum compensation for such literary material for the first period of up to one hundred eighty (180) days, and an additional ten percent (10%) of the applicable minimum compensation for each subsequent period of up to one hundred eighty (180) days.

Notwithstanding anything in this Basic Agreement to the contrary, the option payment(s) shall be credited against the purchase price or other compensation payable to the writer.

The foregoing paragraphs shall not apply to arrangements under which the consideration for the agreement is the Company's good faith effort to effectuate network or other buyer/licensee interest or otherwise obtain a development commitment for the material.

b. Other Compensation Minimums

Company agrees that the minimum basic compensation to be paid for writing services covered by this Basic Agreement shall be as herein set forth during the periods indicated below. The periods are herein designated:

| | From | Through |
|---|---|---|
| "1st Period" | November 1, 2004 - | October 31, 2005 |
| "2nd Period" | November 1, 2005 - | October 31, 2006 |
| "3rd Period" | November 1, 2006 - | October 31, 2007 |

The applicable minimum shall be the minimum for each writer, except when a *bona fide* team of no more than two (2) writers offers, prior to employment on the script in question, to collaborate, in which event such writers shall be considered a unit, which unit shall receive in the aggregate not less than the applicable minimum compensation.

In addition, if a *bona fide* team of no more than three (3) writers offers, prior to employment on the script in question, to collaborate, the team as a unit shall receive in the aggregate not less than two hundred percent (200%) of the applicable minimum compensation, of which each individual writer shall be paid not less than one-third (a) of said aggregate compensation. If all three (3) writers are also employed pursuant to Article 14 of this Basic Agreement, the two hundred percent (200%) of minimum compensation may be reduced to not less than one hundred fifty percent (150%).

With respect to the provisions for increased rates during specified periods, the intent is that, as to freelance employment, the rates applicable when the employment is entered into shall apply, except that when an employment is entered into during one period, but is not to start until a subsequent period, the rate applicable during the subsequent period applies.

2. "High Budget" Films

For the purpose of this schedule, "High Budget" television motion pictures are those for which the negative costs equal or exceed the following amounts:

| | |
|---|---|
| 15 minutes or less | $150,000 |
| 30 minutes or less (but more than 15 minutes) | 215,000 |
| 60 minutes or less (but more than 30 minutes) | 300,000 |
| 75 minutes or less (but more than 60 minutes) | 400,000 |
| 90 minutes or less (but more than 75 minutes) | 500,000 |
| 120 minutes or less (but more than 90 minutes) | 900,000 |
| For each additional 30 minutes or less, an additional | 300,000 |

However, in the case of non-prime time network films, "High Budget" films shall be films the negative costs of which equal or exceed the following amounts:

| | |
|---|---|
| 15 minutes or less | $ 60,000 |
| 30 minutes or less (but more than 15 minutes) | 100,000 |
| 60 minutes or less (but more than 30 minutes) | 200,000 |
| 75 minutes or less (but more than 60 minutes) | 260,000 |
| 90 minutes or less (but more than 75 minutes) | 340,000 |
| 120 minutes or less (but more than 90 minutes) | 450,000 |
| For each additional 30 minutes or less, an additional | 125,000 |

3. "Low Budget" Films

For the purpose of this schedule, "Low Budget" television motion pictures are those for which the negative cost is less than the amounts indicated above.

4. "Negative Cost"

a. "Negative cost," for the purposes of this Article 13.B., shall be deemed to include all actual costs and expenses of production, including overhead and, except to the extent hereinafter provided, excluding deferments. If no overhead has been charged, an amount equal to twenty percent (20%) of all direct charges shall be added to represent an overhead charge.

b. It is agreed that if the Company rents studio facilities and the customary rental includes a charge for overhead, the provisions of the preceding quoted sentence shall be waived, but the Guild shall have the right at all times to have a determination by arbitration as to whether said customary rental charge has in fact included a charge for overhead.

c. If more than fifty percent (50%) of the cost of any item is deferred, the negative cost of the film shall be revised to include a charge of not less than fifty percent (50%) of the total cost of such item including the amount deferred.

d. If the compensation of any actor, writer, director or producer shall include a participation in the receipts of a film and the initial salary paid such employee shall be less than one hundred percent (100%) of his/her established television salary, or fifty percent (50%) of his/her established theatrical motion picture salary (if he/she has not established his/her television salary), the negative cost shall be revised to include an amount equal to such established television salary or fifty percent (50%) of such established theatrical motion picture salary, as the case may be. The "established theatrical

motion picture salary" for the purposes hereof shall be computed by dividing the total compensation earned by the employee in theatrical motion pictures during the year immediately preceding the assignment in question by the total weeks and fractions thereof worked for such compensation.

e. Any dispute relating to the determination of the negative cost of a film shall be resolved by a Price Waterhouse audit, the costs of which are to be borne equally by the Company and the Guild.

f. If a Low Budget minimum shall be paid to a writer prior to the production of a film whose negative cost shall in fact require the payment of a High Budget minimum, the writer shall be paid the difference not later than thirty (30) days after the completion of production of the film.

5. Story Claim By Production Executive

If Company shall claim that a writer has been assigned to write a teleplay based upon a story composed or created by a production executive, the story and teleplay shall be subject to an automatic arbitration pursuant to the provisions of Television Schedule A hereof, and if the arbitrators shall accord both the story and teleplay credit to the writer, then the combined story and teleplay minimum above provided for shall apply to the material so written, provided that Company may appeal any such credit determination to arbitration pursuant to Articles 10, 11 and 12 hereof.

6. Step Outline

The writer may not be compelled to prepare a step outline of the teleplay. For such purpose, the term "step outline" shall mean a development of the story in the form of a condensed scene-by-scene progression indicating action and the substance of essential story dialogue, but without dialogue.

7. Schedule of Minimum Compensation

a. **Story** (For all television films except (1) network prime time programs of the types covered by subparagraph d. below and (2) serials which are covered by subparagraph e.(1) or e.(3) below)

**HIGH BUDGET**

| Program Length in Minutes | 11/1/04-10/31/05 | 11/1/05-10/31/06 | 11/1/06-10/31/07* |
|---|---|---|---|
| 15 or less | $ 2,390 | $ 2,462 | $ 2,536 |
| 30 or less (but more than 15) | 4,374 | 4,505 | 4,640 |
| 60 or less (but more than 30) | 7,947 | 8,185 | 8,431 |
| 75 or less (but more than 60) | 11,314 | 11,653 | 12,003 |
| 90 or less (but more than 75) | 11,944 | 12,302 | 12,671 |
| 120 or less (but more than 90) | 15,650 | 16,120 | 16,604 |

**LOW BUDGET**

| Program Length in Minutes | 11/1/04-10/31/05 | 11/1/05-10/31/06 | 11/1/06-10/31/07* |
|---|---|---|---|
| 15 or less | $ 2,034 | $ 2,095 | $ 2,158 |
| 30 or less (but more than 15) | 3,383 | 3,484 | 3,589 |
| 60 or less (but more than 30) | 6,396 | 6,588 | 6,786 |
| 75 or less (but more than 60) | 9,109 | 9,382 | 9,663 |
| 90 or less (but more than 75) | 9,752 | 10,045 | 10,346 |
| 120 or less (but more than 90) | 12,882 | 13,268 | 13,666 |

b. **Teleplay** (For all television films except (1) network prime time programs of the types covered by subparagraph d. below and (2) serials which are covered by subparagraph e.(1) or e.(3) below)

**HIGH BUDGET**

| Program Length in Minutes | 11/1/04-10/31/05 | 11/1/05-10/31/06 | 11/1/06-10/31/07* |
|---|---|---|---|
| 15 or less | $ 4,374 | $ 4,505 | $ 4,640 |
| 30 or less (but more than 15) | 7,102 | 7,315 | 7,534 |
| 60 or less (but more than 30) | 13,764 | 14,177 | 14,602 |
| 75 or less (but more than 60) | 20,029 | 20,630 | 21,249 |
| 90 or less (but more than 75) | 21,170 | 21,805 | 22,459 |
| 120 or less (but more than 90) | 28,079 | 28,921 | 29,789 |

* See page 72.

**LOW BUDGET**

| Program Length in Minutes | 11/1/04-10/31/05 | 11/1/05-10/31/06 | 11/1/06-10/31/07* |
|---|---|---|---|
| 15 or less | $ 3,185 | $ 3,281 | $ 3,379 |
| 30 or less (but more than 15) | 5,474 | 5,638 | 5,807 |
| 60 or less (but more than 30) | 10,438 | 10,751 | 11,074 |
| 75 or less (but more than 60) | 15,063 | 15,515 | 15,980 |
| 90 or less (but more than 75) | 15,983 | 16,462 | 16,956 |
| 120 or less (but more than 90) | 21,149 | 21,783 | 22,436 |

c. **Story and Teleplay** when the same writer prepares both ("bargain rates") (For all television films except (1) network prime time programs of the types covered by subparagraph d. below and (2) serials which are covered by subparagraph e.(1) or e.(3) below)

**HIGH BUDGET**

| Program Length in Minutes | 11/1/04-10/31/05 | 11/1/05-10/31/06 | 11/1/06-10/31/07* |
|---|---|---|---|
| 15 or less | $ 5,968 | $ 6,147 | $ 6,331 |
| 30 or less (but more than 15) | 10,930 | 11,258 | 11,596 |
| 60 or less (but more than 30) | 19,868 | 20,464 | 21,078 |
| 75 or less (but more than 60) | 28,317 | 29,167 | 30,042 |
| 90 or less (but more than 75) | 29,858 | 30,754 | 31,677 |
| 120 or less (but more than 90) | 39,129 | 40,303 | 41,512 |

**LOW BUDGET**

| Program Length in Minutes | 11/1/04-10/31/05 | 11/1/05-10/31/06 | 11/1/06-10/31/07* |
|---|---|---|---|
| 15 or less | $ 5,068 | $ 5,220 | $ 5,377 |
| 30 or less (but more than 15) | 8,447 | 8,700 | 8,961 |
| 60 or less (but more than 30) | 15,999 | 16,479 | 16,973 |
| 75 or less (but more than 60) | 23,175 | 23,870 | 24,586 |
| 90 or less (but more than 75) | 24,382 | 25,113 | 25,866 |
| 120 or less (but more than 90) | 32,207 | 33,173 | 34,168 |

---

* See page 72.

For programs in excess of one hundred twenty (120) minutes, compensation is based on the one hundred twenty (120) minute or less minimum (shown above) plus, for each additional thirty (30) minutes or less, the following additional payments:

| HIGH BUDGET | 11/1/04-10/31/05 | 11/1/05-10/31/06 | 11/1/06-10/31/07* |
|---|---|---|---|
| Story | $3,707 | $3,818 | $3,933 |
| Teleplay | 6,909 | 7,116 | 7,329 |
| Story and Teleplay | 9,269 | 9,547 | 9,833 |

| LOW BUDGET | 11/1/04-10/31/05 | 11/1/05-10/31/06 | 11/1/06-10/31/07* |
|---|---|---|---|
| Story | $3,125 | $3,219 | $3,316 |
| Teleplay | 5,151 | 5,306 | 5,465 |
| Story and Teleplay | 7,830 | 8,065 | 8,307 |

The minimums set forth in the above schedules constitute the writer's minimum compensation for the purposes of Article 15.B.

The category of minimums provided for in subparagraph c. of this paragraph 7. (the so-called "bargain rate") is applicable only when the employment is for story and teleplay, not when the employment is for story with option for teleplay.

cc. **Story with Options**

If Company engages a writer to write a story with an option to have the writer write a teleplay, the Company must exercise such option, if at all, within fourteen (14) days after delivery of the final story.

d. **Network Prime Time** (For all network prime time episodic series, one-time shows, unit series shows, once-per-week network prime time serials, and anthology programs. This subparagraph d. is not applicable to programs covered by Appendix A and other non-dramatic programs (*e.g.*, *Wild Kingdom* and travelogues). The rates set forth in this subparagraph d. are not to be utilized for the purposes of Article 15.B. of this Agreement.)

* See page 72.

(1) **Story**

| Program Length in Minutes | 11/1/04-10/31/05 | 11/1/05-10/31/06 | 11/1/06-10/31/07* |
|---|---|---|---|
| 15 or less | $ 3,646 | $ 3,728 | $ 3,812 |
| 30 or less (but more than 15) | 6,682 | 6,832 | 6,986 |
| 45 or less (but more than 30) | 9,222 | 9,429 | 9,641 |
| 60 or less (but more than 45) | 11,763 | 12,028 | 12,299 |
| 90 or less (but more than 60) | 15,716 | 16,070 | 16,432 |
| For Serials and Episodic Programs 120 or less (but more than 90) | 20,988 | 21,460 | 21,943 |
| For other than Serials and Episodic Programs 120 or less (but more than 90) | 22,905 | 23,420 | 23,947 |

(2) **Teleplay**

| Program Length in Minutes | 11/1/04-10/31/05 | 11/1/05-10/31/06 | 11/1/06-10/31/07* |
|---|---|---|---|
| 15 or less | $ 8,853 | $ 9,052 | $ 9,256 |
| 30 or less (but more than 15) | 14,377 | 14,700 | 15,031 |
| 45 or less (but more than 30) | 15,206 | 15,548 | 15,898 |
| 60 or less (but more than 45) | 19,396 | 19,832 | 20,278 |
| 90 or less (but more than 60) | 27,945 | 28,574 | 29,217 |
| For Serials and Episodic Programs 120 or less (but more than 90) | 35,856 | 36,663 | 37,488 |
| For other than Serials and Episodic Programs 120 or less (but more than 90) | 39,128 | 40,008 | 40,908 |

(3) **Story and Teleplay** when the same writer prepares both ("bargain rates")

| Program Length in Minutes | 11/1/04-10/31/05 | 11/1/05-10/31/06 | 11/1/06-10/31/07* |
|---|---|---|---|
| 15 or less | $10,953 | $11,199 | $11,451 |
| 30 or less (but more than 15) | 20,044 | 20,495 | 20,956 |
| 45 or less (but more than 30) | 23,109 | 23,629 | 24,161 |
| 60 or less (but more than 45) | 29,482 | 30,145 | 30,823 |
| 90 or less (but more than 60) | 41,480 | 42,413 | 43,367 |
| For Serials and Episodic Programs 120 or less (but more than 90) | 54,576 | 55,804 | 57,060 |
| For other than Serials and Episodic Programs 120 or less (but more than 90) | 59,653 | 60,995 | 62,367 |

(continued)

(continued)

| Program Length in Minutes | 11/1/04-10/31/05 | 11/1/05-10/31/06 | 11/1/06-10/31/07* |
|---|---|---|---|
| For programs in excess of one hundred twenty (120) minutes, compensation is based on the one hundred twenty (120) minute or less minimum (shown herein) plus, for each additional thirty (30) minutes or less, the following additional payments: | | | |
| Story | $ 3,521 | $ 3,600 | $ 3,681 |
| Teleplay | 6,566 | 6,714 | 6,865 |
| Story and Teleplay | 8,810 | 9,008 | 9,211 |

dd. **Segment Rate**

Writers who are employed to write segments for use on programs meeting the requirements of this section may, at the option of the Company, be paid in accordance with this section rather than in accordance with the otherwise applicable provisions of this Agreement. In order to utilize this section, the Company (1) must apply this section to all writers employed on the program or, in the case of a program series, the individual episode; and (2) must inform such writers no later than the time of assignment to the program that this section is being utilized. As to any single dramatic program or any program of a dramatic television series thirty (30) minutes or more in length which consists of self-contained segments of various lengths (whether or not such segments are intercut within each program), the aggregate minimum compensation shall be one hundred seventy-five percent (175%) of the applicable minimum compensation for story and teleplay set forth in subparagraphs c. and d. Writers employed to write segments for use in such programs shall be compensated at the following rates:

* See page 72.

| Total Length of Program | Length of Segment | Segment Compensation as Percentage of Aggregate Minimum Compensation |
|---|---|---|
| 30 min. or less | 3 min. or less | 10% |
| | 5 min. or less (over 3) | 15% |
| | 10 min. or less (over 5) | 30% |
| | 15 min. or less (over 10) | 40% |
| 60 min. or less (but more than 30 min.) | 8 min. or less | 16b% |
| | 15 min. or less (over 8) | 20% |
| | 20 min. or less (over 15) | 25% |
| | 30 min. or less (over 20) | 40% |
| 90 min. or less (but more than 60 min.) | 8 min. or less | 10% |
| | 15 min. or less (over 8) | 12½% |
| | 20 min. or less (over 15) | 16b% |
| | 30 min. or less (over 20) | 27½% |
| | 60 min. or less (over 30) | 40% |
| 120 min. or less (but more than 90 min.) | 8 min. or less | 8a% |
| | 15 min. or less (over 8) | 10% |
| | 20 min. or less (over 15) | 12½% |
| | 30 min. or less (over 20) | 20% |
| | 60 min. or less (over 30) | 30% |

Should the total minimum compensation payable to the writers of the segments pursuant to the schedule immediately above be less than the aggregate minimum compensation specified above, the difference shall be distributed among the segment writers in proportion to the segment compensation set forth above. In said distribution, the Company may credit to an individual writer any overscale payment paid to such writer.

With respect to such programs, the following provisions will be incorporated into appropriate sections of the MBA:

(1) The applicable minimums for rewrites shall be twenty-five percent (25%) of the segment minimum as determined in accordance with the above formula.

(2) Separation of rights shall apply to each segment, excluding only those elements (continuing characters, etc.) which are part of the continuing series format.

(3) Any story for which no teleplay is written during the same production season will revert to the writer.

(4) The minimum compensation as computed above for each writer shall be the basis for calculation of

all rerun, foreign telecast and theatrical exhibition payments required under the Basic Agreement.

(5) Writing credits are to be given for each individual segment, identified by segment title, with a single card devoted to each segment.

e. **Serials**

(1) Employment and purchase of literary material for serials produced for broadcast three (3), four (4), five (5), six (6) or seven (7) times per week other than prime time is treated in Appendix A. (See Appendix A, Article 13.)

(2) The minimum compensation for stories and/or teleplays, rewrites and polishes for episodes of a once-a-week network prime time serial shall be the corresponding minimums or stories and/or teleplays, rewrites and polishes for episodes of network prime time episodic series.

(3) As to serials other than those described in subparagraphs e.(1) and (2) above, there is to be no differentiation between stories and teleplays for compensation purposes and minimum compensation for writing such material for such serials shall be as follows:

| | 11/1/04-10/31/05 | 11/1/05-10/31/06 | 11/1/06-10/31/07* |
|---|---|---|---|
| 15 or less | $ 4,115 | $ 4,238 | $ 4,365 |
| 30 or less (but more than 15) | 6,852 | 7,058 | 7,270 |
| 60 or less (but more than 30) | 13,017 | 13,408 | 13,810 |
| 90 or less (but more than 60) | 18,602 | 19,160 | 19,735 |

For programs in excess of ninety (90) minutes, compensation is based on the ninety (90) minute or less minimum shown herein, plus, for each additional thirty (30) minutes or less, the difference between the appropriate ninety (90) minute compensation and the sixty (60) minute compensation.

* See page 72.

f. **Installment Payments**

Payment of the writer's agreed upon compensation shall be made in installments as follows:

(1) If employment is for Story and Teleplay, not less than

(a) Thirty percent (30%) of agreed compensation on delivery of story.

(b) Forty percent (40%) of agreed compensation on delivery of first draft teleplay. In no event shall the total of installments (a) and (b) be less than ninety percent (90%) of the applicable minimum compensation for story and teleplay.

(c) Balance of agreed compensation on delivery of final draft teleplay.

(2) If employment is for Teleplay, not less than

(a) Sixty percent (60%) of agreed compensation or ninety percent (90%) of applicable minimum compensation, whichever is greater, on delivery of first draft teleplay.

(b) Balance of agreed compensation on delivery of final draft teleplay.

With respect to any employment under Article 13.B.7.a., b., c. or d. above relating to pilots and one-time programs ninety (90) minutes or more in length, the Company will pay to the writer, not later than the next regular payday in the week following the day the Company instructs the writer to commence his/her services, a single advance amount (to be applied against the first compensation which otherwise would be due to the writer) at least equal to ten percent (10%) of the monies which otherwise would be due to the writer upon delivery of the first required material.

If the writer of a television motion picture ninety (90) minutes or longer has negotiated a salary sufficient to allow for three (3) revisions of the teleplay as follows, and the writer's contract provides for such revisions, the first draft teleplay shall be delivered to the producer (or other executive) designated in the writer's deal memorandum or contract and such producer shall be authorized to give notes to the writer and the writer shall utilize such notes in the first revision.

Payment for such writing steps would be as follows:

(1) commencement (10% of agreed compensation);
(2) delivery of story (20% of agreed compensation);
(3) delivery of first draft teleplay to producer (40% of agreed compensation);
(4)[2] (a) delivery of first set of revisions to producer, based on producer's notes, if any (10% of agreed compensation); or
(b) if producer has not requested a revision, delivery of first set of revisions to network or licensee (10% of agreed compensation);
(5) delivery of second set of revisions (10% of agreed compensation); and
(6) delivery of polish (10% of agreed compensation).

SPECIAL COMPANY AFFIRMATIVE COVENANT OF TIMELY PAYMENT IN LONG-FORM TELEVISION

The following is without derogation of any other payment obligation in this Agreement.

Given that industry practice in long-form television includes situations in which the Company (which employs the writer) receives payments, sometimes in stages, from a licensee, and that the licensee may contract with the Company for a number of drafts of a script prior to a production commitment, it is understood, and the Company hereby affirms that:

(1) The obligation to make timely payment to the writer pursuant to this Article 13.B.7.f. and Article 13.B.9., including with respect to step (4)(a) above, or otherwise, is an obligation of the Company regardless of any funding arrangement with a licensee of the motion picture; and

(2) Lack of receipt by Company of payment from a licensee is not, and shall not be used as, an excuse for failure to pay the writer on a timely basis.

g. **Plot Outline - Narrative Synopsis of Story**

Company may request writer to prepare a narrative synopsis of reasonable length (herein designated as an

---

[2] See Sideletter to Article 13.B.7.f. on pages 526-527 of this Agreement ("Letter of Understanding of Licensees of Television Motion Pictures Ninety Minutes or Longer").

"outline") of a story owned by writer in order to determine its suitability for television purposes. The minimum compensation for the preparation of such outline shall be:

| Program Length in Minutes | 11/1/04-10/31/05 | 11/1/05-10/31/06 | 11/1/06-10/31/07* |
|---|---|---|---|
| 15 or less | $1,196 | $1,232 | $1,269 |
| 30 or less (but more than 15) | 1,992 | 2,052 | 2,114 |
| 60 or less (but more than 30) | 3,776 | 3,889 | 4,006 |
| 75 or less (but more than 60) | 4,923 | 5,071 | 5,223 |
| 90 or less (but more than 75) | 5,581 | 5,748 | 5,920 |
| 120 or less (but more than 90) | 7,357 | 7,578 | 7,805 |

Company shall, within fourteen (14) days from time of delivery of such outline, notify writer of its election to acquire such outline and employ writer to prepare a teleplay based thereon. If Company shall so elect, the agreed compensation paid for the outline shall be deemed an advance against the applicable minimum compensation for such story with an option for teleplay, which option shall be deemed exercised, and writer shall receive the difference, if any. If Company shall elect not to proceed, it shall return the outline to the writer not later than the end of such fourteen (14) day period and writer shall be entitled to retain the above applicable minimum for the outline and shall own all right, title and interest in the literary material contained in such outline, except to the extent that the outline was prepared for an episodic series or serial-type film and program format and/or characters belonging to the Company were incorporated in the material written by the writer.

Company shall sign and deliver to writer, on the date of hiring, a slip stating it has employed the writer to prepare an outline of such material and that the conditions of such employment are upon terms not less favorable than those provided by this subparagraph g.

h. **Compensation for Rewrites and Polishes**

Company shall pay not less than the following minimum compensation with respect to rewrites and polishes:

---

* See page 72.

(1) **Rewrites**

**High Budget** - Non-serial pictures and serials described in 13.B.7.e.(2)

| Program Length in Minutes | 11/1/04-10/31/05 | 11/1/05-10/31/06 | 11/1/06-10/31/07* |
|---|---|---|---|
| 15 or less | $ 2,577 | $ 2,654 | $ 2,734 |
| 30 or less (but more than 15) | 4,303 | 4,432 | 4,565 |
| 45 or less (but more than 30) | 6,222 | 6,409 | 6,601 |
| 60 or less (but more than 45) | 8,139 | 8,383 | 8,634 |
| 75 or less (but more than 60) | 11,425 | 11,768 | 12,121 |
| 90 or less (but more than 75) | 11,990 | 12,350 | 12,721 |
| 120 or less (but more than 90) | 15,839 | 16,314 | 16,803 |

**Low Budget** - Non-serial pictures and serials described in 13.B.7.e.(2)

| Program Length in Minutes | 11/1/04-10/31/05 | 11/1/05-10/31/06 | 11/1/06-10/31/07* |
|---|---|---|---|
| 15 or less | $ 1,887 | $ 1,944 | $ 2,002 |
| 30 or less (but more than 15) | 3,231 | 3,328 | 3,428 |
| 60 or less (but more than 30) | 6,160 | 6,345 | 6,535 |
| 75 or less (but more than 60) | 8,561 | 8,818 | 9,083 |
| 90 or less (but more than 75) | 9,095 | 9,368 | 9,649 |
| 120 or less (but more than 90) | 12,018 | 12,379 | 12,750 |

**Teleplays** for serials described in 13.B.7.e.(3)

| Program Length in Minutes | 11/1/04-10/31/05 | 11/1/05-10/31/06 | 11/1/06-10/31/07* |
|---|---|---|---|
| 15 or less | $2,051 | $2,113 | $2,176 |
| 30 or less (but more than 15) | 3,429 | 3,532 | 3,638 |
| 60 or less (but more than 30) | 6,499 | 6,694 | 6,895 |

(2) **Polishes**

**High Budget** - Non-serial pictures and serials described in 13.B.7.e.(2)

| Program Length in Minutes | 11/1/04-10/31/05 | 11/1/05-10/31/06 | 11/1/06-10/31/07* |
|---|---|---|---|
| 15 or less | $1,289 | $1,328 | $1,368 |
| 30 or less (but more than 15) | 2,148 | 2,212 | 2,278 |
| 45 or less (but more than 30) | 3,106 | 3,199 | 3,295 |
| 60 or less (but more than 45) | 4,076 | 4,198 | 4,324 |

(continued)

* See page 72.

(continued)

| Program Length in Minutes | 11/1/04-10/31/05 | 11/1/05-10/31/06 | 11/1/06-10/31/07* |
|---|---|---|---|
| 75 or less (but more than 60) | $5,705 | $5,876 | $6,052 |
| 90 or less (but more than 75) | 5,989 | 6,169 | 6,354 |
| 120 or less (but more than 90) | 7,918 | 8,156 | 8,401 |

**Low Budget** - Non-serial pictures and serials described in 13.B.7.e.(2)

| Program Length in Minutes | 11/1/04-10/31/05 | 11/1/05-10/31/06 | 11/1/06-10/31/07* |
|---|---|---|---|
| 15 or less | $ 939 | $ 967 | $ 996 |
| 30 or less (but more than 15) | 1,611 | 1,659 | 1,709 |
| 60 or less (but more than 30) | 3,077 | 3,169 | 3,264 |
| 75 or less (but more than 60) | 4,279 | 4,407 | 4,539 |
| 90 or less (but more than 75) | 4,551 | 4,688 | 4,829 |
| 120 or less (but more than 90) | 6,013 | 6,193 | 6,379 |

**Teleplays** for serials described in 13.B.7.e.(3)

| Program Length in Minutes | 11/1/04-10/31/05 | 11/1/05-10/31/06 | 11/1/06-10/31/07* |
|---|---|---|---|
| 15 or less | $1,031 | $1,062 | $1,094 |
| 30 or less (but more than 15) | 1,723 | 1,775 | 1,828 |
| 60 or less (but more than 30) | 3,256 | 3,354 | 3,455 |

i., j., k. and l. [deleted]

m. (1) **Format**

Minimum basic compensation for a format shall be:

| | |
|---|---|
| 11/1/04 - 10/31/05 | $8,269 |
| 11/1/05 - 10/31/06 | 8,517 |
| 11/1/06 - 10/31/07* | 8,773 |

If a story, or stories, are included in a purchased format and the story is used, the applicable minimum for such story or stories shall apply. If such story or stories are not used, no story minimum would apply.

If a writer is employed to write a format and a story or stories are included, at the direction of Company, the applicable story minimum shall apply.

* See page 72.

At the time of purchase or hire, Company shall submit to writer any formats in control of the Company relating to the project for which writer has been engaged. The writer shall be obligated to read, initial and date such format.

(2) **Bible**

Minimum basic compensation for a network prime time bible shall be:

| | |
|---|---|
| 11/1/04 - 10/31/05 | $41,807 |
| 11/1/05 - 10/31/06 | 43,061 |
| 11/1/06 - 10/31/07* | 44,353 |

plus ten percent (10%) thereof for each detailed storyline in excess of six (6) ordered by the Company in connection therewith. With respect to a non-network and/or non-prime time bible for a multi-part closed end series, the minimum basic compensation shall be twenty percent (20%) less than set forth above. The writer of the bible shall be entitled to the applicable story payment (including the additional compensation set forth in Article 13.B.7.d.(1), if applicable) for each segment or episode of the multi-part program or prime-time serial for which he/she receives story credit. Ten percent (10%) of the applicable minimum for a bible may be credited against such payment for each story. Notwithstanding the foregoing, should the Company separately pay the full story and teleplay minimum to the bible writer or any other writer, the story payment (including the additional compensation set forth in Article 13.B.7.d.(1), if applicable) otherwise due to the bible writer under this subparagraph shall not be required.

(3) **Rewrite or Polish of Format or Bible**

Minimum basic compensation for a rewrite of a format shall be fifty percent (50%) of the applicable minimum set forth above. Minimum basic compensation for a polish of a format shall be twenty-five percent (25%) of the applicable minimum set forth above.

* See page 72.

Minimum basic compensation for a rewrite or polish of a bible shall be:

| | Rewrite | Polish |
|---|---|---|
| 11/1/04 - 10/31/05 | $20,904 | $10,452 |
| 11/1/05 - 10/31/06 | 21,531 | 10,766 |
| 11/1/06 - 10/31/07* | 22,177 | 11,089 |

provided, however, that when the writer rewrites or polishes more than six (6) story lines in the bible, the minimum basic compensation shall be increased as follows (for rewrite or polish, as the case may be) for each such story line in excess of six (6):

| | Rewrite | Polish |
|---|---|---|
| 11/1/04 - 10/31/05 | $2,088 | $1,046 |
| 11/1/05 - 10/31/06 | 2,151 | 1,077 |
| 11/1/06 - 10/31/07* | 2,216 | 1,109 |

With respect to rewriting or polishing a non-network and/or non-prime time bible, the minimum basic compensation shall be twenty percent (20%) less than set forth above.

n. **Narration**

Minimum basic compensation for a narration shall be as follows:

**NARRATION**

(by writer other than writer of teleplay or story and teleplay)

**FILM ASSEMBLED IN STORY SEQUENCE**

| Nature of Material Already Written under MBA when Narration Writer Hired | Credit to Narration Writer[3] | Freelance Minimum | Residuals to Narration Writer |
|---|---|---|---|
| 1. No Material | "*Narration Written by*" | See Rate Schedule A | Yes, based on % of applicable freelance minimum in Rate Schedule A |

(continued)

* See page 72.

[3] Credit not to affect rates - There is no separation of rights for narration.

(continued)

**FILM ASSEMBLED IN STORY SEQUENCE**

| Nature of Material Already Written under MBA when Narration Writer Hired | Credit to Narration Writer[3] | Freelance Minimum | Residuals to Narration Writer |
|---|---|---|---|
| 2. Story only | "*Narration Written by*" (If story credit, then on same card) | See Rate Schedule A | Yes, based on % of applicable freelance minimum in Rate Schedule A |
| 3. Story and Teleplay | None, but if over 8 minutes of narration (aggregate), only receive "*Narration by*" credit (same card)<br><br>Automatic arbitration | See Rate Schedule C | If "Narration by" credit, then only shared residuals, as determined in WGA credit arbitration (aggregate of no more than story & teleplay residuals) |

**NARRATION**

(by writer other than writer of teleplay or story and teleplay)

**FILM FOOTAGE NOT ASSEMBLED IN STORY SEQUENCE**

| Nature of Material Already Written under MBA when Narration Writer Hired | Credit to Narration Writer[3] | Freelance Minimum | Residuals to Narration Writer |
|---|---|---|---|
| 1. No Material | "*Written by*" | See Rate Schedule B | Yes, based on % of applicable freelance minimum in Rate Schedule B |
| 2. Story only | "*Narration Written by*" (If story credit, then on same card) | See Rate Schedule A | Yes, based on % of applicable freelance minimum in Rate Schedule A |
| 3. Story and Teleplay | None, but if over 8 minutes of narration (aggregate), only receive "*Narration by*" credit (same card)<br><br>Automatic arbitration | See Rate Schedule C | If "Narration by" credit, then only shared residuals, as determined in WGA credit arbitration |

**NOTE:** Excluded from these provisions is material described in Article 13.B.7.p.

[3] Credit not to affect rates - There is no separation of rights for narration.

Two writers collaborating equal one unit, to receive in the aggregate not less than applicable minimum.

Narration writer may be hired on a week-to-week basis, subject to Article 13.B.7.s.

The following rates are for High Budget:[4]

**RATE SCHEDULE A**

| Program Length in Minutes[5] | 11/1/04 - 10/31/05 | 11/1/05- 10/31/06 | 11/1/06- 10/31/07* |
|---|---|---|---|
| 15 or less | $ 5,169 | $ 5,324 | $ 5,484 |
| 30 or less (but more than 15) | 8,593 | 8,851 | 9,117 |
| 60 or less (but more than 30) | 16,297 | 16,786 | 17,290 |
| 75 or less (but more than 60) | 22,846 | 23,531 | 24,237 |
| 90 or less (but more than 75) | 24,008 | 24,728 | 25,470 |
| 120 or less (but more than 90) | 31,710 | 32,661 | 33,641 |
| plus, for each additional ½ hour or fraction thereof | 7,704 | 7,935 | 8,173 |

**RATE SCHEDULE B**

| Program Length in Minutes[5] | 11/1/04 - 10/31/05 | 11/1/05- 10/31/06 | 11/1/06- 10/31/07* |
|---|---|---|---|
| 15 or less | $ 5,968 | $ 6,147 | $ 6,331 |
| 30 or less (but more than 15) | 10,921 | 11,249 | 11,586 |
| 60 or less (but more than 30) | 19,868 | 20,464 | 21,078 |
| 75 or less (but more than 60) | 27,320 | 28,140 | 28,984 |
| 90 or less (but more than 75) | 28,805 | 29,669 | 30,559 |
| 120 or less (but more than 90) | 37,740 | 38,872 | 40,038 |
| plus, for each additional ½ hour or fraction thereof | 8,952 | 9,221 | 9,498 |

**RATE SCHEDULE C**

| Aggregate sound track running time in minutes of narration written by writer hired pursuant to this chart | 11/1/04 - 10/31/05 | 11/1/05- 10/31/06 | 11/1/06- 10/31/07* |
|---|---|---|---|
| 2 minutes or less of narration | $ 828 | $ 853 | $ 879 |
| Over 2 minutes through 5 minutes of narration | 2,899 | 2,986 | 3,076 |
| Over 5 minutes of narration | Teleplay rewrite minimum for applicable program length | | |

---

[4] If Low Budget, then applicable rates are equal to corresponding rates for Low Budget teleplay (under "A" above) and Low Budget story and teleplay (under "B" above).

[5] Running time is in terms of sound track.

* See page 72.

o. **Remakes**

The Company's right to remake a television motion picture shall be subject to the following:[6]

(1) If the credited writer's material is used for the remake and no writer is employed to rewrite, adapt or revise such material for the remake, the Company will pay such writer a sum equal to the applicable minimum compensation for the intended medium of the remake appropriate to the writer's initial employment to write such material. Said minimum compensation shall not be diminished by virtue of any sharing of credit by said writer for the remake (but this provision shall not be construed as affecting the rule that a *bona fide* team shall be considered a unit as provided in subparagraph B.1. of this Article). In addition, the writer will be entitled to receive payments in accordance with Article 15.A. with respect to a theatrical remake licensed to free television, Article 15.B. with respect to reruns or foreign telecast of a television remake, and Article 51 with respect to a theatrical or free television remake released in Supplemental Markets.

(2) If a writer is employed to rewrite, adapt or revise such literary material for the remake, then the credited writer of the original material also shall be a participant in the credit determination and if accorded credit shall be paid the applicable minimum compensation for the intended medium of the remake appropriate to such credit. In the event of a television remake, the writer of the original material, if accorded credit, will be entitled to share, in accordance with such credit, in any additional compensation for television reruns or theatrical exhibition which may become due. Said minimum compensation shall not be diminished by virtue of any sharing of credit by said writer for the remake, (but this provision shall not be construed as affecting the rule that a *bona fide* team shall be considered a unit as provided in subparagraph B.1. of this Article). In addition, such writer of the original material will be entitled to share in any additional compensation in accordance with Article 15.A. with respect to a theatrical remake licensed to free television,

---

[6] But as to any series in production prior to March 6, 1973, this paragraph B.7.o. shall remain as in the 1970 WGA Agreement and as to any series in production prior to March 2, 1977, which was not in production prior to March 6, 1973, this paragraph B.7.o. shall remain as in the 1977 WGA Agreement.

Article 15.B. with respect to foreign telecast of a television remake, and Article 51 with respect to a theatrical or free television remake released in Supplemental Markets. The portion of additional compensation referred to in this subparagraph (2) which is payable to the original writer shall be equal to the portion of credit awarded pursuant to subparagraph (a) below.

(3) With respect to a television remake, the "applicable minimum compensation" in subparagraphs (l) and (2) of this subparagraph o. means the applicable rates provided for in Article 13.B.7.a., b. or e. of this Agreement.

In a credit arbitration concerning such remake, the arbitrators shall determine the following issues:

(a) the contribution made by the writer(s) of the original material expressed as a percentage of the whole; and

(b) the form of credit to be accorded such writer(s), which credit may include a credit in the nature of a source material credit, such as "Based on a Teleplay by..."

p. **Non-Commercial Openings and Closings**

When a writer other than the writer of the teleplay for a television film writes literary material for self-contained units of entertainment which are used as opening, closing and/or bridging material in such film, the total minimum compensation for all such self-contained units in such film will be:

| Aggregate Running Time of Material | 11/1/04 - 10/31/05 | 11/1/05- 10/31/06 | 11/1/06- 10/31/07* |
|---|---|---|---|
| 3 minutes or less | $2,148 | $2,212 | $2,278 |
| More than 3 minutes | 3,016 | 3,106 | 3,199 |

It is further expressly understood that the foregoing rates are not intended to apply to customary or routine introductions, bridges or conclusions. An example of the material intended to be covered is the material delivered by Alfred Hitchcock on the series "*Alfred Hitchcock Presents*." In addition, if such units are rerun, as the term "rerun" is used in Article 15.B.1.b., Company shall pay the writer additional payments expressed in percentages of said total minimum compensation at the rates specified

* See page 72.

in said Article 15.B.1.b. It is expressly understood that, except as specifically provided herein, this paragraph is not intended to extend the coverage of this Basic Agreement to, nor provide payment for, any matter in any television film not elsewhere covered by this Basic Agreement.

q. **Total Writing Cost**

Company shall not produce a television film based upon material subject to this Basic Agreement the total purchase and writing cost for which shall be less than the applicable minimum compensation for narration, a story and teleplay, or teleplay, as the case may be.

r. **Pilot Scripts, Back-up Scripts and Spin-offs**

(1) **Pilot Script**

A writer employed to write a pilot story or a pilot story and teleplay shall receive for said pilot story or pilot story and teleplay an amount equal to one hundred fifty percent (150%) of the applicable minimum initial basic compensation (including the rates set forth in Article 13.B.7.d., where applicable) set forth in this Article 13.B. for a pilot story or pilot story and teleplay, but this provision shall not be construed to increase said writer's rights or minimum compensation for any other purpose under this Basic Agreement, such as, but not limited to, reruns and theatrical uses.

If a writer was paid less than the amount set forth herein by reason of the fact that Company did not intend that the material would be used in a pilot at the time the writer was engaged or material acquired by the Company, but the Company nevertheless actually exploits the television series sequel rights to such material without making a pilot, then such writer shall be paid the amount by which the applicable pilot fee set forth above exceeds the compensation originally paid to the writer for such material.

(2) **Back-up Script**

A writer employed to write a back-up script shall receive for said story and/or teleplay an amount equal to one hundred fifteen percent (115%) of the applicable minimum initial basic compensation (including the rates set forth in Article 13.B.7.d., if applicable) set forth in this Article 13.B. for a story and/or teleplay, but this provision shall not be

construed to increase said writer's minimum compensation for any other purpose under this Basic Agreement, such as, but not limited to, reruns and theatrical uses.

(3) **Spin-off**

When the Company knows prior to engaging a writer to write a story or story and teleplay for an episode of a series that such episode is intended to be used as a spin-off, the Company shall also advise the writer at the time of the initial interview. If Company does not have such knowledge but thereafter broadcasts one or more programs in a new television series based upon such episode, then, if the initial compensation paid such writer for such episode was less than one hundred fifty percent (150%) of the WGA minimum initial basic compensation therefor, Company shall pay writer the difference between such one hundred fifty percent (150%) and writer's initial compensation, but this provision shall not be construed to increase the writer's minimum basic compensation for any other purposes under this Basic Agreement, such as, but not limited to, reruns and theatrical use. Such payment need not be made when the new television series is based primarily on either a public domain format or public domain character or characters used in the spin-off episode.

s. **Week-to-Week and Term Employment**

(1) Company agrees that except as hereinafter provided, all employment of writers shall be only on a freelance (non-exclusive) basis, and such employment shall be upon terms and conditions which conform in principle to, and shall not be less favorable than, the terms and provisions hereof.

(2) The Company may employ writers on a term contract basis as follows:

| Overall Term | Guaranteed Weeks of Employment | Compensation Per Week | | |
|---|---|---|---|---|
| | | 11/1/04 - 10/31/05 | 11/1/05- 10/31/06 | 11/1/06- 10/31/07* |
| (a) 52 | 40 | $2,724 | $2,806 | $2,890 |
| (b) 26 | 20 | 2,980 | 3,069 | 3,161 |
| (c) 14 | 14 | 3,231 | 3,328 | 3,428 |
| (d) 6 | 6 | 3,477 | 3,581 | 3,688 |

* See page 72.

(e) In no event shall a writer employed on a term basis receive less than the total applicable minimum compensation, as set forth in this Basic Agreement, to which he/she would have been entitled had he/she been employed on a freelance basis. At the end of each guaranteed period of employment on a term basis, Company shall compute the aggregate minimum compensation to which the writer would have been entitled under this Basic Agreement had he/she been employed on a freelance basis to write the literary material written by the writer during such period, and shall deduct therefrom the total compensation accruing to the writer during such period, and will promptly pay to the writer the excess, if any. Any dispute as to the amount of compensation payable under this subparagraph (e) may be submitted to arbitration, as herein provided. All the provisions of this Basic Agreement, to the extent the same are applicable, shall apply to such term employment, including but not limited to the provisions relating to additional compensation for reruns and theatrical release, and the separation of rights provisions.

(f) The suspension period provided in the so-called "force majeure" clause of employment agreements with writers employed on a week-to-week basis or for a definite term, who receive salary at the rate set forth in subparagraph (d) above or less a week, shall not exceed four (4) weeks; provided, however, that Company shall have the right to continue such suspension from week to week, not exceeding six (6) additional weeks, at one-half salary. If the salary of any such writer shall be at the rate of more than set forth in subparagraph (d) above per week, such suspension period shall not exceed eight (8) weeks. Nothing herein contained shall be construed to deprive the Company of its right to terminate any such employment agreement after the commencement of the suspension period.

(g) For a partial workweek (defined as a workweek consisting of less than six (6) days work) following the guaranteed period

of employment, a writer shall be paid one-fifth of his/her weekly compensation for each day employed in such partial workweek.

Such writer shall be paid one-fifth of weekly compensation for each day worked at Company's direction in excess of five (5) times the number of weeks worked.

(h) Such writer under a week-to-week employment may write any literary material covered hereunder; provided, however, if such literary material amounts to a rewrite or more, such writer shall be paid not less than the minimum freelance compensation for such literary material, computed as of the end of his/her employment or as of the end of each six (6) month period, whichever occurs sooner. The compensation of a week-to-week writer shall be the compensation per week as set forth in subparagraph (d) above.

(3) Notwithstanding the foregoing, the Company may employ on a term contract basis a writer who has not been previously employed as a writer under any Guild MBA in television, theatrical motion pictures or radio dramatic or comedic programs as follows:

(a) An overall term of fourteen (14) consecutive weeks with fourteen (14) weeks guaranteed employment at a minimum compensation equal to seventy-five percent (75%) of the rate set forth in subparagraph (2)(c) above; or

(b) An initial overall term of seven (7) consecutive weeks with seven (7) weeks guaranteed employment at a minimum compensation equal to sixty percent (60%) of the rate set forth in subparagraph (2)(d) above plus, pursuant to option or agreement, a second overall term of seven (7) consecutive weeks with seven (7) weeks guaranteed employment at a minimum compensation equal to eighty percent (80%) of the rate set forth in subparagraph (2)(d) above.

(4) The Company may employ a writer on a guaranteed episode basis. When such writer's

initial guarantee is at least five (5) episodes, the minimums provided in Article 13.B.7.s.(2)(a) - (c) shall apply to such initial guarantee based on the number of weeks such writer actually works.

8. Reading Time and Obligations of Freelance Writer Re Revisions

a. Story

The Company shall have not more than fourteen (14) days (including Sundays and holidays) after the writer's first submission of the story within which to make one (1) request for revision of such story; provided that if, after the writer has made the requested revision of the story first submitted, the Company shall make a second request for revision, such second revision shall be incorporated in the teleplay; it being understood that the Company shall not be entitled to more than two (2) requests for revision of the story and not more than fourteen (14) days shall elapse between the first submission of the story and the commencement of the preparation of the teleplay by the writer.

Company may have a second revision of story before teleplay upon additional payment of one-half story minimum, except when second revision of the story is accomplished by execution in the teleplay. It is understood this does not permit a new story.

Story revision time and obligations shall apply to formats.

b. Teleplay

The Company shall have not more than fourteen (14) days (including Sundays and holidays) after the writer's first submission of the material in teleplay form within which to make one (1) request for revision of the material; provided that if Company shall make such request within seven (7) days (including Sundays and holidays) after the first submission of the literary material in teleplay form, Company shall be entitled to make a second request for revision within seven (7) days (including Sundays and holidays) after submission of the teleplay as first revised. Neither revision permitted under this subparagraph b. shall involve a substantial change in the story line.

c. Teleplays Over 30 Minutes

With respect to films more than thirty (30) minutes in length, the fourteen (14) day period mentioned in

subparagraph b. shall be increased to twenty-one (21) days and the first seven (7) day period mentioned in subparagraph b. shall be increased to fourteen (14) days.

d. Writer's Obligation

The writer shall be obligated to make revisions requested by the Company in compliance with the foregoing provisions.

e. Company's Best Efforts

Company agrees to use its best efforts to read the material submitted and call for any necessary revisions as soon as possible after submission.

f. Writer Entitled to Script

The Company shall promptly, at the close of production, provide the writer with two (2) copies of the revised final shooting script.

g. Revisions in Pilot

The time limits referred to in subparagraphs a., b., and c. shall be increased by seven (7) days for pilot stories and teleplays whenever the writer is paid at least double minimum compensation.

9. Time of Payment

Company will use its best efforts to pay to the writer the applicable installment payment provided in Article 13.B.7.f. within forty-eight (48) hours after delivery of the narrative synopsis, story, first draft or final draft teleplay, as the case may be, but in no event shall any such payment be made later than seven (7) days after the delivery of such narrative synopsis, story or first or final draft teleplay. Payment shall not be contingent upon the acceptance or approval by the Company of the literary material so delivered. Company shall include in writer's deal memorandum or personal service contract:

a. the place where and the name(s) and function of the person(s) to whom delivery of such material is to be made, and

b. the name(s) of the person(s) authorized to request rewrites of such material.

Company shall give writer written notice of any change in the name(s) of the person(s) to whom delivery is to be made and/or the name(s) of the person(s) authorized to request rewrites.

The payment for the week shall be made on the Company's regular payday in the following week for writers employed on a week-to-week or term basis.

Company will pay interest of one and one-half percent (1.5%) per month when any payment due to the writer pursuant to this Article 13.B. is due and not paid as provided herein. If the Company has failed to make such payment because the executed contract was not delivered by the writer to the Company, then no such interest is due. If the contract is not so delivered by the writer because of a dispute as to the terms of the contract and the Company shall be held to be wrong, the above-described interest payment shall be applicable.

10. Cut-Off

There shall be no right to cut-off in teleplay employment.

11. Script Annotations

If the Company is to require one or more script annotations, it shall so inform the writer at the time of the negotiation of the writing assignment, or option or acquisition of literary material, unless from the nature of the project the Company's need for the annotation(s) is not reasonably known at the outset. In the latter case, the Company shall inform the writer that an annotation is needed when the Company knows, or reasonably should have known, of it.

If the Company uses written guidelines or standards describing the type of information to be included in an annotation for a fact-based project or a project inspired by fact, such guidelines or standards shall be furnished to the writer when the Company first informs the writer that an annotation is needed.

12. Notice of Conditions Precedent

For long-form television projects, Company shall attach a cover sheet to the document memorializing the agreement reached between the Company and the writer which sets forth in summary form all conditions precedent which must be satisfied before writing services can commence. The terms of such cover sheet shall not alter or vary the terms of the agreement reached between the Company and the writer and, in any event, the terms of the writer's agreement shall prevail.

**C. CLAIMED OVERPAYMENTS** (See Article 11.A.9.)

**D. PAYMENT PROCEDURES (GENERAL)**

Company agrees to meet from time to time at the request of the Guild with representatives of the Guild to review Company's payment procedures for the purpose of assuring timely payment of

compensation as provided in this Article 13. The AMPTP shall cooperate with the Guild in obtaining compliance by the Companies with the provisions of this Basic Agreement governing time of payment. In addition, the AMPTP has issued a bulletin dated August 11, 1989 to Companies signatory to the 1988 MBA reminding them of their obligations to make payment to writers within the time periods set forth in Articles 13.A., 13.B., 15.A., 15.B. and 51 and advising them of the interest charge of one and one-half percent (1.5%) per month assessed on monies not paid timely as provided therein.

## ARTICLE 14 WRITERS ALSO EMPLOYED IN ADDITIONAL CAPACITIES (TELEVISION)

### A. DEFINITION

The parties acknowledge that it is customary in the television industry to employ persons to render services as writers under the terms of this Basic Agreement, and the same persons to render services in other capacities which are not subject to this Basic Agreement. For the purposes of this Article 14, a person employed as a writer (as defined in Article 1.C.1.a. of this Basic Agreement) and also as an executive producer, producer, associate producer or story editor (as such terms are customarily used and understood in the television industry) is referred to as a "writer also employed in additional capacities," or "such person" or "such writer." Because of the difficulty of ascertaining the amount, duration, nature and extent of the services rendered by such person as a writer, and for the purpose of avoiding disputes concerning those matters and concerning the extent of such person's contributions as a writer to the programs with respect to which he/she renders his/her services, the parties agree that the duration or term of such person's employment as a writer in relation to a particular series, during a particular production season, shall be no less than the duration or term of his/her employment in the additional capacity in relation to such series, during such production season (except as provided in Paragraphs C. and I. of this Article 14), and that such person shall be employed as a writer in relation to such series, during such production season only in accordance with the provisions of this Article 14.

### B. CONTRACTS OF EMPLOYMENT

The contract of employment of a writer also employed in additional capacities may cover both the employment as a writer and the employment in additional capacities, or there may be a separate contract covering the employment as a writer and a separate contract covering the employment in additional capacities, provided that in the latter case (*i.e.*, when there are separate contracts) separate compensation shall be provided for the services as a writer from the services in additional capacities, and such separately stated compensation for such person's services as a writer shall not be less than the appropriate minimum compensation for a writer also employed in additional capacities as provided in Paragraph K. of this

Article 14. Similarly, when the employment as a writer and in additional capacities is covered by the same contract, and the compensation as a writer is segregated from the compensation for the additional services, such compensation as a writer shall not be less than the appropriate minimum compensation for a writer also employed in additional capacities as provided in said Paragraph K. When the contract of employment of a writer also employed in additional capacities under such contract does not segregate his/her compensation as a writer from his/her compensation for his/her additional services, the Company shall have the right to allocate to his/her services as a writer not less than the appropriate minimum compensation for a writer also employed in additional capacities as provided in said Paragraph K. Except as provided in the immediately preceding sentence, none of the compensation due such person for his/her services in a capacity or capacities other than as a writer shall be offset or credited against any compensation due such person for his/her services as a writer.

## C. FORMS OF EMPLOYMENT

A writer also employed in additional capacities may be employed as a writer only on a week-to-week or term basis, (which employment may be exclusive), at no less than the appropriate minimum compensation provided in Paragraph K. of this Article 14 and subject to all of the provisions of this Basic Agreement; provided, however, that if the Company employs two (2) such persons, then the Company may employ other individuals (referred to in this Article 14 for convenience as "additional writers") as writers also employed in additional capacities, in relation to the respective series, and such additional writers may be employed as writers on a week-to-week, term or freelance basis, and the duration or term of their employment need not be coterminous with the duration or term of their employment in additional capacities.

## D. AMOUNT, NATURE AND EXTENT OF SERVICES

Because of the difficulty of determining the amount, nature and extent of the services as a writer performed by a writer also employed in additional capacities and his/her contribution as a writer to any specific program of a series, it is agreed that, for the purposes of Paragraph G. of this Article 14, such writer (other than the additional writers referred to in Paragraph C. of this Article 14) shall be deemed to have performed services as a writer on each program of the series for which he/she is employed for which writing is done during the respective production season; provided, however, that if the employment of such writer has been suspended for cause, or terminated for cause (and for this purpose, any termination of employment of a writer employed on a week-to-week basis shall be deemed to be termination for cause), the number of programs of the respective series for which such writer shall be compensated pursuant to said Paragraph G. shall be proportionately reduced. In the case of suspension, the reduction shall be in the proportion that the length of the suspension bears to the overall period of employment of such

writer during the respective production season; in the case of termination, the reduction shall be in the proportion that the length of the period from the date of termination to the completion of principal photography of the series during such production season bears to the period from the commencement of such person's employment as a writer during such production season to the date of completion of principal photography of the series during such production season. If such calculation results in a fraction, no payment shall be made with respect to a fraction of less than fifty percent (50%), and full payment of one (1) program fee shall be made with respect to a fraction of fifty percent (50%) or more. An additional writer (as such is referred to in Paragraph C. above) who is employed on a week-to-week, term or freelance basis, need not be deemed to have performed services on each program of the series for which he/she is employed, but shall be entitled to a program fee (or to a share thereof) pursuant to Paragraph G. for each program for which he/she did render writing services during his/her employment. The Company shall notify the term or week-to-week writer that he/she is an additional writer at the time of his/her employment, or (as to a writer already employed) when he/she is assigned as an additional writer.

E. 1. **What Minimum Compensation Covers**

All writing services rendered by a writer also employed in additional capacities up to and including rewrites shall be deemed to be compensated by the minimum compensation provided for such writer pursuant to Paragraph K. of this Article 14.

2. All formats, stories and teleplays written by such writers during their employment as writers also employed in additional capacities shall be separately compensated, without any offset, credit or allocation of any kind against or by any other compensation of any kind due said individual. Notwithstanding the foregoing, with respect to any writer hereunder who is guaranteed compensation of at least one hundred thousand dollars ($100,000.00) for up to fifty-two (52) weeks of employment for both writing and non-writing services, the Company shall have the right to credit such compensation freely against the compensation which otherwise would be due to said writer for the writing of any literary material during such employment (but not against residuals or the program fees provided for in Paragraph G. below) or for non-writing services. In the event of such crediting, the applicable minimum compensation for writing services set forth in Paragraph K. below shall be credited at no less than one hundred ten percent (110%) thereof, and the compensation for the writing of stories and teleplays for non-pilot one-time programs ninety (90) minutes or longer shall be credited at no less than one hundred fifty percent (150%) of the applicable minimum therefor (but this provision shall not be construed to increase the writer's compensation for any other purpose under this Basic Agreement, such as, but not limited to reruns and

theatrical uses). In such event, the base amount upon which the Company shall compute Health contributions with respect to such employment shall be two hundred fifty thousand dollars ($250,000.00) and the base amount upon which the Company shall compute Pension contributions shall be two hundred two thousand dollars ($202,000.00). If the period of guaranteed employment is longer than fifty-two (52) weeks, the applicable base amount for computation of contributions referred to above shall be increased proportionately. If the period of guaranteed employment is shorter than fifty-two (52) weeks, the applicable base amount for computation of contributions shall be decreased proportionately. As to contracts in effect on March 1, 1985, the Company may elect to pay pension and health contributions according to the formula set forth above or according to the formula in the 1981 MBA.

3. **Writers Not Considered to be "Writers Also Employed in Additional Capacities"**

In any case in which a writer is employed to write one or more formats, stories or teleplays, or any combination (with or without options) of formats, stories or teleplays, on a freelance basis, concurrently with his/her employment as a producer, executive producer, associate producer or story editor, and whether or not such freelance employment is entered into at the same time as he/she enters into his/her employment in such other capacity or at a different time or times, such person shall not, by reason of such freelance employment, be deemed to be a "writer also employed in additional capacities" for any of the purposes of this Article 14, and this Article 14 shall in no way apply to such employment, notwithstanding anything to the contrary in this Article 14.

F. 1. **Becoming a "Writer Also Employed in Additional Capacities" After Initial Employment**

If an individual is initially employed as an executive producer, producer, associate producer or story editor, but not as a writer, so that at the time of such employment such individual is not a "writer also employed in additional capacities" as defined in Paragraph A. of this Article 14, but if, during such employment, such individual, with the knowledge and consent of the Company, performs services as a writer for the series for which he/she is employed in such additional capacity, such individual shall, from the time he/she starts to perform such services as a writer, be deemed to be employed as a "writer also employed in additional capacities" for the purposes of this Article 14, except that: (a) if such writing services are limited to those described in subparagraphs (a) to (h), inclusive, of Article 1.C.1.a. of this Basic Agreement and to those described in subparagraph E.3. of this Article 14; or (b) if such person is not a "writer," by reason of the provisions of the third paragraph of said Article 1.C.1.a. (immediately following said subparagraph (h)) and such writing

does not qualify him/her as a "writer," then in any of said excepted cases, such employment of such individual shall not be subject to this Paragraph F. With respect to contracts in existence on the date of execution of this Agreement, providing for employment as an executive producer, producer, associate producer or story editor, but not for employment as a writer, and which do not contain an express provision that the employee shall not render services as a writer, or is not employed to render services as a writer, such contracts shall be deemed to include such a provision for the purposes of this Paragraph F., if the Company serves written notice on such person to the effect that such person shall not render services as a writer (other than the excepted services referred to above in this subparagraph 1. and in subparagraph E.3. of this Article 14).

2. **Duration of Services**

A person who becomes a writer also employed in additional capacities pursuant to subparagraph 1. of this Paragraph F. shall continue to be employed as a writer in connection with the respective series on a term contract basis for a period coterminous with the remainder of the duration or term of his/her employment in the other capacity or capacities in relation to such series during the respective production season or until the completion of principal photography of all programs of such series produced during such production season, whichever is the earlier, subject to the following provisions of this Paragraph F. and to the provisions of Paragraph I. of this Article 14. In such case, the Company shall have the right to allocate to his/her services as a writer no less than the appropriate minimum compensation for a writer also employed in additional capacities as provided in Paragraph K. of this Article 14.

3. Notwithstanding anything to the contrary in this Paragraph F., if such person is an "additional writer," as defined in Paragraph C. of this Article 14, then such person shall be deemed to be employed as a writer and also in additional capacities, pursuant to this Paragraph F., only during the period during which he/she performs services as a writer, and such employment may be on a week-to-week, term or freelance basis.

4. **Substitute Writer**

Any writer employed on a term basis pursuant to this Paragraph F. may be replaced by the Company with another writer at any time during such term, provided that:

a. the substitute writer may not be replaced during the term of his/her employment as a writer during the respective production season, except for cause;

b. the rate of compensation payable to such substitute writer for writing shall be no less than the appropriate minimum rate of compensation provided for in Paragraph K. of this Article 14, or the rate paid to the replaced writer for writing, whichever is higher;

c. the term of employment of the substitute writer shall be no less than the remainder of the term of employment of the replaced writer during the respective production season.

Subparagraph a. of this subparagraph 4. is to be interpreted as meaning that the Company shall pay the writer's compensation but shall not be obligated to use such writer's services as a writer, and may employ other writers to perform such services. This subparagraph 4. does not apply to any "additional writer" referred to in subparagraph 3. of this Paragraph F.

5. The Company specifically represents to the Guild that it is not the intention of the Company to use any of the provisions of this Article 14 in such manner as to evade the purpose and intent of this Article 14. Specifically, the Company expressly represents that it is not its intention to, and agrees that it will not, use the provisions of subparagraphs E.3. or F.1. for the purpose of avoiding its obligations under this Article 14 regarding the coterminous employment of a writer also employed in additional capacities. Accordingly, when a person is employed as an executive producer, producer, associate producer or story editor with no intention that such person is to perform services as a writer, including rewrites and polishes (other than the excepted writing services referred to in subparagraphs E.3. and F.1. of this Article 14), and provided that his/her contract of employment for such other capacity or capacities provides that such person shall not render services as a writer, or is not employed to render services as a writer (other than the excepted writing services referred to in subparagraphs E.3. and F.1.):

a. If such person, without the Company's knowledge and consent, nevertheless does perform services as a writer on the series for which he/she is employed in the other capacity or capacities (other than the excepted writing services referred to in subparagraphs E.3. and F.1.), then promptly after the Company or the Guild becomes aware of that fact, it shall notify the other party, and said parties shall jointly and cooperatively take appropriate steps designed to prevent such person from further performing unauthorized writing services. If the Guild believes that the Company knows of and condones such person's unauthorized writing, or that it was originally the intent of the Company and its employee to evade the provisions of this Article 14, the Guild may bring the matter to arbitration (but not to grievance) pursuant to Articles 10

and 11 of this Basic Agreement. If the arbitrator rules in favor of the Guild, the arbitrator shall have the power to make a monetary award to the Guild, no part of which shall be paid or otherwise applied to the benefit of the writer, directly or indirectly. In determining the amount of such award, if any is granted, the arbitrator may consider, among other things, the amount of the minimum compensation which would have been paid to such writer had he/she initially been employed for the particular series during the particular production season as a writer and in additional capacities pursuant to this Article 14.

b. If such person, with the Company's knowledge and consent (and the fact of said knowledge or consent is not disputed by the Company), nevertheless does any rewriting or polishing, then such person shall be deemed to be a term writer pursuant to Article 14.B. retroactively from the commencement of his/her employment by the Company on the particular series during the respective production season.

c. If his/her contract of employment does not include a provision that such person shall not render services as a writer, or is not employed to render services as a writer (other than the excepted writing services referred to in subparagraphs E.3. and F.1.), and if such person nevertheless does any rewriting or polishing, then such person shall be deemed to be a term writer pursuant to Article 14.B. retroactively from the commencement of his/her employment by the Company on the particular series during the respective production season.

**G. PROGRAM FEES**

Each person whose employment as a writer is governed by this Article 14, whether such employment is on a week-to-week, term or freelance basis (including the "additional writers" defined in Paragraph C. of this Article 14), shall be paid a program fee for each program of a series produced for network prime time exhibition, for which such writer performed services as a writer pursuant to this Article 14 (or is deemed to have performed services as a writer, as provided in Paragraph D. of this Article 14), in the following amount:

| PROGRAM FEES | EFFECTIVE | | |
|---|---|---|---|
| | 11/1/04 - 10/31/05 | 11/1/05- 10/31/06 | 11/1/06- 10/31/07* |
| 30 minute program | $ 796 | $ 814 | $ 832 |
| 60 minute program | 1,056 | 1,080 | 1,104 |
| 90-minute program or longer | 1,321 | 1,351 | 1,381 |

Provided, however, that in no event for a particular program need the Company pay total program fees in an amount which exceeds three (3) times the applicable rate. If more than three (3) writers (a team is deemed to be one (1) writer) are entitled to receive program fees for the same program, a total sum of three (3) times the applicable rate shall be divided equally among them. Program fees may not be prepaid nor may they be offset or credited against or by any other compensation of any kind due the respective writers and must be paid not later than the first regular payroll date following completion of principal photography of the respective program. Program fees shall not be included in "applicable minimum compensation" for the purposes of Article 15.B. of this Basic Agreement, but shall be included in "initial compensation" for the purposes of Article 17 of this Basic Agreement.

H. **SUSPENSION, TERMINATION AND/OR OFFSET**

Nothing in this Article 14 shall be interpreted as precluding the Company from exercising rights of suspension for cause or termination for cause under individual employment contracts, nor from exercising rights of offset, if any, in relation to an indebtedness of the writer to the Company pursuant to law, subject, however, to the provisions of Article 11.A.9. of this Basic Agreement.

I. **HIATUS PERIODS**

For the purposes of this Paragraph I., the following periods will be referred to as "writing hiatus" periods:

1. With respect to a writer also employed in additional capacities (except one who becomes such a writer pursuant to Paragraph F. of this Article 14 and except a story editor), the period between the date of commencement of his/her employment in a particular production season until the occurrence of the earliest of the following:

   a. Services as a writer are performed by any writer on the respective series during such production season;

   b. A commitment is made with a writer (other than as a writer also employed in additional capacities) for such series during such production season;

---

* See page 72.

c. A story conference is held with a writer for such series during such production season;

d. Principal photography of a program of such series is started during such production season; and the period following the completion of principal photography of the last program of such series produced during such production season until the termination of such person's employment during such production season.

2. With respect to a writer also employed in additional capacities (including one so employed pursuant to Paragraph F. of this Article 14, but not including a story editor), if in a particular production season principal photography of all of the programs of the respective series theretofore ordered by the network has been completed, the period between such date of completion until the occurrence of the earliest of the following after the start of such period:

a. Services as a writer are performed by any writer on the respective series during such production season;

b. A commitment is made with a writer (other than as a writer also employed in additional capacities) for such series during such production season;

c. A story conference is held with a writer for such series during such production season;

d. Principal photography of a program of such series is started during such production season, provided that such period continues for at least fourteen (14) consecutive days.

The Company may suspend the employment of such person as a writer during any writer hiatus period, both as to services as a writer and compensation as a writer; provided, however, that such person's overall compensation shall be allocated or re-allocated by the Company so that there shall be no reduction in the overall compensation of such person by reason of such suspension, and provided further that the re-allocated payments are subject to contributions to an industry pension plan.

J. For the purposes of this Article 14, one-time programs including but not limited to a movie-of-the-week, and development deals for specific television programs, shall each, separately, be considered to be a "series," and the employment of an individual as a writer and in additional capacities for such a show or deal shall be governed by this Article 14; the writer also employed in additional capacities on such show or program shall receive the program fee regardless of whether such writer receives or shares in a "Written by" credit. Payment of the program fee for such show or program shall not be payable before the screen authorship credits are finally determined. If there are one

or more periods of suspension of writing services between the various steps of a development deal or of a project for a show (for example, between format and screenplay, or between teleplay and production), the employment as a writer of the individual employed as a writer and in other capacities may be suspended as to services and compensation during such periods of suspension.

**K. MINIMUM COMPENSATION**

The minimum compensation for week-to-week and term employment for writers also employed in additional capacities shall be the following:

| | RATE PER WEEK | | |
|---|---|---|---|
| | 11/1/04 - 10/31/05 | 11/1/05- 10/31/06 | 11/1/06- 10/31/07* |
| 1. Week-to-week & term employment up to and including 9 weeks | $6,484 | $6,679 | $6,879 |
| 2. Term employment 10 weeks through 19 weeks | 5,404 | 5,566 | 5,733 |
| 3. Term employment 20 weeks or over | 4,860 | 5,006 | 5,156 |

The Company may employ a writer on a guaranteed episode basis. When such writer's initial guarantee is at least five (5) episodes, the minimums provided in Article 14.K.2. or 3. shall apply to such initial guarantee based on the number of weeks such writer actually works.

**L. 1. Submission of Contracts to Guild**

When the employment of a writer also employed in additional capacities is covered by a single contract, a copy of the entire contract shall be submitted to the Guild as provided in Article 19.C.1. of this Basic Agreement. When such employment is covered by separate contracts, the Company shall, concurrently with the delivery to the Guild of a copy of the writer's employment contract pursuant to said Article 19.C.1., deliver to the Guild a copy of those provisions of the contract governing the additional services which define or specify the term of employment.

**2. Weekly Work Lists**

The weekly list provided for in Article 3.A.1. of this Basic Agreement shall indicate the type of employment as a writer (week-to-week, term or freelance), the series for which the person is employed as a writer, whether the writer is also employed in additional capacities and, if so, in what additional capacities. Such list shall also include the names of persons, if any, who perform services as writers during the respective week (other than services described in subparagraphs (a) to (h),

* See page 72.

inclusive, of Article 1.C.1. of this Basic Agreement), but who are not "writers" because of the provisions of the third paragraph of said Article 1.C.1.a. (immediately following subparagraphs (a) through (h)). If such a person is included, the list shall state that he/she is excepted as a "writer" pursuant to Article 1.C.1.a. of this Basic Agreement. Apart from the mere listing of names, as required by Article 3.A.1., any information once given in the report pursuant to this subparagraph L.2. need not be repeated in subsequent reports unless there is a change in the information previously given.

M. **BETTER TERMS**

Nothing contained in this Article 14, including the rights of the Company to allocate compensation and to terminate or suspend employment as a writer as above set forth, shall prevent any such writer from negotiating and contracting with the Company for better terms for the benefit of such writer than are provided in this Article 14. Only the Guild shall have the right to waive any of the provisions of this Article 14 on behalf of or with respect to such writer.

**ARTICLE 15 TELEVISION EXHIBITION**

A. **THEATRICAL**

1. **Pre-1960 Motion Pictures**

As to all motion pictures, the principal photography of which commenced prior to June 13, 1960, the Guild agrees that it does not and will not, either during the term of this Basic Agreement or at any time thereafter, make any claim for compensation for or with respect to the exhibition of such motion pictures on television.

2. The provisions of this subparagraph 2. relate and apply only to theatrical motion pictures as defined in Article 1.A.2.:

a. produced by the Company or within the provisions of subparagraph 3.h.(1) of this Article 15.A.; and

b. the principal photography of which commenced on or after November 1, 2004, which motion pictures are, either during the term hereof or at any time thereafter, released to free television; and

c. based upon a story or screenplay written by writer while in the employ of the Company or in the employ of the actual producing Company as described in subparagraph 3.h.(4) of this Article 15.A. (to which employment the provisions of this Basic Agreement apply as provided in Article 5 hereof) or acquired by the Company (or such actual producing Company) from a professional writer

(to which acquisition the provisions of this Basic Agreement apply as provided in Article 5 hereof), which writer or professional writer receives screen credit for the authorship of such story or screenplay, as provided in Theatrical Schedule A.

3. **Payment**

As to each such theatrical motion picture referred to in subparagraph 2. above (herein sometimes called "Such Picture"), except as provided in Article 64, the Company will pay to each participating writer (as such term is hereinafter defined) as additional compensation, a *pro rata* share of two percent (2%) (hereinafter referred to as the "percentage payment") of the Company's accountable receipts from the distribution of Such Picture on free television, computed as hereinafter provided and subject to the following conditions:

a. The term "Producer's gross," as used herein, means the worldwide total gross receipts derived by the distributor of Such Picture (who may be the Company or a distributor licensed by the Company) from licensing the right to exhibit Such Picture on free television; provided, however, that in the case of any Such Picture which is produced outside of the United States, if Such Picture is subject to this Basic Agreement and if such production is under an arrangement (herein referred to as a "foreign production deal") pursuant to which a foreign producer or distributor provides or guarantees any of the financing for the production of Such Picture or furnishes any other consideration for such production and a foreign distributor acquires one or more foreign territories for the distribution of Such Picture on free television, then no monies from any such distribution in any such foreign territory shall be included in Producer's gross except to the extent such foreign producer or foreign distributor is obligated to account to Company or to the distributor of Such Picture for such monies, and except for gross receipts received by such foreign distributor from such distribution in the United Kingdom.

If the distributor of Such Picture does not distribute Such Picture directly to free television, but employs a subdistributor to so distribute Such Picture, then the "Producer's gross" shall be the worldwide total gross receipts derived by such subdistributor from licensing the right to exhibit Such Picture on free television. In case of an outright sale of the free television distribution rights for the entire world, or any territory or country, the income derived by the seller from such sale, but not the income realized by the purchaser or licensee of such rights, shall be the "Producer's gross." If any such outright sale shall include free television exhibition rights

and other rights, then (but only for the purpose of the computation required hereunder) the Company shall allocate to the free television exhibition rights a fair and reasonable portion of the sales price which shall, for the purpose hereof, be the "Producer's gross." In reaching such determination, Company may consider the current market value of free television exhibition rights in comparable motion pictures.

If the Guild shall contend that the amount so allocated was not fair and reasonable, such claim may be determined by submission to arbitration as herein provided. If the arbitrator shall find that such allocation was not reasonable and fair, he/she shall determine the fair and reasonable amount to be so allocated. If the outright sale includes free television distribution rights to more than one motion picture, Company shall likewise allocate to each Such Picture a fair and reasonable portion of the sales price of the free television rights. If the Guild contends that such allocation is not fair and reasonable, the question may be determined by submission to arbitration as above provided. If the arbitrator shall find that such allocation was not fair and reasonable, he/she shall determine the fair and reasonable amount to be so allocated to each Such Picture. Nothing with respect to the price received on the outright sale of only free television distribution rights in a single Such Picture shall be subject to arbitration except that in the event of a dispute, there may be arbitrated the question of whether the price reported by the Company to the Guild as having been received by the Company on such outright sale is less than the amount actually received by the Company on such outright sale. Sums paid to any advertising agency in connection with any exhibition of any Such Picture on free television shall not be included in Producer's gross.

**Guild's right to elect.** The parties further agree with reference to Article 15.A.3.: If, in the upcoming negotiations with SAG and DGA, the Company agrees to modify the basic substantive provisions regarding licensing of theatrical motion pictures for exhibition on free television, Company will so notify the Guild and accord it the opportunity to elect that this subparagraph be modified in the same manner, as of the date on which the Guild so notifies the Company. Adjustments which statistically maintain the relative allocations of proceeds derived from post-1960 theatrical motion pictures licensed to television among SAG, DGA and WGA as established in 1960 (*i.e.*, the ratio of 6, 2 and 2 of accountable receipts, respectively) will not activate this provision, but an increase in the relative allocations to SAG or DGA in such proceeds will activate this

provision, with any such increase to be accorded proportionately to WGA. Upon request, the Guild shall be provided with the statistics upon which the adjustments have been made, and the Guild's right to activate this provision shall be arbitrable. The Guild shall give notice of its election within sixty (60) days after receipt of the Company's notice or after being provided with the statistics referred to, whichever is later. The election shall be limited to accepting the entire agreement reached with SAG or DGA on licensing theatrical motion pictures for exhibition on free television, and only such entire agreement, but with appropriate equivalent adjustment for writers for provisions peculiar to actors or directors, as the case may be.

b. **"Accountable Receipts"**

The term "accountable receipts," as used herein, means the balance of the Producer's gross after deducting an arbitrary forty percent (40%) of the Producer's gross for distribution fees and expenses, except that in the case of an outright sale of free television distribution rights, there shall be deducted only an arbitrary ten percent (10%) of the Producer's gross for sales commissions and expenses of sale.

c. **When Payment Obligation Accrues**

Company's obligation shall accrue hereunder only after accountable receipts are received by Company, but as to foreign receipts such obligation shall accrue only when such receipts can be freely converted to U.S. dollars and are remitted to the United States and until such time, no frozen foreign receipts shall be included in accountable receipts. Payment of amounts accruing hereunder shall be made quarterly on the basis of quarterly statements, as hereinafter provided. Upon request, and if permitted by the authorities of a foreign country, the Company will transfer to any writer, in the currency of such foreign country, his/her share, if any, of frozen foreign receipts in such country, provided the writer will bear any costs involved; and such transfer shall be deemed to be payment to the writer of an equivalent number of U.S. dollars at the then current free market rate for blocked funds of that category as determined by the Company. Concurrently with such transfer, the writer will pay to the Company in U.S. dollars the total amount the Company is required to withhold from such payment under all applicable laws. If the Company utilizes frozen foreign currencies derived from exhibition of Such Picture on free television by conversion thereof to properties that may be freely exported and turned to account, the amount

so utilized by the Company shall be deemed to have been converted to U.S. dollars at the then current free market rate for blocked funds of that category determined as above provided. Frozen foreign receipts from free television shall be deemed to be released on a first-in, first-out basis, unless the authorities of the foreign country involved designate a specific period that would render such basis inapplicable. Such released funds shall be allocated between Such Picture and other motion pictures distributed by the distributor on free television in the same ratio that receipts, derived from the distribution of Such Picture on free television within the foreign country, bear to the total receipts derived from the distribution of Such Picture and all other motion pictures on free television within the foreign country, during the applicable period, unless the authorities of the foreign country involved require another method of allocation, in which case such other method shall be used. Foreign receipts shall be accounted for in U.S. dollars at the rate of exchange at which such receipts are actually converted and remitted, and should any discounts, taxes, duties or charges be imposed in connection with the receipt or remittance of foreign funds, only so much of such funds as remains thereafter shall be included in accountable receipts. Company shall not be responsible for loss or diminution of foreign receipts as a result of any matter or thing not reasonably within the control of the Company. The Guild and the writers shall be bound by any arrangements made in good faith by the Company or for its account, with respect to the deposit or remittance of foreign revenue. Frozen foreign receipts shall not be considered trust funds and the Company may freely commingle the same with other funds of the Company. No sums received by way of deposits or security need be included in Producer's gross until earned, but when the Company is paid a non-returnable advance by a distributor, such advance shall be included in the Producer's gross.

A "non-returnable advance" is to be included in "accountable receipts" when Such Picture is "available" and "identifiable" and the amount of the advance payment is "ascertainable."

Such Picture is "available" when the first of the following occurs:

(1) The product first may be exhibited or otherwise exploited by a specified method of distribution and in a territory under the terms of the applicable license or distribution agreement, or

(2) It first may be sold or rented by a retailer under the terms of the applicable license or distribution agreement.

Such Picture is "identifiable" when the Company first knows or reasonably should have known that a given motion picture is covered by a particular license or distribution agreement for its exploitation in the applicable market.

The amount of the advance payment is "ascertainable" if:

(1) the advance is for one (1) motion picture, means of exhibition, and territory, or

(2) the total amount of the advance is for more than one (1) motion picture, means of exhibition and/or territory, in which case the Company shall fairly and reasonably allocate such advance among the licensed motion pictures, exhibition markets and/or territorial markets. As each of these pictures becomes identifiable and available, the allocated portion of the non-returnable advance is to be included in "Producer's gross" for that quarter. The Company shall notify the Guild of its allocation when the report of "Producer's gross," which includes the advance, is to be filed. The Guild has the right to challenge in an MBA arbitration a failure to allocate or any allocation that it contends is not fair and reasonable.

If Such Picture is available in any territory or by any means of exhibition, and is identifiable and the amount of the advance is ascertainable, but the Company does not provide the WGA with the information required by the MBA and applicable law, then the advance shall be deemed includable in "accountable receipts" no later than six (6) months after the Company receives it.

An advance received by a Company's parent, subsidiary or any other related or affiliated entity or successor-in-interest, or by any other entity to which the advance payment is directed by the Company or license or distribution agreement, shall be considered as an advance payment received by the Company.

d. If any license or outright sale of exhibition rights to Such Picture on free television includes as a part thereof any recorded commercial or advertising material, the Company shall be permitted to allocate a reasonable amount (in accordance with then current standard charges in the industry) to such commercial or advertising

material, and the amount so allocated shall not be included in Producer's gross hereunder.

e. The term "participating writer," as used herein, means a writer who, while in the employ of the Company or in the employ of the actual producing Company of Such Picture as described in subparagraph 3.h.(1) below (to which employment the provisions of this Basic Agreement apply), or a professional writer from whom the Company (or such actual producer) acquired literary material (to which acquisition the provisions of this Basic Agreement apply), participated in the writing of and received credit pursuant to Theatrical Schedule A hereof for the writing of the story or screenplay upon which Such Picture was based. If Such Picture is a remake of a prior motion picture, and if any of the writers of the prior motion picture receives writing credit for the remake, such writers shall be deemed to be "participating writers" for the purposes of this Article 15.A., but then only if their employment as writers for the prior motion picture, or if the purchase of literary material from them for the prior motion picture, was covered by and subject to a collective bargaining agreement with the Guild.

The "*pro rata* share" payable to each participating writer shall be as follows:

(1) If the participating writer or writers receive "Written by" credit, one hundred percent (100%) thereof shall be payable to the credited writer or writers receiving "Written by" credit.

(2) If the participating writer or writers receive either story or screen story credit, or screenplay credit, but not both, one hundred percent (100%) thereof shall be payable to the credited participating writer or writers receiving story or screen story, or screenplay credit, as the case may be; provided, however, that if the individual employment contract or purchase agreement with the other writer(s) (*i.e.*, those who are not subject to this Basic Agreement) provides for payment to such writer or writers of the additional compensation provided for in this Article 15.A., such writer or writers shall receive the share which would have been payable had such writer or writers been participating writers, as provided in subparagraph (3) below.

(3) If the participating writer or writers receive both "Story by" or "Screen Story by" and screenplay credit, seventy-five percent (75%) thereof shall be payable to the credited screenplay writer or

writers, and twenty-five percent (25%) thereof to the credited story or screen story writer or writers. In the event there is a minor credit, such as adaptation, the writer or writers receiving such minor credit shall be paid ten percent (10%) thereof which sum shall be deducted from the screenplay writer's share.

Any participating writers receiving the same screen credit referred to above shall share equally in such percentage amount specified.

If there are one or more participating writers who receive screenplay credit and no credit is given for story or screen story, then the *pro rata* share which would have been payable to a participating writer had he/she received such story or screen story credit shall, subject to the provisions of the next following paragraph, be paid to the participating writers who receive such screenplay credit. The provisions of the immediately preceding sentence shall also apply with respect to the determination under the Producer-Writers Guild Theatrical Basic Agreements of 1960, 1963, 1970 and 1973 of "*pro rata* shares" payable to participating writers as therein defined.

If the writer's services on Such Picture are performed for the Company on a loan-out basis, then for the purposes of this Article 15.A., the Company shall be deemed to be the employer, and the lender shall not have any responsibility hereunder with respect to Such Picture.

f. **Time and Manner of Payment**

If the picture is licensed for network exhibition, payment with respect to the gross receipts from such license shall be made as follows:

(1) If, under the terms of the license, there is no possibility that the picture can or may be dropped out of the license, payment must be made within thirty (30) days after receipt of payment from the network with respect to Such Picture.

(2) If there is a possibility that Such Picture can or may be dropped out of such license, then payment with respect to Such Picture shall be made within thirty (30) days after exhibition of Such Picture on television pursuant to such license, but not earlier than thirty (30) days after receipt of payment from the network with respect to Such Picture.

Payment shall be accompanied with a written report of the license fee payable for Such Picture pursuant to the license and of the amount paid by the network for Such Picture.

With respect to exhibition of the picture on free television other than pursuant to a license for network exhibition, the following provisions of this subparagraph f. shall apply:

Within a reasonable time after the expiration of each calendar or fiscal quarter, but not exceeding sixty (60) days, Company will furnish or cause to be furnished to the Guild a written report showing the Producer's gross during the preceding quarter from the distribution of each Such Picture by Company on free television with respect to which Company is required to make payments hereunder (whether distributed by the Company or through another distributor).

Concurrently with the furnishing of each such report, the Company will make the payments shown to be due by such report. All payments shall be made by check payable to the order of the writers entitled thereto, and shall be delivered to the Guild for forwarding to such writers, and compliance herewith shall constitute payment to the writers.

No such reports need be furnished with respect to any period during which there was no such Producer's gross. The Company shall make available for inspection by the Guild all distributor's statements and exhibitor's statements which are available to the Company insofar as they relate to such Producer's gross, and all the financial terms of contracts pertaining to such Producer's gross, and the Guild shall have the right, at reasonable times, to examine the books and records of the Company as to such Producer's gross pertaining to such distribution of any Such Picture, at whatever place or places such records are customarily kept by the Company. If the Guild requests that it be informed of the license fee paid under a license for the free television exhibition of the picture, or if the Guild requests that it be sent an extract of the financial terms of such a license, and if such information is not extensive in nature, the Company will forward such information or extract without making it necessary for the Guild to send a representative to the offices of the Company. In general, the Company will cooperate

in furnishing such information to the Guild by mail or telephone, when doing so is not unreasonable or burdensome. If more than one picture is licensed in a single license agreement, the Company shall inform the Guild, at its request, of the identity of the pictures covered by the license, and shall make available for inspection by the Guild in the office where such license agreement is customarily kept a copy of the terms of such license showing the titles of the pictures licensed under such agreement and the license fee for each Such Picture. Company agrees to cooperate in responding to reasonable inquiries from the Guild as to whether any Such Picture is currently being distributed for telecasting on free television. An inadvertent failure to comply with the reporting provisions of this subparagraph f. shall not constitute a default by the Company hereunder, provided such failure is cured promptly after notice thereof from the Guild is received by the Company.

Company shall make all social security, withholding, unemployment insurance, and disability insurance payments required by law with respect to the additional compensation provided for in this Article 15.A.

If the Company shall fail to make any payment provided for in this Article 15.A. to be made to the writer when and as the same becomes due and payable, it shall bear interest at the rate of one and one-half percent (1.5%) per month on the unpaid balance thereof commencing to accrue on the earlier of: (a) seven (7) days after notice in writing to Company from the Guild of such delinquency, or (b) sixty (60) days after such payment becomes due and payable.

The compensation payable under this Article 15.A. shall be excluded from the gross compensation upon which Company contributions are to be made to the Pension Plan.

g. **Crediting**

If a participating writer's employment agreement with the Company requires that the writer's compensation shall be based, in whole or in part, upon, or measured by, a percentage of the gross receipts derived from the distribution of Such Picture, then such percentage compensation shall be credited against any amounts payable to the writer hereunder, and likewise any payment due to the writer hereunder shall be credited against such percentage compensation. When all or a part of a writer's compensation is a specified sum of

money, commonly known and referred to as a "deferment," such deferment may not be credited against amounts payable by the Company to such writer hereunder.

h. With respect to all Such Pictures, the following provisions shall be applicable:

(1) Acquisition of Title by Company:

If Company was not the actual producer of Such Picture which was produced by a signatory Company, but acquired title thereto by purchase, assignment, transfer, voluntary or involuntary, or by foreclosure of a chattel mortgage or security agreement or a pledgee's sale, Company shall nevertheless be obligated to make the payments herein provided when Such Picture is exhibited on free television, unless such payment required hereunder has already been paid.

(2) Financing-Distribution Agreement by Company:

The obligation of the signatory Company hereunder with respect to the payments provided for in this Article 15.A. shall also apply to any Such Pictures produced by an independent producer under a contract between the signatory Company and such independent producer for the production of such motion picture, and for the financing and distribution thereof by the signatory Company. However, such signatory Company shall not be liable for the payment of any television fees based on monies received by a foreign distributor under a foreign production deal as defined in subparagraph a. of this subparagraph 3., with respect to which such foreign distributor or such independent producer is not obligated to account to such signatory Company. Nor shall such signatory Company be obligated to obtain any Television Distributor's Assumption Agreement from any foreign distributor referred to in subparagraph a. of this subparagraph 3. except if such foreign distributor is obligated to account to such signatory Company pursuant to subparagraph a. of this subparagraph 3. with respect to monies as therein provided.

(3) Company Liability:

It is expressly understood and agreed that Company shall in all events remain bound hereunder to make the payments due by reason of

the exhibition of each Such Picture on free television, irrespective of the assumption of such liability by any other person, firm or company as hereinabove provided, except as otherwise expressly provided in this Basic Agreement.

(4) Failure to Deliver Assumption Agreement:

The failure of Company to obtain and deliver an executed assumption agreement as provided in Article 65.A. or subparagraph i. of this Article 15.A.3. shall be deemed a substantial breach of this Basic Agreement.

i. If the Company shall sell, transfer, assign or otherwise dispose of its rights in any literary material (to which the provisions of Article 15.A.3., 47 and 65 of this Basic Agreement apply, or may apply) prior to the production of a motion picture based thereon, to any person or company (hereinafter referred to as the "Buyer") other than a person or company with headquarters outside the United States, the Company shall obtain from the Buyer a separate agreement in substantially the following form:

**"LITERARY MATERIAL ASSUMPTION AGREEMENT**

________________________________________
(hereinafter referred to as the 'Buyer')
agrees with ________________________________
(Company)
that the story, screenplay or story and screenplay covered by this agreement is subject to the 2004 Writers Guild of America–Alliance of Motion Picture & Television Producers Theatrical and Television Basic Agreement (herein the 'Basic Agreement') and particularly to the provisions of Article 15.A.3. thereof pertaining to additional payments to writers on release of a theatrical motion picture based thereon to free television (but excluding subparagraph h. of said Article 15.A.3.), and the said Buyer hereby agrees, expressly for the benefit of the Writers Guild of America, west, Inc., and Writers Guild of America, East, Inc. (herein referred to as the Guild), as representatives of the writers involved, to abide by and perform the provisions of said Basic Agreement and make the additional payments required thereunder, as aforesaid. For the purpose of applying such provisions of said Basic Agreement, the writer or writers of such material shall be treated in all respects as though the said material were written by such writer or writers while in the employ of the Buyer.